Matthew M. Lavin, Esq. (*pro hac vice*)
Wendy A. Mitchell, Esq. (CA SBN 158553)
**NAPOLI SHKOLNIK PLLC**
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
(212) 397-1000 / Fax (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
Katie J. Spielman, Esq. (CA SBN 252209)
**DL LAW GROUP**
345 Franklin Street
San Francisco, CA 94102
(415) 678-5050 / Fax (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| LD, DB, BW, RH and CJ on behalf of themselves and all others similarly situated,<br><br>       Plaintiff,<br><br>  vs.<br><br>UNITED BEHAVIORAL HEALTH, INC. a California corporation, and VIANT, INC., a Nevada corporation,<br><br>       Defendants. | Case No.: 4:20-CV-02254-YGR<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO UNITED BEHAVIORAL HEALTH, INC.'S MOTION TO DISMISS**<br><br>Complaint Filed: April 2, 2020<br>Trial Date:     None Set<br><br>Hearing Date:   August 11, 2020<br>Hearing Time:   2:00 p.m.<br>Courtroom:    1 |

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................................... ii

I.    Introduction ................................................................................................................................ 1

II.   Reimbursement Methodology .................................................................................................... 1

III.  The RICO § 1962(c) Claim Should Not Be Dismissed. ........................................................... 5

   A.   Plaintiffs Have Plausibly Alleged a RICO Enterprise .................................................... 6

   B.   Plaintiffs Have Plausibly Alleged Predicate RICO Acts by United & Viant ....................... 8

      1.   *"Federal Health Offenses" as a Specified Unlawful Activity for the Laundering of Monetary Instruments is a Predicate RICO Act Under 18 U.S.C. § 1961.* ....................... 8

      2.   *Plaintiffs Have Sufficient Alleged RICO Predicate Acts of Mail and Wire Fraud* ............. 9

   C.   Plaintiffs Have Plausibly Pled Proximate Cause ............................................................... 10

IV.  Plaintiffs' ERISA Claims Are Properly Pleaded ...................................................................... 11

   A.   Plaintiffs properly plead claims for relief "Under the Terms Of" Their ERISA  plans Pursuant to § 502(a)(1)(B) based on United's failure to comply with plan terms requiring payment of out-of-network claims based on UCR ............................................................. 11

   B.   Plaintiffs Properly Plead Breach of ERISA Fiduciary Duty Claims Under § 502(a)(3)...... 14

      1.   *United Breached Its Fiduciary Duties of Loyalty and Due Care (Count V)* .................... 14

      2.   *Plaintiffs State a Claim for Failure to Provide a Full and Fair Review (Count VI)* ........ 19

      3.   *Plaintiffs Have Standing to Pursue Injunctive and Equitable Relief Under ERISA* ......... 20

   C.   United is a Proper Defendant Under 502(c)........................................................................ 22

V.   Conclusion ................................................................................................................................ 22

1

2                                    **TABLE OF AUTHORITIES**

3    **Cases**

4    *Am. Chem. Soc'y v. Commax Techs., Inc.*,
5        2007 WL 963968 (N.D. Cal. Mar. 30, 2007)........................................................................8

6    *Bias v. Wells Fargo & Co.*,
         942 F.Supp.2d 915 (N.D. Cal. Apr 25, 2013) ...................................................................7

7    *Bridge v. Phoenix Bond & Indem. Co.*,
8        553 U.S. 639 (2008)........................................................................................................10

9    *Celotex Corp. v. Catrett*,
         477 U.S. 317 (1986).........................................................................................................11

10   *CIGNA Corp. v. Amara*,
11       563 U.S. 421 (2011) ............................................................................................14, 15, 16

12   *Cirino v. Bank of Am., N.A.*,
         2014 WL 9894432 (C.D. Cal. Oct. 1, 2014)......................................................................8

13   *Cook v. Brewer*,
         637 F.3d 1002 (9th Cir. 2011) .........................................................................................11
14

15   *Crutcher v. Multiplan, Inc.*,
         2016 WL 6832644 (W.D. Mo. Nov. 18, 2016)...................................................................6

16   *Del Castillo v. Community Child Care Council of Santa Clara Country, Inc.*,
17       2019 WL 2644234 (N.D.cal. 2019) ..................................................................................18

18   *Depot, Inc. v. Caring for Montanans, Inc.*,
         915 F.3d 643 (9th Cir. 2019) ...........................................................................................16

19   *Downey Surgical Clinic, Inc. v. Ingenix*, Inc.,
20       2013 WL 12114069 (C.D. Cal. Mar. 12, 2013) .................................................................7

21   *Escalante v. California Physicians Service*,
         309 F.R.D. 612 (C.D.Cal. 2015) ......................................................................................18

22   *Franco v. Connecticut General Life Ins, Co.*,
23       289 F.R.D. 121 (D.N.J. 2013)..........................................................................................13

24   *Fremont Emergency Services (Mandavia), Ltd. v. United HealthCare Insurance, Co., et al.*,
         Case No. A-19-79278-B (Clark County, NV, June 24, 2020) ...........................................6

25   *Friedman v. 24 Hour Fitness USA, Inc.*,
         580 F. Supp. 2d 985 (C.D. Cal. 2008) ..............................................................................7

26   *Gomez v. Guthy-Renker, LLC*,
27       2015 WL 4270042 (C.D. Cal. July 13, 2015)....................................................................5

28   *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
         295 F. Supp. 3d 927 (N.D. Cal. 2018) ..............................................................................5

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
2017 WL 4890594 (N.D. Cal. Oct. 30, 2017).................................................................7

*In re Wells Fargo Ins. Mktg. & Sales Practices Litig.,*
2018 WL 4945541 (C.D. Cal. June 18, 2018) .........................................................5, 6

*Montanile v. Board of Trustees of Nat. Elevator Industry Health benefit Plan,*
136 S.Ct. 651 (2016)...................................................................................................17

*Moyle v. Liberty Mut. Benefit Plan,*
823 F.3d 948 (9th Cir. 2016) ...............................................................................14, 16

*Moyle v. Liberty Mut. Ret. Ben. Plan,*
823 F.3d 948 (9th Cir. 2016) .......................................................................................15

*Neubronner v. Milken,*
6 F.3d 666 (9th Cir.1993) ..............................................................................................9

*Odom v. Microsoft Corp.,*
486 F.3d 541 (9th Cir. 2007) ...............................................................................5, 6, 7, 9

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.,*
943 F.3d 1243 (9th Cir. 2019) .....................................................................................10

*Schmuck v. United States,*
489 U.S. 705 (1989)........................................................................................................9

*Sebastian Int'l, Inc. v. Russolillo,*
128 F. Supp. 2d 630 (C.D. Cal. 2001) ..........................................................................9

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (1985)........................................................................................................5

*Thole v. U.S. Bank, N.A.,*
140 Sup. Ct. 1615 (2020).............................................................................................21

*United States v. Ritchie,*
342 F.3d 903 (9th Cir. 2003) .......................................................................................11

*United States v. Blinder,*
10 F.3d 1468 (9th Cir. 1993) .........................................................................................6

