1  Matthew M. Lavin, Esq. (*pro hac vice*)
   Aaron R. Modiano, Esq. (*pro hac vice*)
2  **NAPOLI SHKOLNIK PLLC**
   5757 W. Century Boulevard, Suite 680
3  Los Angeles, CA 90045
   (212) 397-1000 / Fax (646) 843-7603
4

5  David M. Lilienstein, Esq. (CA SBN 218923)
   Katie J. Spielman, Esq. (CA SBN 252209)
6  **DL LAW GROUP**
   345 Franklin Street
7  San Francisco, CA 94102
   (415) 678-5050 / Fax (415) 358-8484
8

9  *Attorneys for Plaintiffs and Putative Class*

10

11                **UNITED STATES DISTRICT COURT**

12        **NORTHERN DISTRICT OF CALIFORNIA - OAKLAND**

13 | LD, DB, BW, RH and CJ on behalf of | Case No.: 4:20-CV-02254-YGR
   | themselves and all others similarly situated, |
14 | | **PLAINTIFFS' RESPONSE IN**
   |                       Plaintiff, | **OPPOSITION TO UNITED BEHAVIORAL**
15 |           vs. | **HEALTH, INC.'S MOTION TO DISMISS**
16
17 | UNITED BEHAVIORAL HEALTH, INC. a | Complaint Filed: April 2, 2020
   | California corporation, and MULTIPLAN, INC., |
18 | a New York corporation, | Hearing Date:   December 22, 2020
   | | Hearing Time:   2:00 p.m.
19 |                       Defendants. | Courtroom:      1 – Fourth Floor
20
21
22
23
24
25
26
27
28

# Table of Contents

Table of Authorities .................................................................................................. ii

I.   Introduction .................................................................................................... 1

II.  Background ..................................................................................................... 2

III. The RICO §§ 1962(c)&(d) Claims Should Not Be Dismissed. .................... 3

A.   Plaintiffs Have Alleged Racketeering Activity with Particularity ............... 5

B.   Plaintiffs Plausibly Allege the Existence of a RICO Enterprise ................. 5

C.   United Directed Affairs of the Enterprise .................................................. 9

D.   Plaintiffs Plausibly Allege Causation ...................................................... 10

E.   Plaintiffs' RICO Claims Are Pled with Sufficient Particularity Under Rule 9(b)................... 12

F.   Plaintiffs Have Alleged a Conspiracy to Violate RICO ........................... 14

IV.  There Is No Overlap with the *PRS* Matter .................................................. 14

V.   Plaintiffs' ERISA Claims Are Properly Pleaded.......................................... 14

A.   Plaintiffs properly plead claims for relief "under the terms of" their ERISA plans pursuant to § 502(a)(1)(B) based on United's failure to reimburse out-of-network claims based on "available data resources of competitive fees in that geographic area," i.e., UCR................... 14

1.   *"Available Data Resources of Competitive Fees" Does Not Mean Any Data United and Multiplan Make Up* ......................................................... 16

2.   *The Reimbursement Rates Paid by Multiplan Are Not Competitive Fees in the Geographic Region* ............................................................... 18

B.   Plaintiffs Properly Plead Breach of ERISA Fiduciary Duty Claims Under Section 502(a)(3) 20

1.   *United Breached Its Fiduciary Duties of Loyalty and Due Care* .................. 20

2.   *Plaintiffs Have Standing to Pursue Injunctive and Equitable Relief Under ERISA* ........ 22

VI.  Conclusion.................................................................................................... 24

1
2

# TABLE OF AUTHORITIES

3

**Cases**

4

*Ashcroft v. Iqbal*,
5
   556 U.S. 662 (2009)................................................................................................. 19
6

*Bias v. Wells Fargo & Co.*,
   942 F. Supp. 2d 915 (N.D. Cal. 2013) ................................................................. 3, 8
7

*Boyle v. United States*,
8
   556 U.S. 938 (2009).................................................................................................. 5
9

*Bridge v. Phoenix Bond & Indem. Co.*,
10
   553 U.S. 639 (2008)................................................................................... 10, 11, 12
11

*CIGNA Corp. v. Amara*,
   563 U.S. 421 (2011)....................................................................................... 2, 21, 22
12

*Cisneros v. Petland, Inc.*,
13
   972 F.3d 1204 (11th Cir. 2020) ............................................................................... 8
14

*Depot, Inc. v. Caring for Montanans, Inc.*,
15
   915 F.3d 643 (9th Cir. 2019) ................................................................................. 22
16

*Holmes v. Sec. Inv. Prot. Corp.*,
17
   503 U.S. 258 (1992)......................................................................................... 10, 11
18

*Horman v. United States*,
19
   116 F. 350 (6th Cir. 1902) ....................................................................................... 4
20

*Kelly v. United States*,
   140 S. Ct. 1565, 206 L. Ed. 2d 882 (2020) ............................................................. 3
21

*Kunin v. Benefit Trust Life Ins. Co.*,
22
   910 F.2d 534 (9th Cir. 1990) ........................................................................... 15, 18
23

*McDaniel v. Chevron Corp.*,
24
   203 F.3d 1099 (9th Cir. 2000) ............................................................................... 17
25

*McNally v. United States*,
   483 U.S. 350 (1987)................................................................................................. 3
26

*Moody v. Liberty Life Assurance Co. of Bos.*,
27
   595 F.Supp.2d 1090 (N.D. Cal. 2009) .................................................................. 17
28

*Moyle v. Liberty Mut. Retirement Benefit Plan*,
  823 F.3d 948 (9th Cir. 2016) .................................................................. 20, 21, 22

*Mull for Mull v. Motion Picture Indus. Health Plan*,
  865 F.3d 1207 (9th Cir. 2017) ................................................................................ 2

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993) ...................................................................................... 5

*O'Neal v. Life Ins. Co. of N. Am.*,
  10 F.Supp.3d 1132 (D. Mont. 2014) ...................................................................... 17

*Paroline v. United States*,
  572 U.S. 434 (2014) .............................................................................................. 11

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ................................................................................................ 3

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ............................................................................................ 9, 10

*Saltarelli v. The Bob Barker Group Medical Trust*,
  35 F.3d 382 (9th Cir. 1994) .................................................................................. 15

*Samaan v. Aetna Life Ins. Co.*,
  2020 WL 4934363 (C.D. Cal. Aug. 21, 2020) ...................................................... 13

*Schmuck v. United States*,
  489 U.S. 705 (1989) .............................................................................................. 10

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985) ................................................................................................ 6

*Smart v. Gillette Co. Long–Term Disability Plan*,
  70 F.3d 173 (1st Cir. 1995) .................................................................................. 18

*Smith v. Jefferson Pilot Fin. Ins. Co.*,
  607 F. Supp. 2d 266 (D. Mass. 2009) .................................................................. 18

*Thole v. U.S. Bank, N.A.*,
  140 Sup. Ct. 1615 (2020) ...................................................................................... 23

*United States v. Goldin Indus., Inc.*,
  219 F.3d 1271 (11th Cir. 2000) .............................................................................. 6

*United States v. Turkette*,
  452 U.S. 576 (1981) ................................................................................................ 6

