Matthew M. Lavin, Esq. (*pro hac vice*)
mlavin@napolilaw.com
Aaron R. Modiano, Esq. (*pro hac vice*)
NAPOLI SHKOLNIK, PLLC
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
Telephone: (212) 397-1000
Facsimile: (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
david@dllawgroup.com
Katie J. Spielman, Esq. (CA SBN 252209)
katie@dllawgroup.com
DL LAW GROUP
345 Franklin St.
San Francisco, CA 94102
Telephone: (415) 678-5050
Facsimile: (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LD, DB, BW, RH, and CJ on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>UNITED BEHAVIORAL HEALTH, a California Corporation, and MULTIPLAN, INC., a New York Corporation,<br><br>    Defendants. | Case No.: 4:20-cv-02254-YGR<br><br>SECOND AMENDED CLASS ACTION COMPLAINT |

**Table of Contents**

Introduction........................................................................................................1
Summary of Claims ............................................................................................3
Parties.................................................................................................................4
    *Plaintiffs* ........................................................................................................4
    *Defendants* ....................................................................................................4
    *Other Interested Parties* ...............................................................................5
Jurisdiction and Venue........................................................................................5
Facts ...................................................................................................................6
    *Summary of the Facts*....................................................................................6
    *Usual, Customary, and Reasonable Rate ("UCR")* .......................................9
    *Intensive Outpatient Program Treatment* ...................................................10
    *Federal RICO Allegations* ...........................................................................12
The Ingenix Precursor.......................................................................................12
    *The RICO Enterprise* ..................................................................................15
        The Defendants formed a RICO Enterprise to Fraudulently Avoid Paying the Usual, Customary, and Reasonable Rates for Reimbursements for IOP Services ...............................................................................................15
        The FAIR Health Database ..................................................................18
        The Underpayment Scheme's Mechanics...............................................21
        Claims Submission..............................................................................26
        Rates of Payment ................................................................................26
        Viant's Methodology ...........................................................................27
        Viant Facility Outpatient Review: "Viant OPR" ................................28
        Standard Analytical Files ....................................................................28
        Target Pricing: Meet or Beat...............................................................29
        MultiPlan and the Viant Methodology ................................................31
        MultiPlan's Secret Annual Events *Meetings of the Enterprise* .........31
        MultiPlan's Secret Road Shows *Further Meetings of the Enterprise*...............33
        The Secret Internal Whitepapers .........................................................33
        The Network Access Agreement ..........................................................34
    *RICO Predicate Acts & ERISA Violations*...................................................35
        LD .......................................................................................................35
        DB .......................................................................................................40
        BW ......................................................................................................46
        RH .......................................................................................................51
        CJ ........................................................................................................56
        The 'Patient Advocacy Department' ("PAD") Letters .........................60
    *RICO Proximate Cause*...............................................................................63

i

*The Continuing Nationwide Pattern and Other Victims Affected*..................................64
*General Allegations to All Counts* ..................................64
*The Direct Harm Caused to the Plaintiffs and Class* ..................................65
CLASS ACTION ALLEGATIONS ..................................66
*The Plaintiff Class* ..................................66
*Rule 23(a)*..................................66
    Numerosity..................................66
    Commonality..................................66
    Typicality ..................................68
    Adequacy ..................................69
*Rule 23(b)*..................................69
Causes of Action ..................................70
*COUNT I: Violation of RICO, 18 U.S.C. § 1962(c)* ..................................70
*COUNT II: Violation of RICO Conspiracy, 18 U.S.C. § 1962(d)* ..................................72
*COUNT III: Claim for Underpaid Benefits Under Group Plans Governed by ERISA* ..73
*COUNT IV: Breach of Plan Provisions in Violation of ERISA § 502(A)(1)(B)* ............74
*COUNT V: Violation of Fiduciary Duties of Loyalty and Due Care and Request for Declaratory and Injunctive Relief*..................................75
*COUNT VI: Claim for Equitable Relief to Enjoin Acts and/or Practices* ..................77
*COUNT VII: Claim for Other Appropriate Equitable Relief*..................................77
JURY TRIAL DEMAND ..................................79

*LD, et al. v. United, et al. – SECOND AMENDED CLASS ACTION COMPLAINT*

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs LD, DB, BW, RH, and CJ are behavioral health patients who bring this action on behalf of themselves and all other similarly situated individuals against defendants United Behavioral Health, Inc., ("United") and Multiplan, Inc., ("Multiplan") and allege the following:

### Introduction

1.    Plaintiffs LD, DB, BW, RH and CJ, (collectively "Plaintiffs") file this class action on behalf of themselves and all those similarly situated (the "Plaintiff Class") who were directly injured by United and MultiPlan's scheme to underpay valid, medically necessary, claims.

2.    Each Plaintiff has received medically necessary behavioral health treatment from an appropriately authorized, licensed, and accredited provider for treating mental health and/or substance use disorders ("MH/SUD").

3.    Each Plaintiff was covered under health insurance either administered or issued by "United."

4.    The Defendant, United Behavioral Health, is one of more than 1,200 "United" Companies. The United companies are not independent, rather they act in concert to maximize profits for the shareholders of United Corporation. MultiPlan, Inc. is a 'cost management' company. Together, United and MultiPlan have formed an enterprise that furnishes a vehicle to deny proper payment for the IOP treatment services that Plaintiffs received.

5.    United and MultiPlan have also conspired together to withhold proper payment for IOP treatment services from Plaintiffs.

6.    United underpaid all of the claims for medically necessary treatment at issue in this litigation.

7.    Because of this, Plaintiffs have been forced to pay out of pocket for behavioral health services United should have covered.

8.    Plaintiffs are financially damaged and seek monetary and injunctive relief.

9.    All Plaintiffs in this case are aware that their attorneys also represent MH/SUD providers in the related case before this court styled, *P.R.S.., et al. v. United, et al.*, Case No.

4:20-cv-02249-YGR.  The Plaintiffs in both matters have waived any perceived or potential conflict.

10.    United is the largest health insurer in the United States, reporting $6.7 billion in profits for the second quarter of 2020, a 97 percent increase from the same period in 2019.[1] United insures approximately 80 million people and controls 14.1% of the commercial healthcare marketplace with annual premiums paid to it totaling $107 billion dollars.

11.    United also controls a large percentage of the commercial healthcare marketplace in the geographic areas where the Plaintiffs reside.

12.    MultiPlan is a private, 'cost-management' company that partners with insurers to reduce the amounts they pay doctors and hospitals.

13.    Together, United and MultiPlan created, developed, managed, and administered the scheme to underpay Plaintiffs and the class.

14.    Every claim at issue in this litigation was required to be paid at a percentage of the usual and customary rate ("UCR"); the rate charged by providers similar to those where Plaintiffs were treated in the same geographic area.

15.    Each of the claims at issue in this litigation was underpaid.

16.    The underpayment directly and proximately damaged Plaintiffs who had had to pay out of pocket to cover costs which United should have paid.

17.    The underpayment arose out of the fraudulent scheme of United and MultiPlan.

18.    United and MultiPlan's fraudulent scheme used the wires and mail to fraudulently represent that the claims would be and were paid at the usual and customary rate.

19.    This scheme has been ongoing and continuous for more than two years.

20.    Without Court intervention, this scheme will continue and continue to cause damage.

---

1 *U.S.' Largest Health Insurer Reports $6.7B In Profits Amid COVID, As N.Y. Cuts State Rates*, Newsweek, August 14, 2020, https://www.newsweek.com/us-largest-health-insurer-reports-67b-profits-amid-covid-ny-cuts-state-rates-1525210 (last visited September 14, 2020).

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

21.     This scheme injured the Plaintiffs and the class in their persons and property as Plaintiffs' and the class have a well-established property interest in their claims for the authorized, medically necessary services they received.

**Summary of Claims**

22.     This action asserts claims under the Federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Employee Retirement Income Security Act of 1974 ("ERISA"), and seeks monetary, injunctive, and declaratory relief.

23.     Plaintiffs' federal RICO action is brought pursuant to 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

24.     Plaintiffs' ERISA claims are brought pursuant to 29 U.S.C. § 1132(a)(1) and 29 U.S.C. § 1132(a)(3).

25.     Together, and as explained more fully in the following sections, United and MultiPlan have formed a RICO enterprise (the "Enterprise").

26.     The Enterprise is an ongoing, informal organization with the common purpose of engaging in the fraudulent scheme to underpay patients' claims for services rendered by MH/SUD providers who do not participate in United's network.

27.     The Enterprise functions as a continuing unit and it came into being on or about January 1, 2015.

28.     The Enterprise furnishes the vehicle through which the acts of racketeering activity are committed.

29.     The acts of racketeering activity, as detailed in later sections, are the development and implementation of the scheme to defraud and use of mail and interstate wire communications in furtherance of that scheme. Pursuant to the scheme, Defendants sought, and did, under-reimburse Plaintiffs' claims for medically necessary IOP services provided to them. Plaintiffs paid the under-reimbursed amount out of their own pockets to the treatment providers, the injuring Plaintiffs in their person and property.

30.     The relationships between United and MultiPlan are not merely standard, commercial, contracts; instead, United and MultiPlan exploit their contractual arrangements to provide false legitimacy and cover to their racketeering activity.

31.     The Enterprise has operated continually since 2015 as reflected in the thousands of underpaid claims at issue in this litigation and in the tens of thousands, or more, of underpaid out-of-network IOP claims in California and across the country.

32.     Plaintiffs' ERISA claims rely upon the same facts as Plaintiffs' federal RICO claims.

**Parties**

*Plaintiffs*

33.     Plaintiff, LD is a pseudonym for an adult behavioral health patient whose identity and health information are protected in this filing pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), codified at 42 U.S.C. §§ 1320(d)(6), *et seq*. At all relevant times, LD was and is a resident of this federal judicial district.

34.     DB is a pseudonym for an adult behavioral health patient whose identity and health information are protected in this filing pursuant to HIPAA.

35.     BW is a pseudonym for an adult behavioral health patient whose identity and health information are protected in this filing pursuant to HIPAA.

36.     RH is a pseudonym for an adult behavioral health patient whose identity and health information is protected in this filing pursuant to HIPAA.

37.     CJ is a pseudonym for an adult behavioral health patient whose identity and health information are protected in this filing pursuant to HIPAA.

*Defendants*

38.     Defendant United Behavioral Health ("United") is a California corporation, with its principal place of business at 425 Market Street, 14th Floor, San Francisco, CA 94105. United is a "provider of mental health[2]" and manages behavioral health services for UnitedHealth Group.

[2] 2018 Statement of Information of United Behavioral Health, Document G063267, Filed September 26, 2018.

4

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

It is responsible for payment of claims related to behavioral services covered under health plans sponsored or administered by UnitedHealth Group or its many wholly owned and controlled subsidiaries, including United Healthcare. None of the subsidiary companies are independent, rather they all act in concert to maximize profits for the shareholders of UnitedHealth Group.

39.     Defendant MultiPlan, Inc. is a New York Corporation with its principle place of business located at 115 5th Avenue, New York, NY 10003. Viant, Inc., is a Nevada corporation and wholly owned subsidiary of MultiPlan. MultiPlan has several wholly owned and controlled subsidiaries, including Viant, all of which act in concert to maximize profits for MultiPlan.

*Other Interested Parties*

40.     Apple, Inc. ("Apple") is a California corporation with its principal place of business at 1 Infinite Loop, Cupertino, California 95014, in Santa Clara County. Apple has over 47,000 employees in the United States.

41.     Apple sponsors an employer funded health plan for its employees. The Apple plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.  Health benefits under the Apple plan are administered by United.

42.     Tesla, Inc. ("Tesla") is a Delaware corporation with its principal place of business at 3500 Deer Creek Road, Palo Alto, California 94304, in Santa Clara County. Tesla has more than 48,000 employees in the United States.

43.     Tesla sponsors an employer funded health plan for its employees. The Tesla plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Health benefits under the Tesla plan are administered by United.

**Jurisdiction and Venue**

44.     At least one Plaintiff is diverse from the Defendants and the amount in controversy exceeds $5,000,000. Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) as the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action where at least one member of a class of plaintiffs is a citizen of a State different from any defendant.

45.     The claims asserted involve matters of interstate and national interest, and the claims at issue arise under federal law.

46.     This court has personal jurisdiction over Defendants because United and/or its subsidiaries maintain offices and transact business across the State of California, including at corporate offices within this jurisdiction. United transacts business in California in such volume that it is at home in this jurisdiction, and subject to the personal jurisdiction of this court.

47.     This court has personal jurisdiction over MultiPlan because MultiPlan and/or its subsidiaries transact business so frequently and with such regularity in Northern California that they avail themselves to the protections of California's laws, are at home in this jurisdiction, and subject to the personal jurisdiction of this court.

48.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965: a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this Judicial District and one or more of the Defendants conducts a substantial amount of business in this Judicial District.

**Facts**

*Summary of the Facts*

49.     Plaintiffs sought treatment for behavioral health disorders, including for mental health and substance use disorders, from licensed, accredited, out-of-network treatment providers.

50.     Plaintiffs received this treatment from the providers.

51.     Plaintiffs were all members of active health insurance policies offering out of network benefits that United either sold and underwrote or administered on behalf of employers.

52.     Plaintiffs' claims for the out-of-network treatment they received were timely and appropriately submitted to United.

53.     None of the claims were denied; however, every claim was underpaid by United.

54.     The Plaintiffs paid underpayment amount to their treatment providers out of their own funds and resources.

55.     United was required to pay each and every of these claims at the usual, customary, and reasonable rate. That is, it was required to pay an amount based on the competitive fees of similar MH/SUD treatment providers in the same geographic area. This rate is also referred to as "UCR" in this complaint.

56.     All of the MH/SUD treatment provided to Plaintiffs was medically necessary.

57.     Claims for all of the MH/SUD treatment were timely and appropriately submitted to United.

58.     None of the claims were denied and all of the claims were under-paid.

59.     United was required to pay for Plaintiffs' treatment based on the usual, customary, and reasonable rate ("UCR"). UCR is a commonly accepted term in the healthcare industry and means generally, the competitive rate charged by similar providers of the same specialty in the same geographic area.

60.     The FAIR Health database, described in more detail in the following sections, allows the public, including Plaintiffs, plans, and others, to estimate the UCR for treatment in a specific geographical area.

61.     United, for many years, until on or about 2015, was legally required to use the FAIR Health database to calculate UCR in its payment of claims for reasons discussed in more detail below.

62.     The significant differences between the publicly available FAIR Health estimates and actual payments provide compelling evidence that the Plaintiffs' claims were not paid based on the UCR.

63.     Patients, such as Plaintiffs, rely on their health insurance to properly pay claims for treatment that they receive. The full costs of MH/SUD treatment can be substantial and patients depend on their health insurance to shoulder their portion of the cost.

