1

2

3

4                      UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7   L.D., et al.,                           Case No.  20-cv-02254-YGR   (JCS)

            Plaintiffs,

8

9        v.                                 **ORDER RE MOTION TO COMPEL**

10   UNITED BEHAVIORAL HEALTH, et al.,       Re: Dkt. No. 144

            Defendants.

11

12

13   **I.      INTRODUCTION**

14          The parties filed a joint discovery letter on June 21, 2022 ("June 21 Letter") and a

15   supplemental discovery letter on July 1, 2022 ("July 1 Letter").  The Court ordered full briefing on

16   the privilege disputes addressed in those letters and the briefing is now complete. The Court also

17   ordered Defendant United Behavioral Health ("United") to lodge the 24 documents that are the

18   subject of it clawback demand and the undersigned has reviewed some of those documents *in*

19   *camera*.  A hearing on Plaintiffs' Motion to Compel ("Motion") was held on July 29, 2022.   The

20   Court sets forth below rulings on certain legal issues that bear on the dispute and guidance related

21   to sample documents that the Court has reviewed.

22   **II.     BACKGROUND**

23       **A.    Allegations in the Complaint**

24          The Third Amended Complaint ("TAC") is the operative complaint in this action.  In its

25   January 12, 2022 Order re: Standard of Review, the Court summarized the allegations in the TAC

26   as follows:

27              Plaintiffs are participants in employer-sponsored benefits plans (the
                "Plans"), which are governed by the Employee Retirement Income
                Security Act of 1974 ("ERISA"), 28 U.S.C. § 1001, et seq.1
28              Defendants   are   UnitedHealthcare   Insurance   Company,   United

1    Behavioral Health (collectively with United Healthcare Insurance
     Company, "United"), and MultiPlan, Inc.

2    Plaintiffs allege that United administered the Plans' healthcare
3    benefits. (TAC ¶¶ 250, 281, 323, 353, 383.)  MultiPlan is a cost-
     management company that allegedly helps insurers reduce the
4    amounts they pay providers by "repricing" claims based on
     comparable claims for similar providers in the same geographical
5    area. (*Id.* ¶¶ 11, 218.) Each plaintiff sought treatment at Summit
     Health, Inc., an out-of-network behavioral health provider, claims for
6    which United allegedly underpaid. (*Id.* ¶¶ 266, 309, 339, 369, 397.)
     Based on allegations that United worked with MultiPlan (through its
7    subsidiary Viant) to establish fraudulent rates to yield the lower,
     repriced claims, plaintiffs assert causes of action for, *inter alia*,
8    violations of ERISA and violations of the Racketeer Influenced and
     Corrupt Organizations ("RICO") Act.

9    Dkt. no. 116 at 1-2.

10       **B.    The Joint Discovery Letters and Motion to Compel**

11       In the June 21 Letter, Plaintiffs asked the Court to conduct an *in camera* review of the

12   documents the United Defendants in correspondence to Plaintiffs on April 7, 2022 sought to "claw

13   back" on the basis of attorney-client privilege, "as well as those documents identified by United in

14   their 'Production 12' privilege log."  June 21 Letter at 1 & Exs. 1 ("Clawback" privilege log

15   listing 24 documents), 2 (amended privilege log for Production 12, listing six documents);  *see*

16   *also id.*, Ex. 3 (expanded privilege log with parties' positions re "clawback" documents).  As to

17   the documents United sought to claw back, Plaintiffs represented that they had reviewed those

18   documents prior to receiving United's request and that the primary purpose of those

19   communications was not seeking or supplying legal advice, as is required under *In re Grand Jury*,

20   23 F.4th 1088, 1092 (9th Cir. 2021); instead, Plaintiffs asserted, "they are primarily for the

21   purpose of giving or receiving business advice."  *Id.* at 1-2.

22       Plaintiffs further asserted in the June 21 Letter that United's privilege claims were

23   undermined by the fiduciary exception to attorney-client privilege, which provides that an ERISA

24   fiduciary "may not assert the attorney-client privilege against plan beneficiaries on matters of plan

25   administration."  *Id.* at 2 (citing *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 932-33 (9th

26   Cir. 2012)). According to Plaintiffs, "[t]he payment of benefits due by a plan administrator" is a

27   fiduciary obligation and "adverse benefit determinations, defined in 29 C.F.R. § 2560.503-1,

28   includ[ing] the underpayment of claims, are fiduciary decisions and subject to fiduciary duties."

*Id.* (citing *Hahnemann Univ. Hosp. v. All Shore, Inc*., 514 F.3d 300, 309 (3d Cir. 2008); *Med. Benefits Adm'rs of MD, Inc. v. Sierra R. Co.*, 2007 WL 2914824, at *5 (E.D. Cal. Oct. 5, 2007)). Plaintiffs represent, however, that "United asserts that the process of underpaying claims does not implicate plan administration or their fiduciary duties." *Id.*

To the extent that United relies on the possibility of litigation with respect to documents that address company-wide programs to avoid the fiduciary exception, Plaintiffs contend they have not satisfied the requirement that "either the context (e.g. actual or imminent litigation on the subject of the communication) or the contents of the communications themselves must reflect that they are defensive in nature and relate to advice sought and obtained to determine how far the trustees are 'in peril.'" *Id.* (citing *Wit v. United Behav. Health*, No. 14-CV-02346-JCS, 2016 WL 258604, at *7 (N.D. Cal. Jan. 21, 2016)). Further, Plaintiffs contend, "[a]t the heart of this litigation is . . . the collusion of United and Multiplan to use Viant OPR to perpetuate a fraud against Plaintiffs and putative class members while claiming to have paid their mental health / substance use disorder claims according to plan terms that require payment based upon the usual and customary rates of similar providers in the same geographic area." *Id.* Thus, they assert, the "company-wide programs" that are the basis for United's privilege assertions are the subject of their RICO claims and fall under the crime-fraud exception to attorney-client privilege. *Id.* (citing *In re Grand Jury Investigation,* 810 F.3d 1110, 1113 (9th Cir. 2016)).

Plaintiffs also argue that "[w]ork product privilege is . . . unavailable to justify withholding these documents as none were prepared specifically for litigation." *Id.* at 3 (citing *Fann v. Giant Food, Inc*., 115 F.R.D. 593, 596 (D.D.C. 1987)). Moreover, they assert, the fiduciary exception also applies to the work product doctrine and applies to documents prepared in response to government inquiries. *Id. Solis v. Food Emps. Lab. Rels. Ass'n,*644 F.3d 221, 232 (4th Cir. 2011); *Durand v. Hanover Ins. Grp., Inc*., 244 F. Supp. 3d 594, 611 (W.D. Ky. 2016)). Plaintiffs argue further that it is United's burden to prove that the fiduciary exception does not apply and they have not met that burden. *Id.* (citing *Durand*, 244 F. Supp. 3d at 613). Plaintiffs conclude by asking the Court "to conduct an *in camera* review of the documents withheld or redacted to date as, based upon United's privilege assertion here, Plaintiffs have reason to believe that

withheld documents are likely not subject to either work-product or attorney client privilege and, to the extent such privileges would otherwise apply, the documents should be produced pursuant to the fiduciary exception." *Id.*

Ten days later, on July 1, 2022, the parties submitted another joint discovery letter indicating that the scope of the privilege dispute had expanded as United produced on June 23, 2022 over 8,000 pages of documents and a 100-page privilege log ("June 23 Privilege Log") listing 1,200 documents; the new privilege log did not cover the June 23 production, however. July 1 Letter at 1. Rather, the privilege log for that production was provided to Plaintiffs on June 30, 2022 and contained 1,875 additional privilege claims. *Id.* Plaintiffs challenged United's new privilege claims and asked for leave to address these privilege logs in its Motion to Compel, which the Court granted

In the Motion, Plaintiffs argue generally that United's privilege logs are deficient. Motion at 1. Plaintiffs filed as an exhibit a 221-page combined privilege log listing 24 "claw-back" documents, six documents withheld or redacted from United's production 12, and 3,153 documents withheld by United on the grounds of attorney-client privilege or as attorney work product. *See* dkt. no. 146-1. As a remedy, they ask the Court to conduct an *in camera* review of fifty randomly selected documents that United has withheld. *Id.*

According to Plaintiffs, United's "privilege logs" do not meet the requirements of this Court's civil standing order.[1] These requirements are "particularly relevant in evaluating claims of

---

[1] The March 1, 2021 Civil Standing Orders for Magistrate Judge Joseph C. Spero ("Standing Order") states as follows:

> Privilege logs shall be promptly provided and must be sufficiently detailed and informative to justify the privilege. See Fed. R. Civ. P. 26(b)(5). No generalized claims of privilege or work product protection shall be permitted. With respect to each communication for which a claim of privilege or work product is made, the asserting party must at the time of its assertion identify: (a) all persons making and receiving the privileged or protected communication. (b) the steps taken to ensure the confidentiality of the communication, including affirmation that no unauthorized persons have received the communication, (c) the date of the communication, and (d) the subject matter of the communication. Failure to furnish this information at the time of the assertion will be deemed a waiver of the privilege or protection.

Standing Order, Section E, paragraph 15.