*United States v. Feldman,*
853 F.2d 648 (9th Cir. 1988) .........................................................................................8

*Varity Corp. v. Howe,*
516 U.S. 489 (1996).....................................................................................................15

*Wit v. United Behavioral Health,*
317 F.R.D. 136 (N.D.Cal. 2016)..................................................................................18

*Yagman v. Allianz Ins.,*
2015 WL 5553462 (C.D. Cal. July 9, 2015) .................................................................7

**Statutes**

18 U.S.C. § 1956 ............................................................................................................. 8

18 U.S.C. § 1961 ............................................................................................................. 8

18 U.S.C. § 24 ................................................................................................................. 8

29 C.F.R. §2560.501-3(h) ............................................................................................. 19

29 U.S.C § 1132(a)(1)(B) ............................................................................................. 20

29 U.S.C. § 1132(a)(3) ................................................................................................. 14

29 U.S.C. § 1132(a)(3)(A) ........................................................................................... 20

29 U.S.C. § 1133 ........................................................................................................... 19

29 U.S.C. §1133(2) ....................................................................................................... 19

ERISA § 502(a)(1)(B) ............................................................................... 10, 11, 12, 15

ERISA § 502(a)(3) ........................................................................................................ 15

ERISA §502(c) .............................................................................................................. 21

**Rules**

29 C.F.R. § 2560.503-1 ................................................................................................ 19

29 C.F.R. § 2560.503-1(m)(4)(i) ................................................................................. 19

Fed. R. Civ. P. 8(a)(3) .................................................................................................. 16

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 11

Fed. R. Civ. P. 56 ......................................................................................................... 11

## I.    INTRODUCTION

United Behavioral Health ("United") mischaracterizes Plaintiffs' allegations as it wants them to be, not as they are. The rates of payment for the underlying healthcare claims at issue in this case were **never** negotiated by Plaintiffs or their healthcare providers.  Plaintiffs BW, CJ, DB, LD and RH *do not* allege that United is required to pay 100% of their providers' charges. At the very outset of their Complaint, Plaintiffs state, "[f]or all the claims at issue here, United represented that the claims would be paid at a percentage of the usual, customary and reasonable ("UCR") rate. In reliance upon that representation, Plaintiffs agreed to treat United's insureds and timely submitted accurate bills." [ECF 1 ¶ 3]. As is stated and substantiated in the complaint, for every claim at issue, Plaintiffs' providers submitted the appropriate claim forms for payment to United on industry standard forms, commonly known as Uniform Billing ("UB") forms" under the Healthcare Common Procedure Coding System ("HCPCS") billing code H0015, which a universally recognized service code for substance abuse intensive outpatient treatment ("IOP").  [ECF 1 ¶¶ 138-139]. Every underpaid claim in this litigation has the HCPCS code H0015.

## II.    REIMBURSEMENT METHODOLOGY

The FAIR Health database "provide(s) reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[1] No providers submit pricing information, only insurers. FAIR Health states that it then uses "information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients."[2] New York, Connecticut and many other states use the FAIR Health database as a guidepost for healthcare consumer protection.

The FAIR Health Database was created as a part of United's 2009 settlement of the *Ingenix* litigation brought by New York's Attorney General and others. Investigations into Ingenix revealed that it intentionally skewed data to underpay out-of-network healthcare claims by billions of dollars

---

[1] FAIR Health Consumer, "About FAIR Health," accessed at https://www.fairhealthcon-sumer.org/#about, last accessed June 19, 2020
[2] *Id*.

over the life of the scheme. In 2009 United Healthcare and its affiliates paid 350 million dollars to settle cases arising from the same conduct. The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[3] In defining the terms for which FAIR Health was to be used, the Settlement Agreement indicated that UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[4] The broad swath of language to which the Ingenix settlement applied shows that calling "UCR" by another name is a difference without a distinction. Some of United's contemporary plans use the term UCR, while others use proxy terms "eligible expense," defined as "[a rate based] on available data resources of competitive fees in that geographic area."[5] As alleged in the complaint, those terms encompass all of the plan language in the health plans and literature United uses and has used since 2009.[6] United's obligation to use FAIR Health rates stems from the language of its plans, each of which claims to use available data resources to pay out-of-network benefits based on competitive fees in a similar geographic area.

Further, Plaintiffs clearly allege in their Complaint the services that they received and that the Mental Health Parity and Addiction Equity Act (MHPAEA) requires mental health to benefits to be in parity with medical and surgical benefits. As United states that they rely on FAIR Health for medical and surgical payments, and have done so since 2011[7], parity requires that mental health and

---

[3] *Settlement Agreement Between United Healthcare Corporation et. al.and Settling Plaintiffs*, dated January 14, 2009 at page 14, term no. 4.4, accessed at https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_Action_Settle-ments_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf, last accessed July 2, 2020.

[4] *Id.*

[5] *See* Defendant's Exhibit A to Motion to Dismiss, ECF 35-2 pp. 5.

[6] *The American Medical Association, et al. v. United Healthcare Corp., et al*., Civil Action No. 00-2800 (S.D.N.Y.).

[7] United's own website states to the public that "Health care benefit plans managed by UnitedHealth Group affiliates began to use FAIR Health's Benchmarking Databases to determine payment for out-of-network professional services within 60 days of first receiving the applicable FAIR Health Benchmark Database Modules at various times in 2011." *Legal – Payment of out-of-network benefits*, https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last accessed June 29, 2020).

substance abuse treatment benefits be determined using the same methodology as medical and surgical benefits. Defendants have obviously failed to do so as shown in the chart below.



The chart above shows the FAIR Health benchmark amounts for Intensive Outpatient Treatment ("IOP") compared to what United actually paid for Plaintiffs' care. IOP is universally billed under HCPCS code H0015. For every single Plaintiff who at issue in this case, the UCR, Prevailing Charge, or otherwise described amount is equal to 100% of the Plaintiffs' healthcare providers' billed charges, because the billed charges are _less_ than the FAIR Health benchmark amounts. United's methodology pays the lesser of the benchmark and the billed charge. Despite United's numerous protestations to the contrary in its motion, the UCR rate, however described, equals 100% of billed charges **_for these Plaintiffs_** only because their billed charges are **_below FAIR Health Benchmarks_**.[9]

---

* FAIR Health 80th Percentile payment data for code H0015 and each Plaintiff's zip-code was accessed at https://www.fairhealthconsumer.org/medical/zip. Last accessed June 18th, 2020.

[9] The California Code of Regulations itself defines how health insurers such as United are to calculate the reasonable and customary value for a given health care service. See 28 C.C.R. § 1300.71 (a)((3)(B). Plaintiffs allege Defendants unlawful scheme at issue herein violates this mandate. See ECF 1, ¶ 105

1    The goal of the FAIR Health Database is to prevent insurers from using skewed

2    methodologies to calculate reimbursements based on UCR (or its synonyms discussed in the Ingenix

3    settlement). While United claims to use FAIR Health in its pricing methodology, it instead hides the

4    ball by using Ingenix's sequel: Viant.