- iii -

*US Airways, Inc. v. McCutchen*,
  569 U.S. 88 (2013) ......................................................................................... 2

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
  714 F.3d 414 (6th Cir. 2013) ........................................................................ 12

*Weiner v. Ocwen Fin. Corp.*,
  2015 WL 4599427 (E.D. Cal. July 29, 2015) ................................................ 8

**Statutes**

18 U.S.C. § 1961(4) .............................................................................................. 5

18 U.S.C. § 1964(c) ............................................................................................ 10

29 U.S.C. § 1001(b) .............................................................................................. 1

ERISA § 502(a)(1)(B) ....................................................................... 14, 20, 21, 23

Section 1132(a)(3) .................................................................................. 20, 21, 23

**Rules**

Fed. R. Civ. P. 8(a)(3) ........................................................................................ 22

Fed. R. Civ. P. 9(b) .............................................................................................. 5

1

## I.    Introduction[1]

2        Plaintiffs' First Amended Complaint ("FAC") is about the fraudulent scheme created by

3    United and Multiplan to underpay valid, medically necessary claims. United and Multiplan

4    fraudulently portray the underpayment of claims as representative of prevailing market rates (FAC

5    ¶¶13-15). They are not. The underpayments are a fraction of prevailing market rates. This scheme

6    enriches United and Multiplan at the expense of patients who are unjustly forced to make up the

7    difference between the prevailing market rate and amount that was paid by their plan out of their own

8    pockets. (FAC ¶16). This scheme has been ongoing since at least 2015 when United was no longer

9    required to utilize the FAIR Health database and has cost patients throughout this country billions of

10   dollars in unjustified, out-of-pocket expenses. (FAC ¶61).

11       The overarching theme of United's motion is to obfuscate the overarching scheme created by

12   United and Multiplan to distract from how their actions are directly at odds with one of the very

13   purposes of ERISA, to protect "the interests of participants in employee benefit plans and their

14   beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial

15   and other information with respect thereto, by establishing standards of conduct, responsibility, and

16   obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies,

17   sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b).

18       This lawsuit is brought on behalf of ERISA plan participants and beneficiaries who have

19   suffered harm as a direct result of illegally underpaid healthcare claims which they have had to make

20   up the difference for.  The Plaintiffs have received balance bills from their providers which reflected

21   the difference between what was charged by their provider and what Defendants actually paid.

22   Plaintiffs have satisfied those balances in whole or in part with their providers and are now seeking,

23   amongst other relief, to be reimbursed by the Defendants for their payments and to enjoin Defendants

24   from the conduct which created the balance bills in the first place.  As the FAC states, "261. Because

25   of United and Multiplan, LD has been denied the full benefits available under the Apple benefit plan

26

27
─────────────
28   [1] As the arguments raised in this brief and the related brief in the *PRS* matter have significant overlap, Plaintiffs hereby incorporate by reference the arguments asserted in response to Defendants' motions to dismiss in *PRS* and Plaintiffs' response in opposition to Multiplan's motion to dismiss (Dkt. 65) as if fully set forth herein.

and **has been damaged in the amount _he has paid out of pocket_** for treatment services that should have been paid by United." (LD FAC ¶261) (emphasis added).

Plaintiff's claims seek to hold the Defendants, United and Multiplan, accountable for their fraudulent conduct, breach of responsibilities, and the harm that they have caused to those patients and beneficiaries that entrusted them with the administration of their healthcare benefits.

## II.   Background

First and foremost, Plaintiffs *do not* assert that any of their plans "require[] payment of 100% of billed charges" as stated by United. (Dkt. 66, Pg. 2). United's reliance upon the Declaration of Ngoc Han S. Nguyen (Dkt. 67-2) and the attached Summary Plan Descriptions (SPDs) is both incorrect and inappropriate. It is incorrect to state "as confirmed by their respective plan's summary plan descriptions, none of their plans requires payment of 100% of billed charges, the vast majority do not require "UCR," and most have differing plan provisions governing out-of-network reimbursements." (Dkt. 66, Pg. 2-3, Ln. 27-1). It is inappropriate to ask the Court to ignore the important difference between a plan and a summary plan description ("SPD"). *CIGNA Corp. v. Amara*, 563 U.S. 421, 446 (2011) ("An SPD is separate from a plan, and cannot amend a plan unless the plan so provides."); *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 92 (2013) ("We have made clear that the statements in a summary plan description "communicat[e] with beneficiaries about the plan, but ... do not themselves constitute the terms of the plan.""). Plaintiffs rely upon SPDs as communications to them but do not accept or represent that they are adequate substitutions for the plans themselves. United has access to the plans as the plan administrator; however, for whatever reason, it has chosen not to produce them. Although the SPD may be consistent with the plan terms, without the actual plans that cannot be determined. *See Mull for Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017).

Interestingly, United never denies the allegations in Plaintiffs' FAC; instead, they portray their enterprise as "a vendor arrangement that benefits UBH, its health plan clients, and their members." The plans do not benefit as United deducts the fully billed amount from the plan account, the patients/members do not benefit as evidenced by the balance bills and the only benefits accrue to the third party plan administrators, United and Multiplan, contrary to the very purpose of ERISA. It

1  is also important to note that no actual plans or employer sponsors of plans are named as defendants

2  here, only United and Multiplan.

### III.   The RICO §§ 1962(c)&(d) Claims Should Not Be Dismissed.

4        The mail and wire fraud statutes protect property rights. *Kelly v. United States*, 140 S. Ct.

5  1565, 206 L. Ed. 2d 882 (2020); *McNally v. United States*, 483 U.S. 350, 356 (1987). Plaintiffs' right

6  to be paid for the unnecessary out-of-pocket expenses they incurred is a property right. *Reiter v.*

7  *Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("Money, of course, is a form of property"). Just as this

8  Court has found that a consumer who has been overcharged can claim injury to property under RICO

9  based on a wrongful deprivation of money in *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 936

10  (N.D. Cal. 2013), so too is are unwarranted out-of-pocket expenses the wrongful deprivation of

11  money. Plaintiffs do not assert that their plans absolve them from *all* out-of-pocket expenses; instead,

12  Plaintiffs seek to recover those out-of-pocket expenses that were incurred as the direct and

13  consequential result of Defendants' underpayment of their claims.