64.     Such is the case with the claims at issue in this litigation.

65.     For all the claims here, the Plaintiffs' claims were paid by United at less than the UCR based amount they were promised and was promised to their MH/SUD providers.

66.     After Plaintiffs received MH/SUD treatment, their providers' billing departments transcribed their medical charts into standardized billing codes, created invoices with standard charges, medical coding, patient demographics, and submitted the invoices electronically to United via interstate wire communications.

67.     Detailed examples for each Plaintiff are provided in following sections.

68.     Every claim at issue was approved for payment, hence this case is about the rate of payment, not the right to payment which was already conceded by United when it underpaid the claim.

69.     Every claim at issue received an underpayment. Examples of underpayments to each Plaintiff are set forth in the following sections.

70.     Instead of paying a "reasonable" rate for Plaintiffs' claims, the Defendants utilized Viant's methodology to fabricate a fraudulent UCR rate and withhold a substantial part of the payment owed for Plaintiffs' claims.

71.     Both United and MultiPlan had management and control over how Viant's methodology was employed to underpay the claims as set forth in more detail in the following sections.

72.     Every claim at issue was paid at a rate well below the UCR in violation of plan terms.

73.     The federal RICO enterprise formed between United and MultiPlan used Viant's methodology to justify the fraudulent withholding of most of the payment owed on each and every claim at issue, thereby directly and proximately injuring Plaintiffs in their person and property.

74.     United and MultiPlan exercised management and control over the enterprise as set forth in more detail in the following sections.

75.     Defendants used the enterprise to fraudulently represent to Plaintiffs and others that the rate paid was the UCR rate, using the wires for telephone calls and other communications and the mail by sending explanation of benefits ("EOBs") and Patient Advocate Department ("PAD") letters to Plaintiffs.

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

76.    It was represented to Plaintiffs that their claims were paid based on the UCR rate, as required according to their plans, that the rate was commensurate with the rates paid similar providers in the same geographic area, and that their MH/SUD providers charged more than similar providers in the same geographic area.

77.    Multiple acts of racketeering activity were committed by Defendants against each of the Plaintiffs as set forth in more detail in the following sections.

78.    United and MultiPlan both profited from their participation in the enterprise.

79.    Specifically, the members of the enterprise retained some or all of the amount by which the Plaintiffs and others' claims were underpaid.

80.    The purpose of the enterprise was for Defendants to profit from the underpayments on these claims.

81.    The Defendants acted in concert to achieve this and the enterprise was under their common control as set forth in detail in the following sections.

82.    The rate generated by Viant's methodology is significantly less than the UCR amount.

83.    United and MultiPlan retained the difference between these two amounts, at the direct expense of the Plaintiffs who paid this amount to their providers.

*Usual, Customary, and Reasonable Rate ("UCR")*

84.    For every claim at issue, Plaintiffs claims were required to be paid at the usual, customary, and reasonable rate, the UCR.

85.    UCR rates are a fixture of the managed care payment system in the United States. When doctors, hospitals or other healthcare providers are out of network and do not have contracts with health insurance companies, claims for their out-of-network services are usually required to be paid at UCR rates.

9

86.     The Centers for Medicare Services (CMS), defines UCR as: "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."[3]

87.     Consumers choose to pay more in the form of higher premiums because they value the ability to receive treatment from out-of-network providers.

88.     Insurance consumers and healthcare providers depend on insurers' good faith calculation of UCR rates. Insurance consumers depend on the ability to determine their expected out-of-pocket costs when choosing an out-of-network provider. Out-of-network providers depend on the ability to determine their expected payment from the patient and their insurer.

89.     Where, as here, a scheme exists to fraudulently misrepresent the UCR, patients, such as Plaintiffs, bear the burden when they pay their providers the amount of the underpayment. Plaintiffs have been damaged in the amounts of the underpayment that they paid to their providers for the MH/SUD services they received. Specifically, Plaintiffs' claims for intensive outpatient program treatment ("IOP") were substantially underpaid.

*Intensive Outpatient Program Treatment*

90.     Intensive Outpatient Programs ("IOPs") are an important tool in traditional behavioral health treatment. IOP is a non-residential, semi-structured level of care that is typically rendered pursuant to a schedule that allows patients to reintegrate into society by returning to work, school, and other functions of daily life. Often, IOP programs are designed to be a support system for patients reintegrating into society from higher, more structured levels of care, such as residential inpatient treatment and partial hospitalization programs.

91.     IOP is a step-down level of care.  Typically, a patient transitions to the IOP level of care after spending a month or more at higher, more structured levels of care such as detoxification, residential inpatient treatment, and partial hospitalization program treatment.

---

[3] Healthcare.gov "Usual Customary or Reasonable"
https://www.healthcare.gov/glossary/UCR-usual-customary-and-reasonable/ (accessed March 20, 2020)

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

92.     Interestingly, United typically does not refer healthcare claims for higher levels of care, such as residential inpatient and partial hospitalization, to MultiPlan for processing. In cases where it does, MultiPlan does not use Viant's methodology to determine the payment amount, meaning the claim gets paid at a much higher rate, a rate that better approximates UCR, and is usually a rate that is acceptable to patients and providers.

93.     Yet, for intensive outpatient treatment, one of the most the most common services provided and billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United frequently sends the claims to MultiPlan who uses Viant's methodologies to process them using the illegal methodologies alleged in this complaint and described in greater detail in the following sections.

94.     Prior to 2019, United defined IOP as "a structured IOP program that maintains hours of service generally 9-19 hours per week […] in an outpatient setting […] to provide education, treatment, and the opportunity to practice new skills outside the program […] focused on addressing the member's condition to the point that the member can be safely, efficiently and effectively transitioned to a lower level of care."[4] According to the guidelines "An Intensive Outpatient Program can be used to treat substance-related disorders or can specialize in the treatment of co-occurring mental health and substance-related disorders." *Id*.

95.     Starting in January 2019, after their guidelines were ruled illegal in *Wit, et al. v United Behavioral Health* (Case No. 14-cv-02346-JCS, N.D. Cal.), United transitioned to the American Society of Addiction Medicine's ("ASAM") level of care guidelines to define its IOP criteria for substance abuse.[5] ASAM classifies IOP as ASAM Level of Care 2.1. Services may be delivered in any appropriate setting that meets state licensure or certification requirements. According to ASAM, IOP care is rendered by a team of appropriately credentialed addiction

---

[4] Optum, United Behavioral Health "Level of Care Guidelines," Doc. No. BH803LOCG052018, pp. 9-10, 19. Effective 05/28/2018

[5] United Healthcare, "Behavioral Health Level of Care Guidelines," https://www.uhcprovider.com/en/health-plans-by-state/tennessee-health-plans/tn-comm-plan-home/tn-cp-behavioral-health.html (last accessed March 20, 2020)

treatment professionals including counselors, psychologists, social workers, addiction-credentialed physicians, and program staff, many of whom have cross-training to aid in interpreting mental disorders and deliver intensive outpatient services. Services are typically offered for at least 9 hours per week. The goal of IOP treatment is to provide a support system including medical, psychological, psychiatric, laboratory, and toxicology. Elements of IOP treatment include counseling, educational groups, occupational and recreational therapy, psychotherapy, Medication Assisted Treatment ("MAT"), motivational interviewing, enhancement and engagement strategies, family therapy, or other skilled treatment services.[6]

*Federal RICO Allegations*

96.     The racketeering acts taken by the Defendant's federal RICO enterprise have their origin in United's past use of the illegal Ingenix scheme.

The Ingenix Precursor

97.     The enterprise formed between United and MultiPlan seeks to reproduce the Ingenix scheme that led United to pay $400 million in settlements in 2009.

98.     This time around, instead of using internally flawed and biased databases as was done with Ingenix, United has employed MultiPlan to play the role of Ingenix and in so doing they have created a federal RICO enterprise.

99.     The New York Attorney General's investigation into Ingenix "uncovered a fraudulent and conflict-of-interest ridden reimbursement system affecting millions of patients and their families and costing Americans hundreds of millions of dollars in unexpected and unjust medical costs."[7]

---

[6] Medicaid Innovation Accelerator Program, "Overview of Substance Use Disorder (SUD) Care Clinical Guidelines: A Resource for States Developing SUD Delivery System Reforms," pp 7, 8, April 2017

[7] Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges, NY AG Press Release, October 27, 2009. https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-reform-consumer (last visited September 16, 2020).

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

100.    In 2009 United Healthcare and its affiliates paid $400 million to settle cases arising from the same conduct. Three hundred fifty million dollars was paid to settle a class action against those entities. Another fifty million dollars was paid for the establishment of the FAIR Health database and website. The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[8] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[9]

101.    Also in 2009, the Office of the Attorney General for the State of New York announced the results of its investigation into Ingenix in a landmark agreement entitled "Assurance of Discontinuance Under Executive Law § 63(15)" ("Assurance Order"). According to the Assurance Order, the payment rates compiled by Ingenix were based on a "conflict of interest." As the Attorney General concluded that the system "meant to reimburse consumers fairly as a reflection of the market is[,] instead[,] wholly owned and operated by the [insurance] industry" who have an "incentive to manipulate the data they submit to Ingenix so as to depress reimbursement rates they determine using the Ingenix schedules, given their own reimbursement obligations toward consumers."

102.    The rates generated by Ingenix were inadequate because: 1) Ingenix did not audit the data provided by insurers to make sure that the charges properly reflect what providers actually charged in the marketplace; 2) Ingenix used statistically invalid "edits" to exclude a disproportionate amount of high charges from its UCR calculations; and 3) Ingenix "lumped" charges for the same service together regardless of whether the service was provided by a certified specialist with many years of experience or a less experienced provider such that the aggregate UCR rate calculated by the database was artificially low.

---

[8] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009, Pg. 14, term no. 4.4:
https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[9] Id.

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

103.    Although this matter did not ultimately go to a jury, the allegations clearly show that this conduct was intentional.

104.    The Assurance Order required the insurance industry to cease using the Ingenix database and create a "new, independent database, not controlled by any insurer, to be used for determining fair and accurate reimbursement rates." The Assurance Order also established a "Healthcare Information Transparency Website" to inform and educate the public about reimbursement rates.

105.    This "new" database was funded by United ($50 million), Aetna ($20 million), Wellpoint ($10 million), Cigna ($10 million), MVP Health Care Inc. ($535,000), Independent Health ($475,000), and HealthNow ($212,500). Out of this settlement, the independent not-for-profit "FAIR Health, Inc." (which stands for "Fair and Independent Research") was created.

106.    When the settlement was announced, Thomas L. Strickland, at the time the Executive Vice President and Chief Legal Officer of UnitedHealth Group, stated: "We are committed to increasing the amount of useful information available in the health care marketplace so that people can make informed decisions, and this agreement is consistent with that approach and philosophy…We are pleased that a not-for-profit entity will play this important role for the marketplace."[10]

107.    Unfortunately, for healthcare providers and the insurance buying public, United's legal obligations under the Assurance Agreement to utilize Fair Health and pay out of network claims at a fair rate predicated upon UCR terminated five years after the creation of Fair Health, in or about 2015.

108.    Not long after the termination of its obligations under the Assurance Agreement, United reverted to its old tricks.  Free of the terms of the settlement and a court order requiring it pay out of network healthcare providers using a UCR rate, but aware of the scrutiny it would receive for creating its own database again, United sought out the services of a third party,

---

[10] Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars, NY OAG Press Release January 13, 2009.

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

MultiPlan, to perpetrate the same fraud.  That is what this case is about, at its essence:  the substitution of Multiplan and Viant for Ingenix.

109.    The present litigation differs from the prior litigation in that the methodology employed by MultiPlan through Viant now plays the role formerly filled by the Ingenix databases.[11] By incorporating MultiPlan and Viant's methodology into the fraud, United's attempt to avoid liability has instead created a RICO enterprise.

*The RICO Enterprise*

The Defendants formed a RICO Enterprise to Fraudulently Avoid Paying the Usual, Customary, and Reasonable Rates for Reimbursements for IOP Services

110.    It is well established that "RICO is widely regarded as a broad statute; indeed, RICOs text itself 'provides that its terms are to be "liberally construed to effectuate its remedial purposes."'" *Boyle v. United States*, 556 U.S. 938, 944 (2009).[12] RICO's breadth of language and construction is particularly evident in the enterprise concept. Included within the definition of enterprise is "*any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added).

111.    Defendants, United and MultiPlan, have associated to form an ongoing informal organization, with the common purpose of engaging in a course of conduct, including the development and implementation of a scheme to fraudulently underpay out-of-network IOP services.

112.    Defendants joined together to create and exploit a false and fraudulently manipulated database as an excuse for under-reimbursing Plaintiffs for services provided, to the Defendants' financial benefit.

---

[11] See "Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars" (Jan. 13, 2009), available at https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-health-insurance-reform-ends (last accessed June 19, 2020)

[12] *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985) ("RICO is to be read broadly.").

113.    The presence or absence of a commercial contract between United and MultiPlan is irrelevant.

114.    An association does not stop becoming an association because the relationships between its members are documented in a contract, nor does anything in the definition of enterprise insulate from liability those whose common purpose includes some legal activity. RICO's definition of enterprise "include[s] both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *United States v. Turkette*, 452 U.S. 576, 580-81 (1981). *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) ("Yet Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its consequences.") (internal citation omitted).

115.    The enterprise between United and MultiPlan is the vehicle for the illegal, racketeering activity of mail and wire fraud. Examples of these activities performed at the direction of both Defendants are set forth in the following sections for every Plaintiff.

116.    The Defendants share a common purpose in performing these activities, to gain financial benefits as the direct result of the fraudulent scheme.

117.    Both Defendants worked together to develop the false and fraudulent UCR rates that were applied to out-of-network IOP claims.

118.    This is clearly set forth in use and development of internal non-public "Whitepapers" described in the following sections. The Whitepapers provided the roadmap that United and MultiPlan jointly developed to produce specific, fraudulent, UCR rates.

119.    United determined the fraudulent rates for under-payment that would be presented as UCR, showing its management over the enterprise, and MultiPlan developed the methodology employed through Viant to achieve United's low rates, without regard to actual usual and customary rates.

120.    United's management of the enterprise is also shown by the fraudulent information United provided when it verified each Plaintiffs' out-of-network rates to their treatment providers.

121.   United "verified" that it would pay the UCR reasonable rate for services knowing that it would never do so. United's communication of these same fraudulent representations over the wires and by the mail also show its management over the enterprise.

122.   United's issuing of the actual under-payment for the Plaintiffs' and other IOP claims shows its management over the scheme.

123.   United and MultiPlan's PAD letters sent to Plaintiffs with both of their names in the letterhead, containing multiple, demonstrably false representations, show their joint management of the scheme.

124.   For all of these under-payments, United compensates MultiPlan based on the amount by which the claims are underpaid.