United States District Court
Northern District of California

privilege that involve inhouse counsel, as is the case in United's privilege logs, because 'the presumption that attaches to communications with outside counsel does not extend to communications with in-house counsel.'" *Id.* (quoting *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002)). Plaintiffs also argue that the late assertion of privilege should be taken into account when determining whether the privilege has been sufficiently asserted. *Id.* at 2 (citing *Burch v. Regents of the University of California*, 2005 WL 6377313, at *1–2 (E.D. Cal. Aug.30, 2005)). According to Plaintiff, they issued their first request for production of documents on July 14, 2021 but the June 23 Privilege Log was the "first substantial privilege log" and was produced less than a month before the close of class certification fact discovery. *Id.*

Plaintiffs contend United's privilege logs fall short because they: 1) contain only "conclusory assertions without supporting facts regarding how United preserved the confidentiality of documents over which it is claiming privilege[;]" 2) contain descriptions that "are insufficiently detailed and specific to evaluate United's claims of privilege[;]" and 3) "fail to identify attachments to many emails that have been withheld or show, individually why such attachments are privileged." *Id.* at 1-2 (citing Entries 1462 and 1467 as examples of entries that reference attachments but do not identify them or describe the basis for the assertion of privilege over the attachments).

Plaintiffs further assert that "United attempts to use pretextual claims of attorney-client privilege to shield business discussions from discovery[,]" pointing to Entry 1592 as an example. That document is described as "Presentation requesting and/or seeking legal advice from United Defendants' in-house counsel (Payman Pezhman) regarding strategic legal planning." *Id.* at 3-4. Plaintiffs opine that "[b]ased upon the many other presentations that have been produced by United, even those with unsupported redactions, it appears highly improbable that the entire presentation was prepared by Lisa LaMaster, [a] United employee who is not a lawyer or within United's legal department, for the purpose of seeking or giving legal advice." *Id.* at 4.

Plaintiffs also contend the declaration offered by United in support of its claims of attorney-client privilege, by Jolene Bradley, shows that United is "misrepresenting the attorney-

1    client privilege."² *Id.* at 4.  According to Plaintiffs, the information Bradley says she provided to

2

3    ² The Bradley declaration is the only evidence United has offered in support of its assertion of
     attorney-client privilege.  Jolene Bradley is Associate Director of Out-of-Network Programs at
4    UnitedHealthcare and states that in that capacity she has "occasion to communicate with, and seek
     legal advice from, in-house counsel, including Courtney Lucas, Ellyn Fuchsteiner, Jessica Zuba,
5    Scott Rees, Dixie Wilhite, and Susan Tully Abdo (among others) regarding responses and
     approaches to handling disputes with providers, plan members, plan sponsors, and government
6    agencies and regulators."  Bradley Decl. ¶ 3.  She further states that she "work[s] with certain of
     these attorneys to provide input in connection with changes to company-wide policies and
7    procedures relating to out-of-network programs" and that she is "also sometimes asked to provide
     information to in-house counsel about how a claim is evaluated using an out of network program
8    in connection with a pending claim or dispute."  *Id.*  In the paragraphs that follow, Bradley
     provides specific examples:
9
10       4. For example, in UHC000013633 and UHC000013642, UHC in-house counsel Ellyn
         Fuchsteiner emailed my team in connection with an inquiry she had received from Voya, a
11       plan sponsor, about the reimbursement afforded to a plan member in connection with
         treatment by an out-of-network provider. Given the context of this communication and the
12       practice I outlined above, it is my understanding that Ellyn was asking for my input so that
         she could render legal advice about how to handle the communications with this plan
13       sponsor.

14       5. In UHC000013785, I was asked to provide certain data at the request of UHC in-house
         counsel Courtney Lucas and Jessica Zuba in connection with a lawsuit that was pending at the
15       time involving Progenity, a provider of out-of-network services. I understood from that
         request that they were seeking my input to render legal advice in connection with that
16       ongoing litigation.

17       6. In UHC000015072, I was asked by UHC in-house counsel Scott Rees to provide input
         in connection with legal advice that had been requested of Scott Rees by members of our
18       Out-of-Network Programs team relating to certain potential modifications to generic plan
         language to be used in certain summary plan descriptions or SPDs. I understood from that
19       request that Scott was seeking my input in order to render legal advice concerning the
         proposed plan language modifications, which would be a company-wide, programmatic
20       change.

21       7. In UHC000015276, I sought legal advice from United Health Group in-house counsel
         Dixie Wilhite. Specifically, I was seeking her opinion as to the legal implications that might
22       follow if certain data fields had been accessed in connection with what we believed at the
         time to have been a data breach. Ms. Wilhite then provided an opinion in response to my
23       request.

24       8. UHC000016128 and UHC000016133 were generated in response to a request from
         UnitedHealth Group employees about the preparation of a response to a list of concerns and
25       issues raised by a plan sponsor, the Healthcare Association of New York ("HANYS").
         During the course of the discussion, we were advised that certain issues HANYS had raised
26       were legal in nature and should be routed to a legal point of contact for further analysis. My
         manager, Vice President for Out of Network Payment Strategy at UnitedHealth Group,
27       Becky Paradise, also weighed in at one point on the e-mail chain and noted that in-house
         counsel Athena Tsakanikas had recently reviewed certain documents relating to the issue
28       HANYS raised and provided her legal opinion on whether those documents supported the

1   in-house counsel about how a claim is evaluated is not privileged because attorney-client privilege

2   does not protect underlying facts.  *Id.* at 4.  Plaintiffs further assert that "[t]he policies and

3   procedures referred to are likewise probably not protected by the attorney client privilege." *Id.*

4   (citing *Hall v. Marriott Int'l, Inc.*, 2021 WL 1906464 (S.D. Cal. May 12, 2021)).

5        Plaintiffs also argue, as they did in the June 21 Letter, that documents withheld as

6   privileged "appear to be created for the primary purpose of business decisions and are not

7   protected by the attorney-client privilege for that reason as well." *Id.* (citing *In re Grand Jury*, 23

8   F.4th 1088, 1092 (9th Cir. 2021)). They note that they reviewed the documents that are the subject

9   of United's clawback letter before United designated the documents as privileged and represent

10  that the primary purpose of these documents was not to give or receive legal advice but instead to

11  provide business advice. *Id.*

12       Plaintiffs reiterate their belief that many of the documents United has withheld address

13  plan administration and are subject to the fiduciary exception to attorney-client privilege. *Id* at 6.

14  They point to Bradley's statement in her declaration that she is "sometimes asked to provide

15  information to in-house counsel about how a claim is evaluated using an out of network program

16  in connection with a pending claim or dispute[,]" arguing that "[t]his statement creates a strong

17  suggestion that many of the documents for which privilege is claimed do concern claims

18  administration and that the fiduciary exception would therefore apply." *Id.*  Further, to the extent

19  United seeks to avoid the fiduciary exception based on the theory that the communications related

20  to anticipated litigation, Plaintiffs contend United has not established that this exception applies,

21  that is, that the communications actually sought or gave legal advice about whether the trustees

22  _____

23       response that was contemplated to HANYS. I was not directly involved in these discussions
         but was copied on the communications and am familiar with the context in which these
24       communications were being made.

25       9. In UHC000013597, I circulated a WebEx meeting invitation to members of my team
         in which I forwarded certain notes I had received from Marjorie Wilde, in-house counsel at
26       MultiPlan. Marjorie had asked that I circulate to the team advice regarding the treatment of
         MultiPlan documents that implicate confidential and proprietary information, so that we
27       could align on the proper methods of protecting such information in the event of litigation
         involving the United Defendants and/or MultiPlan.

28  Bradley Decl. ¶ 4-9.

United States District Court
Northern District of California

1    were in legal peril or the communications were made in the context of actual or imminent

2    litigation. *Id.* (citing *Wit v. United Behav. Health*, No. 14-CV-02346-JCS, 2016 WL 258604, at *7

3    (N.D. Cal. Jan. 21, 2016)).

4        Plaintiffs also contend the work product doctrine does not protect the documents listed on

5    the privilege log because none was prepared specifically for litigation. *Id.* at 7 (citing *Fann v.

6    *Giant Food, Inc*., 115 F.R.D. 593, 596 (D.D.C. 1987)). According to Plaintiffs, "United's

7    assertions of work product do not identify specific litigation or even imminent litigation. Instead,

8    it is attempting to use this doctrine to shield run-of-the-mill business documents that are

9    unfavorable to it from being produced." *Id.* at 7-8. They further assert that the fiduciary

10   exception applies to the work product doctrine and that United has not established that it does not

11   apply to these communications. *Id.* at 7 (citing *Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d

12   221, 232 (4th Cir. 2011); *Durand v. Hanover Ins. Grp., Inc*., 244 F. Supp. 3d 594, 611 (W.D. Ky.

13   2016)).

14       Finally, Plaintiffs contend the crime-fraud exception applies to many of the documents

15   United has withheld as privileged, citing Bradley's statement in her declaration that many of the

16   documents involve company-wide programs and asserting that these programs are the subject of

17   Plaintiffs' RICO claims. *Id.* at 8. Plaintiffs contend *in camera* review of documents under the

18   crime fraud exception requires only "a minimal showing that the crime-fraud exception could

19   apply[ ]" and that they have met that requirement. *Id.* (quoting *In re Grand Jury Investigation*,

20   974 F.2d 1068, 1071 (9th Cir. 1992)). In particular, Plaintiffs note that their RICO claim "asserts

21   that United and MultiPlan engaged in a scheme to generate fraudulently low reimbursement rates

22   and underpay mental health/substance abuse claims" while "United's privilege log refers to out of

23   network programs, MultiPlan, and how to 'respond' to inquiries and disputes involving both." *Id.*

24   Therefore, Plaintiffs assert, it is appropriate for the Court to conduct an *in camera* review of a

25   sampling of documents to determine whether the crime-fraud exception applies.