5    As the above chart shows, and as alleged in Plaintiffs' Complaint, Defendants' methodology

6    resulted in Plaintiffs' claims being reimbursed at rates ranging from 11% to 25% of the FAIR Health

7    reimbursement amount. The flawed and illegal methodology employed by Defendants that produced

8    these results is what this case is about.[10]

9    The data contained in this graph has only recently become available to the general public, but

10   United, as the putative creator of the FAIR Health database, has had access to it for years.  Evidence

11   in this case will show that United and Viant employees responsible for Outpatient Repricing (OPR)

12   had FAIR Health data at their fingertips through an in-house claims system at Viant known as

13   "Toolbox," and could have properly applied FAIR Health to its pricing at any time but chose not to

14   do so. Instead, they used random, made-up benchmarks to artificially reprice claims so that United

15   and Viant could make as much of a margin as possible at its customers' expense.

16   United and Viant automatically charge self-funded employer plans the full amount of an out

17   of network providers' billed charges.  United and Viant make money on these claims by pocketing

18   the difference, or the "margin," between what they charged the employer's self-funded plan (100%

19   of billed charges) and the amount they were able to "save" by underpaying the claim (the Viant

20   payment).  United and Viant conspire to illegally siphon hundreds of millions of dollars a year using

21   this enterprise, ripping off employer plans, providers and patients alike, all of whom are kept in the

22

23

24   _____

25   [10] The same unlawful conduct is at issue in both the instant action and in the related action, *Pacific
     Recovery Solution et al. v. United Behavioral Health and Viant*, Case No. 4:20-cv-02254-YGR.  In

26   this, the patient case (because the Plaintiffs are the actual patients who received intensive outpatient
     substance abuse treatment), United and Viant's claim underpayments left Plaintiffs with outstanding

27   health care bills that they paid out of pocket.  In contrast, in the *Pacific Recovery*, or provider action,
     the provider-Plaintiffs did not get paid by their patients, and were out-of-pocket the difference be-

28   tween their billables and United and Viant's underpayments.

dark about this scheme. This is how United and Viant make their ill-gained profits from out of network care.  This case is about the damage it inflicts on healthcare providers.

As is stated in the Plaintiffs' Complaint, each of the Plaintiffs in this case had met their deductible and co-insurance responsibilities in full by the time they began receiving IOP services from their providers. This means that each of the plaintiffs was entitled to have his or her claims reimbursed at 100% of the fair allowable amount: 100% of their providers' billed charges. Instead, each of the Plaintiffs has had to pay or make arrangements to pay tens of thousands of dollars in balance bills. As the Complaint substantiates and makes abundantly clear, this case is about ensuring Plaintiffs and all those similarly situated have equitable access to life saving mental health care without incurring crippling debt.

### III.      THE RICO § 1962(C) CLAIM SHOULD NOT BE DISMISSED.

Plaintiffs' RICO § 1962(c) Claim (Count VII) should not be dismissed. RICO claims are to "be liberally construed to effectuate its remedial purposes" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) *quoting Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985). Also, "[RICO] has become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Sedima* at 499. Further, each inappropriate application of the non-UCR methodology and the actions by Defendants that flowed from such application are more than sufficient to show that Viant committed "two predicate acts" despite their claims to the contrary.

Further, Plaintiffs have asserted far more than a mere "commercial relationship" between Viant and United. Viant is far more than a mere conduit and the contract between Viant and United is far from 'routine.' United and Viant shared a common purpose to illegally and deceptively underpay HCPCS H0015 claims for their mutual profit. United and Viant do not have an arms'-length commercial relationship.

Plaintiffs' allegations resemble those in *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) than the cases cited by Viant including *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042 (C.D. Cal. July 13, 2015). First, *Gomez* cites *Odom* approvingly and distinguishes its facts where a payment processor, a mere conduit for the transactions, was not part of a RICO enterprise. Further, another California District Court has criticized *Gomez* for the very proposition Viant relies on. *See In re Wells*

*Fargo Ins. Mktg. & Sales Practices Litig.*, 2018 WL 4945541, at \*4 (C.D. Cal. June 18, 2018) ("Taken at face value, this *[Gomez]* is an interesting conclusion, considering RICO's broad "enterprise" definition. Indeed, it would be strange to prevent RICO from reaching any case where two parties have a contractual relationship—a conclusion Wells Fargo seems to encourage the Court to adopt.")

Plaintiffs have alleged "a common purpose to deceive" which is sufficient for a RICO enterprise. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 981 (N.D. Cal. 2018) (distinguishes its facts from *Gomez*, "[t]hese allegations and others in the FAC go beyond connecting Defendants to each other by way of normal commercial dealings. Rather, like the allegations regarding Microsoft and Best Buy in *Odom*, Plaintiffs' allegations support that Defendants shared a common purpose to deceive.

Further, corporations may constitute an entire RICO enterprise. *See United States v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993) ("If a corporation can form part of an "associated in fact" enterprise, *a fortiori*, a group of corporations should be able to constitute the entire enterprise.") Also, United and Viant, both corporations named as RICO defendants, each represent a legal entity and, alone, may be charged as the RICO enterprise. *See In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*, 2018 WL 4945541, at \*4 (C.D. Cal. June 18, 2018).

### A.  Plaintiffs Have Plausibly Alleged a RICO Enterprise

United's interpretation of Plaintiffs' Complaint is flawed and misrepresents the allegations actually raised in the Complaint. United and Viant shared a common purpose to deceive even though such purpose is not even required to create an association-in-fact enterprise. United and Viant acted in concert to develop policies, practices, and procedures governing the processing and payment of claims *independent of any actual plan terms*. This enterprise had the purpose of deceiving plan sponsors, insureds, beneficiaries, and healthcare providers to their detriment and the financial benefit of Defendants. The service agreement that United has with Viant will be sought in discovery and, upon information and belief, this agreement masks the true policies, practices, and procedures.

Several Courts have found RICO violations plausible based on allegations against an insurer and its third-party payor when hidden, illegal methodologies were used in determining claim reimbursements. *See, for example, Crutcher v. Multiplan, Inc.*, 2016 WL 6832644 (W.D. Mo. Nov.

1   18, 2016); *Fremont Emergency Services (Mandavia), Ltd. v. United HealthCare Insurance, Co., et*
2   *al.*, Case No. A-19-79278-B (Clark County, NV, June 24, 2020).

3           Defendants have created an enterprise that determines Outpatient Repricing (OPR) tied to a
4   target price that is not made known to plan sponsors, insureds, beneficiaries, and healthcare providers
5   and then pays claims at or below the target price. The target price is an arbitrarily low amount
6   determined by the Defendants and is not based on FAIR health data even though Defendants have had
7   access to the FAIR health database since its inception. This is the enterprise that presents itself as UCR
8   while it is anything but. Both Defendants profit from this enterprise that exists independent from any
9   plan terms.