14        It is perhaps ironic that United asserts "Plaintiffs' new allegations merely append sinister-

15  sounding descriptors to a vendor arrangement that benefits UBH, its health plan clients, and their

16  members by helping to control medical costs—exactly what managed care companies are supposed

17  to do" (Dkt. 66, Pg. 6, Ln. 9-11) when on November 11, 2020, Muddy Waters Research, , a well-

18  respected securities due diligence research and analysis firm based in San Francisco, released a

19  market report on Multiplan[2] which caused Multiplan's stock to plunge 28%. The 14-page report,

20  entitled "Multiplan: Private Equity Necrophilia Meets The Great 2020 Money Grab" was based on

21  interviews with former Multiplan executives. This report succinctly addresses many of the same

22  issues as this lawsuit. Of particular relevance to the present litigation are the following excerpts:

23
24    In our view, which we believe is shared in the health insurance industry, MPLN
      [Multiplan] is not on "right side of healthcare". Rather, **it is a conflicted middleman**
25    **that actually profits when individual [plan] members are regularly stuck with**
      **balance bills**. (Pg. 2) (bolding added)

26
27    **United customers [health insurers] described MPLN's fee structure as a "scam",**
      **while complaining of persistent member balance billing in claims where MPLN**

28  [2] https://d.muddywatersresearch.com/content/uploads/2020/11/MW_MPLN_11112020.pdf (last ac-
    cessed 11/23/2020)

**was involved.** We learned from two former MPLN executives and a MPLN customer that **MPLN's billing model may enable it to get paid more per claim than the healthcare providers whose bills it reprices.** We understand that major insurers have forced MPLN to reduce its take rate in recent years, in some cases reportedly cutting MPLN's take rate from 12% to 6% of "savings". MPLN has not disclosed this development in its bullish presentations. (Pg. 3-4) (bolding added)

The reality is that MPLN's revenue model actively encourages balance billing: Customer relationships that most expose members to balance bills are the "type of revenue-generating customer that MPLN wants", per one former executive. (Pg. 4-5)

[T]he problem with MPLN is that the company stopped giving customers the level of service that they wanted several years ago, as private equity firms were looting the business for cash. (Pg. 7).

Though MPLN contends it is "on the right side of healthcare", our discussions with former executives and customers revealed a company whose interests conflict with those of its clients... (Pg. 7).

This seems a far cry from a "vendor arrangement that benefits UBH, its health plan clients, and their members by helping to control medical costs."

Plaintiffs' property is the object of the Defendants' scheme to defraud. *Pasquantino*, 544 U.S. at 355. United has joined together with Multiplan to reproduce the Ingenix scheme that led United to pay $400 million in settlements in 2009. They have joined together to interpose false and fraudulent data as an excuse to avoid paying their obligations to Plaintiffs and others in full to their direct financial benefit. (FAC ¶¶ 111-137). As set forth below, this scheme meets all of RICO's requirements.

It has long been the law that "[i]f the scheme or artifice in its necessary consequence is one which is calculated to injure another, to deprive him of his property wrongfully, then it is to defraud within the meaning of the statute." *Horman v. United States,* 116 F. 350, 352-53 (6th Cir. 1902). Every claim at issue has been adjudicated medically necessary and allowed as payable by the United. (FAC¶ 1-2, 6, 21, 29, 53-56). What is at issue is not the Plaintiffs' right to have their claims paid; but rather, Plaintiffs have incurred unnecessary out-of-pocket expenses and seek to recover those as the direct result of United's underpayments.

United's statement that, "the most one can infer from these allegations is that a contract exists to reduce medical costs" (Dkt. 66, Pg. 6, Ln 13-14) is not only in direct conflict with the FAC, whose allegations are taken as true at this pleading stage, it also appears to be in conflict basic reality as shown by the Muddy Waters Research report quoted above that states "MPLN's revenue model actively encourages balance billing: Customer relationships that most expose members to balance bills are the "type of revenue-generating customer that MPLN wants." United, the largest private health care insurer in the country, participates in this very scheme with Multiplan for its own profit and to the detriment of plans, patients, and providers.

### A.  Plaintiffs Have Alleged Racketeering Activity with Particularity

Rule 9(b) does not require a plaintiff to be omniscient or to provide every conceivable detail. Rather, "[a] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993) (internal quotations and citations omitted). Plaintiffs have met that standard.

Plaintiffs have identified the predicate acts of racketeering activity: as to *LD* FAC ¶¶ 243-273, as to *DB* FAC ¶¶ 274-310, as to *BW* FAC ¶¶ 311-339, as to *RH* FAC ¶¶ 340-368, as to *CJ* FAC ¶¶ 369-395, and the fraudulent and deceptive Patient Advocacy Department ("PAD") letters that crossed state lines (FAC ¶¶ 396-411). Plaintiffs have detailed the RICO enterprise (FAC ¶¶ 110-241). Plaintiffs have also satisfied RICO's proximate cause requirements (FAC ¶¶ 412-417).

### B.  Plaintiffs Plausibly Allege the Existence of a RICO Enterprise

RICO is generally regarded as a broad statute and, indeed, RICO's text "provides that its terms are to be "liberally construed to effectuate its remedial purposes."" *Boyle v. United States*, 556 U.S. 938, 944 (2009), *quoting* Pub. L. No. § 904(a), 84 Stat. 922, 947 (1970). RICO's breadth of language and construction is particularly evident in the enterprise concept. *Boyle*, 556 U.S. at 949. Included within the definition of enterprise is "**any** union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). The Supreme Court has emphasized that the "term 'any' ensures that the definition has a wide reach and the very concept of an association in fact is expansive") *Boyle*, 556 U.S. at 944 (internal citation omitted).

Thus, an association-in-fact enterprise may be *any* group of persons associated together for a common purpose of engaging in a course of conduct. *Boyle*, 556 U.S. at 946, *quoting United States v. Turkette*, 452 U.S. 576, 583 (1981). An association-in-fact enterprise may be formal or informal, and requires only three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Turkette* 452 U.S. at 583. "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).

United argues that there cannot be an enterprise because the only relationship between the United Defendants and Multiplan is "a vendor arrangement that benefits UBH, its health plan clients, and their members" (Dkt. 66, Pg. 6, Ln 9-10) and go so far as to call it "unremarkable." (*Id.* Ln 13). However, Plaintiffs clearly allege that United and Multiplan shared a common purpose to develop false and fraudulent reimbursement rates that were applied to Plaintiffs and IOP providers. (FAC ¶¶ 26, 114-116). United and Multiplan jointly developed 'Whitepapers,' a detailed roadmap used to develop their fraudulent scheme. (FAC ¶¶ 231-237). Plaintiffs detail the association of United and Multiplan in an ongoing, informal association with the common purpose of engaging in a course of conduct, including the development and implementation of a scheme to fraudulently underpay out-of-network IOP services. (FAC ¶¶ 111-12). The presence or absence of a commercial contract between United and Multiplan is irrelevant.

An association does not stop becoming an association because the relationships between its members are documented in a contract, nor does anything in the definition of enterprise insulate from liability those whose common purpose includes some legal activity. RICO's definition of enterprise "include[s] both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *Turkette*, 452 U.S. at 580-81 (1981). *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) ("Yet Congress wanted to reach both

'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its consequences.") (internal citation omitted).

The enterprise between United and Multiplan is the vehicle for the illegal, racketeering activity of mail and wire fraud. Plaintiffs have alleged a solid basis for their belief that the rates paid to them are a fraction of what they should be (FAC ¶¶ 138-152); they set forth the mechanics of the scheme (FAC ¶¶ 153-181); the claims submission process (FAC ¶¶ 182-185); the purpose of the underpayments (FAC ¶¶ 186-192); how Multiplan and United utilized the distorted Viant methodology of distorted databases and inappropriate "target" pricing ((FAC ¶¶ 193-212), and how all of this was developed, implemented, and managed by the Defendants (FAC ¶¶ 213-241).