125.   Plaintiffs and other IOP patients have a property interest in their claims and the right to be repaid in the amount they paid to their providers that should have been paid by United.

126.   Underpaying the claims by fraudulent means deprives Plaintiffs and other patients of their property.

127.   United and MultiPlan have profited and continue to profit from this fraud.

128.   The Enterprise is the vehicle for Defendants' fraudulent acts of racketeering activity.

129.   United profits by fraudulently retaining money that should be paid for IOP treatment.

130.   MultiPlan profits when United pays it for successfully implementing Viant's fraudulent methodology.

131.   MultiPlan's implementation of Viant's methodology to further the fraudulent scheme and further the purpose of the enterprise shows MultiPlan's management over the enterprise.

132.   Further, there are relationships among the entities associated with the enterprise.

133.   United contracts with MultiPlan to provide a fig leaf of legitimacy to their activities.

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

1

2

134.     United and MultiPlan coordinate their efforts in undertaking the racketeering activities.

3

4

135.     United and MultiPlan share the money obtained from Plaintiffs and other victims of the scheme.

5

6

136.     The relationships between United and MultiPlan are sufficient to permit them to pursue the enterprise's purpose.

7

8

137.     The enterprise functions as a continuing unit. These relationships between United and MultiPlan continue to the present and the enterprise continues to pursue its purpose.

9

The FAIR Health Database

10

11

138.     United could have avoided this litigation if they had employed an actual UCR methodology in determining out-of-network IOP rates.

12

13

14

15

139.     The creation of the FAIR Health database was intended to provide one such methodology. At the time of its creation, New York Attorney General Andrew Cuomo believed that the FAIR Health database would solve the inherent conflicts of interest that plagued the Ingenix databases.

16

17

18

19

20

21

22

140.     The FAIR Health database claims "to provide reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[13] No providers submit pricing information, only insurers do so. FAIR Health claims that it then uses "information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients."[14] New York, Connecticut and many other states use the FAIR Health database as a guidepost for healthcare consumer protection.

23

24

25

141.     The purpose and intent behind the establishment of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments, as was done using Ingenix.

26

27

28

[13] FAIR Health Consumer, "About FAIR Health," accessed at https://www.fairhealthconsumer.org/#about, last accessed June 19, 2020

[14] *Id*.

142.     As set forth earlier, United had utilized the Ingenix databases to significantly under reimburse valid claims. This is the exact same conduct United and MultiPlan are accused of committing in this complaint.

143.     In past litigation, United has asserted to courts that FAIR Health "analyzes and groups medical procedures by codes, the geographical area where the procedures were performed, and the amount charged by the providers. This database is often used by private health insurers to calculate the "usual and customary" fee for specific procedures and inform the amounts that they will be willing to pay to out-of-network providers." *UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 145 (N.Y. Sup. Ct. 2015).

144.     United was required to use FAIR Health's UCR methodology until the expiry of the settlement agreement with the New York Attorney General.[15]

145.     United began using FAIR Health in 2011 and did so, as required, until 2015.[16]

146.     The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[17] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[18]

147.     When the FAIR Health requirement expired in or about 2015, United began planning to resurrect the fraudulent scheme by forming an enterprise with MultiPlan wherein MultiPlan assumed the functions previously performed by Ingenix, with its wholly owned subsidiary Viant's methodology standing in for the Ingenix databases.

---

[15] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009:
https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[16] Id.

[17] Id.

[18] *Id.*

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

148.    As Plaintiffs billed less for IOP treatment than the similar providers in the same geographic area, the Plaintiffs UCR rate is equal to 100% of that providers' billed charges. The FAIR Health benchmark amounts allow providers such as Plaintiffs to compare their billed charges to the billed charges of other, similar providers in the same geographic area. When billed charges are less than the FAIR Health benchmark amounts, the provider will expect to be paid at 100% of billed charges. When a provider's charges exceed the FAIR Health benchmark, the provider can estimate what they will be paid based on the appropriate FAIR Health benchmark.

149.    The goal of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments. Defendants' methodology produced rates ranging from 11% to 25% of the FAIR Health benchmark. Plaintiffs do not assert that FAIR Health is the only possible method for determining UCR; rather, it is an accepted method for determining UCR. That Defendants' scheme generates rates ranging from 11% to 25% of the comparable FAIR Health benchmark shows that Defendants' payment rate is not reflective of UCR as illustrated by the following chart.



* FAIR Health 80th Percentile payment data for code H0015 and each Plaintiff's zip-code was accessed at https://www.fairhealthconsumer.org/medical/zip (last accessed June 18th, 2020).

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

150.    United and Viant's employees responsible for Outpatient Review (OPR) had FAIR Health data loaded onto their virtual "Toolbox" in their in-house claims routing system known colloquially at Multiplan and Viant as "FRED",  and  they could have properly applied FAIR Health benchmark pricing at any time,  but they consciously chose not to do so. Instead, they employed a fraudulent, underpayment scheme that damaged providers and Plaintiffs in their persons and property.

151.    United represents to the general public that where payment for out-of-network services is to be made at the usual and customary rate, United "most commonly refer[s] to a schedule of charges created by FAIR Health, Inc. ('FAIR Health') to determine the amount of the payment."[19]

152.    As described more fully in the following sections, this statement is demonstrably false.

The Underpayment Scheme's Mechanics

153.    Instead of reimbursing IOP claims, including Plaintiffs, at UCR rates, United deployed a scheme to underpay claims for its own benefit, and for the benefit of its associates, forming an enterprise with MultiPlan to reap profits from underpaying claims.

154.    MultiPlan aided and abetted United in developing and deploying this scheme.

155.    MultiPlan knew that United would and did use the mail and wires in interstate communications and that such communications would be fraudulent as more fully set out throughout the Complaint.

156.    MultiPlan aided and abetted United in these fraudulent, interstate communications using the mail and wires through its role in the RICO Enterprise.

157.    MultiPlan knew that such mail fraud had been and was being committed in furtherance of the scheme to defraud.

158.    This scheme injured not only Plaintiffs but all patients whose plans covered out-of-network providers of IOP services.

---

[19] https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last visited June 10, 2020).

159.   The goals of United's scheme were to pocket the difference between the fair and reasonable price of healthcare (the UCR) and the underpaid amount; for United to retain funds that should have been paid for IOP claims; to eliminate competition between contracting and non-contracting IOP providers; to push non-contracting providers into unfavorable contracts with United; and to avoid liability for the scheme (the "underpayment scheme").

160.   United conspired with MultiPlan Inc. to perpetrate the underpayment scheme.

161.   MultiPlan Inc. promotes itself across the health insurance industry as an unregulated cost management company. MultiPlan offers a menu of services for "cost control." Some of the above services are legitimate, but others are fraudulent.

162.   MultiPlan offers a host of mechanisms for "cost control." It has an internal engine, known within the company as FRED. FRED takes inputs from the claims United forwards to it, and routes them to the chosen repricing tool. Publicly, Viant summarizes its methodology as follows: a tool to evaluate "outpatient claims for opportunities to reduce the charges to levels that are usually charged by the provider and customarily charged by similar providers in the area for equivalent services" based on "on payer-established parameters."[20]

163.   In reality, however, Viant's calculations and methodology are not completely or even partially transparent: *i.e.* they are deliberately opaque. Viant uses a complex methodology implemented by a proprietary software engine designed to cull the lowest possible number from a flawed, proprietary database of healthcare claims data that is wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area.

164.   Despite having access to the largest database of provider data in the country, FAIR Health, at the click of button, Viant does not utilize the FAIR Health database's charge data.

165.   Viant does not utilize the FAIR Health data because, as the database is widely accessible, as designed, doing so would make Viant's fraudulent manipulations readily apparent.

---

[20]MultiPlan Payer Resource Center: "Viant Facility Usual & Customary Review" https://www.multiplan.com/payers/resourcecenter/salescenter/pdfs/MKT5101_Viant_Facility_UC_Review.pdf. Last accessed September 21, 2020.

166.    Instead, Viant utilizes a much less robust and more easily manipulated data set in its underpayment methodology. Viant's methodology recalls the passage from Mark Twain's *Autobiography*, quoting Benjamin Disraeli, "[t]here are three kinds of lies: lies, damned lies, and statistics."

167.    Viant's methodology thus operates by culling data from a "Outpatient Standard Analytical File" ("SAF"). An SAF is composed of data that are collected from Medicare Part B providers for services rendered to Medicare beneficiaries by the Department of Health and Human Services (DHHs) / Centers for Medicaid and Medicaid Services (CMS).

168.    Using a SAF from CMS to fabricate a UCR rate is improper for numerous reasons. First, the patient demographics of Medicare patients will differ significantly from and not be representative of the patient demographics in the commercial market. Second, the MH/SUD facilities that provide IOP treatment to patients with commercial insurance will not be 'similar' to those that may provide IOP treatment to a Medicare beneficiary. Facilities providing IOP treatment to a Medicare beneficiary have no reasonable expectation that they will be paid for IOP treatment as Medicare does not provide coverage for IOP treatment.

169.    These expectations and agreements are set forth in greater detail as to each Plaintiff in the following sections. Facilities providing IOP treatment to patients with commercial insurance expect to be paid by the payer for the IOP treatment they provide. Further, the facilities submitting Medicare claims will be institutional providers such as hospitals and home health agencies that are licensed to accept Medicare. IOP treatment providers are not licensed to accept Medicare and cannot be licensed to accept Medicare for IOP treatment because Medicare does not reimburse IOP treatment. Mental health facilities and treatment providers have different licenses than do medical and surgical facilities and providers. Third, the SAF does not provide rates based on the provider's geographic location; instead, it provides a *national* number. Geographic location is an essential component of the UCR rate.

170.    The claims information in the SAF does not include the provider's charge data, the claims data only includes the amounts paid on the claim. As IOP claims are not covered or

paid under Medicare, the SAF file will not show any payments for IOP treatment and thus be completely unsuitable for determining appropriate IOP rates.

171.    IOP treatment falls under HCPCS[21] code H0015: "Alcohol and/or drug services; intensive outpatient (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment, counseling; crisis intervention, and activity therapies or education."[22]

172.    The SAF data are particularly ill-suited and susceptible to manipulation for IOP treatment because HCPCS code H0015 is not even a service covered or paid for by Medicare hence there is little to no data for H0015 in the SAF. Any data for H0015 that is present will not be a representative sample because it will only reflect H0015 claims for Medicare beneficiaries and no H0015 claims are covered by Medicare.

173.    As such, the SAF, comprised of data from providers treating Medicare beneficiaries will not provide an accurate representation of IOP providers as the HCPCS code applicable to IOP treatment is not eligible to be paid by Medicare.

174.    As the SAF contains no charge data for services that Medicare does not cover, the SAF has no data about the IOP services at issue in this case.

175.    Instead of using FAIR Health that does contain actual data for HCPCS H0015, the Viant methodology "crosswalks" the healthcare claims. "Crosswalking" is technical jargon for the process of using rates for one service to come up with or fill-in rates for another service.

176.    FRED uses crosswalking to fill gaps when it does not have enough data to come up with a valid output number. This is the act opposite of using a UCR calculation, such as FAIR

---

[21] "HCPCS is a collection of standardized codes that represent medical procedures, supplies, products and  services. The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers." *HCPCS (HCPCS - Healthcare Common Procedure Coding System) – Synopsis*, https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/HCPCS/index.html (last visited September 23, 2020).

[22] https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/Alpha-Numeric-HCPCS-Items/2020-Alpha-Numeric-HCPCS-File (last visited September 23, 2020).

Health, which would be based on actual data from actual providers, something both MultiPlan and United have at their literal fingertips if they were to choose to use it.

177.    The Viant methodology's crosswalking, reflects a subjective decision that is directed by United and implemented by MultiPlan. The crosswalking is not subject to independent review, scrutiny, or oversight.

178.    The crosswalking is wholly unnecessary given the presence of FAIR Health and the other data available to United and Viant.

179.    MultiPlan does not disclose or even admit to the data "proxies" it uses in Viant's methodology.

180.    The "proxies" are selected by MultiPlan based on direction given by United and used by the Viant methodology to provide fraudulently low payment amounts.

181.    The direction given by United and implementation undertaken by MultiPlan shows that both United and MultiPlan exercised management and direction over the RICO enterprise.

182.    MultiPlan, as payment for access to the Viant methodology, receives a percentage of the difference between a fair and reasonable rate (the UCR) and the artificially low number Viant delivers as a rate of payment.

183.    For all of the claims here, United conspired with MultiPlan to utilize Viant to generate and pay artificially depressed rates with no resemblance to the methodology United claimed to have used in mailed correspondence, electronic correspondence, its published media, and telephone conversations with Plaintiffs and/or their representatives.

184.    Plaintiffs were harmed in their person and property by Defendants' scheme. They paid the underpayment amount to their IOP treatment providers when that amount should have been paid by United, and they were lied to by the Defendants who told them that the rates being paid were consistent with an objective calculation of usual, customary, and reasonable rates, and that it was their providers who were charging substantially more than other, similar providers in the same geographic area.

185.     Plaintiffs bring this suit to recover their damages for these payments they made that they should not have been obligated to make, to enjoin Defendants from continuing their fraud, and to ensure appropriate damages are levied against Defendants for their racketeering enterprise such that the verdict shall be precautionary for all payers contemplating using the false and fraudulent pricing tool.

Claims Submission

186.     The Plaintiffs' claims were all submitted to United following substantially similar processes. The claims submission process operated as follows: the providers' billing departments translated patients' medical charts into standardized billing codes, created invoices with standard charges, coding and patient demographics, and submitted the invoices electronically to United.

187.     The invoices were all submitted using standardized claims forms UB-04 forms. Every claim at issue in this case was submitted directly to United through an electronic clearinghouse to the unique United Payer ID.

188.     The claims were submitted both electronically using an Electronic Data Interchange ("EDI") process, by facsimile, or by mail.

189.     After receiving the claims, they were processed, approved for payment, the payment amount was determined, and the claims were paid with accompanying notes about how much the patient owed and United's explanation for the amount it paid. Additionally, the patients received PAD letters from United and MultiPlan stating that their providers' billed charges exceeded the UCR and that the patients could owe their providers the difference. United used MultiPlan's Viant methodology in a scheme to underpay Plaintiffs' claims for Defendants' benefit.

Rates of Payment

190.     When United processed the claims at issue in this case, it had to decide how much it would pay for services.

191.     Instead of deciding how much to pay internally, and despite having hundreds of millions of lines of claim data and years of claims history to reference, a database of payment

information it paid to create, and its own in-house data analytics company, United outsourced the task of claims pricing.

192.     United knew that it was required to pay Plaintiffs' out-of-network IOP claims based on rates equivalent to amounts charged for similar services by similar providers in patients' treating providers' geographic areas.

193.     However, instead of using the FAIR Health Database or its own internal data, United used MultiPlan to produce rates. The lower the rate that MultiPlan produced, the more money MultiPlan was paid.