26       **C.    United's Response**

27       In its Opposition to Plaintiffs' Motion, United asserts that its "privilege logs comply with

28   all of this Court's requirements and show that the privileged communications warrant protection."

United States District Court
Northern District of California

Opposition at 1.  According to United, "Plaintiffs provide nothing to the contrary other than conclusory broadside attacks."  *Id.*  In particular, United contends that all of the requirements of the Court's Standing Order have been satisfied and represents that "the United Defendants carefully reviewed the documents and productions to ensure no unauthorized persons had received the communications, and included an affirmation in each transmittal email that to the best of their knowledge, no unauthorized persons had received the communications."  *Id.* at 2-3. According to Defendants, this is all that is required to support the claims of privilege under *In re Grand Jury*. *Id.* (citing 974 F.2d at 1071).

United recognizes that one cannot simply "assume" that a communication involving in-house counsel is privileged but represents that it did not take that approach, instead producing "numerous documents involving in-house counsel, and [withholding] or redact[ing] only those documents involving attorney-client communications 'made for the purpose of securing legal advice.'" *Id.* (quoting *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002)). Moreover, it contends it has provided detailed descriptions of the withheld documents and not boilerplate descriptions, which courts have found to be insufficient.  *Id.*  at 3-4.

United also argues that its privilege logs were timely, asserting that "Plaintiffs served multiple rounds of confusing and conflicting sets of requests—*beginning* in July 2021, but continuing with more requests on August 27, 2021, September 20, 2021, January 27, 2022, March 22, 2022, May 4, 2022, and May 31, 2022—totaling several hundred requests that needed to be reconciled and clarified."  *Id.* at 4 (emphasis in original).  According to United, its "rolling document production and privilege logs – all of which were completed well in advance of depositions and the close of fact discovery – have been reasonable in light of the complexity and context of this case." *Id.* at 4-5.

United rejects Plaintiffs' argument that its assertions of privilege should be viewed with suspicion generally, and further contends the "primary purpose" test is satisfied as to the documents listed on its privilege logs.  *Id.* at 5-6.  According to United, Plaintiffs' position is "speculative" and they have "point[ed] to a single privilege log entry (No. 1592) as supposed evidence that the United Defendants' privilege claims are unsupported.  *Id.* at 6.

With respect to Entry 1592, United rejects Plaintiffs' challenge, arguing that privilege has been adequately asserted as to that document because "the entry identifies the author (Lisa LaMaster), in-house counsel (Payman Pezhman), and the privilege basis ("Presentation requesting and/or seeking legal advice from the United Defendants' in-house counsel (Peyman Pezhman) regarding strategic legal planning")" and "Ms. LaMaster, a former member of the out-of-network programs group that helped run the program at issue in this case (among other things), is entitled to seek legal advice from in-house counsel, and to have those communications be protected by privilege." *Id.* United further asserts that Plaintiffs have taken out of context the statement in the Bradley declaration that she sometimes is asked to provide "information" to in-house counsel to argue that privilege does not apply to such communications, pointing out that the information Bradley says she provides sometimes is "about how a claim is evaluated using an out of network program in connection with a pending claim or dispute." *Id.* (quoting Bradley Decl. ¶ 3). According to United, "Courts routinely conclude that communications that include factual information are nonetheless privileged when they 'as a whole concern the giving and receiving of legal advice.'" *Id.* (quoting *Klein v. Meta Platforms, Inc.*, 2022 WL 767096, at *3 (N.D. Cal. Mar. 11, 2022)).

Nor, United asserts, is there any basis for Plaintiffs' assertion that "'[t]he policies and procedures referred to' in the Bradley Declaration are 'probably not protected by the attorney client privilege.'" *Id.* at 6. According to Defendants, the case cited by Plaintiffs in support of this argument, *Hall v. Marriott Int'l, Inc.*, 2021 WL 1906464 (S.D. Cal. May 12, 2021), is not on point because the court in that case merely compelled production of numerous categories of documents, including policies and procedures, but did not elaborate on whether the policies or procedures at issue were privileged; rather, it said that if any of the compelled documents were privileged a privilege log should be provided. *Id.* at 7. According to United, there is no privilege exception for policies and procedures "and the only issue is whether privileged communications about those policies should be protected." *Id.*

United argues that Plaintiffs' arguments based on the primary purpose test fail because as to all of the documents withheld on the basis of privilege, the *sole* purpose of the communication

was to seek or provide legal advice. *Id.* They offer the following examples:

> For example, many of the withheld or redacted documents reflect legal advice that UHC's in-house lawyers provided to UHC's out-of-network programs group (non-lawyer business clients) about the extent to which plan language should be revised to support a new program offering. *See*, *e.g.*, entry nos. 2540, 2576, 2646, 2726, & 2746. Others reflect legal advice from in-house counsel concerning litigation and claims disputes (see, e.g., entry nos. 1316, 1460, 1510 & 1677); the legal viability of programmatic changes across the company (see, e.g., entry nos. 363, 1516, & 1535); strategic legal planning (see, e.g., entry nos. 1542, 1545, 1551 & 1573); or draft language for plan documents, communications with members or plan sponsors, contracts, or agreements (*see, e.g*., entry nos. 1314, 2049, 2659, 2646, 2576, 2726, & 2746).

*Id.* at 7-8.

According to United, "[t]hat these privileged communications concern the United Defendants' 'business' does not mean they are not privileged, because it is well-established that businesses are entitled to legal advice." *Id.* at 8 (citing *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) ("A client is entitled to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs.")). United further asserts that "[w]hether the subject matter is a business or something else, there is a 'rebuttable presumption' that a lawyer is hired 'to give "legal advice," whether the subject of the advice is criminal or civil, business, tort, domestic relations, or anything else.'" *Id.* (quoting *Chen*, 99 F.3d at 1501). United contends "[r]ecent decisions in this District confirm this approach[,]" pointing to *Staley v. Gilead Sciences, Inc*., 2021 WL 4318403, at *2 (N.D. Cal. July 16, 2021). *Id.*

United further asserts that the fiduciary exception to attorney-client privilege does not apply to the documents it has withheld because the communications withheld as privileged: 1) do not involve legal advice sought or received in connection with fiduciary functions; and 2) are "defensive in nature, involving actual and potential litigation (or government or regulatory scrutiny) faced by the United Defendants." *Id.* at 9-15. As to the first argument, United argues that it is *Plaintiffs*' burden to show that the fiduciary exception applies and that in order to meet that burden Plaintiffs must show that it was acting as a fiduciary with respect to "Plaintiffs' own plans (self-funded employee benefits plans for Apple and Tesla)." *Id.* (citing *Mett*, 178 F.3d at 1063–65); *see also id*. at 2 (citing *Fischel v. Equitable Life Assur*., 191 F.R.D. 606, 609 (N.D.

11

1   Cal. 2000) in support of argument that it is the burden of the party challenging the assertion of

2   privilege to establish that an exception to the privilege, including the fiduciary and crime-fraud

3   exceptions, apply).

4          According to United, Plaintiffs' assertion that the fiduciary exception applies fail because

5   "they make no effort to connect any attorney-client communications by the United Defendants to

6   any fiduciary function for any ERISA plan – let alone any fiduciary functions for Plaintiffs' own

7   plans[.]" *Id.* at 9.  Rather, United asserts, "most of the documents highlighted in Plaintiffs' motion

8   to compel bear no connection (even indirectly) to their claims, their plans, or their lawsuit." *Id.* at

9   9-10 (offering as examples Plaintiffs' challenge to the redactions in Entry nos. 1636 to 1640,

10  which United contends were "just a few sentences of legal advice on a presentation deck regarding

11  'Outlier Cost Management,' a completely different program that did not apply to Plaintiffs' claims

12  and is not at issue in this case.").

13         Even for communications that may be relevant to Plaintiffs' claims, United contends, "the

14  key point is that they did not involve any fiduciary functions, so Plaintiffs cannot be viewed as the

15  'true clients' and the fiduciary exception does not apply." *Id.*  According to United, courts have

16  recognized that third party administrators often "wear two hats" and sometimes do not act as a

17  fiduciary. *Id.* at 10 (citing *Pegram v. Herdrich*, 530 U.S. 211, 224–25 (2000); *Del Prete v.*

18  *Magellan Behav. Health, Inc.*, 112 F. Supp. 3d 942, 946 (N.D. Cal. 2015)). United contends

19  Plaintiffs have not shown that it was wearing its "fiduciary hat" in connection with the

20  communications it has withheld as privileged and the privilege log establishes that it was not,

21  showing that "they were instead acting in their own business interests to develop service[s] and

22  programs for a broad, varied customer base." *Id.*  Moreover, United asserts, it has "a perfectly

23  legitimate need to seek legal advice in the course of developing and maintaining these programs."