10          As in *Odom*, the enterprise between United and Viant has a common purpose to deceive. This
11  is above and beyond the normal commercial relationships. This common purpose to deceive is alleged
12  in Plaintiffs' Complaint and creates a RICO enterprise. Plaintiffs' allegations show that United and
13  Viant had far more than "routine commercial dealing.". [ECF 34 Pg. 14]. Further, at least one
14  California District Court has found that an association-in-fact enterprise can exist without all members
15  sharing the same fraudulent purpose. *See Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985
16  (C.D. Cal. 2008). *Friedman* is cited approvingly in *Yagman v. Allianz Ins.*, 2015 WL 5553462, at *2
17  (C.D. Cal. July 9, 2015) for the proposition that a RICO enterprise may be premised on contractual
18  relationships for financial services. *See also, Bias v. Wells Fargo & Co.*, 942 F.Supp.2d 915, 942 (N.D.
19  Cal. Apr 25, 2013) (finding that plaintiff sufficiently alleged a RICO enterprise consisting of a bank
20  and third-party vendors and brokers who provided default-related services "at the core of the scheme");
21  *Downey Surgical Clinic, Inc. v. Ingenix*, Inc., 2013 WL 12114069, at *12 (C.D. Cal. Mar. 12, 2013)
22  ("By sharing the information with each other, Plaintiffs have sufficiently alleged a "hub-and-spoke"
23  type enterprise because they have alleged agreement among the Plan Defendants.")

24          United and Viant share the necessary common purpose through their enterprise that is every
25  bit as dishonest as the defeat device in the Volkswagen diesel litigation where the court found the
26  partnership between Volkswagen and Bosch in implementing the defeat device sufficient. *See In re*
27  *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4890594, at *17
28  (N.D. Cal. Oct. 30, 2017) ("allegations are sufficient to satisfy the four elements of their § 1962(c)

RICO claim. They have plausibly alleged that Bosch partnered with Volkswagen to implement the defeat device in the affected vehicles, and by doing so participated in the conduct of a years-long enterprise to defraud U.S. regulators and consumers.")

United and Viant are witting co-conspirators even though "RICO does not require intentional or "purposeful" behavior by corporations charged as members of an association-in-fact….[n]or does RICO require that the association-in-fact be a conspiracy; there must be an enterprise regardless of whether there is any conspiracy to engage in the predicate acts of racketeering." *United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988). Further, no unlawful "common purpose" is required for a RICO enterprise in the Ninth Circuit even though Plaintiffs believe that they have alleged as such. *See Cirino v. Bank of Am., N.A.*, 2014 WL 9894432, at *10 (C.D. Cal. Oct. 1, 2014).

Rather, "a corporation may fulfill the requirement if it: (1) made the RICO activities possible and profitable by providing a legal shield for the illegal activity, and (2) also functioned to achieve objectives that were not illegal." *Am. Chem. Soc'y v. Commax Techs., Inc.*, 2007 WL 963968, at *4 (N.D. Cal. Mar. 30, 2007). United and Viant made the RICO activities alleged possible; it is irrelevant whether there were other objectives that were not illegal.

As set forth in the Complaint, United and Viant have anything but a routine service contract, and United's claims to the contrary do not make it so, especially on the pleadings at this early stage of litigation.

**B.  Plaintiffs Have Plausibly Alleged Predicate RICO Acts by United & Viant.**

> *1.    "Federal Health Offenses" as a Specified Unlawful Activity for the <u>Laundering of Monetary Instruments</u> is a Predicate RICO Act Under 18 U.S.C. § 1961.*

The Federal Health Offenses asserted by Plaintiffs constitute unlawful activity that can form the basis of a RICO claim as they are included in the specified unlawful activities defined in Code section relating to the laundering of monetary instruments. A claim for the laundering of monetary instruments is a specified predicate act under RICO. Under 18 U.S.C. § 1961 "(1) "racketeering activity" means…(B) any act which is indictable under any of the following provisions of title 18, United States Code…section 1956 (relating to the laundering of monetary instruments)" and pursuant to 18 U.S.C. § 1956(c)(7), "any act or activity constituting an offense involving a Federal health care

1   offense" is included in the definition of "specified unlawful activity." 18 U.S.C. § 1956(c)(7)(F).

2   Federal health care offenses are defined at 18 U.S.C. § 24. Plaintiffs have alleged Defendants'

3   violation of Federal health care offenses in their Complaint. *See* [ECF 1 ¶¶ 247-250].

4       18 U.S.C. § 1956 states, "[w]hoever, knowing that the property involved in a financial

5   transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct

6   such a financial transaction which in fact involves the proceeds of specified unlawful activity -- (A)(i)

7   with the intent to promote the carrying on of specified unlawful activity…a financial transaction shall

8   be considered to be one involving the proceeds of specified unlawful activity." Based on the

9   allegations in the Complaint, Defendants have conducted numerous such financial transactions as their

10  proceeds derive from specified unlawful activity, the aforementioned Federal health care offenses.

11      *2.   Plaintiffs Have Sufficient Alleged RICO Predicate Acts of Mail and Wire Fraud*

12      Plaintiffs have sufficiently alleged and pled RICO predicate acts of mail and wire fraud. In

13  pleading these acts, "[t]he only aspects…that require particularized allegations are the factual

14  circumstances of the fraud itself... Rule 9(b) "requires the identification of the circumstances

15  constituting fraud ***so that the defendant can prepare an adequate answer from the allegations***."

16  *Odom v. Microsoft Corp*., 486 F.3d 541, 554 (9th Cir. 2007) (emphasis added, citation omitted).

17      It is not Defendants' fraudulent calls and letters that are the scheme, it is the creation and use

18  of Outpatient Repricing (OPR) tied to a target price that is not made known to plan sponsors, insureds,

19  beneficiaries, and healthcare providers and then paying claims at or below the target price while

20  representing to the world that the UCR methodology was used. The wire and mail communications

21  are incidental to this scheme. Further, upon information and belief, the wire and mail communications

22  did cross state lines. Indeed, given the diversity between the parties, it is impossible for the

23  communications not to have crossed state lines.

24      Here Defendants' mailings and wire communications are only "incident to an essential part of

25  the scheme," they only need to be in furtherance of a scheme to defraud, and do not themselves need

26  to be fraudulent or untrue. *See Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 635 (C.D. Cal.

27  2001) *citing Schmuck v. United States*, 489 U.S. 705 (1989).

28

Plaintiffs' Complaint alleges that the communications by mail and wire were in furtherance of the underlying scheme. Plaintiffs' Complaint is not required to describe every single piece of mail and wire communication in detail; instead, the is required to be specific enough to "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir.1993) (internal quotation marks and citation omitted).

However, should the Court find Plaintiffs' allegations insufficient, the Plaintiffs would request leave to conduct limited discovery as to Viant and United as the scheme alleged is similar to one of insider trading with specific details only being in Defendants' possession. In such cases, in the Ninth Circuit in *Neubronner* recognizes that limited discovery is appropriate. *Id.* at 671 ("But surely we can not expect a private plaintiff in an insider trading case to plead with the specificity Rule 9(b) requires without allowing some limited opportunity for discovery.")