The FAC alleges a common unlawful purpose amongst the members of the enterprise to avoid paying the required usual and customary reimbursement rates for the services in question. This common purpose is achieved by manipulating reimbursement rates through a false and fraudulent database. The fraudulent reimbursement rates are developed jointly by Multiplan and United. Indeed, the rates are what the United Defendants have directed Multiplan to "target." Defendants know that the rates they are using are not based on objective, reliable data.

Demonstrating the absence of "a vendor arrangement that benefits UBH, its health plan clients, and their members" Defendants cannot explain why the same IOP claims, performed at the same facilities and charged the same fees, are reimbursed at dramatically different rates:

| SUMMIT ESTATE SAMPLE CLAIMS EXPERIENCE* | | | | | | | |
|---|---|---|---|---|---|---|---|
| YEAR | BILLED | UNITED (VIANT) | UNITED (NON VIANT) | MERITAIN | AETNA | ANTHEM | UMR (UNITED SUBSIDIARY) |
| **2018** | $1,875.00 | $229.56 | n/a | $1,593.75 | $1,166.44 | $1,687.50 | $1,749.94 |
| **2019** | $2,156.25 | $229.81 | $2,156.25 | n/a | $1,380.80 | $1,940.63 | $1,832.81 |

*Data is based on average claim experience across multiple claims for multiple patients in the indicated calendar year.

The table above is culled from data related to Summit Estate, the provider who treated the class representative Plaintiffs in this case, but the claims experience depicted in it is similar for the putative class. Had Plaintiffs here not been victimized by the RICO enterprise, they would not have had to pay balance bills out of their own pockets. This chart depicts rates paid by various insurance companies for IOP services to Summit Estate. It also includes data reflecting what United pays for

1  IOP claims when its claims are **not** sent to Viant to pricing. For each patient whose data was used to

2  compile the above chart, benefits were verified over the phone during a verification call. In every

3  single instance, the insurance company's representative stated that claims would be paid based on

4  rates **charged** by similar providers in the rendering provider's geographic area, also known as the

5  usual, reasonable and customary rate, or "UCR."  This is a standard term and representation made in

6  out of network healthcare transactions.

7       As shown in the above table, claims paid by United and priced by Viant/Multiplan regularly

8  averaged $1,000.00 *less* than what other insurance companies paid for the same IOP services, **and**

9  **over $1800 *less* than what United paid to Summit Estate when claims were not processed**

10  **through Viant**. Thus, it is more than "plausible" that Defendants' RICO enterprise caused Plaintiffs

11  to suffer large balance bills and damages. As this chart and multiple references in the FAC to the

12  agnostic FairHealth database make clear, the surprise rates priced by Viant were *anything but* a

13  "competitive fee."

14       If the reimbursement rates were "above-board," Defendants would not be paying several

15  vastly different rates and claim them all to be "reasonable and customary" or "competitive." Nor

16  would a reliable pricing program produce wildly different reimbursements for the same services

17  provided so close in time. Likewise, comparison of the reimbursement paid by Defendants against

18  the FAIR Health Benchmark (FAC ¶¶ 138-152), created because of the United's prior Ingenix fraud,

19  confirms that Plaintiffs claims were grossly underpaid.

20       Also contrary to United's arguments, a common purpose of making money does not insulate

21  members of an enterprise from liability where their methods are illegitimate. The common purpose

22  of making money by fraud is sufficient to find a RICO enterprise. *See, for example, Cisneros v.*

23  *Petland, Inc.*, 972 F.3d 1204, 1212 (11th Cir. 2020) (collecting cases). *Weiner v. Ocwen Fin. Corp.*,

24  2015 WL 4599427, at *10 (E.D. Cal. July 29, 2015). Because the complaint clearly alleges that the

25  members of the enterprise stand to gain sufficient financial benefits from their scheme to avoid paying

26  Plaintiffs what they are owed, Plaintiffs have properly alleged a "common purpose" for the purposes

27  of RICO. *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013) ("Plaintiffs have

28

also explicitly alleged that the enterprise members, including the vendors and brokers, "devised a scheme to defraud borrowers and obtain money from them by means of false pretenses."")

### C. United Directed Affairs of the Enterprise

United contends that the FAC fails to allege facts sufficient to establish that they participated in the operation or management of the enterprise. As set out by the Supreme Court:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise,4 but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

Plaintiffs specifically allege numerous ways in which United has satisfied this requirement in the FAC, stating, for example:

> **United determined the fraudulent rates for under-payment that would be presented as UCR, showing its management over the enterprise**, and MultiPlan developed the methodology employed through Viant to achieve United's low rates, without regard to actual usual and customary rates. **United's management of the enterprise is also shown by the fraudulent information United provided when it verified each Plaintiffs' out-of-network rates to their treatment providers**. United "verified" that it would pay the UCR reasonable rate for services knowing that it would never do so. United's communication of these same fraudulent representations over the wires and by the mail also show its management over the enterprise. **United's issuing of the actual under-payment for the Plaintiffs' and other IOP claims shows its management over the scheme.** FAC ¶¶ 119-122. (bolding added).

> The Viant methodology's crosswalking, reflects **a subjective decision that is directed by United** and implemented by Multiplan. The crosswalking is not subject to independent review, scrutiny, or oversight. FAC ¶173 (bolding added)

> The "proxies" are selected by Multiplan based **on direction given by United** and used by the Viant methodology to provide fraudulently low payment amounts. FAC ¶176 (bolding added).

> **Executives from United including Rebecca Paradise, the Vice President of Out of Network Payment Strategies, reviewed, commented, and provided feedback on MultiPlan's Whitepapers in order to structure United's relationship with**

**MultiPlan** and implement the Viant methodology to underpay claims and violate plan language in whatever manner would make the most money for United and Multiplan. **United's representatives provided direction to MultiPlan such that MultiPlan would revise its Whitepapers to ensure that the Viant methodology would underpay claims in violation of plan language such as those of the Plaintiffs.** The Whitepapers explain that United would set performance standards which were defined by Target Prices. MultiPlan would use Viant to derive a price under the Target Price. United would pay MultiPlan a percentage of the "savings" generated by use of the Viant methodology. The Whitepapers also explain that United could represent "savings" to its customers that were not the actual amounts it paid the healthcare services at. As such, **these jointly developed Whitepapers provide a partial blueprint of the Enterprise, the vehicle that would be used to carry out the fraudulent racketeering acts that directly damaged Plaintiffs through the underpayment of valid, medically necessary IOP claims.** FAC ¶¶ 233-237 (bolding added).

These facts, if proven, would establish that United played a role in operating or managing the RICO enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

**D. Plaintiffs Plausibly Allege Causation**

RICO creates a civil cause of action on behalf of "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter. . . ." 18 U.S.C. § 1964(c). In a RICO case based upon acts of mail or wire fraud, "[t]he gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (*quoting Schmuck v. United States*, 489 U.S. 705, 712 (1989)). This is true even if the mailing itself contains no false information, *Schmuck*, 489 U.S. at 715, because "the indictable act under § 1341 is not the fraudulent misrepresentation, but rather the use of the mails with the purpose of executing or attempting to execute a scheme to defraud." *Bridge*, 553 U.S. at 652.