194.     MultiPlan offered a menu of pricing tools that it knew would be used to produce fraudulently depressed payment rates for the UCR for IOP services.

195.     For all of the claims at issue here, United and MultiPlan agreed to use the Viant methodology instead of one of MultiPlan's other, legitimate services.

196.     United deliberately avoided using MultiPlan's legitimate services because those services priced claims at rates higher than what United wanted pay. United opted to use Viant's methodology because it knew, based on meetings between United and MultiPlan, that the payment rates Viant's methodology would produce would be artificially low.

<u>Viant's Methodology</u>

197.     The following summary represents a high-level overview of the Viant methodology for pricing claims:

198.     The pricing process starts with United forwarding a claim to MultiPlan. At its sole discretion, United chooses which claims to price internally, which claims to send for one of MultiPlan's other, legitimate, pricing services, and which claims to price through Viant.

199.     United sends claim information to MultiPlan via a software "electronic data interchange" program ( "EDI"). The EDI process allowed United to communicate several critical inputs to MultiPlan:

- Claims Information (Policy Type, Charge Amount, CPT/HCPCS Codes)
- Designated Repricing Tool (Data iSight, Negotiations, Viant, Rental Networks, or some combination of those tools)

27

- The Benchmark "target price" for the claim (i.e. the benchmark price that determined MultiPlan's compensation); or

- The percentile (usually 60% or 40%) of the manipulated, "crosswalked" SAF database to use to set a benchmark rate (explained below).

200.    Once MultiPlan received information from UHC, it started the repricing process by sending UHC's inputs through its "Claims Savings Engine" known internally as FRED which routed the claim to Viant.

201.    At issue here are only claims sent to Viant for repricing.

Viant Facility Outpatient Review: "Viant OPR"

202.    The Viant Outpatient Review or "Viant OPR" is the methodology that was employed to provide the false appearance of legitimacy to the underpayment amount.

203.    Viant OPR compared the claims sent to it with "similar" claims in the SAF.

204.    The fatal flaw however, as set forth above, was that the SAF contained no "similar" claims.

Standard Analytical Files

205.    The backbone of the Viant OPR tool is the "Standard Analytical File" or "SAF." The SAF is a collection of the claims data from every claim submitted to Medicare during a several year period, anonymized then condensed into a single database. Within that database are amounts that every hospital and facility charged for the services they provided to Medicare beneficiaries. Viant's OPR uses the amounts those Medicare facilities charge to determine its rates.

206.    The SAF does not contain any charge information from intensive outpatient substance use providers, like those whose claims are at issue here. The SAF does not contain any charge data for non-participating providers. Those two gaps in the SAF file make the Viant OPR system a bad fit for repricing the claims at issue here, because there was no data in the database for Viant to manipulate, and because a database that includes only Medicare participating providers is categorically faulty when the database is used to price claims for Medicare non-participating providers.

207.    When the Viant OPR engine did not have any data from the SAF to reprice claims, Viant's software engineers, in effect, made it up. Software engineers, not clinicians, would decide on services that were "close-enough" to the billed services, and then use the "close-enough" services' rates to reprice claims. The process of finding the "close-enough" service was known internally at MultiPlan as "Crosswalking." Crosswalking was undisclosed, inaccurate, and inappropriate for services that Medicare does not cover.

208.    Even when Viant made-up a rate, that still wasn't good enough. Viant would still apply the percentile chosen by United (usually 60% or 40%) to lower the rate even more.

209.    Viant never disclosed how or why it chose the specific services it did that were "close enough" to IOP services.

210.    When Viant chose what services were "close enough" to IOP, it also used a nation-wide median rate. That meant that Viant did not adjust the rate based on geographic inputs. Every time Viant claimed that geography was a factor in pricing of the IOP services for claims such as Plaintiffs', it was lying.

211.    Every time MultiPlan made a representation that the Viant OPR rates it paid were based on those of similar IOP providers in a similar geographic area, it was lying, because the services were not the same.

212.    MultiPlan had complete control over the technical methodology of the Viant tool, how it implemented the inputs and changes requested by United, and how it used its control to manipulate and misrepresent rates for its own benefit, for the purpose of making as much money as possible.

Target Pricing: Meet or Beat

213.    In addition to the corrupted Viant methodology, United sent Viant a "target rate" for each claim. The "target rate" is United's arbitrarily selected rate for IOP treatment. United sent MultiPlan the target rate for each claim at issue in this litigation. The target rate thus became the benchmark amount to be paid for the IOP claim.

214.    Within MultiPlan this was known as a "meet or beat" price. In all cases, United had complete control over the Target Price and MultiPlan had complete control over its use in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the Viant methodology. The following flow chart summarizes the process Defendants use to illegally price the claims:



215.     The Viant methodology's imperative was to beat United's Target Price. MultiPlan was compensated based on if and by how much it could undershoot that benchmark. Typically, MultiPlan pocketed at least 4% of the "savings" amount, or the difference between the Target Price and the amount a provider was actually paid. The dollar amount that United ultimately paid for the claims in this case was the lowest of three numbers: Target Price, Billed Amount, or Viant produced rate. In every case, the compensation structure agreed upon between MultiPlan and United incentivized artificially low rate and, invariably, the application of the Viant produced rate. Once the Viant methodology yielded its supposedly data-backed rate, it returned the rate information to United via the EDI. United or its subsidiary then issued under-

payment to the Plaintiffs' providers for their claims at the rate "derived" from the Viant methodology.

216.    While United would represent, among other things, that the Viant methodology derived rate was comparable to, and based on, what similar providers in in the same geographic area charged or accepted for the same or similar services, in fact the purpose of the scheme was to produce a rate that was neither reasonable nor customary.

MultiPlan and the Viant Methodology

217.    MultiPlan actively offered the Viant methodology to United as a product capable of underpaying claims with minimal provider pushback. MultiPlan knew and explained to United that the Viant methodology could provide the appearance of legitimacy and offer cover for the fraudulent underpayment of IOP claims. United believed that the "independent" Viant methodology could shield it from liability as compared to what had happened with Ingenix even though the scheme was the same. MultiPlan and United worked out the details of their racketeering activities and created their enterprise to carry out their racketeering activities through, among other things, in person meetings and events and documents called Whitepapers.

MultiPlan's Secret Annual Events

*Meetings of the Enterprise*

218.    MultiPlan secretly discussed the Viant OPR Review methodology with United at annual events hosted by the Client Advisory Board of MultiPlan ("CAB"). The "CAB" consists of the senior marketing individuals at MultiPlan including Susan Mohler, MultiPlan's Vice President of Marketing, and Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network Strategy Network and Michael McEttrick, the Vice President Healthcare Economics.

219.    At these events, United and MultiPlan and Multiplan's other customers would come together, at various locations around the country, to discuss, among other topics, the Viant repricing scheme and how to make more money off it.

220.    These secret meetings established a forum for United and others to engage in Enterprises with MultiPlan to suppress the rates paid to healthcare providers.

31

221.    During these events, MultiPlan presented slide shows outlining the profits or "savings" that could made using Viant methodology.

222.    The Viant methodology is specifically designed to be adapted and customized based on input and direction from the insurer and these events and the Road Shows described below allowed United and its competitors to discuss the customizations they wanted in the pricing with MultiPlan, directly.

223.    Both United and MultiPlan had management and oversight of the RICO enterprise that they formed to use Viant's methodology in their racketeering activities.

224.    The CAB emphasized the "liability shield" provided by Viant methodology and the ability of the insurer to direct underpayments from behind the fig leaf.

225.    The CAB emphasized that MultiPlan's healthcare repricing tools were unregulated.

226.    The absence of regulation allowed United and MultiPlan to jointly develop the underpayment scheme unfettered.

227.    United partnered with MultiPlan to use the Viant methodology so that the "UCR" rate produced through Viant's methodology could be presented as "independent" and "defensible," permitting United and other insurers to abdicate their responsibility for the derived rates.  All of this was hyperbole meant to hide the fraud.

228.    MultiPlan emphasized to United at these meetings that if they were ever subject to pushback or scrutiny about their UCR rates, they needed only to point to the unregulated Viant methodology and assert that they relied on Viant's use of mysterious "objective" and "data-backed" pricing methodology, the details of which, of course, were never revealed.

229.    Strategies were discussed for how to handle situations where dissatisfied patients and/or providers pushed back or challenged the amount. In such situations, the Viant methodology and rate was deceitfully presented to them as a "fair" and "transparent" justification for the underpayment.

230.    MultiPlan and United depended on keeping the actual terms and methodology of Viant secret.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### MultiPlan's Secret Road Shows

*Further Meetings of the Enterprise*

231.    MultiPlan's CAB, including representatives Susan Mohler of MultiPlan and Dale White, MultiPlan's Executive Vice President of Sales, also brought secret "Road Shows" or client status updates mixed with sales pitches directly to United and presented PowerPoint slideshows detailing the profits that could be realized by insurers using the Viant pricing methodologies.

232.    During the Road Shows and in subsequent interactions, The CAB produced detailed descriptions of Viant's methodology through internal non-public "Whitepapers" and sought input from United on how it would like its claims routed through the myriad MultiPlan payment engines, including Viant OPR, to achieve the most profits for United.

233.    Representatives of United and MultiPlan discussed the OPR Review pricing methodology in detail at these Road Shows and other ways to illegally lower the rates paid for healthcare services to patients with United representatives such as Rebecca Paradise, the Vice President of Out of Network Payment Strategies at United.

234.    The Whitepapers are essential to the implementation of the scheme and formation of the enterprise between United and MultiPlan to carry out their racketeering and other illegal activities and were developed through the collaboration of United and MultiPlan.

### The Secret Internal Whitepapers

235.    MultiPlan's marketing and sales departments, including Jaqueline Kienzle, Vice President of Sales and Account Management at MultiPlan, and manager of United's account, Susan Mohler and Dale White provided United with these internal non-public Whitepapers. The Whitepapers were created by the Multiplan marketing department and Multiplan's data engineers.

236.    Whitepapers are secret internal documents that explain, in detail, exactly how the Viant methodology could be implemented to output literally any payment price United wanted

and achieve for any result, regardless of what the language of the patients health plan actually was.

237.    Executives from United including Rebecca Paradise, the Vice President of Out of Network Payment Strategies, reviewed, commented, and provided feedback on MultiPlan's Whitepapers in order to structure United's relationship with MultiPlan and implement the Viant methodology to underpay claims and violate plan language in whatever manner would make the most money for United and Multiplan.

238.    United's representatives provided direction to MultiPlan such that MultiPlan would revise its Whitepapers to ensure that the Viant methodology would underpay claims in violation of plan language such as those of the Plaintiffs.

239.    The Whitepapers explain that United would set performance standards which were defined by Target Prices. MultiPlan would use Viant to derive a price under the Target Price. United would pay MultiPlan a percentage of the "savings" generated by use of the Viant methodology.

240.    The Whitepapers also explain that United could represent "savings" to its customers that were not the actual amounts it paid the healthcare services at.

241.    As such, these jointly developed Whitepapers provide a partial blueprint of the Enterprise, the vehicle that would be used to carry out the fraudulent racketeering acts that directly damaged Plaintiffs through the underpayment of valid, medically necessary IOP claims.

<u>The Network Access Agreement</u>

242.    The National Network Access Agreement ("Agreement") is a written contract between United and MultiPlan the sets out how United and MultiPlan will profit from the proceeds of the Viant underpayments.

243.    Rebecca Paradise of United and Jaqueline Kienzle of MultiPlan are the custodians of this Agreement.

244.    Exhibits and Amendments to this Agreement detail the fee and incentive structure between the parties and how United compensates MultiPlan for access to the Viant

methodology.  It also discusses how MultiPlan receives a percentage of the margin between the target rate and the artificially low number Viant delivers as a rate of payment.

245.    Although a benign legal contract between business on its face, the Agreement actually serves as convenient cover and a vehicle for the parties to share the ill-gotten gains of the Viant pricing methodology.

*RICO Predicate Acts & ERISA Violations*

246.    As demonstrated for each Plaintiff below, there were multiple acts of racketeering activity directed at each of the Plaintiffs and each of the Plaintiffs was directly and proximately injured as a result of the Defendants' racketeering activities.

LD

247.    At all relevant times, LD was a full-time employee of Apple and a participant in an employer funded benefits plan offered by Apple and subject to ERISA.

248.    At all relevant times, health benefits for LD's Apple benefits plan were administered by United.

249.    At all relevant times, LD was actively enrolled in a United PPO plan which offered out of network benefits for behavioral health services, including IOP treatment.

250.    In 2018, LD was diagnosed with ICD-10 Code F.10.20, or "Alcohol Use Disorder." Soon thereafter, LD sought treatment at Summit Estate, Inc. ("Summit Estate"), a duly licensed and accredited out of network behavioral health provider located in Los Gatos, CA, in Santa Clara County.

251.    LD's Apple United PPO Plan in effect at the time of his treatment provides that when Covered Health Services other than pharmaceutical products are provided by an out-of-network provider, Eligible Expenses are determined based on "available data resources of competitive fees in that geographic area." The specific Plan provision describing the reimbursement methodology for out-of-network services states the following:

252.    When Covered Health Services are provided by an out-of-network provider, Eligible Expenses are determined, based on:

35

*LD, et al. v. United, et al. – SECOND AMENDED CLASS ACTION COMPLAINT*

- Negotiated Rates agreed to by the out-of-network provider and either UHC or one of UHC's vendors, affiliates or subcontractors, at UHC's discretion.

- If rates have not been negotiated, then one of the following applies:

   o For Covered Health Services other than Pharmaceutical Products, Eligible Expenses are determined based on available data resources of competitive fees in that geographic area.

   o When Covered Health Services are Pharmaceutical Products, Eligible Expenses are determined based on 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market.

   o When a rate is not published by CMS for the service, UnitedHealthcare uses a gap methodology established by OptumInsight and/or a third party vendor that uses a relative value scale.  The relative value scale is usually based on the difficulty, time, work, risk and resources of the service.  If the relative value scale currently in use becomes no longer available, UnitedHealthcare will use a comparable scale(s).

253.   Summit Estate does not have a negotiated rate with UHC or any of its vendors, affiliates, or subcontractors.

254.   IOP services are not Pharmaceutical Products. The Plan describes pharmaceutical products as growth hormone therapy and prescription drugs that can be obtained only with a prescription written by a qualified physician.

255.   The Plan provides that "When you receive care through an out-of-network provider, the plan pays 70 percent of Eligible Expenses after the out-of-network deductible is met." The Plan further provides that "[i]f you do not have access to UHC preferred network providers in your residential area, contact UHC Member Services at 866-348-1286.  UHC can help you find network providers or make arrangements to have your out-of-network claim paid at the network level of benefits."