24  *Id.* (citing as examples entry nos. 513 & 1459 (purportedly, legal advice regarding "out-of-

25  network programs"); entry nos. 1542, 1545, 1551 & 1573 (purportedly, legal advice regarding

26  "strategic legal planning"); entry nos. 363, 1516, & 1535 (purportedly, legal advice regarding

27  "system or program transitions"); entry nos. 1644 & 2729 (purportedly, legal advice regarding

28  "contract negotiations"); entry nos. 1314, 2049, 2659, 2646, 2576, 2726, & 2746 (purportedly,

legal advice regarding "draft language for plan documents, communications with members or plan sponsors, contracts, or agreements"). United asserts this legal advice does not fall under the fiduciary exception because "courts have recognized that service providers are not acting as fiduciaries when developing and maintaining broadly available programs and services, even when the programs may impact reimbursements under ERISA plans." *Id.* (citing *DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 744–47 (6th Cir. 2010); *Pegram*, 530 U.S. at 223).

United rejects Plaintiffs' argument that communications relating to "United's 'Facility R&C' program and the use of Viant OPR" (the out-of-network programs at issue) should be subject to the fiduciary exception, because these programs can impact 'plan administration.'" *Id.* at 12 (citing Motion at 5-6). It contends Plaintiffs "twist the words" of the Bradley declaration and take an expansive approach to the fiduciary exception, which it says the Ninth Circuit has rejected. *Id.* (citing *Mett*, 178 F.3d at 1064–65). United further asserts that "Plaintiffs' cases are easily distinguishable, because they all involved legal advice received in the course of core fiduciary functions for the plaintiff's ERISA plan." *Id.* at 12-13 (distinguishing *Stephan v. Unum Life Insurance*, 697 F.3d 917, 932 (9th Cir. 2012); *Waller v. Blue Cross of California*,  32 F.3d 1337, 1342 (9th Cir. 1994); *Wit v. United Behavioral Health*, 2016 WL 258604, at *8–14 (N.D. Cal. Jan. 21, 2016 )).

United also contends many of the withheld documents fall outside of the fiduciary exception because "they are defensive in nature, involving actual and potential litigation (or government or regulatory scrutiny) faced by the United Defendants." *Id.* at 13 (citing *Mett*, 178 F.3d at 1064, 1066; *Fischel v. Equitable Life Assur.*, 191 F.R.D. 606, 609 (N.D. Cal. 2000)). United rejects Plaintiffs' assertion that it must point to specific litigation to invoke this exception, pointing to the Ninth Circuit's holding in *Mett* that the exception applied where there was "'trouble was in the air' even though 'no legal action was then pending against the defendants in connection with the pension plans.'" *Id.* (quoting *Mett*, 178 F.3d at 1064).  Similarly, United points out, the undersigned found in *Wit* that communications fall under this exception when they "relate to advice sought and obtained to determine how far the trustees are 'in peril.'" *Id.* (citing 2016 WL 258604, at *7).

1     United contends the privilege log reflects many entries that meet this standard and point to

2  a number of examples:

> For example, entry nos. 1316, 1460, 1510 and 1677 concern
> discussions with the United Defendants' in-house and outside counsel
> regarding potential exposure to liability in "litigation or claims
> disputes," including communications regarding legal strategy for
> active litigation with members, providers, or other entities. Other
> entries—such as nos. 2145, 2381 to 2382, 2384 to 2387, and 2395 to
> 2400—concern legal advice regarding an inquiry by the Department
> of Labor relating to mental health parity issues, and thus implicate the
> United Defendants' personal interests in having legal advice. And
> entry nos. 1605, 1608 to 1609, and 1627 to 1628 concern legal advice
> regarding a Department of Labor audit.

9  *Id.* at 14.

10     United also rejects Plaintiffs' assertion that it has improperly withheld documents under

11  the work product doctrine, asserting that "the documents withheld by the United Defendants on

12  the basis of the work product doctrine contain 'mental impressions, conclusions, opinions, or legal

13  theories of a party's attorney.'" *Id.* at 15.  They point to entry nos. 65, 1316, and 2812 to illustrate

14  this point, asserting that "all contain emails written by attorneys that reflect their mental

15  impressions related to ongoing or anticipated litigation." *Id.* United further asserts that "these

16  documents were prepared 'in anticipation of litigation or for trial' as required by Federal Rule of

17  Civil Procedure 26(b)(3)(A)[,]" citing as examples entries 977, 1930, 1933, 1944, 1947, 2063,

18  2064, 2065, 2074, 2076 (discussing active litigation).  *Id.*   United argues that it is not required to

19  point to specific litigation to claim work product protection because it is enough that there was a

20  good faith basis to anticipate litigation.  *Id.* at 15 (citing *Am. C.L. Union of N. Cal. v. U.S.

21  Dep't of Just.* ("*Am. C.L. II*"), 880 F.3d 473, 486–87 (9th Cir. 2018); *Am. C.L. Union of N. Cal. v.

22  Dep't of Just.* ("*Am. C.L. I*"), 70 F. Supp. 3d 1018, 1029–30 (N.D. Cal. 2014), aff'd in part, rev'd

23  in part sub nom. *Am. C.L. II*, 880 F.3d 473 (9th Cir. 2018); *Skyline Wesleyan Church v. Cal. Dep't

24  of Managed Health Care*, 322 F.R.D. 571, 588 (S.D. Cal. 2017); *Schaeffer v. Gregory Village

25  Partners, L.P.*, 78 F. Supp. 3d 1198, 1206 (N.D. Cal. 2015)).

26     United argues that the crime-fraud exception to attorney-client privilege also does not

27  apply.  *Id.*  at 16-17. According to United, Plaintiffs must "make a *prima facie* showing that the

28  challenged communications 'were in furtherance of an intended or present illegality.'" *Id.*  at 16

United States District Court
Northern District of California

1    (quoting *United States v. Zolin* ("*Zolin I*"), 809 F.2d 1411, 1418 (9th Cir. 1987)). United further

2    asserts that Plaintiffs have not met the "present illegality" requirement, making only vague

3    references to their RICO allegations and suggesting that because Plaintiffs challenge company-

4    wide programs, no communication involving a company-wide program can be privileged. *Id.* at

5    17.  The Ninth Circuit requires more, United asserts, and courts "routinely reject the crime-fraud

6    exception in cases involving civil RICO allegations." *Id.* (citing *Chen*, 99 F.3d at 1503).

7         Finally, United asserts Plaintiffs have not demonstrated that *in camera* review of withheld

8    documents is appropriate. *Id.*  at 17-20.  According to United, to justify *in camera* review,

9    Plaintiffs must "advance 'a factual basis adequate to support a good faith belief by a reasonable

10   person that *in camera* review of the materials may reveal evidence' that the materials are not

11   privileged." *Id.* (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989)("*Zolin II*").  United

12   contends Plaintiffs "offer no evidence or other factual support for their privilege challenges" and

13   therefore the Court should deny their request for *in camera* review of any of the withheld

14   documents. *Id.* United also argues that Plaintiffs' reliance on *Doyle v. FBI*, 722 F.2d 554, 555 (9th

15   Cir. 1983) in support of their request is misplaced because that case involved a Freedom of

16   Information Act dispute rather than a dispute about privilege in a civil action "and the Ninth

17   Circuit rejected an argument that the district court should have conducted *in camera* review of a

18   random sample of documents." *Id.*

19        **D.    Reply**

20         In their Reply, Plaintiffs reiterate their position that United has asserted claims of privilege

21   and work product protection that are suspect, that it has withheld documents that are subject to the

22   fiduciary duty and crime-fraud exception, and that *in camera* review of a sample of documents is

23   justified. They also represent that "United's sole 30(b)(6) designee[ ] repeatedly testified in her

24   July 13/14 deposition that she relied upon the advice and review of United's in-house counsel on

25   issues of plan terms, administrative services agreements, and other matters and had no knowledge

26   or opinion on certain of these issues."  Reply at 1.  In using the privilege as a sword and a shield,

27   Plaintiffs contend, United has waived attorney-client privilege as to related communications. *Id.*

28   (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.1992)).

1  **III.    ANALYSIS**

2      **A.    General Legal Standards Governing Attorney-Client Privilege**

3       "The attorney-client privilege protects confidential communications between attorneys and

4  clients, which are made for the purpose of giving legal advice." *United States v. Sanmina Corp.*,

5  968 F.3d 1107, 1116 (9th Cir. 2020).  "Issues concerning application of the attorney-client

6  privilege in the adjudication of federal law are governed by federal common law." *United States v.*

7  *Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009) (citations and internal quotations omitted).  Federal

8  courts apply an eight-part test to determine if a communication is subject to attorney-client

9  privilege.  *Id.* at 607.  Under that test, attorney-client privilege applies "(1) Where legal advice of

10 any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the

11 communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his

12 instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless

13 the protection be waived." *Id.* (internal quotations and citations omitted). "Because it impedes full

14 and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* at 607

15 (internal quotations and citation omitted).

16      The party asserting the privilege has the burden of establishing the privileged nature of the

17 communication.  *Id.* at 609. To meet that burden, the party asserting the privilege must make a

18 *prima facie* showing that the privilege protects the information the party intends to withhold.  *In re*

19 *Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992);  *see also* Fed. R. Civ. P.