### C.  Plaintiffs Have Plausibly Pled Proximate Cause

The Ninth Circuit takes an expansive view of proximate cause under RICO, stating "proximate cause [under RICO] is "a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case."" *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1250 (9th Cir. 2019) *quoting Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).

As outlined in the Complaint and *supra*, Plaintiffs have strong reason to believe that they were harmed as a direct result of Defendants' scheme to utilize a non-UCR methodology and sham negotiations to massively underpay Plaintiffs' IOP claims at the expense of Plaintiffs and, though outside the scope of this particular case, the enterprise also profited at the expense of providers and plan sponsors.

Plaintiffs and the putative class were not privy to the inner workings of the scheme. Instead, they only knew of the representations that United made to the world as to the UCR methodology and Viant's statements in written and wire communications that they adhered to and implemented that methodology. Only by reprocessing every IOP claim under a fair, transparent methodology can

Plaintiffs and the putative class be made whole and have the scheme ended. Injunctive relief is also appropriate to prevent this scheme from continuing to harm Plaintiffs and the putative class.

Further, even though direct reliance is not a required RICO element (*see Painters* at 1259), Plaintiffs and the putative class relied on Defendants to employ the stated methodology and issue payments according to that methodology.

## IV. PLAINTIFFS' ERISA CLAIMS ARE PROPERLY PLEADED

### A.  Plaintiffs properly plead claims for relief "Under the Terms Of" Their ERISA plans Pursuant to § 502(a)(1)(B) based on United's failure to comply with plan terms requiring payment of out-of-network claims based on UCR

United contends that Plaintiff fails to state a cause of action for improper denial of benefits under ERISA § 502(a)(1)(B) because Plaintiffs' plans ("the Plans") do not obligate United to pay out of network claims at 100% of billed charges. United's argument both mischaracterizes the allegations in Plaintiffs' complaint, and improperly places a question of fact before the court at this early stage in this proceeding. United's argument that Plaintiffs' ERISA claims must be dismissed is based on a misreading of Plaintiff's claims and allegations, and asks this Court to make factual determinations inappropriate for a motion to dismiss.

ERISA § 502(a)(1)(B) allows a civil action to be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

In contravention to the well-established standards of this Court, United seeks to inject issues and alleges facts that go far beyond the Complaint. Its motion to dismiss is United's attempt to circumvent discovery and the procedural requirements of a motion for summary judgment, and instead, prematurely move the Court to engage in findings of fact.  Specifically, United invites the court to engage in questions of fact regarding the data and calculations used by the Plans to determine UCR rates (or, to use United's term for UCR, "Eligible Expenses).  United also asks the Court to engage in findings of fact challenging Plaintiffs' allegation that their provider, Summit Estate's, billed charges are equal to UCR rates in Silicon Valley, and that United confirmed this during a verification

1    of benefits call prior to Plaintiffs' admissions.  None of these factual determinations are properly

2    before the court at this stage in the proceedings.

3              If a court considers evidence "...outside of the pleadings, it must normally convert the Rule

4    12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party

5    an opportunity to respond." *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). In those situations, the

6    defendant bears the burden of proof and "all parties shall be given reasonable opportunity to present

7    all material made pertinent to such a motion by Rule 56." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

8    (1986). Accordingly, a complaint can be dismissed "only if it appears beyond doubt that the plaintiff

9    could prove no set of facts in support of his claim which would entitle him to relief" *Cook v. Brewer*,

10   637 F.3d 1002, 1004 (9th Cir. 2011).

11             Here, Plaintiffs have properly pleaded all required elements of an ERISA § 502(a)(1)(B) claim.

12   Plaintiffs are employees of Apple and Tesla, and were at all relevant times participants in their

13   respective ERISA Plans. [ECF 1, Compl. ¶¶ 169, 182, 195, 207, 220].   United served as the plan

14   administrator for each of the Plans.  [Id. ¶¶ 90, 170, 183, 196, 208, 221]  Under the terms of the Plans,

15   United was required to pay for out of network treatment for mental health and substance use disorders

16   at the Usual Customary and Reasonable (UCR) rate. [Id. ¶¶ 6, 8, 82, 104, 105.]  While Plaintiffs object

17   to the purported "excerpts" of Plan documents attached to United's request for judicial notice, even

18   United's own evidence verifies that OON benefits are paid based on competitive (i.e. UCR) rates in

19   the geographic area.  The 2018 Apple Benefits Book, Exh 1 to Nguyen Decl. in support of United's

20   Mot. to Dismiss (Dkt. 35-2), at p. 26 states:

21                         Whenever you use out-of-network providers, the percentage of benefits
22                         paid will be based on UCR rates.

23             The 2018 Apple Plan further advises participants and beneficiaries that they can easily find out

24   if their provider is charging more than UCR by obtaining the Current Procedural Terminology (CPT)

25   code for the treatment they seek, the provider's anticipated fees for the treatment, and the provider's

26   zip code, and then inputting that information at www.fairhealth.org. *Id.*

27

28

1      The 2019 Apple Plan attached to the Nguyen declaration filed concurrently with United's

2  motion, also describes benefit levels for out of network care based on UCR.[11]  Specifically, the 2019

3  Apple Plan states that when rates have not been negotiated with the OON provider[12], eligible expenses

4  are determined "based on available data resources of competitive fees in that geographic area."  Exh.

5  2, Nguyen Decl. at p. 31.  In other words, the usual customary and reasonable rate for the service.

6  This is precisely what Plaintiff's alleged in their complaint: "'United describes UCR rates as "based

7  on what other health care professionals in the relevant geographic areas or regions charge for their

8  services.'"  [ECF 1, Compl. ¶ 8].  This language is drawn directly from United's website, referenced

9  in Plaintiffs' complaint, https://www.uhc.com/legal/information-on-payment-of-out-of-network-

10  benefits, where United explains that benefits for out of network claims will be paid based on:

11      the lower of either:
       – the out-of-network provider's actual charge billed to the member, or

12      – 'the reasonable and customary amount,' 'the usual, customary and

13      reasonable amount,' 'the prevailing rate,' or other similar terms that
       base payment on what other healthcare professionals in a geographic

14      area charge for their services.

15      The same United website explains that United obtains data about prevailing rates in a

16  geographic region from FAIR Health, and that United's use of FAIR Health resulted from "a January

17  2009 settlement agreement between UnitedHealth Group Incorporated and the NYAG" which

18  "[closed] Ingenix's PHCS and MDR Databases . . . following the establishment of the new database

19  to be owned and operated by FAIR Health." *Id*.

20      Plaintiffs signed a contract with their provider obligating them to be responsible for all charges

21  not paid by United. [Compl. ¶ 27.]   All named Plaintiffs received their healthcare services from

22

23  _____

24  [11] As noted in Plaintiffs' concurrently filed Objection to Request for Judicial Notice, there are incon-

25  sistencies between the excerpts of the purported 2019 Apple plan document filed with United's Ngu-
   yen Declaration and purported copy of Plaintiffs' 2019 Apple plan. However, the operative language

26  regarding reimbursement of out of network expenses according to data resources of competitive fees
   in the geographic area is the same.