Although a plaintiff seeking to recover damages in a civil RICO action must establish that the defendant's violation was a proximate cause of the plaintiff's injury (*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)); fundamentally, RICO proximate causation is "a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 272 n. 20), and 659 (refusing to "ignore *Holmes*' instruction that proximate cause is generally not amenable to bright-line rules"); *Paroline v. United States*, 572 U.S.

434, 444 (2014) (quoting *Bridge*'s description of proximate cause as "a flexible concept")[3]. Having rejected a bright-line test for proximate causation, the Court identified a series of motivating principles to guide application of the directness requirement:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely. *Holmes*, 503 U.S. at 269-70 (citations omitted).

United's challenge to proximate causation rest on the assumption that reliance is required in all mail and wire fraud cases. That assumption is incorrect and specifically refuted by the Supreme Court. *Bridge* held that reliance is (1) not an element of mail fraud itself, 553 U.S. at 648-50, (2) not an element of 18 U.S.C. § 1962(c), *id.*, (3) and is not required by 18 U.S.C. § 1964(c). *Id. at 654-58*. Simply put, if a plaintiff's injuries are directly caused by the violator, its conduct cannot be barred from recovery by a reliance requirement that is not to be found in the mail or wire fraud statutes or in RICO itself.

*Bridge* unequivocally holds that <u>directness</u> does not contain within it a requirement of <u>reliance</u>: "the mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim." 553 U.S. at 653, quoting *Anza*, 547 U.S. at 476 (Thomas, J. concurring in part and dissenting in part). Removing any doubt, *Bridge* specifies that "One can conduct the affairs of a qualifying enterprise through a pattern of . . . [racketeering activity indictable as mail fraud] without anyone relying on a fraudulent misrepresentation." *Bridge*, 553 U.S. at 649. In

---

[3] The application of the direct injury requirement in RICO is sui generis. *Holmes,* 503 U.S. at 272 n. 20 (Consequently, "use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text. We do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached.")

other words, while reliance *may* serve as a proxy for legal and factual causation, *it is not* a condition of their existence.  553 U.S. at 649 ("one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation."). "For RICO purposes, reliance and proximate cause remain distinct—if frequently overlapping—concepts. While reliance is 'often used to prove . . . the element of causation,' that does not mean it is the only way to do so." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013) (internal quotations omitted). Or, as *Bridge* put it, "the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action." 553 U.S. at 659 (citation omitted). The unavoidable conclusion is that reliance does not matter if facts plausibly showing direct injury are alleged. *See also*, *Wallace*, 714 F.3d at 420 ("A plaintiff need only show use of the mail in furtherance of a scheme to defraud and an injury proximately caused by that scheme."). Plaintiffs have done so here.

As in *Bridge*, Plaintiffs' injuries are "a foreseeable and natural consequence" of Defendants' scheme. 553 U.S. at 658. And, as in *Bridge*, there are no independent factors that could account for Plaintiffs' injury and no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation. Because none of the harm for which Plaintiffs seek to recover was first visited upon a third person, their claims do not require the court to go beyond the first step in regard to damages. Similarly, there are no more immediate victims who are better situated or motivated to sue than Plaintiffs. Because no one other than Plaintiffs is entitled to claim reimbursement for the out-of-pocket expenses that Plaintiffs' incurred as the direct result of underpaid care, no one else has a better incentive to vindicate the law as a private attorney general. *Bridge*, 553 U.S. at 658.

**E.  Plaintiffs' RICO Claims Are Pled with Sufficient Particularity Under Rule 9(b)**

Rule 9(b) does not require a plaintiff to be omniscient or to provide every conceivable detail. Rather, "[a] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993) (internal quotations and citations omitted). This standard is met. Much of Defendant's attack on the fraud claims is predicated on fundamentally misunderstanding the fraud alleged in the FAC. In addition to the racketeering activity, the predicate acts of mail and wire

fraud identified in the FAC, the FAC goes into great detail identifying the dates, content, and other information of the misrepresentations made to Plaintiffs by Defendants in addition to the activity that directed and implemented the fraudulent, illegal Viant methodology. Therefore, United knows exactly the factual basis for the fraud causes of action asserted against it.

Further, Plaintiffs have plead that what United underpays is not a "competitive fee" in the relevant zip code. Taking United's "competitive fee" argument to its logical conclusion (Dkt. 66 Pg. 15), United can determine "competitive fee" means whatever it wishes it to mean, it can do so in secrecy, and make whatever representations it wishes without ever being held accountable for the truth of its statements. While Plaintiffs *do not* assert that United is required to use FAIR Health to determine the "competitive fee," as a sister court recently held, "[t]he Plan states that "R&C is based on available data resources of competitive fees in that geographic area. **FAIR Health is one source of such data.**" *Samaan v. Aetna Life Ins. Co.*, 2020 WL 4934363, at *4 (C.D. Cal. Aug. 21, 2020) (bolding added). It is entirely "plausible" to assume that a FAIR Health rate would not then be several multiples of another data source's "competitive fee" for the exact same service. Further, United's attempt to conflate "billed" and "paid" is not even supported by the inappropriate SPDs they submitted as nowhere in the 991 pages of SPDs is "competitive fee" defined as the amount *paid* and not the amount *billed* or *charged*.

Ultimately, it will be through discovery that Plaintiffs will prove this (though Plaintiffs already have provided the Court substantial of evidence of it). <u>Through discovery Plaintiffs will prove that "competitive fees based on available data resources" does in fact mean 80th percentile of UCR/FairHealth in at least two ways: 1: with economic data and price data for the area, and 2: by showing that united has paid at that rate in the past and is doing so now as well with plans with the exact same language. Plaintiffs have pled with sufficient particularity at this stage.</u> It will also be shown through discovery that terms such as "Usual, Customary and Reasonable" rate, the "Reasonable and Customary" amount, the "Usual and Customary" amount, the "Reasonable Charge," the "Prevailing Rate," the "Usual Fee," the "Competitive Fee," or some other similar phase, in the context of the health industry, mean the same thing and the industry shorthand for these terms is "UCR."

**F.  Plaintiffs Have Alleged a Conspiracy to Violate RICO**

The only argument asserted by the Defendants with regard to Plaintiffs' claim under 18 U.S.C. § 1962(d) is that it should fail because no claim is properly alleged under § 1962(c).  Because a claim has been alleged under § 1962(c), that argument necessarily fails.

**IV.    There Is No Overlap with the *PRS* Matter**

There is no duplication in claims between cases brought by Providers, and cases brought by Patients. There is a single "pot" of outstanding, underpaid funds. Some patients paid balance bills, the vast majority did not. Those patients able to pay balance bills are the plaintiffs here. They seek payment for the underpayment amount that they paid to their provider that should have been paid by Defendants. Those Patients that could not pay balance bills left the providers to pursue those amounts from United and Multiplan. The Providers are the Plaintiffs in the *PRS* matter. The harms do not overlap. Every time a claim was underpaid either the patient was harmed, **<u>or</u>** the provider was harmed. The difference between each of those articulated harms is the dividing line along which *LD* and *PRS* respective plaintiff classes is drawn. In both cases, harm was direct. Patients, the Plaintiffs here, have been harmed when they paid balances they should not have been liable for but for United and Multiplan's underpayments. The Providers in the *PRS* case were harmed when United and Multiplan underpaid claims and that amount is still outstanding.