256. The Plan provides that "[i]f you choose a UHC network provider, the plan pays 90 percent of your costs for most other services, after a $300 per person (or a maximum of $900 per family) deductible."

257. The Plan sets forth an annual out-of-pocket maximum of $4000 for each person or $8000 for a family, and provides that "[a]fter the maximum has been reached, the plan pays 100 percent of eligible costs."

258. LD had already reached his annual out-of-pocket maximum by the time he began IOP treatment at Summit Estate in July of 2019.

259. Prior to admitting to treatment, to ascertain the precise financial responsibility LD would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Summit Estate called United on at the number listed on the back of LD's insurance card. During this call, United's representative verified that LD had active benefits for out of network behavioral health treatment, and represented that the plan would pay 90% of UCR rates until LD's out of pocket cost sharing responsibilities ("out of pocket maximum"), such as deductibles and co-insurance, were met. United specified these out of pocket amounts and further stated that once these were fully satisfied, United would pay 100% of UCR rates. During this call, United's representative stated that UCR would be paid based on the 80th percentile of charges for similar services in the geographic area.

260. Summit Estate's charge for IOP services is $2,156 per diem.

261. The Fair Health 80th percentile of IOP services in Summit Estate's zip code is $2,576 per diem.

262. Based upon United's many assurances regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, LD decided to attend treatment at Summit Estate and paid, in full and up front, all out of pocket cost sharing expenses, such as the deductible and co-insurance, in order to take full advantage of the maximum benefit available: 100% of UCR rates. But United did not pay the rate set forth in the Plan and that had been confirmed on the verification call.

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

263.     Between 7/29/2019 and 12/31/2019, across two treatment episodes, LD received 30 days of IOP behavioral health treatment services at Summit Estate.

264.     After LD received treatment, Summit Estate submitted timely invoices to United seeking payment pursuant to the terms stated on the verification call LD's employee benefit plan. Suddenly and without warning, United caused those claims to be sent to its agent, MultiPlan, for repricing. As a result of Viant's repricing, United allowed only $8,733.60 of  $64,687.50 billed to United for LD's IOP services, or 13.5% of the billed charges. The allowed amount includes DB's out of pocket payments, in addition to United's payments.

265.     Because of United and MultiPlan, LD has been denied the full benefits available under the Apple benefit plan and has been damaged in the amount he has paid out of pocket for treatment services that should have been paid by United..

266.     For example, LD submitted a claim for IOP services received from Summit Estate on September 12, 2019 to United in the amount of $2,156.25. That claim should have been reimbursed under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees for similar services in the same geographic region.

267.     United, through MultiPlan's Viant, imposed a $1,865.13 reduction below what the Apple Plan required to be reimbursed, and paid only $291.12 on the claim. The EOB issued by United indicates that the patient responsibility is $1,865.13, and offers no explanation for the gross departure from the out-of-network reimbursement methodology required by the Plan.

268.     The only information provided by United in the EOB regarding the underpaid reimbursement amount was the remark code of "CY." Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the EOB were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

269.   The "CY" notation statement admits that 1) United lied on the verification call to the Plaintiff's provider and that 2) MultiPlan derived the payment using hidden methodology that has no relationship to the Plaintiff's actual benefit plan. In fact, none of that information is used by MultiPlan when it calculates prices. The information was further false because, as explained throughout this complaint, the data MultiPlan through Viant uses to price these claims is <u>not</u> based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

270.   Importantly, for the higher levels of services provided to this Plaintiff by their provider, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit plan, 90% or 100% based on UCR. This incongruity highlights the fraud present in the payment of IOP claims.

271.   IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment. Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method United and MultiPlan were going to use to price the claim.

272.   At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider.

273.   The Plaintiff has been directly harmed by this underpayment.

274.   United and MultiPlan's use of Viant to underprice the claim deprived the Plaintiff of property – money – that the Plaintiff paid to the provider that should have been paid by United to the provider for this claim. Moreover, this money had already been paid to United through the Plaintiff's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

275.   LD, and Summit estate on behalf of LD have made numerous, more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available.

276.   LD has been forced to enter into and make payments on a payment plan with Summit Estate for amounts that should have been covered by United.

277.   LD would not have sought treatment for behavioral health if LD had known that the benefits would be repriced by MultiPlan using Viant.

DB

278.   At all relevant times, DB was a full-time employee of Apple and a participant in an employer funded benefits plan offered by Apple which is subject to ERISA.

279.   At all relevant times, health benefits for the Apple plan were administered by United.

280.   At all relevant times, DB was actively enrolled in a United PPO plan which offered out of network benefits for behavioral health services, including IOP treatment.

281.   In 2018, DB was diagnosed with ICD-10 Code F.10.20, or "Alcohol Use Disorder." Soon thereafter, DB sought treatment at Summit Estate in Los Gatos, CA, in Santa Clara County.

282.   DB's treatment spans two Plan years, 2018-2019.

283.   DB's 2018 Apple United PPO Plan provides that out-of-network services are reimbursed based on UCR rates. The specific plan provision describing the reimbursement methodology for out-of-network services in the 2018 Plan states the following:

Usual, Customary, and Reasonable Rates

UCR stands for the usual, customary, and reasonable rates for health care services provided in your geographic region.  Apple's health plan administrators review and establish these "going rates."  Whenever you use out-of-network providers, the percentage of benefits paid will be based on UCR rates.  For example, if a provider bills you more than what UnitedHealthcare (UHC) or MetLife determines is usual, customary, and reasonable, you pay the difference. By accepting UCR rates as allowable fees, apple lets providers know it will not pay excessive charges.

You can find out if your doctor or dentist is charging more than the UCR rate by requesting the following information before seeking treatment:

- The Current Procedural Terminology (CPT) code for the treatment you seek.
- The doctor's or dentist's anticipated fees for the treatment.
- Your provider's billing zip code.

You can call your health plan's member services department or refer to www.fairhealth.org to find out if your providers fees are within the UCR guidelines.

284.   The 2018 Plan provides that "When you receive care through an out-of-network provider, the plan pays 70 percent of Eligible Expenses after the out-of-network deductible is met, and benefits are paid based on usual, customary, and reasonable (UCR) rates."

285.   The 2018 Plan further provides that "[i]f you do not have access to UHC preferred network providers in your residential area, contact UHC Member Services at 866-348-1286. UHC can help you find network providers or make arrangements to have your out-of-network claim paid at the network level of benefits."

286.   The 2018 Plan provides that "[i]f you choose a UHC network provider, the plan pays 90 percent of your costs for most other services, after a $300 per person (or a maximum of $900 per family) deductible."

287.   The 2018 Plan sets forth an annual out-of-pocket maximum of $4000 for each person or $8000 for a family, and provides that "[a]fter the maximum has been reached, the plan pays 100 percent of eligible costs."

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

288.    DB's 2019 Apple United PPO Plan provides that when Covered Health Services other than pharmaceutical products are provided by an out-of-network provider, Eligible Expenses are determined based on "available data resources of competitive fees in that geographic area." The specific Plan provision describing the reimbursement methodology for out-of-network services states the following:

When Covered Health Services are provided by an out-of-network provider, Eligible Expenses are determined, based on:

- Negotiated Rates agreed to by the out-of-network provider and either UHC or one of UHC's vendors, affiliates or subcontractors, at UHC's discretion.

- If rates have not been negotiated, then one of the following applies:

    o For Covered Health Services other than Pharmaceutical Products, Eligible Expenses are determined based on available data resources of competitive fees in that geographic area.

    o When Covered Health Services are Pharmaceutical Products, Eligible Expenses are determined based on 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market.

    o When a rate is not published by CMS for the service, UnitedHealthcare uses a gap methodology established by OptumInsight and/or a third-party vendor that uses a relative value scale. The relative value scale is usually based on the difficulty, time, work, risk and resources of the service. If the relative value scale currently in use becomes no longer available, UnitedHealthcare will use a comparable scale(s).

289.    Summit Estate does not have a negotiated rate with UHC or any of its vendors, affiliates, or subcontractors.

290.    IOP services are not Pharmaceutical Products. The Plan describes pharmaceutical products as growth hormone therapy and prescription drugs that can be obtained only with a prescription written by a qualified physician.

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

291.     The 2019 Plan provides that "When you receive care through an out-of-network provider, the plan pays 70 percent of Eligible Expenses after the out-of-network deductible is met." The Plan further provides that "[i]f you do not have access to UHC preferred network providers in your residential area, contact UHC Member Services at 866-348-1286. UHC can help you find network providers or make arrangements to have your out-of-network claim paid at the network level of benefits."

292.     The 2019 Plan provides that "[i]f you choose a UHC network provider, the plan pays 90 percent of your costs for most other services, after a $300 per person (or a maximum of $900 per family) deductible."

293.     The 2019 Plan sets forth an annual out-of-pocket maximum of $4000 for each person or $8000 for a family, and provides that "[a]fter the maximum has been reached, the plan pays 100 percent of eligible costs."

294.     DB had already reached his annual out-of-pocket maximums for both of the plan years by the time he began IOP treatment at Summit Estate in November of 2018 and the spring of 2019.

295.     Prior to admitting to treatment, to ascertain the precise financial responsibility DB would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Summit Estate called United on at the number listed on the back of DB's insurance card. During this call, United's representative verified that DB had active benefits for out of network behavioral health treatment, and represented that the plan would pay 90% of UCR once DB's out of pocket cost sharing responsibilities ("out of pocket maximum"), such as deductibles and co-insurance, were met.  United specified these out of pocket amounts and further stated that once these were fully satisfied, United would pay 100% of UCR rates. During this call, United's representative stated that UCR would be paid based on the 80th percentile of charges for similar services in the geographic area.

296.     Summit Estate's full billed charges for IOP services in 2018 was $1,875 per diem.

297.     The Fair Health 80th percentile of charges for similar services in the geographic area for IOP services in Summit Estate's zip code in 2018 was $2,576 per diem.

298.   Summit Estate's full billed charges for IOP services in 2019 was $2,156 per diem.

299.   The Fair Health 80th percentile of charges for similar services in the geographic area for IOP services in Summit Estate's zip code in 2019 was $2,576 per diem.

300.   Based upon United's many assurances regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, DB decided to attend treatment at Summit Estate and paid, in full and up front, all out of pocket cost sharing expenses, such as the deductible and co-insurance, in order to take full advantage of the maximum benefit available: 100% of UCR. But United did not pay the rate set forth in the Plan and that had been confirmed on the verification call.

301.   Between 11/26/2018 and 4/11/2019, across two treatment episodes, DB received 51 days of IOP behavioral health treatment services at Summit Estate.

302.   After DB received treatment, Summit Estate submitted timely invoices to United seeking payment pursuant to the terms stated on the verification call DB's employee benefit plan. Without warning, United caused those claims to be sent to its agent, MultiPlan, for repricing. As a result of the repricing utilizing Viant, United allowed only $9,375.00 of the $112,316.28 billed to United for IOP services, or 8.3% of the billed charges. The allowed amount includes DB's out of pocket costs.

303.   Because of United and MultiPlan, DB has been denied the full benefits available under the Apple and has been damaged in the amount he has paid out of pocket for treatment services that should have been paid by United.

304.   For example, DB submitted a claim for IOP services received from Summit Estate on April 9, 2019 to United in the amount of $2,156.25. That claim should have been reimbursed under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees of other providers of the same service in the same geographic region based on available data resources, *i.e.*, FAIR Health.

305.   United, through the Viant methodology, imposed a $1,889.78 reduction below what the Apple Plan required to be reimbursed, and paid only $266.47 on the claim. The EOB issued by United misleadingly does not list any patient responsibility, and offers no explanation

for the gross departure from the out-of-network reimbursement methodology required by the Plan.

306.    The only information provided by United in the EOB regarding the underpaid reimbursement amount was the remark code of "CY."  Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the EOB were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

307.    Importantly, for the higher levels of services provided to this Plaintiff by their provider, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit plan, 80% or 100% based on UCR. This incongruity highlights the fraud present in the payment of IOP claims.

308.    IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment. Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method United and MultiPlan were going to use to price the claim.

309.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, United and MultiPlan have

unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider.

310.    The Plaintiff has been directly harmed by this underpayment.

311.    United and MultiPlan's use of Viant to underprice the claim deprived the Plaintiff of property – money – that the Plaintiff paid to the provider that should have been paid by United to the provider for this claim. Moreover, this money had already been paid to United through the Plaintiff's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

312.    DB, and Summit estate on behalf of DB have both made numerous, more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available.

313.    DB has been forced to enter into and make payments on a payment plan with Summit Estate for amounts that should have been covered by United.

314.    DB would not have sought treatment for behavioral health if DB had known that the benefits would be repriced by MultiPlan through Viant.

<u>BW</u>

315.    At all relevant times, BW was a full-time employee of Apple and a participant in an employer funded benefits plan offered by Apple which is subject to ERISA.

316.    At all relevant times, health benefits for the Apple plan were administered by United.

317.    At all relevant times, BW was actively enrolled in a United PPO plan which offered out of network benefits for behavioral health services, including IOP treatment.

318.    In 2018, BW was diagnosed with ICD-10 Code F.10.20, or "Alcohol Use Disorder."  Soon thereafter, BW sought treatment at Summit Estate, Inc. located in Los Gatos, CA, in Santa Clara County.

319.    BW's Apple United PPO Plan in effect at the time of his treatment provides that when Covered Health Services other than pharmaceutical products are provided by an out-of-network provider, Eligible Expenses are determined based on "available data resources of

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

competitive fees in that geographic area."   The specific Plan provision describing the reimbursement methodology for out-of-network services states the following:

> When Covered Health Services are provided by an out-of-network provider, Eligible Expenses are determined, based on:
>
> - Negotiated Rates agreed to by the out-of-network provider and either UHC or one of UHC's vendors, affiliates or subcontractors, at UHC's discretion.
>
> - If rates have not been negotiated, then one of the following applies:
>
>   o For Covered Health Services other than Pharmaceutical Products, Eligible Expenses are determined based on available data resources of competitive fees in that geographic area.
>
>   o When Covered Health Services are Pharmaceutical Products, Eligible Expenses are determined based on 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market.
>
>   o When a rate is not published by CMS for the service, UnitedHealthcare uses a gap methodology established by OptumInsight and/or a third party vendor that uses a relative value scale.  The relative value scale is usually based on the difficulty, time, work, risk and resources of the service.  If the relative value scale currently in use becomes no longer available, UnitedHealthcare will use a comparable scale(s).

320.   Summit Estate does not have a negotiated rate with UHC or any of its vendors, affiliates, or subcontractors.

321.   IOP services are not Pharmaceutical Products. The Plan describes pharmaceutical products as growth hormone therapy and prescription drugs that can be obtained only with a prescription written by a qualified physician.