20 26(b)(5)(A)(ii) (providing that a party claiming that information is privileged must "describe the

21 nature of the documents, communications, or tangible things not produced or disclosed – and do

22 so in a manner that, without revealing information itself privileged or protected, will enable other

23 parties to assess the claim.").  The Ninth Circuit has "recognized a number of means of

24 sufficiently establishing the privilege, one of which is the privilege log approach."  974 F.2d at

25 1071 (citing *Dole v. Milonas*, 889 F.2d 885, 888 n. 3, 890 (9th Cir. 1989)). In *In re Grand Jury*

26 *Investigation,* for example, the Ninth Circuit found that a *prima facie* showing of privilege had

27 been made as to eleven documents that had been withheld based on a privilege log and affidavits

28 regarding the "confidential nature" of the documents.  *Id.*; *see also Dolby Lab'ys Licensing Corp.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *v. Adobe Inc.*, 402 F. Supp. 3d 855, 865 (N.D. Cal. 2019) ("[A]ttorney declarations generally are

2  necessary to support the designating party's position in a dispute about attorney-client privilege.").

3      "[*I*]*n camera* review is [also] an acceptable means to determine whether disputed materials

4  fit within the privilege." *In re Grand Jury Investigation*, 974 F.2d 1068. at 1074.  Because *in*

5  *camera* review is "an intrusion[,]" it must be justified, but the threshold is not high. *Id.* In

6  particular, "[t]o empower the district court to review the disputed materials *in camera*, the party

7  opposing the privilege need only show a factual basis sufficient to support a reasonable, good faith

8  belief that in camera inspection may reveal evidence that information in the materials is not

9  privileged." *Id.* at 1075.  If that threshold is met, the decision whether to conduct the review rests

10  within the discretion of the district court. *Id.*

11      **B.    Waiver Arguments**

12      As a preliminary matter, the Court addresses the two waiver arguments made by Plaintiffs

13  in their motion papers.  The first is the assertion in the motion that because of United's delay in

14  providing the bulk of its privilege log, the privilege, and any work product protection, should be

15  found to be waived as to communications that are described in the log simply with boilerplate

16  language that does not provide the specificity necessary to establish that the communication is

17  protected. *See* Motion at 2.  The second is an assertion in Plaintiffs' reply brief that testimony by

18  United's 30(b)(6) witness on July 13 and 14, 2022 that United relied on the advice of its in-house

19  counsel gave rise to waiver of attorney-client privilege.

20      As to the first argument, there is no doubt that boilerplate assertions of privilege can give

21  rise to waiver of the privilege under some circumstances.  *See Burlington N. v. United States Dist.*

22  *Court For the Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005)).  As the court in *Burch v.*

23  *Regents of Univ. of Cal.*, explained, the Ninth Circuit adopted the following approach in

24  *Burlington*:

25          The Ninth Circuit held [in *Burlington*] that boilerplate objections or
          blanket refusals in response to a Rule 34 [of the Federal Rules of Civil
26          Procedure] request for production of documents are insufficient to
          assert a privilege. However, it rejected a per se waiver rule that would
27          deem a privilege waived if a privilege log intended to meet Rule
          26(b)(5)'s requirements were not produced within Rule 34's 30-day
28          time limit. . .  The court then held that district courts are to use the 30-
          day deadline for responding to document requests contained in

17

> Federal Rule of Civil Procedure 34 as a "default guideline" to make a "case-by-case determination" of timeliness for meeting Rule 26(b)(5)'s requirements by considering several factors. *Id*. The factors are: (1) the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged; (2) the timeliness of the objection and accompanying information about the withheld documents; (3) the magnitude of the document production; and (4) other particular circumstances of the litigation that make responding to discovery unusually simple or unusually difficult. . .
>
> The *Burlington* factors are generally to be applied "in the context of a holistic reasonableness analysis," aimed at preventing needless waste of time and manipulation of the discovery process. . . . Though the Ninth Circuit stopped short of providing a bright-line rule, the Burlington Court did specifically note that "in the absence of mitigating considerations," a district court would be justified in finding that a party had waived its asserted privileges by submitting a privilege log five months after the Rule 34 deadline.

No. CV.S-04-0038 WBS GGH, 2005 WL 6377313, at *1 (E.D. Cal. Aug. 30, 2005) (citing *Burlington*, 408 F.3d at 1148-1149).

Here, the information in the record concerning the circumstances of United's production and the alleged delay in producing a privilege log is insufficient for the Court to determine whether a finding of waiver is warranted. Although Plaintiffs point out that their first request for production was made over a year ago, Defendants contend there have been many requests for production since that time. Further, it is not clear from the privilege log that Plaintiffs filed: 1) which request for production each document is responsive to; 2) when the non-privileged documents responsive to that request were produced; and 3) when United first provided a privilege log listing the document at issue. Nor does the Court have sufficient information to evaluate whether disputes related to Plaintiffs' requests justified any delay in United's production of documents or associated privilege logs relative to the time the documents were requested. Thus, while the Court does not rule out the possibility that Plaintiffs may be able to make a targeted showing that United has waived attorney-client privilege as to specific documents because it did not provide in a timely manner the information required to establish attorney-client privilege, the Court does not have sufficient information to make a finding of waiver based on the current record.

As to the second waiver argument, based on the rule that the privilege that "protects

United States District Court
Northern District of California

1   attorney-client communications may not be used both as a sword and a shield[,]" *Chevron Corp. v.*
2   *Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citation omitted), the Court concludes that this
3   argument is not yet ripe for determination or adequately briefed.  The testimony at issue was given
4   after United filed its Opposition and thus, the issue was not raised until Plaintiffs filed their Reply
5   brief.  Further, in their Reply brief Plaintiffs raised the argument only generally without pointing
6   to the specific testimony they contend resulted in waiver or any particular documents or subject
7   matter.  Therefore, the Court does not rule on this argument.[3]

8          **C.**     **Whether Primary Purpose Test is Satisfied**

9                **1.**   **Legal Standards**

10      "The fact that a person is a lawyer does not make all communications with that person
11   privileged." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002), as amended on denial of
12   reh'g (Mar. 13, 2002).  In *In re Grand Jury,* Ninth Circuit decided, as a matter of first impression,
13   that where a communication has a dual purpose, for example to give or receive both legal advice
14   and business advice, the communication is protected by attorney-client privilege only where the
15   "primary purpose" of the communication is "to give or receive legal advice, as opposed to
16   business . . . advice." 23 F.4th 1088, 1091 (9th Cir. 2021).  The court explained that a dual-
17   purpose communication can only have a single "primary" purpose and thus, the primary purpose
18   test is narrower than the "because of" test that some courts have used, which asks only if there is a
19   causal connection.  *Id.*  The court reasoned that "[a]pplying a broader 'because of' test to attorney-
20   client privilege might harm our adversarial system if parties try to withhold key documents as
21   privileged by claiming that they were created 'because of' litigation concerns[,]" finding that this
22   approach "would create perverse incentives for companies to add layers of lawyers to every
23   business decision in hopes of insulating themselves from scrutiny in any future litigation." *Id.* at
24   1093-1094.

25      In the corporate context, courts have recognized that in-house counsel is often involved in

---

[3] The Court notes that although this issue is not ripe for determination on the current record,
Plaintiffs raised this issue in their Reply brief, which was filed July 15, 2022 (the last day of fact
discovery) and therefore, to the extent Plaintiffs seek to pursue this issue, their request for the
Court's assistance is timely under Civil Local Rule 37-3.

the day-to-day operation of the company.  *United States v. Chevron Corp*., No. C-94-1885 SBA, 1996 WL 264769, at *4 (N.D. Cal. Mar. 13, 1996), amended, No. C 94-1885 SBA, 1996 WL 444597 (N.D. Cal. May 30, 1996). Because communications with in-house counsel relating only to the business operations of the company are not protected by attorney-client privilege, a client seeking to protect communications between a corporate client and in-house counsel must "make a clear showing that in-house counsel's advice was given in a professional legal capacity." *Id*. at *4. However, "if an attorney gives a client legal advice on a business decision, that communication is protected by the privilege (assuming, e.g., that the communication was made in confidence and in his or her capacity as an attorney)." *Staley v. Gilead Scis., Inc*., No. 19-CV-02573-EMC, 2021 WL 4318403, at *2 (N.D. Cal. July 16, 2021) (citing *United States v. Chen*, 99 F.3d 1495, 1501-02 (9th Cir. 1996).

### 2.  Discussion

#### a.  Entry 1592

Plaintiffs cite one specific example of a document listed on the privilege log they believe is unlikely to satisfy the primary purpose test, Entry 1592. On the privilege log, the author is listed as Lisa LaMaster and the document creation date is listed as July 22, 2016.  No recipients are listed. The communication is described as "Presentation requesting and/or seeking legal advice from United Defendants' inhouse counsel (Payman Pezhman) regarding strategic legal planning." United states in its brief that LaMaster was a member of United's out-of-network programs group that helped run the program at issue in this case (among other things), but this information is not included in the privilege log.  Nor does the privilege log provide information that allows the Court to determine, even on a general level, the type of legal advice being sought, what "strategic legal planning" means, the nature of the program that was the subject of the communication or the context in which the presentation was created or given.  The Court also notes that the same boilerplate phrase ("strategic legal planning") is used throughout the privilege log to justify withholding communications.  *See, e.g.,* Entries 8-12, 33-34, 36, 43-45, 47, 58, 61, 67, 85, 112, 230, 234, 243, 257, 276-277, 295, 317-318, 322-324, 329, 386, 408-409. Finally, United has not provided a supporting affidavit from the attorney whose advice was purportedly sought, Payman

1   Pezhman, to support the assertion of privilege.  Given that Pezhman is in-house rather than outside

2   counsel, the Court finds that United has failed to make a clear showing based on the privilege log

3   that this entire document (or indeed, any of it) satisfies the primary purpose test and therefore is

4   subject to attorney-client privilege.