27  [12] Plaintiffs' IOP providers had no pre-existing contractual relationship with United, and only admitted

28  Plaintiffs for treatment based on United's representations that it would reimburse at UCR rates.
   [Comp. ¶ 29]

Summit Estate. [*Id.* ¶¶ 172, 185, 198, 210, 222].  As an out-of-network facility, Summit Estate had no pre-existing contractual relationship with United, meaning that the provider and United had not agreed to a rate that United would pay for Summit Estate's services.  [*Id.* ¶ 29]  In every case, prior to admitting the patient, Summit Estate contacted United to conduct a verification of benefits (VOB). [*Id.* ¶¶ 173, 186, 199, 211, 223] During the VOB call, United's representatives verified that Plaintiffs had out-of-network benefits for the IOP services, and told Plaintiffs' provider that benefits would be paid at a percentage of UCR ranging from 70% to 90% until each Plaintiff had met his or her out of pocket maximum, at which point United would pay 100% of UCR rates. [Id.]  In the specific case of Plaintiffs' provider, Summit Estate, the UCR rate equals 100% of Summit Estate's billed charges. [*Id.* ¶¶ 174, 187, 200, 212, 224] This is not an unusual or atypical outcome, since by definition the UCR is tied to the competitive rate for a given service in a given geographic area.

United cites to one of three separate *Franco* cases in its motion, including, here, *Franco v. Connecticut General Life Ins, Co.*, 289 F.R.D. 121 (D.N.J. 2013).  That opinion, however, concerned the plaintiff's motion for class certification and not a motion to dismiss.  *Franco* did involve underpayment of claims, albeit much different claims than are at issue herein.  The court agreed that the proposed ERISA class did satisfy both commonality and typicality requirements, but found that the predominance requirement was not met.  While United may be expected to raise the predominance issue later in this litigation, that court's ruling on that discrete criterion for class certification is hardly dispositive herein.  In fact, the court in *Franco* rejected the insurer defendant's earlier motion to dismiss.  It held that the plaintiff-subscribers did adequately pleas plausible ERISA claims regarding underpaid benefits.

**B. Plaintiffs Properly Plead Breach of ERISA Fiduciary Duty Claims Under Section 502(a)(3)**

*1.   United Breached Its Fiduciary Duties of Loyalty and Due Care (Count V)*

United argues that Plaintiffs' breach of fiduciary duty causes of action against it pursuant to 29 U.S.C. § 1132(a)(3) should be dismissed because the underlying allegations of wrongdoing are the same as those alleged in Plaintiffs' § 1132(a)(1)(B) benefits claim.  United further argues that

1   Plaintiffs' breach of fiduciary duty claim should be dismissed because the relief they seek is legal

2   rather than equitable in nature.  Both of United's arguments fail.

3        As to United's claim that Plaintiffs' allegations of United's wrongdoing in support of the (a)(3)

4   claims are the same as those underlying their (a)(1)(B) claims, the law is well settled that Plaintiffs

5   may pursue relief under both provisions of ERISA simultaneously at the pleading stage.  In *Moyle v.*

6   *Liberty Mut. Benefit Plan*, 823 F.3d 948 (9th Cir. 2016) the Ninth Circuit made clear that in the wake

7   of the Supreme Court's *Cigna Corp. v. Amara*, 563 U.S. 421 (2011) decision, (a)(3) and (a)(1)(B)

8   claims may proceed simultaneously at the pleading stage, even if the relief sought is the same, as long

9   as there is no double recovery. Second, the relief Plaintiffs seek in their (a)(3) claims differs from that

10  sought in her (a)(1)(B) claims. Plaintiffs seeks recovery of underpaid benefits in connection with their

11  (a)(1)(B) benefits claims.  In connection with their (a)(3) claims, Plaintiffs seek relief that is purely

12  equitable in nature.

13       Specifically, Plaintiffs seeks to enjoin United and Viant from continuing to engage in the

14  practice of repricing and grossly underpaying for out of network behavioral health care, in violation

15  of the terms of the Plans, along with declaratory relief declaring that such practices were and are

16  improper and violate the terms of the Plans. Plaintiff further seeks an order requiring United and Viant

17  to reprocess the claims they illegally underpaid and to provide transparency as to any methodology

18  they apply to the reprocessing of those claims.  Finally, Plaintiff seeks an award of surcharge and

19  disgorgement of ill-gotten profits from Viant and United resulting from the improper claims repricing.

20       The Ninth Circuit in *Moyle* stated unequivocally that claims under both (a)(1)(B) and (a)(3)

21  ERISA provisions can proceed simultaneously at the pleading stage. *Id.* at 962 (noting "[s]ome of our

22  pre-*Amara* cases held that litigants may not seek equitable remedies under § 1132(a)(3) if §

23  1132(a)(1)(B) provides adequate relief. [collecting citations] However, those cases are now 'clearly

24  irreconcilable' with *Amara* and are no longer binding.")

25       ERISA § 502(a)(1)(B) allows a plan participant to bring an action "to recover benefits due to

26  him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights

27  to future benefits under the terms of the plan." ERISA § 502(a)(3) provides that:

28              [a] civil action may be brought . . . by a participant, beneficiary, or
                fiduciary (A) to enjoin any act or practice which violates any provision

- 15 -

1

2

of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

3

4       The evolution of the jurisprudence regarding pleading of (a)(1)(B) benefits claims and (a)(3)

5   fiduciary duty claims began with *Varity Corp. v. Howe*, 516 U.S. 489 (1996) In *Varity*, the Supreme

6   Court held that ERISA's right of action for breach of fiduciary duties set forth in ERISA § 502(a)(3)

7   is a "'catchall' provision[] [that] act[s] as a safety net, offering appropriate equitable relief for injuries

8   caused by violations that [§502] does not elsewhere adequately remedy." *Id.* at 512.

9       Fifteen years after *Varity*, in *Cigna Corp. v. Amara*, 563 U.S. 421 (2011), the Supreme Court

10   addressed the forms of relief available to ERISA participants and beneficiaries. In *Amara*, the Court

11   held that ERISA § 502(a)(3) offered equitable relief in the form of plan reformation, even though the

12   plaintiffs therein also claimed benefit relief under § 502(a)(1)(B). The *Amara* plaintiffs advanced

13   simultaneous claims under (a)(1)(B) for benefits, and for reformation of the plan terms under (a)(3).

14   The Court held that plan reformation was available to the *Amara* plaintiffs under (a)(3) as an equitable

15   remedy, and that "once the plan was reformed under § [502](a)(3) to reflect the terms of the old plan,

16   it could be enforced under § [502](a)(1)(B)."  The Court in *Amara* also held that the "appropriate

17   equitable relief" available under § 502(a)(3) refers to "those categories of relief that, traditionally

18   speaking (i.e., prior to the merger of law and equity) 'were *typically* available in equity.'" *Amara* at

19   439.  The Court held that "affirmative and negative injunctions obviously fall within [the category of

20   equitable relief.]"  *Id.* at 440.  Additionally, the Court held that certain forms of relief under equity,

21   while they may result in the payment of moneys rightly owed to trust beneficiaries, nevertheless

22   "resemble[] forms of traditional equitable relief" and are available to ERISA plan participants and

23   beneficiaries under 502(a)(3). *Id.*  This includes surcharge, which the Court noted "prior to the merger

24   of law and equity this kind of monetary remedy against a trustee . . . was 'exclusively equitable.'" *Id.*

25   at 442.