**V.    Plaintiffs' ERISA Claims Are Properly Pleaded**

**A.  Plaintiffs properly plead claims for relief "under the terms of" their ERISA plans pursuant to § 502(a)(1)(B) based on United's failure to reimburse out-of-network claims based on "available data resources of competitive fees in that geographic area," i.e., UCR**

ERISA § 502(a)(1)(B) allows a civil action to be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Here, Plaintiffs have properly pleaded all required elements of an ERISA § 502(a)(1)(B) claim. Plaintiffs are employees of Apple and Tesla, and were at all relevant times participants in their respective ERISA Plans. [ECF 57, FAC ¶¶ 243, 274, 311, 340, 369]. United served as the plan administrator for each of the Plans. [*Id*. ¶¶ 3, 244, 275, 312, 341, 370, 498] Under the terms of the

Plans, United was required to pay for out of network treatment for mental health and substance use disorders based on available data resources of competitive fees in that geographic area, or, in other words, at the Usual Customary and Reasonable (UCR) rate. [Id. ¶¶ 14, 55].

United appears to dispute that the language in its plans promising to reimburse out of network claims "based on data of competitive fees in the geographic area" equates to UCR. United posits instead that the language allows it to choose any data, including Viant's data, which bear no relationship to actual usual and customary rates in the region. FAC ¶ 119. As set forth in Plaintiff's First Amended Complaint, Viant's pricing algorithm, known within the company as FRED "cull[s] the lowest possible number from a flawed, proprietary database of healthcare claims data that is wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area." FAC ¶ 159.

United's argument must be rejected because Viant's algorithm does not reflect competitive fees for IOP services, and because a reading of the Plan term regarding reimbursement for eligible expenses that would allow United to pay claims using false data is absurd and, at best for United, constitutes an ambiguity in the Plans which must be resolved in favor of the insured and in accordance with the insured's reasonable expectations. *See Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539-540 (9th Cir. 1990); *see also*, *Saltarelli v. The Bob Barker Group Medical Trust*, 35 F.3d 382, 386-87 (9th Cir. 1994) (holding that under the doctrine of reasonable expectations, the court must "protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer.")

Plaintiffs have alleged that the language in their plans requiring United to pay for out of network services based on data of competitive fees for the service in the region, sets forth a definition of UCR. As alleged, "UCR is a commonly accepted term in the healthcare industry and means generally, the competitive rate charged by similar providers of the same specialty in the same geographic area." *Id*. ¶ 59.

**The Plan Terms**

Plaintiff DB is and at all times relevant was an employee of Apple. DB received IOP substance use treatment during two plan years, 2018 and 2019. The 2018 Apple Plan states that "Whenever you use out-of-network providers, the percentage of benefits paid will be based on UCR rates." FAC ¶ 279.

The 2018 Apple Plan further advises participants and beneficiaries that they can easily find out if their provider is charging more than UCR by obtaining the Current Procedural Terminology (CPT) code for the treatment they seek, the provider's anticipated fees for the treatment, and the provider's zip code, and then inputting that information at www.fairhealth.org. *Id*.

The 2019 Apple Plan also describes benefit levels for out of network care based on UCR. Specifically, the 2019 Apple Plan states that when rates have not been negotiated with the OON provider[4], eligible expenses are determined "based on available data resources of competitive fees in that geographic area." (FAC ¶ 284). The remaining Plaintiffs, LD, RH, CJ, and BW have identical language in their Apple and Tesla Plans.

Plaintiffs' provider, Summit Estate, charged $2,156 per diem for IOP services in 2019. (FAC ¶¶ 149, 256, 323, 352, 379.) The FAIR Health 80th percentile of charges for IOP services in Summit Estate's zip code is $2,576. (FAC ¶¶ 149, 257, 324, 353, 380.) United's contention that Plaintiffs have alleged that it was required to pay 100% of billed charges when no Plan term requires payment at 100% of billed charges is misleading and specious. United was required to pay *Plaintiffs' claims* at 100% of the provider' billed charges because those charges were *less than* the 80th percentile of the fees of other providers of the same service in the same geographic region. FAC ¶¶ 262, 329, 358, 385. Instead, United paid just $291 to $309, or 11% to 25% of the comparable FAIR Health benchmark, leaving Plaintiffs with the obligation to pay the balance bills owed. FAC ¶ 149.

   1.   *"Available Data Resources of Competitive Fees" Does Not Mean Any Data United and Multiplan Make Up*

---

[4] Plaintiffs' IOP providers had no pre-existing contractual relationship with United, and only admitted Plaintiffs for treatment based on United's representations that it would reimburse at UCR rates. [FAC. ¶ 249, 285, 316, 345, 373]

The parties dispute the interpretation of the phrase "competitive Fees in the geographic area based on available data resources," which defines "Eligible Expenses" in the Plans.  Plaintiffs contend that this term means the usual, customary and reasonable rate for a given medical service in a given geographic region.  Plaintiffs further contend that there are objective data that are readily available that show the competitive fees charged for medical services by zip code.

Defendants do not deny that the reimbursement rates paid to Plaintiffs' providers are not commensurate with competitive fees in the relevant geographic area for IOP services. Defendants do not deny that the reimbursement rates paid to Plaintiffs' providers were based on Viant's pricing algorithm.  Rather, Defendants argue that they were permitted, under the terms of the Plan, to use Viant's pricing algorithm because it qualifies as an "available data resource[] of competitive fees" in the relevant geographic area.  Defendants' plan interpretation is impermissibly self-serving.

"Although an ERISA plan is a contract, ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Courts therefore normally apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws. These principles comprise a nationally uniform federal common law applied in the ERISA context." *Moody v. Liberty Life Assurance Co. of Bos.*, 595 F.Supp.2d 1090,1098 (N.D. Cal. 2009) (internal quotation marks and citations omitted). The "terms in a pension plan should be interpreted in an ordinary and popular sense as would a [person] of average intelligence and experience." *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000) (internal quotation marks omitted) (alteration in original). "When disputes arise as to the meaning of one or more terms, [the court] first look[s] to the explicit language of the agreement to determine the clear intent of the parties." *Id.* "An ambiguity exists when the terms or words of a pension plan are subject to more than one reasonable interpretation." *Id.* (citation omitted).

Where an ambiguity exists, the court applies the rule of *contra proferentem*, under which ambiguities in an insurance contract are construed against the insurer. *See O'Neal v. Life Ins. Co. of N. Am.*, 10 F.Supp.3d 1132, 1136 (D. Mont. 2014) ("Terms that are not defined by the plan (and other ambiguities) are to be construed against the drafter of the plan."). The doctrine is applicable "if, after applying the normal principles of contractual construction, the insurance contract is fairly susceptible

of two different interpretations[.]" *Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 539 (9th Cir. 1990)); *see also, Smith v. Jefferson Pilot Fin. Ins. Co.*, 607 F. Supp. 2d 266, 270 (D. Mass. 2009) ("Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.") (quoting *Smart v. Gillette Co. Long– Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995)).