322.   The Plan provides that "When you receive care through an out-of-network provider, the plan pays 70 percent of Eligible Expenses after the out-of-network deductible is met."  The Plan further provides that "[i]f you do not have access to UHC preferred network

47

providers in your residential area, contact UHC Member Services at 866-348-1286.  UHC can help you find network providers or make arrangements to have your out-of-network claim paid at the network level of benefits."

323.    The Plan provides that "[i]f you choose a UHC network provider, the plan pays 90 percent of your costs for most other services, after a $300 per person (or a maximum of $900 per family) deductible."

324.    The Plan sets forth an annual out-of-pocket maximum of $4000 for each person or $8000 for a family, and provides that "[a]fter the maximum has been reached, the plan pays 100 percent of eligible costs."

325.    BW had already reached his annual out-of-pocket maximum by the time he began IOP treatment at Summit Estate in July of 2019.

326.    Prior to admitting to treatment, to ascertain the precise financial responsibility BW would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Summit Estate called United on at the number listed on the back of BW's insurance card.  During this call, United's representative verified that BW had active benefits for out of network behavioral health treatment, and represented that the plan would pay 70% of UCR until BW's out of pocket cost sharing responsibilities ("out of pocket maximum"), such as deductibles and co-insurance, were met. United specified these out of pocket amounts and further stated that once these were fully satisfied, United would pay 100% of UCR. During this call, United's representative stated that UCR would be paid based on the 80th percentile of charges for similar services in the geographic area.

327.    Summit Estate's full billed charges for IOP services is $2,156 per diem.

328.    The Fair Health 80th percentile of charges for similar services in the geographic area for IOP services in Summit Estate's zip code is $2,576 per diem.

329.    Based upon United's many assurances regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, BW decided to attend treatment at Summit Estate and paid, in full and up front, all out of pocket cost sharing expenses, such as the deductible and co-insurance, in order to take full

advantage of the maximum benefit available: 100% of UCR. But United did not pay the rate set forth in the Plan and that had been confirmed on the verification call.

330.    Between 7/29/2019 and 12/31/2019, across two treatment episodes, BW received 26 days of IOP behavioral health treatment services at Summit Estate.

331.    After BW received treatment, Summit Estate submitted timely invoices to United seeking payment pursuant to the terms stated on the verification call BW's employee benefit plan. Without warning, United caused those claims to be sent to its agent, Viant, for repricing. As a result of Viant's repricing, United allowed only $8,046.39 of the $56,062.50 billed to United for IOP services, or 14% of billed charges. The allowed amount includes DB's out of pocket contributions, in addition to the money United paid.

332.    Because of United and Viant, BW has been denied the full benefits available under the Apple benefit plan and has been damaged in the amount he has paid out of pocket for treatment services that should have been paid by United.

333.    BW, and Summit estate on behalf of BW have both made numerous, far more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available.

334.    For example, BW submitted a claim for IOP services received from Summit Estate on August 22, 2019 to United in the amount of $2,156.25. That claim should have been reimbursed under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees of other providers of the same service in the same geographic region based on available data resources, *i.e.*, FAIR Health.

335.    United, through MultiPlan's Viant, imposed a $1,952.47 reduction below what the Apple Plan required to be reimbursed, and paid only $203.78 on the claim. The EOB issued by United indicates that the patient responsibility is $1,952.47, and offers no explanation for the gross departure from the out-of-network reimbursement methodology required by the Plan.

336.    The only information provided by United in the EOB regarding the underpaid reimbursement amount was the remark code of "CY."  Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network

services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the EOB were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

337.    Importantly, for the higher levels of services provided to this Plaintiff by their provider, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit plan, 70% or 100% based on UCR. This incongruity highlights the fraud present in the payment of IOP claims.

338.    IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment. Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method United and MultiPlan were going to use to price the claim.

339.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider.

340.    The Plaintiff has been directly harmed by this underpayment.

341.    United and MultiPlan's use of Viant to underprice the claim deprived the Plaintiff of property – money – that the Plaintiff paid to the provider that should have been paid by United

to the provider for this claim. Moreover, this money had already been paid to United through the Plaintiff's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

342.    BW has been forced to enter into and make payments on a payment plan with Summit Estate for amounts that should have been covered by United.

343.    BW would not have sought treatment for behavioral health if BW had known that the benefits would be repriced by MultiPlan through Viant.

RH

344.    At all relevant times, RH was a full-time employee of Apple, and a participant in an employer funded benefits plan offered by Apple which is subject to ERISA.

345.    At all relevant times, health benefits for the Apple plan were administered by United.

346.    At all relevant times, RH was actively enrolled in a United PPO plan which offered out of network benefits for behavioral health services, including IOP treatment.

347.    In 2018, RH was diagnosed with ICD-10 Code F.10.20, or "Alcohol Use Disorder."  Soon thereafter, RH sought treatment at Summit Estate, Inc. located in Los Gatos, CA, in Santa Clara County.

348.    RH's Apple United PPO Plan in effect at the time of his treatment provides that when Covered Health Services other than pharmaceutical products are provided by an out-of-network provider, Eligible Expenses are determined based on "available data resources of competitive fees in that geographic area." The specific Plan provision describing the reimbursement methodology for out-of-network services states the following:

> When Covered Health Services are provided by an out-of-network provider, Eligible Expenses are determined, based on:
>
> - Negotiated Rates agreed to by the out-of-network provider and either UHC or one of UHC's vendors, affiliates or subcontractors, at UHC's discretion.
> - If rates have not been negotiated, then one of the following applies:

51

- o For Covered Health Services other than Pharmaceutical Products, Eligible Expenses are determined based on available data resources of competitive fees in that geographic area.
- o When Covered Health Services are Pharmaceutical Products, Eligible Expenses are determined based on 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market.
- o When a rate is not published by CMS for the service, UnitedHealthcare uses a gap methodology established by OptumInsight and/or a third party vendor that uses a relative value scale.  The relative value scale is usually based on the difficulty, time, work, risk and resources of the service.  If the relative value scale currently in use becomes no longer available, UnitedHealthcare will use a comparable scale(s).

349.    Summit Estate does not have a negotiated rate with UHC or any of its vendors, affiliates, or subcontractors.

350.    IOP services are not Pharmaceutical Products. The Plan describes pharmaceutical products as growth hormone therapy and prescription drugs that can be obtained only with a prescription written by a qualified physician.

351.    The Plan provides that "When you receive care through an out-of-network provider, the plan pays 70 percent of Eligible Expenses after the out-of-network deductible is met." The Plan further provides that "[i]f you do not have access to UHC preferred network providers in your residential area, contact UHC Member Services at 866-348-1286.  UHC can help you find network providers or make arrangements to have your out-of-network claim paid at the network level of benefits."

352.    The Plan provides that "[i]f you choose a UHC network provider, the plan pays 90 percent of your costs for most other services, after a $300 per person (or a maximum of $900 per family) deductible."

353.    The Plan sets forth an annual out-of-pocket maximum of $4000 for each person or $8000 for a family, and provides that "[a]fter the maximum has been reached, the plan pays 100 percent of eligible costs."

354.    RH had already reached his annual out-of-pocket maximum by the time he began IOP treatment at Summit Estate in July of 2019.

355.    Prior to admitting to treatment, to ascertain the precise financial responsibility RH would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Summit Estate called United on at the number listed on the back of RH's insurance card.  During this call, United's representative verified that RH had active benefits for out of network behavioral health treatment, and represented that the plan would pay 70% of UCR until RH's out of pocket cost sharing responsibilities ("out of pocket maximum"), such as deductibles and co-insurance, were met.  United specified these out of pocket amounts and further stated that once these were fully satisfied, United would pay 100% of UCR rates. During this call, United's representative stated that UCR would be paid based on the 80th percentile of similar services in the geographic area.

356.    Summit Estate's full billed charges for IOP services is $2,156 per diem.

357.    The Fair Health 80th percentile of charges for similar services in the geographic area for IOP services in Summit Estate's zip code is $2,576 per diem.

358.    Based upon United's many assurances regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, RH decided to attend treatment at Summit Estate and paid, in full and up front, all out of pocket cost sharing expenses, such as the deductible and co-insurance, in order to take full advantage of the maximum benefit available: 100% of UCR. But United did not pay the rate set forth in the Plan and that had been confirmed on the verification call.

359.    Between 07/01/2019 and 10/01/2019, RH received 26 days of IOP behavioral health treatment services at Summit Estate.

360.    After RH received treatment, Summit Estate submitted timely invoices to United seeking payment pursuant to the terms stated on the verification call RH's employee benefit plan.

Without warning, United caused those claims to be sent to its agent, MultiPlan's Viant, for repricing. As a result of Viant's repricing, United allowed only $7,569.12 of the $56,062.50 billed to United for IOP services, or 13.5% of billed charges. The allowed amount includes DB's out of pocket payments, in addition to amounts United paid.

361. Because of United and MultiPlan, RH has been denied the full benefits available under the Apple benefit plan and has been damaged in the amount he has paid out of pocket for treatment services that should have been paid by United.

362. For example, RH submitted a claim for IOP services received from Summit Estate on October 10, 2019 to United in the amount of $2,156.25. That claim should have been reimbursed under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees of other providers of the same service in the same geographic region based on available data resources, *i.e.*, FAIR Health.

363. United, through MultiPlan's Viant, imposed a $1952.47 reduction below what the Apple Plan required to be reimbursed, and paid only $203.78 on the claim. The EOB issued by United indicates that the patient responsibility is $1,952.47, and offers no explanation for the gross departure from the out-of-network reimbursement methodology required by the Plan.

364. The only information provided by United in the EOB regarding the underpaid reimbursement amount was the remark code of "CY." Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the EOB were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

365. Importantly, for the higher levels of services provided to this Plaintiff by their provider, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit

plan, 70% or 100% based on UCR. This incongruity highlights the fraud present in the payment of IOP claims.

366.    IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment. Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method United and MultiPlan were going to use to price the claim.

367.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider.

368.    The Plaintiff has been directly harmed by this underpayment.

369.    United and MultiPlan's use of Viant to underprice the claim deprived the Plaintiff of property – money – that the Plaintiff paid to the provider that should have been paid by United to the provider for this claim. Moreover, this money had already been paid to United through the Plaintiff's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

370.    RH, and Summit estate on behalf of RH have both made numerous, far more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available.

371.    RH has been forced to enter into and make payments on a payment plan with Summit Estate for amounts that should have been covered by United.

372.    RH would not have sought treatment for behavioral health if RH had known that the benefits would be repriced by MultiPlan through Viant.

<u>CJ</u>

373.    At all relevant times, CJ was a full-time employee of Tesla, and a participant in an employer funded benefits plan offered by Tesla which is subject to ERISA.

374.    At all relevant times, health benefits for the Tesla plan were administered by United HealthCare ("United").

375.    At all relevant times, CJ was actively enrolled in a United PPO plan which offered out of network benefits for behavioral health services, including IOP treatment. In 2018 CJ was diagnosed with ICD-10 Code F.10.20, or "Alcohol Use Disorder."  Soon thereafter, CJ sought treatment at Summit Estate, Inc. ("Summit Estate"), a duly licensed and accredited out of network behavioral health provider located in Los Gatos, CA, in Santa Clara County.

376.    CJ's Tesla United PPO Plan in effect at the time of his treatment provides that when Covered Health Services other than pharmaceutical products are provided by an out-of-network provider, Eligible Expenses are determined based on "available data resources of competitive fees in that geographic area." The specific Plan provision describing the reimbursement methodology for out-of-network services states the following:

When Covered Health Services are received from a non-network provider, Eligible Expenses are determined, based on:

- Negotiated Rates agreed to by the non-network provider and either UnitedHealthcare or one of UnitedHealthcare's vendors, affiliates or subcontractors, at UnitedHealthcare's discretion.

- If rates have not been negotiated, then one of the following amounts:

    o For Covered Health Services other than Pharmaceutical Products, Eligible Expenses are determined based on available data resources of competitive fees in that geographic area.

    o When Covered Health Services are Pharmaceutical Products, Eligible Expenses are determined based on 110% of the published rates allowed

by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market.

    o   When a rate is not published by CMS for the service, UnitedHealthcare uses a gap methodology established by OptumInsight and/or a third party vendor that uses a relative value scale. The relative value scale is usually based on the difficulty, time, work, risk and resources of the service. If the relative value scale currently in use becomes no longer available, UnitedHealthcare will use a comparable scale(s).

377. Summit Estate does not have a negotiated rate with UHC or any of its vendors, affiliates, or subcontractors.

378. IOP services are not Pharmaceutical Products. The Plan describes pharmaceutical products as products "that are administered on an outpatient basis in a Hospital, Alternative Facility, Physician's office, or in a Covered Person's home. Examples of what would be included under this category are antibiotic injections in the Physician's office or inhaled medication in an Urgent Care Center for treatment of an asthma attack, or Botox when Medically Necessary."

379. The Plan sets forth a schedule of benefits, which states that non-network substance-related and addictive disorder services will be reimbursed at "70% for Partial Hospitalization/Intensive Outpatient Treatment after you meet the Annual Deductible."

380. The Plan sets forth annual non-network out-of-pocket maximums of $3,000 for each person or $6,000 for a family, and provides that "[i]f your eligible out-of-pocket expenses in a calendar year exceed the annual maximum, the Plan pays 100% of Eligible expenses for Covered Health Services through the end of the calendar year."

381. CJ had already reached his annual out-of-pocket maximum by the time he began IOP treatment at Summit Estate in April of 2019.

382. Prior to admitting to treatment, to ascertain the precise financial responsibility CJ would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Summit Estate called United on at the number listed on the back of CJ's insurance card. During this call, United's representative verified that CJ had active benefits for out of network

behavioral health treatment, and represented that the plan would pay 70% of UCR rates until CJ's out of pocket cost sharing responsibilities such as deductibles and co-insurance, were met. United specified these out of pocket amounts and further stated that once these were fully satisfied, United would pay 100% of UCR rates. During this call, United's representative stated that UCR would be paid based on the 80th percentile of charges for similar services in the geographic area.

383.    Summit Estate's full billed charges for IOP services is $2,156 per diem.

384.    The Fair Health 80th percentile of charges for similar services in the geographic area for IOP services in Summit Estate's zip code is $2,576 per diem.

385.    Based upon United's many assurances regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, CJ decided to attend treatment at Summit Estate and paid, in full and up front, all out of pocket cost sharing expenses, such as the deductible and co-insurance, in order to take full advantage of the maximum benefit available: 100% of UCR. But United did not pay the rate set forth in the Plan and that had been confirmed on the verification call.

386.    Between 04/08/2019 and 05/02/2019, CJ received 12 days of IOP behavioral health treatment services at Summit Estate.

387.    After CJ received treatment, Summit Estate submitted timely invoices to United seeking payment pursuant to the terms stated on the verification call CJ's employee benefit plan. Suddenly and without warning, United caused those claims to be sent to its agent, MultiPlan's Viant, for repricing. As a result of Viant's repricing, United allowed only $3,419.49 of the $25,875.00 billed to United for IOP services, or 13.2% of the billed charges. The allowed amount includes CJ's out of pocket costs in addition to amounts paid by United.