5             b.   Bradley Declaration

6        United has supplied a declaration by Jolene Bradley, who is Associate Director of Out-of-

7   Network Programs at United, in support of its privilege claims.   Bradley states that she often

8   receives requests from United in-house counsel for "input in connection with changes to company-

9   wide policies and procedures relating to out-of-network programs" and for "information . . . about

10  how a claim is evaluated using an out of network program in connection with a pending claim or

11  dispute."  Bradley Decl. ¶ 3.

12       The Court addresses below, in connection with the fiduciary exception, whether United has

13  adequately supported its privilege claims as to the second category of communications and the

14  specific examples offered by Bradley.  To the extent that United relies on the first category of

15  communications described by Bradley in her declaration (requests for and provision of input

16  related to companywide policies and procedures) the Court finds that Bradley's declaration is not

17  sufficient to establish that such communications are privileged because "changes to company-wide

18  policies and procedures relating to out-of-network programs" may or may not implicate legal

19  considerations; the fact that in-house counsel may have requested input as to such changes does

20  not establish that these communications would reveal any primarily legal (as opposed to business)

21  communications.  The Court further notes that an affidavit from the attorney who sought the

22  information from Bradley attesting that the information requested was primarily for a legal

23  purpose would carry more weight than Bradley's declaration given that she is not an attorney and

24  does not claim she was seeking legal advice.

25       **D.   Whether Fiduciary Doctrine Applies**

26            **1.   Legal Standards**

27       The Ninth Circuit "has joined a number of other courts in recognizing a 'fiduciary

28  exception' to the attorney-client privilege."  *United States v. Mett*, 178 F.3d 1058, 1062-63 (9th

United States District Court
Northern District of California

Cir. 1999) (citing *United States v. Doe*, 162 F.3d 554, 556-57 (9th Cir.1998); *United States v. Evans*, 796 F.2d 264, 265-66 (9th Cir.1986)).  The exception originated with English trust law but has been applied to various fiduciary relationships, including in the ERISA context.  *Id.*  "As applied in the ERISA context, the fiduciary exception provides that an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration."  *Id.* at 1063;  *see also Pegram v. Herdrich*, 530 U.S. 211, 223–24 (2000)(Although an ERISA fiduciary "may have financial interests adverse to beneficiaries" and thus wear "two hats" – for example, when a plan sponsor "modif[ies] the terms of a plan as allowed by ERISA to provide less generous benefits" – "ERISA does require . . . that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."  *Id.* (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443–444 (1999); *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)).

In *Mett*, the Ninth Circuit identified two rationales that have been offered in the case law and commentary for the fiduciary exception.  178 F.3d at 1063. The first rationale is based on "an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration."  *Id.* (citing *In re Long Is. Lighting Co.*, 129 F.3d 268, 271-72 (2d Cir. 1997)).  Under this view, the *Mett* court explained, the fiduciary exception is seen as "an instance of the attorney-client privilege giving way in the face of a competing legal principle."  *Id*.  The second rationale  focuses instead on the "role of the trustee," "endors[ing] the notion that, 'as a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served.'"  *Id.* (quoting *United States v. Evans*, 796 F.2d 264, 266 (9th Cir. 1986) (quoting *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co*., 543 F. Supp. 906, 908–10 (D.D.C.1982)).  Under this view, the *Mett* court explained, the so-called "fiduciary exception" is not an exception at all but instead "reflects the fact that, at least as to advice regarding plan administration, a trustee is not 'the real client' and thus never enjoyed the privilege in the first place."  *Id*.

"On either rationale, however, it is clear that the fiduciary exception has its limits - by agreeing to serve as a fiduciary, an ERISA trustee is not completely debilitated from enjoying a

22

United States District Court
Northern District of California

confidential attorney-client relationship." *Id.*   To understand these limits, the court in *Mett* looked to the "seminal English opinion from which the fiduciary exception springs," *Talbot v. Marshfield*, 12 L.T.R. 761, 762 (Ch. 1865) and the "leading American case," *Riggs National Bank v. Zimmer*, 355 A.2d 709 (Del. Ch. 1976). *Id.*   In *Talbot*, the court required production of legal advice provided to trustees "prior to any threat of suit, advising them regarding the propriety of paying advances to the children of the testator." *Id.*   On the other hand, it found that the privilege protected from production legal advice to the trustees "dispensed after the commencement of suit, aimed at advising them 'how far they were in peril.'" *Id.*   In *Riggs*, the *Mett* court explained, the court required production of legal advice that was prepared for the trustees in connection with "potential tax litigation on behalf of the trust," not only citing the fact that the trustees were "not the real clients" but also noting that the legal advice was *not* prepared "for the purpose of the trustees' own defense in any litigation against themselves." *Id.*   The *Mett* court noted, "[a]t the time the [the legal advice] [in *Riggs*] was prepared the litigation then pending was a petition for instructions, the very nature of which normally indicates that the trustees were not implicated in any way." *Id.* at 1064 (quoting *Riggs*, 355 A.2d at 711).

Based on *Talbot* and *Riggs*, the *Mett* court concluded that "the case authorities mark out two ends of a spectrum." *Id.* at 1064.   At one end of the spectrum, "where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries." *Id.*   At the other end, "where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact." *Id.*   The court looked to both the context of the communication and its content to determine where on the spectrum the communications in that case fell, explaining that the latter is dispositive. *Id.*   The court recognized that while communication-by-communication analysis is "perhaps untidy, [it] is crucial if the attorney-client privilege and the fiduciary exception are to coexist." *Id* (citing *In re Long Is. Lighting Co..*, 129 F.3d at 272).

In the wake of *Mett*, district courts have continued to struggle with the "task of sorting out

23

when the exception applies in the gray areas in between" the two ends of the spectrum identified in *Mett*. *Klein Northwest Mutual Life Ins. Co*., 806 F. Supp. 2d 1120, 1131 (S.D. Cal. 2011). A number of district court decisions have addressed this question in cases involving the denial of benefits sought by an individual plaintiff. In that context, courts have found that advice sought by trustees must "concern[ ] their own *imminent* criminal or civil liability" in order to be privileged. *Gundersen v. Metropolitan Life Ins.* Co., No. 10-cv-50 DB, 2011 WL 48755, at * 9 (D. Utah Feb. 7, 2011) (emphasis added) (citing *Mett*, 178 F.3d at 1066); *see also Neathery v. Chevron Texaco Corp. Group Accident Policy No. OK826458*, No. 05-cv-1883 JM CAB, 2006 WL 4690828, at *2 (S.D. Cal. 2006) (holding that "[c]ommunications with counsel made concerning the investigation and consideration of Plaintiff's appeal, before the litigation commenced, constituted pre-decisional legal advice about the administration of the plan."). Thus, "most courts agree that the exception no longer applies after the final denial of an administrative claim." *Klein*, 806 F. Supp. 2d. at 1132 (citing cases); *see also Sizemore v. Pacific Gas & Elec. Retirement Plan*, 952 F. Supp. 2d 894, 901 (N.D. Cal. 2013) (ordering production of attorney-client communications that were made during the pendency of the plaintiff's second administrative appeal of the plan's denial of his claim on the basis that defendants had "accepted the appeal in order to fully evaluate plaintiff's claim" and thus had "voluntarily stepped back into their role as fiduciaries" during the pendency of that second appeal). On the other hand, "[c]ourts have regularly rejected the notion that *the possibility* a claim will be denied results in a divergence of interest. . . ." *Klein*, 806 F. Supp. 2d at 1132 (citing cases) (emphasis added). As the court in *Gunderson* pointed out, in *Riggs* (the case cited in *Mett* as the leading American case on the fiduciary exception) the court found that an opinion prepared for the trustees by counsel fell under the fiduciary exception *even though* "failure to comply with the law would have created liability and was the subject of the case before the court." 2011 WL 48755, at * 9.

As the undersigned observed in another ERISA class action against United, "[t]he task of drawing the line is more difficult in putative class actions as there appears to be little case law that applies the fiduciary exception in that context." *Wit v. United Behav. Health*, No. 14-CV-02346-JCS, 2016 WL 258604, at *6 (N.D. Cal. Jan. 21, 2016). In *Wit*, the undersigned concluded that

"in the class action context, as in cases involving individual claimants, an approach that focuses too heavily on litigation exposure without requiring a showing that advise was *actually* sought for defensive purposes undermines the principles that the fiduciary exception is designed to protect." 2016 WL 258604, at *7.  The Court explained:

> In particular, the fiduciary exception recognizes that beneficiaries are entitled to information about how their benefits are administered and that when counsel is advising an ERISA trustee about plan administration, this advice is generally for the benefit of the plan members.  As virtually any policy or guideline may, at some point, be the subject of litigation, merely invoking that possibility is not sufficient to avoid the exception.  Rather, either the context (e.g. actual or imminent litigation on the subject of the communication) or the contents of the communications themselves must reflect that they are defensive in nature and relate to advice sought and obtained to determine how far the trustees are "in peril."

*Id*.  (quoting *Mett*, 178 F.3d at 1064).