26       The Ninth Circuit holding *Moyle* in 2016 adopted the Eight Circuit's reading of *Amara*, which

27   "permits plaintiffs to present § [502](a)(1)(B) and § [502](a)(3) as alternative — rather than

28   duplicative — theories of liability." The court held that "[t]his approach is an accurate application of

1    *Amara* in light of *Varity* because it allows plaintiffs to plead alternate theories of relief without

2    obtaining double recoveries." *Id.* at 961.

3         The Court noted that this reading was not only consistent with *Amara* and *Varity*, but also the

4    Federal Rules of Civil Procedure, which require that "[a] pleading that states a claim for relief must

5    contain ... a demand for the relief sought, *which may include relief in the alternative* or different types

6    of relief." Fed. R. Civ. P. 8(a)(3) (emphasis added). Moreover, the Court held that "allowing plaintiffs

7    to seek relief under both § [502](a)(1)(B) and § [502](a)(3) is consistent with ERISA's intended

8    purpose of protecting participants' and beneficiaries' interests." *Id.* at 962.

9         *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643 (9th Cir. 2019), on which United relies

10   heavily, does not change the result or holding of *Amara* or *Moyle*, nor does it strip Plaintiffs of the

11   right to pursue equitable relief against United for its fiduciary breaches.  *Depot* involved a suit brought

12   by multiple employers against Blue Shield for charging excessive monthly premiums.  The plaintiffs

13   alleged that Blue Shield secretly added premium surcharges to cover kickbacks to the local chamber

14   of commerce, at whose recommendation the employers purchased the policies at issue. The employers

15   brought causes of action under both ERISA and state law to recover the excess premium charges.

16        The Ninth Circuit held that premium rate-setting does not involve fiduciary conduct by the

17   insurer, does not constitute ERISA plan management, and does not involve control over plan assets.

18   It further held that Blue Shield's conduct did not constitute a "prohibited transaction" under ERISA,

19   on the basis that the two types of relief sought, restitution of premiums and disgorgement were, under

20   the facts alleged in that case, legal, not equitable in nature.

21        Plaintiffs here, on the other hand, seek expressly equitable relief under their (a)(3) counts. For

22   example, Plaintiffs seek multiple forms of declaratory relief, including declarations that "United's

23   payments were improper underpayments," that "United's payment methodologies were and are

24   improper." [ECF 1, Prayer For Relief ¶¶ 8-9]. Plaintiffs also seek an order that United reprocess all

25   underpaid claims using an appropriate methodology.  [Id., Prayer For Relief ¶ 12] None of these forms

26   of relief are analogous to the relief sought in *Depot*.

27        Defendant's reliance on *Montanile v. Board of Trustees of Nat. Elevator Industry Health*

28   *benefit Plan*, 136 S.Ct. 651 (2016) is puzzling, since that action involved the opposite factual situation

1    to herein.  At issue was an ERISA plan's attempt to recoup, via subrogation and under ERISA §

2    502(a)(3), the medical expenses it paid when its insured was injured by a drunk driver and later settled

3    a third-party personal injury action.  The Supreme Court held that "when an ERISA-plan participant

4    wholly dissipates a third-party settlement on nontraceable items, the plan fiduciary may not bring suit

5    under § 502(a)(3) to attach the participant's separate assets." 136 S.Ct. at p. 653.  To the extent

6    traceability is even at issue, which it is not under the facts of this action, Defendants retained all profits

7    from the underpayment of claims.  That is why restitution and or disgorgement are among the potential

8    remedies to be determined—at a later stage of this litigation.

9         Also, *Montanile* was decided on summary judgment.  Given the volume of potential class

10   action remedies requested by Plaintiffs, from an independent, neutral repricing of the underpaid H0015

11   claims, to a variety of declarations regarding United's improper payment methodologies, [See ECF 1,

12   Prayer for Relief ¶¶ 7-13] *Montanile* does not counsel the outright dismissal of Plaintiffs' ERISA

13   causes of action.

14        *Del Castillo v. Community Child Care Council of Santa Clara Country, Inc.*, 2019 WL

15   2644234 (N.D.cal. 2019) also does not support Defendant's position.  The idea that Plaintiff's section

16   (a)(3) cause of action is nothing more than a disguised request for the legal remedy of monetary

17   damages is itself nothing more than a disguised attempt to rewrite Plaintiff's complaint.

18        Central to Plaintiffs' request for relief is the reprocessing of claims.  This is inherently

19   equitable in nature.  *Wit v. United Behavioral Health*, 317 F.R.D. 136 (N.D.Cal. 2016), another action

20   involving a certified ERISA class, is instructive.  There, the denied in part and granted in part, with

21   leave to amend, a motion to dismiss.  It noted that certain forms of relief available under ERISA §

22   502(a)(3), such as restitution or disgorgement, can be both legal and equitable in nature.  2019 WL

23   2644234 at * 7.  It noted that "restitution in equity [is] ordinarily in the form of a constructive trust or

24   an equitable lien, where the money or property . . . can be traced to particular funds or property in the

25   defendant's possession." *Id.* (internal quotations and citations omitted).  These are equitable, not legal

26   remedies.

27        Elsewhere, courts have concluded that "while ultimately money may be obtained, the relief

28   sought . . . is non-monetary." *Meidi v. Aetna, Inc. 63 Empl. Ben. Cas.* 1124 at *21. (emphasis in

1    original).  The discussion in *Meidi* canvasses cases nationwide, all agreeing that claims "reprocessing

2    is not monetary relief." *Id.*

3           This issue looks far beyond a motion to dismiss.  *Meidi* involved the granting of class

4    certification.  So did a more recent case in this jurisdiction, *Escalante v. California Physicians Service*,

5    309 F.R.D. 612 (C.D.Cal. 2015).  The plaintiff filed an ERISA class action.  The complaint asserted

6    two claims, one under 29 U.S.C. §1132(a)(1)(B) and one under § 1132 (a)(3). See *Escalante* at p. 616.

7    The prayer for relief included requests for disgorgement of profits, and "re-review of all improperly

8    denied claims." *Id.*  The court granted class certification.

9           In light of *Escalante* and the many cases nationwide, all class actions, all involving causes of

10   action under section 502(a)(1)(B) and (a)(3), and all including requests for reprocessing of claims, the

11   clear weight of the authorities compel denial of Defendant's motion to dismiss Plaintiffs' ERISA

12   causes of action.