Setting aside that Plaintiffs have in fact alleged at length that Viant's pricing algorithm does not reflect competitive fees charged for medical services in the relevant geographic markets (*See* FAC ¶¶ 265), Defendants' interpretation of this Plan term would render it meaningless. Defendants' interpretation would allow United to pay claims based on inaccurate data, fabricated data, self-serving data, or incomplete data. This is precisely what United was doing prior to 2009 when it used the Ingenix database to calculate reimbursement rates, a practice that ended in multiple lawsuits, including from the attorney general of New York, resulting in a $400 million settlement payment from United. FAC ¶¶ 97-102.

In connection with the New York Attorney General's investigation of United's reliance on the Ingenix database, United also entered into an Assurance Order requiring it to cease using the Ingenix database, to establish a "Healthcare Information Transparency Website" to inform and educate the public about reimbursement rates, and to create a new, independent database, not controlled by any insurer, to be used for determining fair and accurate reimbursement rates. FAC ¶ 104. To the extent United has undertaken to inform and educate its own insureds about reimbursement rates, it states on its public website that out-of-network claims will be paid based on the lesser of the OON provider's billed charges or "'the reasonable and customary amount,' 'the usual, customary and reasonable amount,' 'the prevailing rate,' or other similar terms that base payment on what other healthcare professionals in a geographic area charge for their services.[5]"

    2.    *The Reimbursement Rates Paid by Multiplan Are Not Competitive Fees in the Geographic Region*

---

[5] https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits, last accessed 11/24/2020; *see also*, FAC ¶ 151.

1    Plaintiffs have alleged that the rates paid when Viant becomes involved – on the order of $291

2    per diem for IOP treatment – is not a competitive fee in Silicon Valley. IOP "[services] are typically

3    offered for *at least* 9 hours per week." FAC ¶ 95 (emphasis added).  United itself until 2019 defined

4    IOP as a structured program "that maintains hours of service generally 9-19 hours per week . . ." FAC

5    ¶ 94. Plaintiffs have alleged that this is figure far below the competitive marketplace price for IOP

6    services in Silicon Valley. It will be plaintiffs' obligation to prove that allegation is true, but on a

7    motion to dismiss Plaintiffs need only meet the plausibility standard set forth in *Ashcroft v. Iqbal*,

8    556 U.S. 662 (2009).

9    Plaintiffs have more than plausibly alleged that the Viant methodology does not produce a

10   "competitive fee" in the relevant zip code and, Plaintiffs will prove that that a "competitive fee" based

11   on available does in fact mean the 80th percentile of UCR / FAIR Health in at least four ways. The

12   first is economic pricing and payment data for the area, which is readily and publicly available from

13   FAIR Health, among other sources. Second, through evidence that United has paid claims at the 80th

14   percentile of FAIR Health in the past and present under plans with the exact same language as that

15   found in Plaintiffs' plans.

16   Indeed, as alleged in the FAC, the named Plaintiffs completed out of network treatment at

17   higher levels of care provided by the same providers before stepping down to the IOP level of care.

18   FAC ¶ 266, 303, 333, 361, 388. Those higher levels of care – residential treatment and partial

19   hospitalization – were reimbursed by United based on UCR. *Id*. Third, United's own website states

20   that it pays out of network claims based on UCR using Fair Health, usually at the 80th or 70th

21   percentile[6]. Fourth, United has Administrative Services Agreements with the plan sponsors, in which

22   the plan sponsor elects a certain percentile, which in almost all cases is either the 70th or 80th

23   percentile of UCR, for the reimbursement of OON claims.

24   If, as United contends, the Plan's requirement to base out of network reimbursement on

25   available data of competitive fees term does not mean anything, or does not mean that United must

26

27   _____

[6] *See* https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits ("Affiliates of
28   UnitedHealth Group frequently use the 80th percentile of the FAIR Health Benchmark Databases to
     calculate how much money to pay for out-of-network services of health care professionals . . . .")

1  rely on real data rather than data it has invented and/or manipulated, then the term must be reformed

2  under ERISA Section 502(a)(3).

3  **B. Plaintiffs Properly Plead Breach of ERISA Fiduciary Duty Claims Under Section**
4  **502(a)(3)**

5  *1.  United Breached Its Fiduciary Duties of Loyalty and Due Care*

6  Section 1132(a)(3) states, "[a] civil action may be brought ... by a participant, beneficiary, or

7  fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms

8  of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to

9  enforce any provisions of this subchapter or the terms of the plan." Our court of appeals has

10 recognized that a claim for benefits under Section 1132(a)(1)(B) and a claim for equitable relief under

11 Section 1132(a)(3) "can proceed simultaneously if they plead distinct remedies." *Moyle v. Liberty*

12 *Mut. Retirement Benefit Plan*, 823 F.3d 948, 961 (9th Cir. 2016).

13 In its motion to dismiss, United argues that Plaintiffs' (a)(3) claims should be dismissed

14 because they have not pleaded a violation of plan terms, because Plaintiffs' claims are legal rather

15 than equitable in nature and plaintiffs seek only money damages, and finally that Plaintiffs lack

16 standing because they "do not allege any facts to support a 'real and immediate threat of future

17 injury.'" Dkt 66 at 16:26-16:28.

18 United's arguments have no basis in the law.  Our court of appeals has expressly rejected the

19 proposition that ERISA plaintiffs may not seek equitable remedies under Section 1132(a)(3) if

20 Section 1132(a)(1)(B) provides adequate relief. *Moyle*, 823 F.3d at 962 (prior decisions holding "that

21 litigants may not seek equitable remedies under [Section] 1132(a)(3) if [Section] 1132(a)(1)(B)

22 provides adequate relief ... are no longer binding").

23 Second, the relief Plaintiffs seek in their (a)(3) claims differs from that sought in their

24 (a)(1)(B) claims. Plaintiffs seeks recovery of underpaid benefits in connection with their (a)(1)(B)

25 benefits claims.  In connection with their (a)(3) claims, Plaintiffs seek relief that is purely equitable

26 in nature.

27 Specifically, Plaintiffs seeks to enjoin United and Multiplan from continuing to engage in the

28 practice of repricing and grossly underpaying for out of network behavioral health care, in violation

1   of the terms of the Plans, along with declaratory relief declaring that such practices were and are

2   improper and violate the terms of the Plans.

3        To the extent United now contends that the term "available data resources of competitive fees"

4   means something other than usual customary and reasonable rates in a geographic region based on

5   accurate data of fees charged in that geographic region, or that it implies United and its agents can

6   make up any data they please, Plaintiffs seek a reformation of that Plan term.  In *Cigna Corp. v.*

7   *Amara*, 563 U.S. 421 (2011), the Court held that ERISA § 502(a)(3) offered equitable relief in the

8   form of plan reformation, even though the plaintiffs therein also claimed benefit relief under §

9   502(a)(1)(B).