388.    Because of United and MultiPlan, CJ has been denied the full benefits available under the Tesla benefit plan and has been damaged in the amount he has paid out of pocket for treatment services that should have been paid by United.

389.    For example, CJ submitted a claim for IOP services received from Summit Estate on April 10, 2019 to United in the amount of $2,156.25. That claim should have been reimbursed

58

under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees of other providers of the same service in the same geographic region based on available data resources, *i.e.*, FAIR Health.

390.    United, through MultiPlan's Viant, imposed a $1,889.78 reduction below what the Apple Plan required to be reimbursed, and paid only $266.47 on the claim. The EOB issued by United misleadingly does not list any patient responsibility, and offers no explanation for the gross departure from the out-of-network reimbursement methodology required by the Plan.

391.    The only information provided by United in the EOB regarding the underpaid reimbursement amount was the remark code of "CY."  Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the EOB were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

392.    Importantly, for the higher levels of services provided to this Plaintiff by their provider, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit plan, 80% or 100% based on UCR. This incongruity highlights the fraud present in the payment of IOP claims.

393.    IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment. Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method United and MultiPlan were going to use to price the claim.

394.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider.

395.    The Plaintiff has been directly harmed by this underpayment.

396.    United and MultiPlan's use of Viant to underprice the claim deprived the Plaintiff of property – money – that the Plaintiff paid to the provider that should have been paid by United to the provider for this claim. Moreover, this money had already been paid to United through the Plaintiff's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

397.    CJ, and Summit estate on behalf of CJ have both made numerous, far more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available.

398.    CJ has been forced to enter into and make payments on a payment plan with Summit Estate for amounts that should have been covered by United.

399.    CJ would not have sought treatment for behavioral health if CJ had known that the benefits would be repriced by MultiPlan through Viant.

<u>The 'Patient Advocacy Department' ("PAD") Letters</u>

400.    Among the clearest indications of the joint management and control of the enterprise is found in the PAD letters, such as the following example, received by Plaintiff B.W., that was sent to each patient by the Defendants:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



401.    These letters have been sent continuously and systematically for more than two years.

402.    These letters were sent across state lines.

403.    The exemplar above was sent to B.W. who received a total of four of these letters

404.    Each Plaintiff received more or two more of these letters.

405.    This letter has been sent to thousands of to IOP patients insured by United.

406.    The letterhead represents both United and MultiPlan's wholly owned and controlled subsidiary Viant.

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

407.    As they jointly appear on the letterhead, this is a strong admission that both Defendants jointly managed the affairs of the Enterprise.

408.    These deceptive and fraudulent letters are among the racketeering predicate acts committed by the Enterprise.

409.    The letter is signed by the deceitfully named "Patient Advocacy Department / Viant."

410.    The letter specifically represents that the claim is paid in compliance with the patient's benefit plan.

411.    The Plans require payment be made based on competitive fees in the same geographic area or, UCR.

412.    This letter clearly shows that payment was not made based on competitive fees in the same geographic area.

413.    This letter is an admission of fraud by United and Viant.

414.    The letter attempts to suggest that the patient's provider charged rates far in excess of what comparable providers in the same geographic areas charged.  This letter implies that the provider charged 7.5 times that of similar providers in the same geographic area. This is demonstrably false as, in the case of this provider, the rates charged are actually at or *below* those of similar providers in the same geographic area based on the FAIR Health database as shown above.

415.    The PAD letters constitute predicate acts of mail fraud for purposes of RICO.

416.    Defendants committed wire or mail fraud each and every time a faulty or inadequate payment was mailed or transmitted to Plaintiffs or their agents.

417.    Defendants worked in concert pursuant to a scheme whereby Defendants knowingly and intentionally did not pay Plaintiffs' claims at a rate based upon UCR, as required. Therefore, Defendants were intentionally defrauding Plaintiffs of amounts due to them for their claims.

418.    As stated succinctly by the Fifth Circuit, completion of the scheme must "depend in some way on the information or documents that passed through the mail." *United States v.*

*Tencer*, 107 F.3d 1120, 1125 (5th Cir.1997). The scheme used the PAD letters to maintain the fraud. As stated by the Supreme Court, "one 'causes' the mails to be used where he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (internal citations and quotation marks omitted).As a member of the RICO Enterprise set forth, Defendant Multiplan knew or should have known that the mail and wires, including the PAD letters and fraudulent UCR rates, would be conveyed through the mail and wires. As such, it is irrelevant whether Multiplan actually communicated with Plaintiffs as they knew or should have known that the acts that they took in furtherance of the scheme would lead to multiple interstate communications that included their fraudulent UCR and other misrepresentations as alleged throughout.

419.    The PAD letters are part of the overall scheme to defraud; they reflect that Defendants worked together, further the illegal objective of the Enterprise, and thus constitute predicate acts of racketeering activity by both Defendants.

420.    The underpayments made to Plaintiffs, although issued by United, also constitute predicate acts by both Defendants as they worked together as part of the scheme to defraud, to create, misrepresent, and pay a fraudulent UCR, to knowingly and intentionally not pay the amounts they were legally required to pay.

421.    To keep this fraud hidden, the patients are discouraged from contacting their employers who issued the plan, their providers or even United and are instead redirected to the enterprise and directed to let the enterprise handle the matter. This is the "liability shield" in action that Viant promised to its Enterprise co-conspirator United.

*RICO Proximate Cause*

422.    Every Plaintiff has been directly injured by Defendants' scheme.

423.    The objective of the scheme is to formulate a fraudulent basis for under reimbursing the Plaintiffs' and IOP claims across the country.

424.    In implementing this scheme, Defendants have underpaid Plaintiffs' and thousands of other's IOP claims.

425.    They have done so on a systematic basis as part of their regular way of doing business and will continue to do so until the legal process forces them to stop.

426.    Plaintiffs and other IOP patients have been directly and proximately injured by Defendants' fraudulent conduct.

427.    Plaintiffs' injuries are not just the foreseeable and natural consequence of Defendants' scheme, they are a clear objective of the scheme.

### *The Continuing Nationwide Pattern and Other Victims Affected*

428.    This Complaint sets forth the manner in which the Enterprise was the vehicle for Plaintiffs' injuries; however, the Enterprise causes damages beyond those done to Plaintiffs that they seek to recover.

429.    The Enterprise also damages the Plaintiffs' and other IOP patients' employers

430.    These damages are separate from the damages to Plaintiffs and other IOP patients.

431.    The Enterprise is used to damage the person and property of patients' employers because it takes the full amount of an IOP providers billed charges from the employer for the IOP claim but does not remit the full amount taken to the IOP provider. Instead, the IOP provider receives an amount that is well below their billed charges and the difference is retained by the Enterprise as their profit.

### *General Allegations to All Counts*

432.    For decades, commercial payors, including United, have purported to reimburse for out-of-network services according to the UCR rates. Reimbursement at UCR rates is so well-established that some states, including California, require certain health plans to reimburse out-of-network services at rates using criteria that parallel the industry-standard for determining UCR. *See, e.g.*, 28 C.C.R. § 1300.71(a)(3)(B) (referring to prevailing provider rates **charged** in the general geographic area in which the services were rendered); Fla. Stat. Ann. § 641.513(5) (referring to "usual and customary provider **charges**" for similar services in the community where the services were provided). Because the industry standard traditionally has been for payment according to the UCR, out-of-network providers and their patients reasonably expect claims to be paid based on UCR.

433.    This understanding and usage was further confirmed during the initial VOB and authorization calls between Plaintiffs' providers and United.

434.    In correspondence received by Plaintiffs, both from United and MultiPlan, as set forth in greater detail below, the Defendants fraudulently represented that the underpayment amount was based on UCR rates.

435.    This representation was deliberate and false.

436.    It is arbitrary, capricious, improper, and a breach of plan terms for United to pay rates other than a true UCR arrived at under a fair methodology.

*The Direct Harm Caused to the Plaintiffs and Class*

437.    All the IOP claims of the Plaintiffs and the class at issue here were underpaid. These are all claims for which out-of-network rates for IOPs are meant to be paid at amounts based on the UCR rate.

438.    United has systematically underpaid the Plaintiffs' and the class' IOP claims since the beginning of the claims period for the present litigation.

439.    United intentionally led Plaintiffs and the Class as well as their treating providers and plans to believe that rates were determined based on a UCR rate.

440.    As alleged above, when Plaintiffs' providers contacted United to verify out-of-network rates during the pre-admission VOB calls, United routinely represented that rates were available at a UCR rate and never stated that the claims would be subject to repricing by MultiPlan through Viant.

441.    Plaintiffs then relied upon United to issue payment to their providers for IOP services at the UCR rate.

442.    Underpayment of Plaintiffs' and other patients' out-of-network IOP claims, directly and proximately Plaintiffs and other patients to then pay the amount underpaid to their providers is a deprivation of their property interest and direct damage to them.

## CLASS ACTION ALLEGATIONS

*The Plaintiff Class*

443.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are satisfied in this case.

444.    Plaintiffs bring this class action on behalf of the Plaintiff Class, defined as:

445.    Any member of a health benefit plan either administered or insured by United whose claims for out-of-network behavioral health treatment, including mental health and/or substance use disorder, were underpaid or repriced by Defendants.

*Rule 23(a)*

Numerosity

446.    This putative plaintiff class includes hundreds of thousands and possibly, millions, of mental health and substance use disorder treatment patients throughout the United States and is therefore so large as to make joinder of all members impracticable within the meaning of Rule 23(a)(1) of the Federal Rules of Civil Procedure.

Commonality

447.    Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are questions of law or fact common to all class members, including, but not limited to, the following:

   a.    Whether the Defendants have underpaid the Plaintiff Class for out-of-network mental health and substance use disorder services based upon improper methodologies for pricing UCR rates;

   b.    Whether the Defendants have breached their fiduciary duties to the Plaintiff class;

   c.    Whether Defendants made false representations to the Plaintiff Class as to how claims for out-of-network mental health and substance use disorder services would be paid;

d.   Whether the Defendants falsely representing the method that was used to pay the claims for out-of-network mental health and substance use disorder services at the time such claims were paid;

e.   Whether the Defendants falsely represented the method that was used to pay the claims for out-of-network mental health and substance use disorder at the time such claims were appealed;

f.   Whether the Defendants falsely represented that the Plaintiff class owed providers amounts which should have been paid by the Defendants, and are not the financial liability of the Plaintiff class;

g.   Whether the improper methodologies and systematic misrepresentations employed by the Defendants made it futile to appeal the claims;

h.   Whether Defendants underpayment constituted as adverse benefit determination;

i.   Whether interest should be added to the payment of unpaid benefits;

j.   Whether Defendants' conduct in California violates California Business and Professions Code § 17200 *et seq*.;

k.   Whether Defendants conduct violates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA);

l.   Whether United's conduct violated their fiduciary duties and/or duty of faith and fair dealing to the Patient Class in employing MultiPlan to reprice claims;

m.   Whether MultiPlan falsely represented to the Patient Class that they represented them.

n.   Whether MultiPlan was the 'agent' of any member of the Patient Class who received IOP mental health and substance use disorder services from providers;

o.   What process and data MultiPlan used in payment determinations;

p.   Whether MultiPlan made fraudulent to representations to the Patient Class regarding their IOP mental health and substance use disorder claims;

q.   Whether United was obligated to pay the claims at the UCR under the terms of the insurance policies;

r.   Whether United revealed the involvement or probable involvement of MultiPlan in claims handling, processing, and/or payment determinations prior to the Patient Class receiving IOP treatment;

s.   Whether MultiPlan received any appeals from the Patient Class or anyone acting on their behalf following benefit determinations;

t.   Defendants' processes for handling appeals following benefit determinations;

u.   What level of treatment was provided to the Patient Class;

v.   What payments were made for the Patient Class' claims;

w.   Whether MultiPlan's Viant methodology adequately and/or accurately applies the relevant UCR in determining benefit amounts;

x.   Whether MultiPlan's Viant pricing data accurately reflect the relevant UCR in the relevant geographical area;

y.   Whether MultiPlan's Viant's repricing actions constitute inappropriate kickbacks

z.   Whether pricing practices comported with the terms of the Patient Class' health benefits and insurance plans;

aa.   Whether MultiPlan was given the members' health benefits and insurance plans.

bb.   Whether MultiPlan utilized the members' health benefit and insurance plans in determining payment amounts;

cc.   Whether United delayed processing appeals;

dd.   Whether MultiPlan's prospective involvement was disclosed in member's benefit plans;

ee.   Whether United breached its fiduciary duty in contracting with MultiPlan for claims pricing;

<u>Typicality</u>

448.   The claims of Plaintiffs are typical of the claims of the defined plaintiff class, within the meaning of Rule 23(a)(3) of the Federal Rules of Civil Procedure, and are based on and arise out of the same uniform and standard illegal practices of the Defendants, as alleged herein by the Plaintiffs. The proposed class representatives state claims for which relief can be

granted that are typical of the claims of absent class members. If litigated individually, the claims of each class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

<u>Adequacy</u>

449.    Plaintiffs are committed to pursuing this action and are prepared to serve the proposed class in a representative capacity with all of the obligations and duties material thereto. They will fairly and adequately represent the interests of the members of the proposed class within the meaning of Rule 23(a)(4) of the Federal Rules of Civil Procedure, and will not have any interests adverse to, or that directly and irrevocably conflict with, the interests of the other class members.

450.    Plaintiffs have retained competent counsel, extremely experienced in class action litigation, which will adequately prosecute this action, and will assert, protect and otherwise well represent the named Class representatives and absent class members.

***Rule 23(b)***

451.    The prosecution of separate actions by individual class members would create a risk of adjudication with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to this action, or could substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

452.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible rights within the Plaintiff Class. Fed. R. Civ. P. 23(b)(1)(A).

453.    The Defendants' actions are generally applicable to the class as a whole, and Plaintiffs seek equitable remedies with respect to the class as a whole, within the meaning of Rule 23(b)(2) of the Federal Rules of Civil Procedure.

454.    The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication

of this controversy, within the meaning of Rule 23(b)(3) of the Federal Rules of Civil Procedure. Common or general proof will be used for each member of the class to establish each element of their claims, as identified above. Additionally, proceeding as a class action is superior to other available methods of adjudication. The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

## Causes of Action

*COUNT I: Violation of RICO, 18 U.S.C. § 1962(c)*

455.    The Plaintiffs re-allege and restate the facts set forth above as if they were fully set forth herein.

456.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

457.    United and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

458.    As set forth above, since at least January 1, 2015, United and MultiPlan have been and continue to be, a part of an association-in-fact RICO enterprise within the meaning of 18 U.S.C. § 1961(4).