### 2.  Discussion

#### a.  Burden

United contends Plaintiffs have not met their burden of establishing that the fiduciary doctrine applies, citing *Metts* for the proposition that it is Plaintiff's burden to demonstrate that United was acting in a fiduciary capacity rather than United' burden to show that it was not.  The Court concludes that United is incorrect.

The question of burden was addressed in *Durand v. Hanover Ins. Grp., Inc*., 244 F. Supp. 3d 594, 613 (W.D. Ky. 2016):

> The Court notes that the burden of establishing the protection of the attorney-client privilege rests with the person or entity asserting it. *Shields v. Unum Provident Corp*., No. 2:05-CV-744, 2007 WL 764298, at *3 (S.D. Ohio Mar. 9, 2007) (citing *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999) (citing *In re Grand Jury Investigation No. 83–2–35*, 723 F.2d 447, 450 (6th Cir. 1983)). If the Court applies this proposition to this case then Defendants have the burden because they are asserting the privilege. However, the analysis does not end here.
>
> The Court is aware that when a party asserts the crime-fraud exception to the attorney-client privilege he or she bears the burden of demonstrating the applicability of that exception. See *United States v. Zolin*, 491 U.S. 554, 568, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). This makes sense because the crime-fraud exception defeats or strips away the privilege when the communications between lawyer and client are " 'made for the purpose of getting advice for the commission of a fraud' or crime." *Id*. at 563, 109 S.Ct. 2619 (quoting

*O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (P.C.)). The Court notes that in the context of ERISA, the fiduciary exception is something of a misnomer because it does not vitiate the attorney-client privilege like the crime-fraud exception. Instead, it sets forth a general proposition that, at least as to advice regarding plan administration, the beneficiaries are the real client, and, thus, the trustee "never enjoyed the privilege in the first place." *Mett*, 178 F.3d at 1063 (citing *Evans*, 796 F.2d at 266). When "[u]nderstood in this fashion, the fiduciary exception is not really an 'exception' to the attorney-client privilege at all." *Id*. Because of this substantial distinction, case law regarding the crime-fraud exception is not an appropriate source for guidance on the question of burden.

While no court appears to have expressly ruled on the question of burden, the majority of courts addressing the fiduciary exception, in the context of ERISA, appear to have reasoned the employer/administrator/trustee has the burden of demonstrating the communications withheld on claim of privilege are not subject to the fiduciary exception. *See e.g., Solis*, 644 F.3d at 231, 233 (the party claiming the privilege bears the burden of demonstrating its applicability to the withheld communications); *Long Island Lighting*, 129 F.3d at 271–273 (the employer/administrator of the plan bears the burden of showing the documents do not concern a fiduciary matter); *Everett*, 165 F.R.D. at 4 (same); Epstein, supra, at 651–62 (administrator bears the burden of demonstrating the communications were made after commencement of litigation or do not concern an administrative or fiduciary matter). For example, in *Everett*, the district court concluded the employer/administrator failed to show the disputed documents "relate solely to non-fiduciary activities or to the formation, amendment or termination of the pension plan." 165 F.R.D. at 4. By contrast, in *Long Island Lighting*, the Second Circuit implicitly concluded the employer/administrator satisfied its burden because no one had questioned the magistrate judge's finding that the disputed documents "clearly related to non-fiduciary matters only." 129 F.3d at 272–73. Thus, in the context of ERISA, the majority view appears to be the employer/administrator has the burden of demonstrating counsel's communications concerned non-administrative/non-fiduciary matters or personal representation in potential or pending litigation.

The *Mett* case involves a direct appeal from criminal convictions arising out of certain improper transactions involving pension benefits plans administrated by defendants. 178 F.3d at 1060–64. The Ninth Circuit reversed the convictions and remanded for a new trial because the trial court erroneously admitted highly prejudicial evidence against the defendants in violation of the attorney-client privilege. *Id*. at 1060–68. In *Mett*, the Ninth Circuit indicated the government had the burden of demonstrating the fiduciary exception applied to counsel's confidential communications. 178 F.3d at 1064. The Ninth Circuit did not provide any supporting analysis beyond citation to *United States v. Bauer*, 132 F.3d 504, 509 (9th Cir. 1997) and the parenthetical comment "government has the burden of showing crime-fraud exception to attorney-client privilege[.]" *Mett*, 178 F.3d at 1064. Thus, the Ninth Circuit looked to crime-fraud exception case law for guidance in determining who had the burden. While the Ninth Circuit's view may be appropriate in a criminal case,

26

1
2
3
4
5
6
7
8

> this is a civil case, and the majority view places the burden on the plan administrator to demonstrate counsel's confidential communications are not subject to the fiduciary exception. *See e.g., Wachtel*, 482 F.3d at 232; *Long Island Lighting*, 129 F.3d at 271–73; *Everett*, 165 F.R.D. at 4; Epstein, supra, at 651–52. Moreover, while the Sixth Circuit and several district courts within the Sixth Circuit have discussed the *Mett* opinion they have followed what appears to be the majority view when addressing the fiduciary exception in ERISA cases. *Moss*, 495 Fed.Appx. at 595–96; *Moss v. Unum Life Ins. Co.*, No. 5:09-CV-209, 2011 WL 321738, at *2–5 (W.D. Ky. Jan. 28, 2011); *Thies v. Life Ins. Co. of N. Am.*, 768 F.Supp.2d 908, 911–912 (W.D. Ky. 2011); *Redd*, 2009 WL 1543325, at *1–2; *Shields v. Unum Provident Corp.*, No. 2:05-CV-744, 2007 WL 764298, at *4–5 (S.D. Ohio Mar. 9, 2007). Therefore, the Court declines to follow *Mett* with regard to who bears the burden in this instance.

*Id.* at 613–14. The undersigned finds the reasoning in *Durand* persuasive and concludes that the reasoning in *Mett* – that where a plan administrator acts as a fiduciary it "never enjoyed the privilege in the first place" – supports the conclusion that in a *civil* case, the plan administrator must bear the initial burden of showing that it is entitled to claim attorney-client privilege because it was not acting as a fiduciary.

Even if *Mett* imposes the burden on the plan beneficiaries to show that the fiduciary exception applies, however, the Court finds United's privilege log and supporting affidavits must supply sufficiently detailed information to allow Plaintiffs to meaningfully challenge United's assertions of privilege and work product protection. Nothing in *Mett* suggests that the court intended to place what would be an impossible burden on the plan beneficiaries to demonstrate, based on vague and generic descriptions in the privilege log, that the withheld documents relate to the defendant's fiduciary duties. Here, the privilege logs supplied by United provide almost no specific information that would allow Plaintiffs to meet that burden – if the burden is, indeed, Plaintiffs' to bear.

The Court further finds that the Bradley Declaration is not sufficient to establish that the fiduciary exception does not apply to the documents United has withheld. Putting to one side whether that declaration establishes that the withheld documents are defensive in nature and therefore outside the ambit of the fiduciary doctrine (discussed below), the Bradley Declaration suggests that at least some of the withheld documents relate to company-wide policies and practices with respect to how claims (including those of the plaintiffs) are reimbursed for out-of-

United States District Court
Northern District of California

1  network services, and therefore involve United's fiduciary duty with respect to claim

2  administration. *See, e.g.,* Bradley Decl. ¶ 4 ("For example, in UHC000013633 and

3  UHC000013642, UHC in-house counsel Ellyn Fuchsteiner emailed my team in connection with an

4  inquiry she had received from Voya, a plan sponsor, about the reimbursement afforded to a plan

5  member in connection with treatment by an out-of- network provider.").

6  Nor is the Court persuaded by United's argument that the fiduciary doctrine can apply only

7  to communications that specifically relate to the Plaintiffs' plans (sponsored by Apple and Tesla).

8  United has not offered authority for this narrow approach.  To the extent that the communications

9  relate to the administration of plans with terms that overlap with the terms of Plaintiffs' plans and

10  thus shed light on how *Plaintiffs'* plans are administered, the alternative rationale offered in *Mett* –

11  that "the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all

12  information regarding plan administration" – also applies.  *Id.*  For example, United's use of Viant

13  OPR to determine the reimbursement rates for members of plans with out-of-network

14  reimbursement provisions similar to those in Plaintiffs' plans would fall under the fiduciary

15  doctrine.

16  On the other hand, United is not required to produce communications that would otherwise

17  be privileged where it was not wearing its "fiduciary" hat, that is, where it was engaging in acts

18  involving the adoption, modification or termination of an employee benefit plan. *See Pegram v.*

19  *Herdrich*, 530 U.S. at 225 (observing that a plan sponsor does not act as a fiduciary when it

20  modifies the terms of a plan to provide less generous benefits); *Durand v. Hanover Ins. Grp., Inc.*,

21  244 F. Supp. 3d at 612.

22  b.  The Defensive Exception

23  As discussed above, the fiduciary exception gives way when the context or content of the

24  communication indicates that it was made in connection with actual or imminent litigation.  On

25  the other hand, the mere possibility that litigation may occur is usually not sufficient to qualify a

26  communication as defensive.  Thus, for example, the fact that an inquiry was directed to United by

27  a plan sponsor about a plan member's reimbursement, *see* Bradley Decl. ¶ 4, does not establish

28  that communications related to the inquiry were defensive in nature.  Similarly, inquiries by the

United States District Court
Northern District of California

1    Healthcare Association of New York, a plan sponsor, relating to "concerns and issues", some of

2    which were legal in nature, *see* Bradley Decl. ¶ 8, do not appear to have implicated any imminent

3    litigation.  (It is unclear whether the inquiries related to United's administration of the plan in that

4    case but there is nothing in the Bradley Declaration suggesting it was not.)

5        Likewise, United has not established that communications relating to "litigation or claims

6    disputes" are defensive because it is not clear how United defines "claims disputes."   *See* Entries

7    1316, 1460, 1510 and 1677.  As previously noted, "most courts agree that the [fiduciary]

8    exception no longer applies after the final denial of an administrative claim[,]"  *Klein*, 806 F.

9    Supp. 2d. at 1132, but where the administrative appeal process is not yet final, courts have found

10   that the plan administrator  remains in the role of the plan fiduciary, seeking to fully evaluate the

11   plan beneficiary's claim.  *Sizemore v. Pacific Gas & Elec. Retirement Plan*, 952 F. Supp. 2d 894,

12   901 (N.D. Cal. 2013).  It is not clear if the "claims disputes" referenced in the privilege log were

13   still the subject of appeals or if a final determination had been made at the time of the

14   communication.

15        c.   Clawback Documents

16        Based on Plaintiffs' representation that the 24 clawback documents, which counsel had an

17   opportunity to review before the clawback demand was made, included documents that fell within

18   the fiduciary exception, the Court requested that those documents be lodged for possible *in*

19   *camera* review.  In order to provide further guidance, the Court has reviewed the following

20   documents: UHC000010918, UHC00013597 (also addressed in Paragraph 9 of the Bradley

21   Declaration), UHC000013633, UHC000013642, UHC000013785, UHC000014211 and

22   UHC000014446. The Court's conclusions as to whether United has adequately supported its

23   claims of privilege as to these documents are set forth below.

24        UHC000010918:  This communication is described in the privilege log as "Email chain

25   including United in-house counsel Joseph Stengl requesting information from business team in

26   connection with response to . . . inquiry directed to him from Maryland Insurance Administration

27   regarding out of network reimbursement." Dkt. 146-1. United produced this document with the

28   contents of the three emails that make up the exchange (all between Joseph Stengl and Sarah

Peterson, with three other United employees copied) redacted on the basis of attorney-client privilege and attorney work product. Because these communications relate to United's out-of-network reimbursement methodology they involve plan administration and therefore fall within the fiduciary exception. Further, there is nothing in the document to suggest there is any imminent enforcement action or pending litigation that would justify withholding these communications on the basis of imminent or pending litigation. Therefore, on the current record, United has not established that these communications were properly withheld.

UHC00013597: In the privilege log, United describes this document as "Email from Jolene Bradley to out-of-network program team reflecting legal advice from Marjorie Wilde, in-house counsel for Multi-Plan, regarding treatment of documents in litigation involving MultiPlan." Bradley describes this communication as follows:

> In UHC000013597, I circulated a WebEx meeting invitation to members of my team in which I forwarded certain notes I had received from Marjorie Wilde, in-house counsel at MultiPlan. Marjorie had asked that I circulate to the team advice regarding the treatment of MultiPlan documents that implicate confidential and proprietary information, so that we could align on the proper methods of protecting such information in the event of litigation involving the United Defendants and/or MultiPlan.

Bradley Decl. ¶ 9. Based on the Court's review of the document and Bradley's declaration, the Court finds that this document relates to general policies regarding the disclosure of Viant Facility R&C documents to United customers, not only in the context of pending or imminent litigation, but also where the information is "necessary to support United's customer in defending *any* challenge to Viant's Review recommendation on the claim." UHC0013597 (emphasis added). To the extent this policy encompasses administrative claims where there has been no final denial, these policies implicate United's fiduciary obligations to plan members. Further, there is nothing in the document that addresses any specific litigation that is pending or imminent. Therefore, on the current record, United has not established that this document was properly withheld.

UHC000013633: This document is described as "Email chain involving United in-house counsel (Ellyn Fuchsteiner) requesting information from business team to render legal advice in anticipation of litigation regarding dispute with plan member and provider." Based on the Court's

review, this email chain relates to a dispute with a plan member who challenged the amount paid by United for "allowed expenses" based on the summary plan description (SPD) language for their plan. The document involves administration of a United plan relating to claim reimbursement and therefore falls within the fiduciary exception unless the nature of the claim dispute that was the subject of these communications was entirely unrelated to the issues raised by Plaintiffs in this case. Further, nothing in the communications themselves or in any supporting declaration indicates that there had been a final administrative denial of the claim. Therefore, based on the current record, this document was not properly withheld on the basis of privilege.

UHC000013642: The description of this communication in United's privilege log is the same as its description for the previous document. The Court's conclusions are the same, except to the extent that a small portion of this email exchange addresses potential changes to the SPD language, as to which United was acting as a settlor rather than a fiduciary. That section of the email chain involves a discussion with in-house counsel about a legal question related to non-fiduciary conduct and was properly withheld.

UHC000013785: This communication is described in the privilege log as "Email exchange involving United in-house counsel (Courtney Lucas and Jessica Zuba) providing information to assist in rendering legal advice regarding litigation involving provider." It is not apparent from the content of the document that this communication relates to pending or imminent litigation; nor can the Court determine the nature of the underlying dispute or whether it relates to plan administration. This document requires an affidavit from an attorney involved in the communication describing the nature of the litigation, including whether the underlying dispute relates to the reimbursement of plan member claims and whether the litigation was actually pending or imminent.

UHC000014211: The privilege log describes this document as "Email chain requesting information at the behest of United in-house counsel (Chris Coxon and Sharon Wakefield) for the purpose of providing legal advice in connection with a pending dispute with a provider." The Court's review of this document suggests this communication related to a dispute about a plan member's claim reimbursement that turned on whether the particular provider was in-network or

United States District Court
Northern District of California

out-of-network.  Therefore, the communication relates to United's fiduciary duties with respect to administration of the member's plan and the fiduciary exception applies unless the nature of the claim dispute that was the subject of these communications was entirely unrelated to the issues raised by Plaintiffs in this case.  Further, there is nothing in this communication that indicates there had been a final administrative denial or that there was litigation pending in connection with the dispute.  Therefore, on the current record, United has not established that this communication was properly withheld.

UHC000014446:  This document is described in the privilege log as "Email chain reflecting legal advice from United in-house counsel Susan Tully Abdo regarding response to complaint from NYDFS."  However, there are only two brief references to Tully-Abdo's legal advice, on page one and page four of the document.  The remainder of the email chain does not appear to reflect or seek legal advice.  Nor is it clear whether the legal advice that is referenced in the email chain related to a fiduciary obligation.  To the extent the NYDFS complaint was pursued on behalf of plan members with complaints about United's administration of their plans this legal advice may fall under the fiduciary exception.  Finally, it is not clear from the email exchange that there was any imminent or pending litigation that would render this communication defensive.  To the extent United seeks to withhold this communication on the basis of privilege it needs to provide an affidavit from an attorney involved in the communication establishing that it was not made in connection with fiduciary acts or that there was actual or imminent litigation related to the communication.

## E.   Whether Crime-Fraud Exception Applies

### 1.   Legal Standards

"Under the crime-fraud exception, communications are not privileged when the client 'consults an attorney for advice that will serve him in the commission of a fraud' or crime." *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (citing *In re Napster, Inc. Copyright Litig*., 479 F.3d 1078, 1090 (9th Cir.2007), abrogated in part on other grounds by *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)(quoting *Clark v. United States*, 289 U.S. 1, 15 (1933)).  A party that invokes the crime-fraud exception must satisfy the following two-part

United States District Court
Northern District of California

test:

> First, the party must show that "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." Second, it must demonstrate that the attorney-client communications for which production is sought are "sufficiently related to" and were made "*in furtherance of* [the] intended, or present, continuing illegality."

*Id*. (citations omitted) (alteration and emphasis added in *In re Napster*). "In a civil case in the Ninth Circuit, 'the burden of proof that must be carried by a party seeking outright disclosure of attorney-client communications under the crime fraud exception should be preponderance of the evidence.'" *Nat.-Immunogenics Corp. v. Newport Trial Grp*., No. 15CV02034JVSJCGX, 2020 WL 8816475, at *2 (C.D. Cal. May 15, 2020) (quoting *Napster*, 479 F.3d at 1094-95). "'[J]udicious use of in camera review, combined with a preponderance burden for terminating privilege, strikes a better balance between the importance of the attorney-client privilege and deterrence of its abuse than a low threshold for outright disclosure.'" *Id*. (quoting *Napster*, 479 F.3d at 1096).

### 2. Discussion

Given the relatively high standard for this exception, at this point Plaintiffs have not established that any particular document is subject to disclosure under the crime-fraud exception.

## IV.   CONCLUSION

United is ordered to review the documents in dispute, produce all documents that are not privileged under the guidance issued herein and produce to Plaintiffs a new privilege log and supplemental declarations to support its claims of privilege where appropriate. This process should be completed by August 19, 2022. By August 26, 2022, the parties will meet and confer and propose a schedule for briefing any remaining disputes related to United's assertion of attorney-client privilege and work product protection that were raised in the Motion.

**IT IS SO ORDERED.**

Dated:  August 5, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge

33

United States District Court
Northern District of California