13           2.    *Plaintiffs State a Claim for Failure to Provide a Full and Fair Review (Count VI)*

14          ERISA requires an administrator to: (1) provide adequate notice in writing to any participant

15   or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific

16   reasons for such denial, written in a manner calculated to be understood by the participant, and (2)

17   afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full

18   and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. §

19   1133; *see also*, 29 C.F.R. § 2560.503-1(g)(1), (h)(2).  A denial, or "adverse benefit determination" is

20   defined in relevant part as a "reduction . . . or a failure to make payment (in whole or in part) for, a

21   benefit. . . ." 29 C.F.R. § 2560.503-1(m)(4)(i). The failure to provide a procedure for appealing adverse

22   benefit determinations violates ERISA's duty to provide a full and fair review. *See* 29 U.S.C.

23   §1133(2); 29 C.F.R. §2560.501-3(h).

24          Plaintiffs allege, in significant detail, how and why United violated its duty to provide a full

25   and fair review. For example, Plaintiff alleges that:

26                United violates its obligations and fiduciary duties under ERISA as it
                  does not advise the patients, its members, that payments are actually
27                underpayments. As underpayments, their decision constitutes an
                  adverse benefit determination. Instead, on the Explanation of Benefits
28                (EOBs) notices, required by ERISA, sent to the patients and providers,

1
2
3
4

only a remark code indicates Viant's involvement. Nowhere does the EOB state that Viant's repricing is permitted under the policy and that the repriced amount is consistent with plan terms. Nowhere does the EOB state that it is an adverse benefit determination that the patient has the right to appeal." Compl. ¶ 53.

5       Plaintiffs further allege that "United paid reduced benefits and did not issue Plaintiffs adverse

6   benefit determinations in an EOBs as required." Compl. ¶ 55. As a result of this conduct, United never

7   provided Plaintiffs or their representatives the opportunity to appeal the underpayment, circumventing

8   the very purpose of ERISA, and imposing huge burdens on Plaintiffs and the Class who reasonably

9   believed they had meaningful out-of-network coverage. Compl. ¶ 56. As a result, United deprived

10  Plaintiffs of a full and fair review by making out-of-network benefit reductions and adverse benefit

11  determinations that are inconsistent with or unauthorized by the terms of the plans, failing to disclose

12  the method United used to arrive at these inappropriate deductions, and failing to disclose the presence

13  of and financial incentives given to Viant. Compl. ¶333. Finally, "Plaintiffs and the Class were denied

14  the opportunity to properly appeal United's adverse benefit determination" Compl. ¶335.

15      Under any reading of ERISA, this conduct is a violation of the duty to provide a full and fair

16  review. The violation is simple and impacted every class member: United, by and through Viant,

17  deliberately underpaid claims and improperly reduced claim payments. Each instance of such

18  underpayment or reduction constituted an adverse benefit determination. United never afforded

19  Plaintiffs the opportunity to appeal or in any way revisit these adverse benefit determinations. Indeed,

20  Viant simply deposited whatever amount it chose directly into a given provider's bank account. Class

21  members such as Plaintiffs only found out about this when they received bills from the providers for

22  the amount that was not paid — usually around 90% of the total billed charges.

23          *3.    Plaintiffs Have Standing to Pursue Injunctive and Equitable Relief Under ERISA*

24      United contends that Plaintiffs lack Article III standing because the disputed benefit payments

25  at issue involve medical treatment received in 2018 and 2019, and therefore Plaintiffs lack standing to

26  pursue "prospective injunctive relief." This argument fails for two reasons.  First, Plaintiffs are still

27  employed by Apple and Tesla, are still covered participants under the respective Plans, and are still in

28  recovery and actively receiving outpatient services now and for the foreseeable future, to maintain

their sobriety.  To the extent relapse is an unfortunately common experience in the course of substance use recovery, Plaintiffs are likely to require IOP treatment in the future for any relapses they may suffer.  Second, ERISA does not require that relief sought under (a)(3) be solely prospective in nature. Plaintiffs seek both prospective and retrospective relief in connection with their (a)(3) claims.

ERISA providers that "[a] civil action may be brought" by a plan participant or beneficiary not only to "recover benefits due . . . under the terms of [a] plan," 29 U.S.C § 1132(a)(1)(B), but also to "enforece . . . rights under the terms of [a] plan," *id.*, to "clarify . . . rights to future benefits under the terms of [a] plan," *id.*, to "enjoin any act or practice which violates any provision of this subchapter," 29 U.S.C. § 1132(a)(3)(A), and to "obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). ERISA Section 502(a)(3) thus specifically contemplates equitable and injunctive relief that is backward looking as well as forward looking, to redress both past and future violations of Plan terms.  Here, Plaintiffs seek injunctive relief ordering a reprocessing of their wrongfully underpaid IOP benefits in accordance with accurate UCR data per the Plan terms, transparency with respect to the methodology used to reprocess the claims, as well as declaratory relief declaring that United's payments were improper underpayments.  [Compl., Prayer for Relief ¶¶ 8, 12, 13]

The recent Supreme Court decision in *Thole v. U.S. Bank, N.A.*, 140 Sup. Ct. 1615 (2020), relied on by Defendant, has no bearing on Plaintiffs' standing on this action.  *Thole* involved defined-benefit pension benefits that the plaintiffs were entitled to and were in fact receiving.  The plaintiffs alleged that the pension assets were poorly invested, resulting is a substantial loss to the plan as a whole.  The court found no Article III standing on the basis that the plaintiffs were still receiving their pensions, would continue to receive their benefits, and that the benefits would remain unchanged regardless of any alleged fund mismanagement.

Here the situation is entirely different.  Defendants' intentional, and substantial claims underpayment left Plaintiffs and putative class members either thousands of dollars out-of-pocket, or with thousands of dollars of unpaid bills.  This is precisely the type of "concrete, particularized, and actual or imminent" injury in fact  hat was lacking in *Thole*. 140 S.Ct. at p. 1618.

### C.  United is a Proper Defendant Under 502(c)

United contends it cannot be held liable under ERISA §502(c) because Apple and Tesla, not United, are the plan administrators. However, United agreed to provide administrative functions for the plan, including provision of appropriate plan documents to plan participants and beneficiaries upon request. As such, it is a proper defendant under 502(c) for failure to provide the Plan documents requested by Plaintiff within the prescribed timeframes. To the extent that United implicates Apple and Tesla as the only proper defendants for 502(c) claim, they are not presently named defendants in the Complaint. Plaintiffs can and will, however, amend the Complaint to name them as party-defendants to this cause of action, and respectfully request leave to do so, should the Court determine this cause of action is currently insufficiently pled.

## V.  CONCLUSION

By reason of the foregoing, it is respectfully submitted that the motion to dismiss should be denied. If the court is inclined to sustain any part of the motion, Plaintiffs respectfully requests leave to amend any deficiencies.

Dated: July 2, 2020

**NAPOLI SHKOLNIK PLLC**
  /s/ Matthew M. Lavin
Matthew M. Lavin
Wendy A. Mitchell

**DL LAW GROUP**
  /s/ David M. Lilienstein
David M. Lilienstein
Katie J. Spielman

*Attorneys for Plaintiffs*
*And the Putative Class*