10       The *Amara* plaintiffs advanced simultaneous claims under (a)(1)(B) for benefits, and for

11  reformation of the plan terms under (a)(3). The Court held that plan reformation was available to the

12  *Amara* plaintiffs under (a)(3) as an equitable remedy, and that "once the plan was reformed under §

13  [502](a)(3) to reflect the terms of the old plan, it could be enforced under § [502](a)(1)(B)." The

14  Court in *Amara* also held that the "appropriate equitable relief" available under § 502(a)(3) refers to

15  "those categories of relief that, traditionally speaking (i.e., prior to the merger of law and equity)

16  'were *typically* available in equity.'" *Amara* at 439. The Court held that "affirmative and negative

17  injunctions obviously fall within [the category of equitable relief.]"  *Id.* at 440.

18       Plaintiffs also seek an order requiring United and Multiplan to reprocess the claims they

19  illegally underpaid and to provide transparency as to any methodology they apply to the reprocessing

20  of those claims.  Finally, Plaintiffs seek an award of surcharge and disgorgement of ill-gotten profits

21  from Multiplan and United resulting from the improper claims repricing.

22       The Ninth Circuit holding *Moyle* in 2016 adopted the Eight Circuit's reading of *Amara*, which

23  "permits plaintiffs to present § [502](a)(1)(B) and § [502](a)(3) as alternative — rather than

24  duplicative — theories of liability." The court held that "[t]his approach is an accurate application of

25  *Amara* in light of *Varity* because it allows plaintiffs to plead alternate theories of relief without

26  obtaining double recoveries." *Id.* at 961.

27       The Court noted that this reading was not only consistent with *Amara* and *Varity*, but also the

28  Federal Rules of Civil Procedure, which require that "[a] pleading that states a claim for relief must

1    contain ... a demand for the relief sought, *which may include relief in the alternative* or different types

2    of relief." Fed. R. Civ. P. 8(a)(3) (emphasis added). Moreover, the Court held that "allowing plaintiffs

3    to seek relief under both § [502](a)(1)(B) and § [502](a)(3) is consistent with ERISA's intended

4    purpose of protecting participants' and beneficiaries' interests." *Id.* at 962.

5           *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643 (9th Cir. 2019), on which United

6    relies, does not change the result or holding of *Amara* or *Moyle*, nor does it strip Plaintiffs of the right

7    to pursue equitable relief against United for its fiduciary breaches. *Depot* involved a suit brought by

8    multiple employers against Blue Shield for charging excessive monthly premiums. The plaintiffs

9    alleged that Blue Shield secretly added premium surcharges to cover kickbacks to the local chamber

10   of commerce, at whose recommendation the employers purchased the policies at issue. The

11   employers brought causes of action under both ERISA and state law to recover the excess premium

12   charges.

13          The Ninth Circuit held that premium rate-setting does not involve fiduciary conduct by the

14   insurer, does not constitute ERISA plan management, and does not involve control over plan assets.

15   It further held that Blue Shield's conduct did not constitute a "prohibited transaction" under ERISA,

16   on the basis that the two types of relief sought, restitution of premiums and disgorgement were, under

17   the facts alleged in that case, legal, not equitable in nature.

18          Plaintiffs here, on the other hand, seek expressly equitable relief under their (a)(3) counts. For

19   example, Plaintiffs seek multiple forms of declaratory relief, including declarations that "United's

20   payments were improper underpayments," that "United's payment methodologies were and are

21   improper." [FAC, Prayer For Relief ¶¶ 8-9]. Plaintiffs also seek an order that United reprocess all

22   underpaid claims using an appropriate methodology. [*Id.*, Prayer For Relief ¶ 12] None of these forms

23   of relief are analogous to the relief sought in *Depot*.

24                  2.      *Plaintiffs Have Standing to Pursue Injunctive and Equitable Relief Under ERISA*

25          United contends that Plaintiffs lack Article III standing because the disputed benefit payments

26   at issue involve medical treatment received in 2018 and 2019, and therefore Plaintiffs lack standing

27   to pursue "prospective injunctive relief." This argument fails for two reasons.  First, Plaintiffs are still

28   employed by Apple and Tesla, are still covered participants under the respective Plans, and are still

1   in recovery and actively receiving outpatient services now and for the foreseeable future, to maintain

2   their sobriety.  To the extent relapse is an unfortunately common experience in the course of substance

3   use recovery, Plaintiffs are likely to require IOP treatment in the future for any relapses they may

4   suffer.  Second, ERISA does not require that relief sought under (a)(3) be solely prospective in nature.

5   Plaintiffs seek both prospective and retrospective relief in connection with their (a)(3) claims.

6        ERISA provides that "[a] civil action may be brought" by a plan participant or beneficiary not

7   only to "recover benefits due . . . under the terms of [a] plan," 29 U.S.C § 1132(a)(1)(B), but also to

8   "enforce . . . rights under the terms of [a] plan," *id.*, to "clarify . . . rights to future benefits under the

9   terms of [a] plan," *id.*, to "enjoin any act or practice which violates any provision of this subchapter,"

10  29 U.S.C. § 1132(a)(3)(A), and to "obtain other appropriate equitable relief (i) to redress such

11  violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. §

12  1132(a)(3)(B). ERISA Section 502(a)(3) thus specifically contemplates equitable and injunctive

13  relief that is backward looking as well as forward looking, to redress both past and future violations

14  of Plan terms. Here, Plaintiffs seek injunctive relief ordering a reprocessing of their wrongfully

15  underpaid IOP benefits in accordance with accurate UCR data per the Plan terms, transparency with

16  respect to the methodology used to reprocess the claims, as well as declaratory relief declaring that

17  United's payments were improper underpayments. [FAC., Prayer for Relief ¶¶ 8, 12, 13]

18       The recent Supreme Court decision in *Thole v. U.S. Bank, N.A.*, 140 Sup. Ct. 1615 (2020),

19  relied on by Defendant, has no bearing on Plaintiffs' standing on this action. *Thole* involved defined-

20  benefit pension benefits that the plaintiffs were entitled to and were in fact receiving. The plaintiffs

21  alleged that the pension assets were poorly invested, resulting is a substantial loss to the plan as a

22  whole. The court found no Article III standing on the basis that the plaintiffs were still receiving their

23  pensions, would continue to receive their benefits, and that the benefits would remain unchanged

24  regardless of any alleged fund mismanagement.

25       Here the situation is entirely different. Defendants' intentional, and substantial claims

26  underpayment left Plaintiffs and putative class members either thousands of dollars out-of-pocket, or

27  with thousands of dollars of unpaid bills. This is precisely the type of "concrete, particularized, and

28  actual or imminent" injury in fact that was lacking in *Thole*. 140 S.Ct. at p. 1618.

1
2
3
4      **VI.     Conclusion**
5          By reason of the foregoing, it is respectfully submitted that the motion to dismiss should be
6      denied. If the court is inclined to sustain any part of the motion, Plaintiffs respectfully requests leave
7      to amend.
8
            Dated: November 24, 2020                **NAPOLI SHKOLNIK PLLC**
9
10                                                   /s/
                                                     Matthew M. Lavin
11                                                   Aaron R. Modiano
12
13                                                   **DL LAW GROUP**
14                                                   /s/
15                                                   David M. Lilienstein
                                                     Katie J. Spielman
16
17                                                   *Attorneys for Plaintiffs*
18
19
20
21
22
23
24
25
26
27
28