459.    The Enterprise is comprised of at least United and MultiPlan.

460.    The Enterprise was and is engaged in activities that span multiple states and affect interstate commerce.

461.    Each of United and MultiPlan have an existence separate and distinct from the Enterprise, in addition to directly participating and acting as a part of the Enterprise.

462.    Each United Defendant and MultiPlan exercise management and/or control over the affairs of the Enterprise.

463.    United and MultiPlan utilize the Viant methodology to obtain fraudulent rates that are then communicated out across state lines using the mail and wires as set forth above.

464.    The Enterprise had, and continue to have, the common and continuing purpose of dramatically underpaying Plaintiffs' and other patients' out-of-network IOP claims in order

70

unlawfully obtain and keep the difference between the appropriate and "reasonable" amount and the underpaid amount for their own benefit and the benefit of the Enterprise.

465.    As set forth above, United and MultiPlan have, since at least January 1, 2015, been, and continue to be, engaged in a scheme to defraud the Plaintiffs and other patients by committing a series of unlawful acts which constitute predicate racketeering acts under 18 U.S.C. §§ 1961(1)(B) and 1962(c), involving multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

466.    Plaintiffs mail and wire fraud allegations as to both Defendants as Plaintiffs have alleged that the mail and wires were used by Defendants as a part of an overall plan to defraud. For in "cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves. In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (internal citations omitted).

467.    Plaintiffs have provided a detailed description of the underlying scheme, the participation of both Defendants, and the connection of the use of mail and wire communications. As such, sufficient predicate acts are pled as to both Defendants.

468.    Further, when evaluating a detailed fraudulent scheme, as alleged *supra*, although Plaintiffs have alleged, in detail, specific use of the mail and wires, still, it is "reasonable to infer that mail and/or telephone communications were used in furtherance of the defendants' scheme." *Beth Israel Med. Ctr. v. Smith*, 576 F. Supp. 1061, 1071 (S.D.N.Y. 1983).

469.    Defendant MultiPlan's actions, as asserted above, in its participation in the sending of 'Patient Advocacy Department' (PAD) letters and in the payment amount constitute necessary predicate acts of racketeering as they are interstate acts of mail and wire fraud.

470.    MultiPlan has also committed the necessary predicate acts of racketeering through its aiding and abetting of mail and wire fraud. Aiding and abetting mail and wire fraud constitutes a predicate act under RICO. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *12 (N.D.

Cal. Oct. 30, 2017); *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 132, 141 (D. Conn. 2014); *Fireman's Fund Ins. Co. v. Plaza Oldsmobile Ltd.*, 600 F. Supp. 1452, 1457 (E.D.N.Y. 1985).

471.    As set out in *In re Volkswagen* cited above, Plaintiffs assert that MultiPlan's aiding and abetting constitutes RICO predicate acts by MultiPlan, as required by the Court in its Order dismissing the 18 U.S.C. 1962(c) cause of action against MultiPlan [Dkt. 73].

472.    Aiding and abetting "comprehends all assistance rendered by words, acts, encouragement, support, or presence." *Reves v. Ernst & Young*, 507 U.S. 170 (1993). Aiding and abetting under 18 U.S.C. § 2 is a RICO predicate act. Under 18 U.S.C. § 2 the defendant is only required to "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *Nye & Nissen*, 336 U.S. 613, 619 (1949) *quoting* L. Hand, J., *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938).

473.    As alleged *supra* MultiPlan has participated in the RICO Enterprise and has acted in such a manner and the intention that the Enterprise succeed.

474.    As a direct and proximate result of United and MultiPlan's violations of 18 U.S.C. § 1962(c), the Plaintiffs were injured, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

### *COUNT II: Violation of RICO Conspiracy, 18 U.S.C. § 1962(d)*

475.    The Plaintiffs reassert and reallege the facts set forth above as if fully set forth herein.

476.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

477.    United and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

478.    As set forth above, since at least January 1, 2015, the Defendants have been, and continue to be, part of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of at least United and MultiPlan.

479.     United and MultiPlan were, and continue to be, associated with the Enterprise and knowingly conspired, within the meaning of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c) by conducting and participating, directly or indirectly, in the management, overseeing, and conduct in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1962(c), including multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, in order to defraud the Plaintiffs and other patients of their obligation and duty to pay usual and customary rates for the out-of-network IOP services they received.

480.     As a direct and proximate result of the RICO Defendants' violations of 18 U.S.C. § 1962(d), the Plaintiffs were injured, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

*COUNT III: Claim for Underpaid Benefits Under Group Plans Governed by ERISA*

481.     The allegations above are hereby repeated as if fully set forth herein.

482.     United violated its legal obligations under ERISA-governed plans and federal common law each time it made the benefit reductions that resulted in the underpayment of the claims at issue.

483.     These underpayments are adverse benefit determinations and are violations of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

484.     In certain employer-funded plans, which are sometimes designated Administrative Services Only or "ASO," United makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to the payment of benefits.

485.     Where United acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, United is liable for underpaid benefits to Plaintiffs and members of the class in both fully insured health plans, where benefits are paid from United's assets, and in employer-funded ASO ERISA health plans.

486.     United further violated its obligations under ERISA when it failed to comply with applicable state laws that require United to pay provider charges using the appropriate methodologies.

487.     United's omissions and lack of disclosure to the Plaintiffs and the Class, its members, violated its legal obligations.

488.     United violated obligations each time it engaged in conduct that discouraged or penalized its members' use of out-of-network providers, such as by making illegal benefit reductions and adverse benefit determinations.

489.     United, as the party which exercised all discretionary authority and control over the administration of the plan of each Plaintiff and Class member including the management and disposition of benefits under the terms of the plan, owed a fiduciary duty to Plaintiffs and the Class.

490.     United breached its fiduciary duties to Plaintiffs and the Class by failing to pay proper out-of-network benefits without justification. United therefore owes, and should be ordered to pay, the benefits that were illegally underpaid based on the policies detailed herein.

491.     Plaintiffs, on their own behalf and on behalf of the members of the Class seek underpaid benefits, recalculated deductible and coinsurance amounts and interest back to the date their claims were originally submitted to United.

492.     Plaintiffs request attorneys' fees, costs, prejudgment interest and other appropriate relief against United.

*COUNT IV: Breach of Plan Provisions in Violation of ERISA § 502(A)(1)(B)*

493.     The allegations above are hereby repeated as if fully set forth herein.

494.     United breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts covered by ERISA healthcare plans to providers in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

495.     United's breaches included, among other things, the misuse of the Viant methodology to improperly calculate UCR and reduce other benefits paid to providers for out-of-network IOP services.

*LD, et al. v. United, et al. – SECOND AMENDED CLASS ACTION COMPLAINT*

496.    Under the terms of its health plans, United administers benefits and is a fiduciary.

497.    In certain employer-funded plans which are sometimes designated ASO, United makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to the payment of benefits.

498.    Where United acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, United is liable for underpaid benefits in both fully insured health plans, where benefits are paid from United's assets, and in employer funded ASO ERISA health plans.

499.    United is liable to the Plaintiffs and the Class as they have overpaid in the amount that United was obligated to pay to providers.

500.    Pursuant to 29 U.S.C. § 1132(a)(l)(B), Plaintiffs and the Class are entitled to recovery for underpaid benefits and declaratory relief relating to United's violation of the terms of its health care plans.

### COUNT V: Violation of Fiduciary Duties of Loyalty and Due Care and Request for Declaratory and Injunctive Relief

501.    The above allegations are hereby repeated as if fully set forth herein.

502.    United acted as a "fiduciary" to Plaintiffs and the Class as such term is understood under 29 U.S.C. § 1002(21)(A).

503.    As an ERISA fiduciary, United owed, and owes, its Members in ERISA plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise.

504.    Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. 29 U.S.C. § 1104(a)(l)(B) and (D).

505.    In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, United violated its fiduciary duty of care.

506.    As an ERISA fiduciary, United owed and owes its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its Members under 29 U.S.C.

§ 1106. United cannot, for example, make benefit determinations for the purpose of saving money at the expense of its Members.

507.     United violated its fiduciary duties of loyalty and due care by, inter alia, making out-of-network benefit reductions and adverse benefit determinations that were not authorized by the plan documents and were also misrepresented on EOBs sent to the Plaintiffs and the Class, causing Plaintiffs and the Class to incur, and pay out of pocket for treatment services that should have been paid by United.

508.     In certain self-insured plans, which are sometimes designated ASO, United makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion with regard to benefits.

509.     Where United acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, United is liable for underpaid benefits to Plaintiffs and the Class in both fully insured health plans, where benefits are paid from United's assets, and in employer-funded ERISA health plans.

510.     United breached its fiduciary duties by sending noncompliant EOBs and other communications to Plaintiffs and the Class.

511.     In addition, United violated (and continues to violate) its fiduciary duty of loyalty by failing to inform Plaintiffs and the Class of material information, including but not limited to flaws in the data and methodology used to determine UCR reimbursement, namely, the UCR reimbursement does not actually reflect a true and accurate UCR.

512.     In fact, by using the U.S. mails and interstate wire facilities, United made representations about UCR and payments for IOP services that it knew were untrue. United knew that both it and Viant made arbitrary and capricious decisions as to "UCR" that did not reflect a true and accurate UCR with United providing financial incentives to MultiPlan that allowed United to pay less than the UCR in violation of the plan terms.

513.     In relying on improper pricing methods, which were noncompliant with its contractual obligations and invalid to make UCR determinations, and in applying, inter alia, a third party repricing agent, MultiPlan's Viant, that was not authorized and nowhere disclosed to

Plaintiffs and the Class in their plan documents, United violated its fiduciary obligations to Plaintiffs and the Class.

514.     Plaintiffs and the Class are entitled to assert a claim for relief for United's violation of its fiduciary duties under 29 U.S.C. § 1132(a)(3), including injunctive and declaratory relief, and its removal as a breaching fiduciary.

*COUNT VI: Claim for Equitable Relief to Enjoin Acts and/or Practices*

515.     The General and Class Allegations are hereby repeated as if fully set forth herein.

516.     Plaintiffs brings this count of their own behalf, and on behalf of the putative class, pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts III through VI are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

517.     Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by United and MultiPlan's breaches of fiduciary duties described in the allegations above and in Counts III through VI above.

518.     Additionally, incorporated into United and MultiPlan's fiduciary duties, is the duty to act at all times in good faith and to deal fairly with Plaintiffs and the Class.

519.     United's duties include, but are not limited to, the duty to act fairly, reasonably and promptly in dealing with their insureds, their agents, and/or representatives for adjusting claims, investigating claims handling and properly paying all claims that United is obligated to pay.

520.     MultiPlan's duties include, but are not limited to, the fiduciary duties assumed by acting as United's agent, the duty to act fairly, reasonably and promptly in dealing with their United's insureds, their agents, and/or representatives, for adjusting claims, investigating claims handling, and properly and promptly returning the claims to United for payment.

521.     In order to remedy these harms, Plaintiffs and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

*COUNT VII: Claim for Other Appropriate Equitable Relief*

522.     The allegations above are hereby repeated as if fully set forth herein.

523.    Plaintiffs brings this count of their own behalf and on behalf of the putative class, pursuant to common law.

524.    The hundreds of thousands, or more, of underpaid claims for out-of-network IOP treatment provided to United's and Empire's insureds are benefits that were conferred upon United.

525.    The Plaintiffs and the Class have been damaged in the amount he has paid out of pocket for treatment services that should have been paid by United. The difference between the appropriate payment based on the UCR rate and the amount that United actually paid is a clear benefit that Plaintiffs and the Class have conferred upon United because they paid monies out of their own pocket that United was obligated to pay.

526.    United retained this benefit failing to reimburse the over-payments made by Plaintiffs and the Class.

527.    Plaintiffs and the Class are owed payments from United as Plaintiffs and the Class were forced to pay their providers for United's shortfall.

528.    Defendants improperly retained the monies that should have been paid for the claims at issue in this cause of action.

529.    It is inequitable to permit Defendants to retain these benefits.

530.    As described in detail supra, the Plaintiffs and the Class relied upon United's assertion in the plan documents and reiterated during lengthy and comprehensive verification of benefits calls that out-of-network claims, when covered, would be paid at the UCR rate as well as the other representations made by Defendants described in detail above.

531.    Coverage is not in dispute or at issue for these claims.

532.    The payment rate of a claim is very material to a patient making decisions about where to seek treatment.

533.    As to reasonable reliance, it is reasonable for United's insureds to rely upon the representations United makes in plan documents and that its agents make during the lengthy verification of benefits calls.

534.     It is also reasonable for United's insureds to rely upon the EOBs and other written correspondence that they received from and on behalf of United and MultiPlan.

535.     Detrimental reliance is clear, the Plaintiffs and the Class relied upon Defendants' representations that reimbursement would be made at the UCR rate. United's failure to reimburse at the UCR rate cause Plaintiffs and the Class to spend their own money to make up for United's underpayments.

536.     Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by Defendants' actions and are entitled to appropriate equitable relief.

**JURY TRIAL DEMAND**

Plaintiffs, on their own behalf and on behalf of the Class, demand a jury trial for all claims so triable.

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment against the Defendants as follows:

1.     Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

2.     Appointing the Plaintiffs as Class Representatives for the Class;

3.     Designating the law firm of Napoli Shkolnik, PLLC, as counsel for the Class;

4.     For general, special, restitutionary and compensatory damages in an amount according to proof.

5.     For treble damages for those claims arising under the Federal RICO Act;

6.     For prejudgment interest on amounts benefits wrongfully withheld.

7.     Injunctive and equitable relief enjoining Defendants from the conduct alleged herein and/or other appropriate equitable relief;

8.     Declaring that United's payments were improper underpayments,

9.     Declaring that United's payment methodologies were and are improper;

10.    Declaring that MultiPlan's benefit determination and negotiation methodologies are improper;

*LD, et al. v. United, et al. – SECOND AMENDED CLASS ACTION COMPLAINT*

11.    Declaring that United and MultiPlan have engaged in an illegal, prohibited, RICO enterprise;

12.    Ordering United to reprocess all underpaid claims using an appropriate methodology;

13.    Ordering United and MultiPlan to provide transparency as to the methodology applied in reprocessing claims and that the methodology be approved by the Court;

14.    For attorney's fees and costs pursuant to statute;

15.    and such other and further relief as the Court may deem appropriate, including but not limited to awarding a surcharge, disgorging Defendants unjust enrichments from their wrongful conduct.

**[SIGNATURE PAGE FOLLOWS]**

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

1        Dated January 15, 2021              NAPOLI SHKOLNIK PLLC

2                                    /s/ _____

3                                    Matthew M. Lavin
                                         Aaron R. Modiano

4

5                                  DL LAW GROUP

6                                  /s/ _____

7                                  David M. Lilienstein
                                  Katie J. Spielman

8                                  *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*LD, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT