1  Matthew M. Lavin (pro hac vice)
   matt.lavin@agg.com
2  Aaron R. Modiano (pro hac vice)
   aaron.modiano@agg.com
3  **Arnall Golden Gregory LLP**
   2100 Pennsylvania Avenue, NW
4  Suite 350S
   Washington, D.C. 20037
5  Telephone:    202.677.4030
   Facsimile:    202.677.4031
6
7  David M. Lilienstein, SBN 218923
   david@dllawgroup.com
   Katie J. Spielman, SBN 252209
8  katie@dllawgroup.com
   **DL Law Group**
9  345 Franklin St.
   San Francisco, CA 94102
10 Telephone:    415.678.5050
   Facsimile:    415.358.8484
11
   Attorneys for LD, DB, BW, RH, CJ, and the Putative Class
12
13             **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
14                    **OAKLAND DIVISION**
15
16 LD, et al.,                          Case No. 4:20-cv-02254-YGR-JCS
17            Plaintiffs,               Hon. Yvonne Gonzalez Rogers
18     v.                               **Plaintiffs' Notice of Renewed Motion,**
                                        **Renewed Motion, and Memorandum of**
19 United Behavioral Health, Inc., et al., **Points and Authority in Support of**
                                        **Renewed Motion for Class Certification**
20            Defendants.
                                        Date: _____
21
22                                      Time: 2pm
23                                      Location: Oakland Courthouse Courtroom 1 –
                                        4th Floor 1301 Clay Street Oakland, CA
24                                      94612
25
26
27
28

*(left margin, vertical text)* ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

## Table of Contents

I.   Proposed Class Definition ................................................................................................2

II.  Factual Background ..........................................................................................................3

A.  Defendants were required to price OON claims at UCR, but applied Viant in a
manner that was incapable of producing UCR for IOP claims .............................3

1.  United manages health plans that provide OON coverage for IOP services. ...............3

2.  United confirmed on verification of benefits calls that claims would be
reimbursed based on UCR. ............................................................................6

3.  Defendants provided forms to patients and providers that confirmed the
application of Viant pricing to their claims without providing detail on their
methodology or an adequate opportunity to contest. .....................................8

B.  Defendants' Viant methodology used inappropriate and irrelevant data sources
that were incapable of producing usual and customary pricing ............................9

1.  Usual and customary pricing requires appropriate data sources to determine
what is usual and customary. .........................................................................9

2.  Viant priced IOP claims using inappropriate and irrelevant data sources
designed to maximize Defendants' profits. ..................................................10

C.  Defendants profited off their scheme through disguised "savings" fees. .........................15

III. Legal Standard ...............................................................................................................16

IV.  Analysis ..........................................................................................................................17

A.  Plaintiffs satisfy the requirements of Rule 23(a). ..............................................17

1.  Plaintiffs have established commonality. ....................................................17

2.  Plaintiffs are sufficiently numerous. ..........................................................24

3.  Plaintiffs are typical and adequate. ............................................................24

B.  Plaintiffs satisfy the requirements of Rule 23(b). ..............................................25

1.  Plaintiffs satisfy Rule 23(b)(1) (incompatible standards class). ................26

2.  Plaintiffs satisfy Rule 23(b)(2) (injunctive class). .....................................27

3.  Plaintiffs satisfy Rule 23(b)(3) (money damages class). ............................27

C.  Plaintiffs have provided an adequate damages model for determining putative
class members' damages for underpayment of benefits. ....................................29

Case No. 4:20-cv-02254-YGR-JCS                                    Plaintiffs' Renewed Motion to Certify

V.  Conclusion ..................................................................................................................31

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

Case No. 4:20-cv-02254-YGR-JCS                    Plaintiffs' Renewed Motion to Certify

**Exhibit List**

| Ex. No. | Description |
| --- | --- |
| 1 | RPC Expert Report |
| 2 | Hall Expert Report |
| 3 | Ohsfeldt Expert Report |
| 4 | Paradise Deposition (United 30(b)(6)) |
| 5 | Praxmarer Deposition |
| 6 | Kienzle Deposition |
| 7 | Crandell Deposition |
| 8 | Borsten Deposition |
| 9 | Bradley Deposition |
| 10 | Lopez Deposition |
| 11 | Franco Deposition |
| 12 | Strait Deposition (UBH 30(b)(6)) |
| 13 | BW Deposition |
| 14 | Ralston Declaration |
| 15 | Crandell Declaration |
| 16 | Franco Declaration |
| 17 | SPD Composite |
| 18 | VOB Composite |
| 19 | IBAAG Composite |
| 20 | VOB Recording Composite |
| 21 | EOB Composite |
| 22 | PRA Composite |
| 23 | PAD Composite |
| 24 | EOM Composite |
| 25 | Composite ASAs |
| 26 | Viant Savings Composite |
| 27 | Non-IOP EOB/PRA Composite |
| 28 | MultiPlan 2021 DOL Emails (MPI-0016819) |
| 29 | Viant OPR Pricing Logic (MPI-0014879) |
| 30 | MultiPlan 2018 H0015 Emails (MPI-0016580) |
| 31 | MultiPlan 2021 DOL Grim Memo (MPI-0014844) |
| 32 | MultiPlan R&C Reduction Emails (MPI-0015753) |
| 33 | MultiPlan 2011 Proposed DOL Responses (MPI-0015933) |
| 34 | Beckstead Declaration Draft (MPI-0016593) |
| 35 | MultiPlan Talking Points (MPI-0016794) |
| 36 | Lopez Email 3/31/20 (UHC000015587) |
| 37 | Viant Standard Missing Value Approach (MPI-0008890) |
| 38 | OON Program Overview (UHC000038587) |
| 39 | Summit Appeal Letter (UBH000003011) |
| 40 | Summit Financial Consent (PLD0003006) |
| 41 | United's OON Procedures (UHC000197899) |
| 42 | United Remark Code Policies (UHC000071826) |
| 43 | Viant 2016 White Paper (MPI-0008643) |
| 44 | Viant 2016 Methodology (MPI-0000488) |

i

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

| 45 | Viant 2009 Methodology (MPI-0007803) |
| 46 | Beckstead 2018 Mapping Email (MPI-0012799) |
| 47 | Crandell Schill Emails (MPI-0002008) |
| 48 | Beckstead Crandell Email (MPI-0014299) |
| 49 | United Fee Percentage Data (UHC000296122) |
| 50 | Shared Savings Fee Revenue (MPI-0009603) |
| 51 | Optum Behav. Health Reimbursement Policy (https://perma.cc/R28H-PCNJ) |
| 52 | 2020 Olson Email (UHC000091861) |
| 53 | 2019 Edwards Email (MPI-0009434) |
| 54 | 2018 Lopez Emails (UHC000131783) |
| 55 | 2018 IBAAG Emails (UHC000030972) |
| 56 | 2020 Tunnel Emails (UHC000091543) |

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone 202.677.4040

ii

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. B. v. Hawaii State Dep't of Educ.*,
  30 F.4th 828 (9th Cir. 2022) ...................................................................24

*Abdullah v. U.S. Sec. Assocs.*,
  731 F.3d 952 (9th Cir. 2013) .............................................................23, 28

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ..................................................................................16

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ..................................................................................16

*Arredondo v. Univ. of La Verne*,
  341 F.R.D. 47 (C.D. Cal. 2022) ................................................................25

*Ballas v. Anthem Blue Cross Life & Health Ins.*,
  2013 WL 12119569 (C.D. Cal. Apr. 29, 2013) .........................................26

*Bauer v. Kraft Foods Glob.*,
  277 F.R.D. 558 (W.D. Wis. 2012) ............................................................28

*Bristol SL Holdings, Inc. v. Cigna Health & Life Ins.*,
  2022 WL 137547 (9th Cir. Jan. 14, 2022) ................................................23

*Brooks v. Educators Mut. Life Ins.*,
  206 F.R.D. 96 (E.D. Pa. 2002) ...........................................................18, 28

*Chun-Hoon v. McKee Foods Corp.*,
  2006 WL 3093764 (N.D. Cal. Oct. 31, 2006) ...........................................17

*Churchill v. Cigna Corp.*,
  2011 WL 3563489 (E.D. Pa. Aug. 12, 2011) ............................................19

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011)...................................................................................30

*Cole v. Asurion Corp.*,
  267 F.R.D. 322 (C.D. Cal. 2010) ........................................................22, 24

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).....................................................................................30

*Coopers & Lybrand v. Livesay*,
  437 U.S. 463 (1978)...................................................................................16

*Des Roches v. California Physicians' Serv.*,
    320 F.R.D. 486 (N.D. Cal. 2017) ............................................................26

*Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*,
    2016 WL 5938722 (C.D. Cal. May 16, 2016) ........................................21

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    2013 WL 12333442 (N.D. Cal. Jan. 8, 2013) .........................................27

*Elkies v. Johnson & Johnson Servs.*,
    2018 WL 11223465 (C.D. Cal. Oct. 18, 2018) .......................................30

*In re First All. Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) ...........................................................22, 23

*Franco v. Connecticut Gen. Life Ins.*,
    289 F.R.D. 121 (D.N.J. 2013) ........................................................19, 21

*Fuller v. Fruehauf Trailer Corp.*,
    168 F.R.D. 588 (E.D. Mich. 1996) .........................................................19

*Geddes v. United Staffing All. Emp. Med. Plan*,
    469 F.3d 919 (10th Cir. 2006) ................................................................19

*Haddock v. Nationwide Fin. Servs.*,
    293 F.R.D. 272 (D. Conn. 2013) ...........................................................28

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..................................................................24

*Head v. Citibank*,
    340 F.R.D. 145 (D. Ariz. 2022) .............................................................29

*Hilario v. Allstate Ins.*,
    2022 WL 17170148 (N.D. Cal. Nov. 22, 2022) ....................................29

*Hodges v. Akeena Solar, Inc.*,
    274 F.R.D. 259 (N.D. Cal. 2011) ..........................................................29

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*,
    102 F.R.D. 457 (N.D. Cal. 1983) ..........................................................17

*Jimenez v. Allstate Ins.*,
    765 F.3d 1161 (9th Cir. 2014) ..........................................................23, 28

*Johnson v. City of Grants Pass*,
    50 F.4th 787 (9th Cir. 2022) ...................................................................24

*Joint Equity Comm. of Invs. v. Coldwell Banker Real Est.*,
    281 F.R.D. 422 (C.D. Cal. 2012) ...........................................................22

iv

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone, 202.677.4040

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

*Kanawi v. Bechtel Corp.*,
    254 F.R.D. 102 (N.D. Cal. 2008)........................................................................26

*Kazda v. Aetna Life Ins.*,
    2022 WL 1225032 (N.D. Cal. Apr. 26, 2022) ...................................................24

*Leyva v. Medline Indus.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................................28

*In re Lithium Ion Batteries Antitrust Litig.*,
    853 Fed. Appx. 56 (9th Cir. 2021)....................................................................25

*Med. Soc'y of New York v. UnitedHealth Grp. Inc.*,
    2019 WL 6888613 (S.D.N.Y. Dec. 18, 2019) ..................................................20

*In re Mersho*,
    6 F.4th 891 (9th Cir. 2021) ...............................................................................25

*Middlesex Cnty. Ret. Sys. v. Semtech Corp.*,
    2010 WL 11507255 (C.D. Cal. Aug. 27, 2010).................................................28

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
    823 F.3d 948 (9th Cir. 2016), *as amended* (Aug. 18, 2016)..............................27

*Nationwide Life Ins. v. Haddock*,
    460 F. App'x 26 (2d Cir. 2012) ........................................................................28

*Negrete v. Allianz Life Ins.*,
    238 F.R.D. 482 (C.D. Cal. 2006) ......................................................................18

*Negrete v. Allianz Life Ins.*,
    287 F.R.D. 590 (C.D. Cal. 2012) ......................................................................23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ........................................................16, 17, 21, 28

*Out-of-Network Substance Use Disorder Claims*,
    2023 WL 2808747 (C.D. Cal. Jan. 13, 2023) ...................................................23

*Parra v. Bashas', Inc.*,
    536 F.3d 975 (9th Cir. 2008) ............................................................................23

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ............................................................................19

*Peters v. Aetna*,
    2 F.4th 199 (4th Cir. 2021) ...............................................................................21

*Postawko v. Missouri Dep't of Corr.*,
    2017 WL 3185155 (W.D. Mo. July 26, 2017)..................................................20

v

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

*Raffin v. Medicredit, Inc.*,
  2017 WL 131745 (C.D. Cal. Jan. 3, 2017) ........................................................................25

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ...................................................................................16, 17

*Santillan v. Gonzales*,
  388 F. Supp. 2d 1065 (N.D. Cal. 2005) ..........................................................................18

*Shuman v. SquareTrade, Inc.*,
  2022 WL 10177658 (N.D. Cal. Oct. 17, 2022)..................................................................29

*Smith v. United HealthCare Servs., Inc.*,
  2002 WL 192565 (D. Minn. Feb. 5, 2002) ......................................................................19

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ...................................................................................17, 24

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)........................................................................................................23

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013).............................................................................................19

*Wachtel v. Guardian Life Ins.*,
  223 F.R.D. 196 (D.N.J. Aug. 5, 2004) ............................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...................................................................................................17, 27

*Waters Corp. v. Millipore Corp.*,
  2 F. Supp. 2d 66 (D. Mass. 1997) ...................................................................................18

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) .................................................................20

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009) ...........................................................................................20

*Williams v. Oberon Media, Inc.*,
  468 F. App'x 768 (9th Cir. 2012) .....................................................................................24

*Wit v. United Behav. Health*,
  58 F.4th 1080 (9th Cir. 2023) ..........................................................................................30

*Yokoyama v. Midland Nat. Life Ins.*,
  594 F.3d 1087 (9th Cir. 2010) .....................................................................................23, 28

## Notice of Motion & Motion

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on _____, at 2 pm in Courtroom 1 – 4th Floor before the Honorable Yvonne Gonzalez Rogers, Plaintiffs in the above-captioned action hereby move for class certification pursuant to Federal Rule of Civil Procedure 23.

The relief Plaintiffs request in this motion is an order: (1) certifying the proposed class defined below; (2) appointing Plaintiffs as representatives of the Class; and (3) appointing Plaintiffs' counsel, Arnall Golden Gregory LLP, as class counsel for the Class, as well as any other relief that this Court deems appropriate and proper. This motion is brought pursuant to Fed. R. Civ. P. 23, and is supported by this Notice of Motion, Motion, and accompanying Memorandum of Points and Authorities, the Declaration of Aaron R. Modiano and all exhibits thereto, all pleadings on file in this lawsuit, and such other support as Plaintiffs may present to this Court.

## Statement of Issues to Be Decided

The issues for this Court to decide are: (1) whether the Court should certify the proposed Class under Fed. R. Civ. P. 23; (2) whether the Court should appoint the Plaintiffs as Class representatives for the Class; and (3) whether the Court should appoint Arnall Golden Gregory LLP as class counsel for the Class.

Plaintiffs' Renewed Motion to Certify

1

2 <u>**Memorandum of Points & Authorities**</u>

3       This case is about Defendants' scheme to underpay nearly 90,000 medical claims.

4 Plaintiffs and the putative class members are 11,280 patients insured or formerly insured by

5 Defendants UnitedHealthcare Insurance Company and United Behavioral Health (together,

6 "United") through employer-sponsored health plans. These patients received valid, medically

7 necessary out-of-network ("OON") treatment for intensive outpatient services ("IOP") relating to

8 mental health or substance use disorders ("MH/SUD"). Their providers submitted claims to

9 United under HCPCS code H0015 or revenue code 0906. United sent these claims to Defendant

10 MultiPlan, Inc. who "repriced" them with its "cost-containment" tool, Viant OPR ("Viant").

11       Every putative class member's health plan participated in United's Reasonable and

12 Customary ("R&C") program. That program required usual and customary rate ("UCR") pricing

13 for all OON claims—including claims for IOP services. To calculate UCR, United routed some

14 types of claims to MultiPlan for "repricing," and for most types of routed claims, MultiPlan

15 probably did calculate UCR. In the case of IOP claims, however, MultiPlan's Viant methodology

16 was incapable of producing a legitimate UCR because its chosen datasets did not include

17 statistically valid, representative, or relevant data on H0015 or 0906 claims. Instead, Defendants

18 used inappropriate and irrelevant alternatives designed to minimize the price so that it was a

19 small fraction of UCR or the billed amount. They did so because plans paid United a "savings

20 fee" measured by the difference between the amount providers billed and Defendants' Viant-

21 priced payment. United charged the "savings fee" to plans and paid a portion of that fee to

22 MultiPlan.

23       This underpricing scheme left Plaintiffs financially responsible for the $300 million

24 shortfall between the UCR required by their plans and Viant-priced payments. At the same time,

25 Plaintiffs' premiums funded the plans' payments of the bogus "savings fee"—a fabricated

26 difference totaling over $100 million resulting from Defendants' pricing chicanery—leaving

27 Plaintiffs doubly hurt. Defendants' scheme raises questions about health care access, corporate

28 responsibility, and broken promises. United, the largest single healthcare company in the United

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 1000
Washington, DC 20037
Telephone: 202.677.4040

States, wields disproportionate power and control over the healthcare landscape. It has used this power to create a byzantine system that in the case of IOP claims targets a vulnerable population—individuals grappling with MH/SUD disorders and earnestly striving for recovery. This case is the only chance for these individuals to receive the healthcare benefits they were promised.

Indeed, Rule 23 is the *only* appropriate and practical method for adjudicating the claims in this case. The members of the putative class suffered a common wrong from a common scheme and have borne the cost of treatment they paid to insure. Although Defendants underpaid putative class members' claims by hundreds of millions of dollars, absent class certification, the number and value of the individual claims at issue make separate suits inefficient and cost prohibitive. This case is the putative class members' last chance.

Common legal and factual issues predominate. Every putative class member's plan participated in United's R&C program, which required UCR pricing of OON IOP claims. Defendants represented to providers on verification of benefits ("VOB") calls that they would pay IOP claims at UCR. Every putative class member received IOP services that generated claims under H0015 or 0906. Defendants paid these claims without dispute because they were medically necessary. Defendants *underpaid*, however, because they priced every IOP claim using a Viant methodology that relied on data that was incapable of producing a UCR rate, as required by the R&C program and plan language. This underpayment left class members financially responsible to their providers and resulted in Defendants receiving millions in ill-gotten phantom "savings" fees from putative class members' plans.

## I.    Proposed Class Definition

Plaintiffs propose the following class definition:

> Any member of a health benefit plan administered or issued by United and governed by ERISA, where the member's plan utilized United's "Reasonable and Customary" program for out-of-network benefits, and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906, priced by MultiPlan's Viant methodology, and never adjusted, during the class period January 1, 2015, to the present.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

## II.    Factual Background

Plaintiffs bring claims under ERISA and RICO for Defendants' scheme to systematically underprice Plaintiffs' IOP claims through Viant. Plaintiffs' claims are brought under: (1) ERISA § 502(a)(1)(B) (Denial of Benefits); (2) ERISA § 502(a)(3) (Breach of Fiduciary Duty); and (3) 18 U.S.C. §§ 1341 & 1343 for violations under 18 U.S.C. § 1962(c)–(d) (RICO).[1]

### A. Defendants were required to price OON claims at UCR, but applied Viant in a manner that was incapable of producing UCR for IOP claims.

A significant part of United's business is the issuance and administration of ERISA health plans. As part of this business, United works with employers to draft plans that set forth coverage details for plan members. *See* Paradise (United 30(b)(6)) Depo., Ex. 4, 22:23–23:6, 45:24–46:18, 229:20–25. Among these details is the handling of out-of-network claims.

#### 1.   *United manages health plans that provide OON coverage for IOP services.*

Health insurers like United contract with health providers to participate "in-network." In-network providers agree to accept reimbursement rates set by United for covered healthcare services they provide and promise not to bill patients for more than any agreed-upon cost-share. Conversely, out-of-network providers have no contractual relationship with United. They have not agreed to accept any specified reimbursement rate for their services and instead bill at their usual rates. United then determines how much of this charge is covered by the patient's plan. Patients are accountable for the rest. *See* Lopez Email 3/31/20, Ex. 36 (UHC000015587); Praxmarer Depo., Ex. 5, 177:4–9, 183:22–183:1, 185:6–21; Kienzle Depo., Ex. 6, 116:3–17; Ralston Decl., Ex. 14 ¶ 12; Paradise 64:13–18.

Health plans favor in-network services—often imposing more cost-sharing obligations on OON services—because insurers can control costs more effectively through in-network contracts. Ohsfeldt Exp. Rep., Ex. 3 ¶¶ 4.1–4.4. However, patients may sometimes need OON providers due to emergencies or lack of in-network options. *See id.* ¶¶ 4.2–4.10; Paradise 274:6–19. For this and other reasons, patients and employers are often willing to pay more for plans with better OON coverage options. *See* BW Depo., Ex. 13, 85:3–18; *see also* Paradise 125:10–

[1] The parties filed a Joint Submission Regarding Elements of Plaintiffs' Asserted Causes of Action which lists out the detailed requirements of each claim. *See* Dkt. No. 290.

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave. NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

126:7. In the case of IOP services, it is more common for patients to use OON providers due to the limited network of behavioral health outpatient providers—even though patients often face substantial additional out-of-pocket financial liability for going OON through cost-sharing obligations and balance billing (i.e., paying the uncovered portion of their health claim). Ohsfeldt ¶¶ 4.9–4.10. This case involves only out-of-network IOP claims.

IOP services are billed under HCPCS code H0015: "Alcohol and/or drug services; intensive outpatient (treatment program that operates at least 3 hours/day and at least 3 days/week . . . based on an individualized treatment plan), including assessment, counseling, crisis intervention, and activity therapies or education." Viant Standard Missing Value Approach ("VSMVA"), Ex. 37 (MPI-0008890). H0015 is a daily code and one unit of H0015 corresponds to at least 3 hours of treatment over a single day. RPC Exp. Rep., Ex. 1 ¶ 50. Some providers bill IOP services under revenue code 0906. The only HCPCS code associated with 0906, however, is H0015 and so claims administrators, including Defendants, automatically assign H0015 to claims billed under 0906.[2] *See* VSMVA; RPC ¶ 31; Crandell Depo., Ex. 7,74:16–75:12.

IOP services include both a professional and facility component. The professional component relates to services rendered by the healthcare provider. RPC ¶¶ 19–20. The facility component relates to the costs associated with the facility where healthcare services are performed. RPC ¶ 20; Crandell Decl., Ex. 15 ¶¶ 11–12. Payment for IOP services should include payment for both the professional and facility components of the service. This occurs in one of two ways. First, H0015 claims may be billed as an all-inclusive per diem charge, which provides payment for both the professional and facility components of the IOP services. RPC ¶ 20; Borsten Depo., Ex. 8, 38:23–39:6, 74:21–24. Alternatively, H0015 claims may be billed as a standalone facility fee only, in which case the professional services are billed separately under different codes. RPC ¶ 25. However IOP services are billed, the professional component of IOP services is generally the largest component of the total charge, usually at least 70%. RPC ¶ 26. In this case, all providers billed H0015 as an all-inclusive per diem charge. *See, e.g.*, RPC ¶ 20; Borsten 363:16–20. Indeed, private insurers, *including United*, require H0015 to be billed at a

---

[2] For this reason, references here to H0015 claims include claims billed to 0906.

1    per diem rate. RPC ¶ 21 (citing sources); Optum Behav. Health Reimbursement Policy, Ex. 51

2    (https://perma.cc/R28H-PCNJ). Nevertheless, Viant priced the H0015 claims using data that

3    included only H0015 stand-alone, non-*per diem* facility fees. RPC ¶¶ 19–20; Crandell 86:5–7. In

4    doing so, Viant ignored the professional component of H0015 and provided payment for only the

5    smaller facility portion. RPC ¶¶ 22–23; *see* Crandell Decl. ¶¶ 11–12; *see*, *infra*, II.B.

6         United organizes and administers its health plans through standardized "programs."

7    Paradise 30:24–31:4. This case involves only one program: the R&C program. *Id.* 30:5–8,

8    163:6–10; *see also* 2020 Olson Email (UHC000091861), Ex. 52. The health plans United offers

9    to employers are rarely, if ever one-of-a-kind—United could not possibly administer tens of

10   thousands of *sui generis* health plans. Instead, United offers plans that are part of "programs"

11   with shared characteristics. *See* Paradise 142:14–144:25; OON Program Overview, Ex. 38

12   (UHC000038587); Bradley Depo., Ex. 9, 46:4–47:3. United offers these programs to employers

13   for selection in building the health plans they prefer and provides template language to support

14   these offerings. *See, e.g.*, Paradise 46:5–12, 50:9–52:17, 54:2–20.

15        The R&C program provides coverage rules for reimbursing OON claims. Although the

16   wording of plans within the program may differ, their substance is identical: They reimburse

17   OON services based on the "usual and customary"[3] rate of providers providing the same services

18   in the same geographic area. *See* Ex. 17 (SPD composite); Lopez Depo., Ex. 10, 23:16–20, 92:4–

19   94:13; Bradley 48:15–49:19; Paradise 55:7–21, 209:12–210:9. "Usual and customary" is a term

20   of art, regularly used and commonly understood within the healthcare industry. Hall Exp. Rep.,

21   Ex. 2 ¶ 5 & Appx. A; Praxmarer 25:20–22, 28:6–22. It means what it sounds like: "Usual and

22   customary" is the rate that represents a percentile—usually the 80th percentile—of similar rates

23   charged by similar providers in the same geographic area. *See* RPC ¶ 69; Ohsfeldt ¶¶ 1.3.8, 5.4–

24   5.5; Lopez 23:16–20, 92:4–94:13; Praxmarer 25:20–22, 28:6–22; Kienzle 112:12–19.

25        Here, because every claim was administered within the R&C program, every claim

26   should have been paid—according to plan language required by the R&C program—based on

27   _____

28   [3] "Reasonable and customary," "usual and customary," and like phrases denote the same
     meaning and are used interchangeably in the industry, including by United, and in this
     memorandum. Hall ¶ 5; Ralston ¶ 7; Franco Depo., Ex. 11, 33:11–13.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

the "usual and customary" rates of providers rendering the same services in the same geographic area. Instead, Defendants priced every R&C IOP claim through Viant using data methodologies that were incapable of producing UCR. *See* Lopez 32:2–6; Bradley 43:24–44:9, 59:12–60:14; RPC ¶ 2; Ralston ¶¶ 9, 11, 21–22, 25; 2019 Edwards Email, Ex. 53 (MPI-0009434).

### 2. *United confirmed on verification of benefits calls that claims would be reimbursed based on UCR.*

When a patient seeks treatment from an OON provider, those providers contact the patient's insurer to determine whether and to what extent the patient's treatment will be covered. *See, e.g.*, Franco Depo., Ex. 11, 30:10–31:5. Otherwise, providers risk providing costly treatment to a patient who may not otherwise be able to pay for treatment—especially in the MH/SUD context. The call a provider makes to a patient's insurer is referred to as a "verification of benefits" call. Here, putative class members' providers made recorded VOB calls to United's agents to determine how United would pay for IOP treatment. *See* Strait (United Behavioral Health 30(b)(6)) Depo, Ex. 12, 68:1–5, 69:3–9, 170:11–21, 177:11–18, 180:1–9. On these calls, providers verified the patients' active insurance, their eligibility for applicable benefits, and the reimbursement method for prospective authorized services. Franco 30:14–31:5, *see also* Ex. 18 (VOB Composite).

Providers rely on the information from VOB calls to determine whether to proceed with a patient's treatment. *See* Summit Appeal Ltr., Ex. 39 (UBH000003011); Summit Fin. Consent, Ex. 40 (PLD0003006); Strait 203:10–204:6. Indeed, United expected providers to rely on the accuracy of the information providers received. Strait 91:10–13, 202:21–204:6. United knew that providers did not have access to actual plans, and so, VOB calls were their primary and generally only source of information for how the claims would be paid. United also knew that *patients* rely on United's VOB representations: Providers relay VOB representations to patients to inform them of their expected payment obligations, which patients rely on to determine whether to proceed with treatment. *See*, *e.g.*, Strait 186:11–21, 203:10–204:6; Franco 36:12–22.

Health insurance companies like United employ dedicated staff and develop standard protocols to handle the high volume of VOB calls they receive. *See* Strait 126:3–14; Paradise 246:23–247:1; United's OON Procedures, Ex. 41 (UHC000197899); Hall ¶ 2; *see also* Strait

6

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

64:1–3. They could not otherwise handle the millions of calls in an individualized manner. For the claims in this case, United employed the same protocol to handle all OON claims relating to the R&C program. Specifically, United's staff used its Internal Benefits at a Glance ("IBAAG") system to respond to benefit inquiries from behavioral health providers. *See* Paradise 244:3–12; Strait 36:1–6, 124:1–125:10, 126:3–9; Ex. 19 (IBAAG composite).

IBAAG is a software program that determines how United agents handle VOB calls. It tells agents how to respond—through scripts—based on the information they obtain from providers. *See* Strait 64:1–3, 124:16–125:10, 125:25–126:9; Bradley 129:14–22, 131:2–25. Here, IBAAG relayed R&C program requirements for IOP claims to United's agents to deliver to providers. That is, IBAAG directed agents to inform providers that the patient's plan reimbursed IOP claims according to a specified percentile—usually 80th percentile—of the UCR of similar providers providing the same services in the same geographic area. *See* Strait 87:22–88:5, 182:7–183:8, 199:5–12, 202:21–204:6; IBAAG composite; *see* 2018 Lopez Emails, Ex. 54 (UHC000131783); 2018 IBAAG Emails, Ex. 55 (UHC000030972). Such UCR pricing is standard in the industry and well-understood by the providers contacting United. Praxmarer 25:20–22, 28:6–22; Franco 33:11–13; Hall ¶ 5. IBAAG did not include any actual plans or plan language, nor any information on the possibility that claims might be "repriced" under a methodology different than the R&C program—like Viant. *See* IBAAG composite; Strait 81:24–82:4, 180:1–9. In fact, from Defendants' perspective, agents did not need access to plans or plan language: All plans were part of the R&C program, which applied the same coverage rules to OON claims regardless of variations in plan language. *See* Strait 81:17–82:4; Paradise 226:17–19, 249:23–250:4.

Agents did not have information other than the information provided by IBAAG. Indeed, agents had no reason or basis to deviate from the information IBAAG provided. Simply put, United agents followed the script. *See, e.g.*, Strait 125:5–19. Accordingly, even though the style of a VOB conversation might vary due to the diversity of human conversation, the substance did not. *See* Ex. 20 (VOB recording composite).

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

### 3. Defendants provided forms to patients and providers that confirmed the application of Viant pricing to their claims without providing detail on their methodology or an adequate opportunity to contest.

Once providers submitted H0015 claims to United subject to the R&C program, United routed those claims to Viant, Viant priced those claims, and United paid the Viant amount to providers. *See*, *e.g.*, Bradley 60:8–14. Neither providers nor patients learned about the Viant pricing until *after* it had occurred, through various documents. Franco Decl., Ex. 16 ¶¶ 6–9; Bradley 175:22–178:16; Strait 157:15–158:2; Kienzle 328:11–22. First, United provided patients with statements known as Explanations of Benefits ("EOBs"). *See* Ex. 21 (EOB composite). These documents indicated that the claims were priced by Viant and directed members to contact Viant for any inquiries. EOBs did not indicate that a claim was priced under the R&C program or other information that would have been necessary for a member to understand that a claim had been underpriced. *See* Strait 147:1–151:19. All EOBs included "remark codes" that categorize the claims. All R&C program claims priced by Viant—without any modification or additional payments—included a "CY" remark code.[4] *See* Kienzle 327:1–5; Paradise 275:9–276:10, Franco Decl. ¶ 8. This case involves only claims that include the "CY" remark code. Second, United sent providers Provider Remittance Advices ("PRAs") containing the same information, directions, and "CY" remark code. *See* Ex. 22 (PRA composite); Paradise 68:21–72:24. Third, both patients and providers received Patient Advocacy Department ("PAD") letters. *See* Paradise 72:8–24; Praxmarer 62:10–14; Kienzle 136:2–7; Ex. 23 (PAD composite). This letter told patients and providers to contact Viant directly regarding any questions about the reimbursement amount. If patients or providers contacted United upon learning that their claim was priced by Viant, they were directed back to Viant. *See* Franco Decl. ¶ 13; Franco 159:21–160:8; Praxmarer 102:2–10, 103:2–22; Paradise 313:5–14. Notably, Viant call specialists were compensated based in part on how much "savings" they generated on claims. Praxmarer 49:13–17, 175:23–176:3. Finally, if a provider contacted Viant, Viant would also send providers an Explanation of

---

[4] Other types of claims had different remark codes. For example, claims that involved additional payments beyond the Viant amount (i.e., negotiated or adjusted claims) received an "IX" code. *See* United Remark Code Policies, Ex. 42 (UHC000071826); Paradise 280:15–23. The proposed class does not include IX code claims—only "CY" code claims.

Methodology ("EOM"). EOMs represented that the reimbursement amount reflected a UCR amount. *See* Praxmarer 1156:14–22; Ex. 24 (EOM composite).

### B. Defendants' Viant methodology used inappropriate and irrelevant data sources that were incapable of producing usual and customary pricing.

United's R&C program provides for UCR pricing of OON claims. *See, e.g.*, Paradise 163:6–20, 209:9–210:9, 232:8–25; Kienzle 106:21–107:8; Ralston ¶ 8. United contracted with MultiPlan, a "repricer," to price OON claims at UCR—that is, to select a new, lower UCR amount to recognize as "eligible" for coverage instead of a provider's billed charge. MultiPlan uses Viant as its proprietary repricing methodology. *See, e.g.*, Paradise 29:16–19; Praxmarer 30:8–9. MultiPlan claims Viant provides UCR pricing, but in the case of H0015 services, Viant's actual purpose is to manufacture discounts from providers' billed charges by misrepresenting its rates as UCR.[5] *See* Praxmarer 32:1–15; Viant 2016 White Paper; *see also* Paradise 191:4–20 (acknowledging repricing facility R&C program generated "about a billion dollars" of revenue for United in 2021). Indeed, although United's R&C program required an appropriate and statistically valid dataset that could produce a UCR for H0015 claims, Viant's dataset was incapable of doing so.

#### 1. Usual and customary pricing requires appropriate data sources to determine what is usual and customary.

UCR pricing requires reference to an appropriate database. Otherwise, there is no way to determine a specified percentile of UCR of similar providers providing the same services in the same geographic area. An appropriate database must have a large sample of relevant charge data for similar medical services provided in similar geographic areas. *See* RPC ¶ 38. For example, Defendants use the FAIR Health database to price *physician* OON clams. Paradise 22:6–19; *see also* 2020 Tunnel Emails, Ex. 56 (UHC000091543). FAIR Health is an independent nonprofit that manages the nation's largest database of privately billed health insurance claims.[6] Its database includes more than 38 billion private claims. FAIR Health organizes its data by both

---

[5] In fact, for other, even *higher* levels of MH/SUD treatment, Defendants paid appropriate UCR rates. *See* Ex. 27 (Non-IOP EOB/PRA composite).

[6] FAIR Health was established following an investigation by the New York Attorney General into, among other things, United's alleged misuse of its earlier proprietary UCR database, "Ingenix," to set unreasonably low provider reimbursement rates.

9

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

procedure code and geographic area. The FAIR Health dataset, unlike Viant's datasets, is relevant and appropriate. Accordingly, United's use of FAIR Health for physician fees—unlike Viant's application to H0015 per diem claims—is appropriate under the R&C program, consistent with plan language, and aligned with the best interests of plan members. *See* Ohsfeldt ¶¶ 9.2, 10.6; Hall ¶ 7.

In some instances, a dataset will not contain data on a particular service. For example, FAIR Health did not publish H00015 claims data for claims prior to 2020. *See* Ohsfeldt ¶ 9.4. In instances like this, a claims administrator like United could turn to other data—like United's own claim data—or an appropriate crosswalking methodology. In this context, crosswalking refers to using the charge data for similar or analogous services with available data as a proxy to determine UCR for the service without sufficient data. Hall ¶ 7; Paradise 221:1–21; Kienzle 76:3–4. Crosswalking may not be applied in an arbitrary fashion, however: The services being compared must be true analogues. It would not be appropriate to crosswalk a behavioral health code with an organ transplant code, for example. Those claims are so dissimilar that crosswalking them would be arbitrary because there is no meaningful relationship between the crosswalked services. Similarly, crosswalking is not appropriate where, as here, there is available claims data that can serve as an appropriate sample. *See* RPC ¶¶ 45–52.

### 2. Viant priced IOP claims using inappropriate and irrelevant data sources designed to maximize Defendants' profits.

Defendants' Viant methodology was incapable for providing a UCR price for IOP claims. *See* Ralston ¶ 9. During the putative class period, Viant applied two methods for calculating IOP claims—one method before October 2018 ("First Method") and one after ("Second Method"). *See* MultiPlan 2021 DOL Emails, Ex. 28 (MPI-0016819); Viant OPR Pricing Logic, Ex. 29 (MPI-0014879); Crandell 132:3–8; Viant 2016 White Paper, Ex. 43 (MPI-0008643); Viant 2016 Methodology, Ex. 44 (MPI-0000488); Ralston ¶¶ 10–25. Both methods relied on inappropriate and irrelevant data. Neither method produced a UCR price for H0015 or any reasonably similar analogue as required by the R&C program. *See* RPC ¶ 2.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

a. *Before October 2018: Viant priced H0015 claims using H0015 claims in OPSAF, a statistically invalid sample that could not produce localized rates.*

Viant's First Method employed a fundamentally flawed and misleading sample of H0015 claims derived from the Medicare Outpatient Standard Analytical File ("OPSAF"). *See* Viant 2009 Methodology, Ex. 45 (MPI-0007803); RPC ¶ 18; Crandell 34:14–17. This method produced an inaccurate and significantly undervalued UCR that reflected only national averages.

There are several problems with using OPSAF to price H0015 claims. First, there is not enough H0015 data in OPSAF to use as a sample. *See* RPC ¶¶ 32–38. This is because Medicare does not reimburse H0015 claims. *See* Crandell 36:5–7, 94:20–95:24; MultiPlan 2021 DOL Emails; Paradise 238:4–8. Accordingly, there is no appropriate reason for providers to submit H0015 claims to Medicare and no reason these claims should appear in OPSAF. Indeed, many of the providers who submitted these claims are provider types that should not be submitting H0015 claims for MH/SUD therapy services—they are, for example, dental clinics and pharmacies. Most or all of the H0015 claims included in OPSAF are presumably the result of mistake— providers accidentally submitting claims for which they could not expect and should not have received payment. RPC ¶ 32. Out of OPSAF's more than 500 million total claims, fewer than 500 are H0015 claims, and those claims are split across several years and multiple geographic areas. *See* Beckstead 2018 Mapping Email, Ex. 46 (MPI-0012799); RPC ¶¶ 33–35. That is not a large enough sample to provide a usual and customary rate. *See* RPC ¶¶ 35–38; *see also* MultiPlan 2018 H0015 Emails, Ex. 30 (MPI-0016580); Crandell 114:14–115:19 (noting very minimal data). Second, OPSAF does not have enough H0015 claims data to produce localized averages as required under the R&C program. *See* Crandell 114:6–116:1; RPC ¶ 36; MultiPlan 2021 DOL Grim Memo, Ex. 31 (MPI-0014844); MultiPlan R&C Reduction Emails, Ex. 32 (MPI-0015753). As a result, before October 2018, Viant provided only national rates for H0015 claims. *See* Crandell 122:12–20; Ralston ¶¶ 10–11. Third, OPSAF includes data for H0015 claims charged only as a *facility* fee—without any compensation for the larger professional component of IOP services. RPC ¶¶ 20–26, 49. In other words, it does not include any charge data for all-inclusive *per diem* charges, which are the only types of charges at issue in this action and required by United. *Id.*; Optum Behav. Health Reimbursement Policy. Because the

11

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

professional component is the largest part of H0015 *per diem* claims, using OPSAF H0015 data to price *per diem* claims will result in categorically underpaid *per diem* claims. RPC ¶¶ 20–26.

Defendants used the First Method to price tens of thousands of H0015 claims resulting in over $100 million in underpayments and tens of millions worth of "savings fees." *See* RPC ¶¶ 40, 76, 78. These claims were paid at a fraction of billed charges or any legitimate UCR price. Indeed, the Viant-priced rate was, on average, less than 10% of billed charges. *See* Beckstead 2018 Mapping Email; MultiPlan 2018 H0015 Emails.

>    b.   *After October 2018: Viant priced H0015 claims based on a payment category*
>         *that had nothing to do with H0015 claims.*

In October 2018, Viant abandoned its First Method and introduced its Second Method for pricing H0015 claims. The Second Method priced H0015 claims by crosswalking those claims to an ambulatory payment classification ("APC") that had nothing to do with H0015 claims. *See* Crandell 123:1–125:16; RPC ¶¶ 45–52; Viant OPR Pricing Logic; MultiPlan 2011 Proposed DOL Responses, Ex. 33 ¶¶ 3–5 (MPI-0015933). Like the First Method, it was incapable of producing a UCR for H0015 and it produced invalid and unreasonably undervalued rates. *See* RPC ¶¶ 45–52; Ralston ¶¶ 16–25.

APCs are categories of services similar in clinical intensity, resource utilization, and cost. They were devised to facilitate government payment for outpatient *facility* services in the Medicare program. They do not cover or compensate *professional* services, which are billed separately by CPT code. *See* RPC ¶ 45. HCPCS codes are grouped under appropriate APCs and facilities are paid based on the APC rate, which is adjusted locally. *See* RPC ¶ 45; Paradise 165:23–166:4; Praxmarer 70:6–71:7.

H0015 is not categorized into any APC because Medicare does not reimburse it. *See* Crandell 43:18–44:3, 63:23–64:2; Paradise 238:6–8. MultiPlan, however, devised the Second Method to arbitrarily crosswalk H0015 claims to APC ▮▮. APC ▮▮ is a "▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮" that corresponds to HCPCS codes that most of the time requires as little as ▮ minutes of counseling services. RPC ¶¶ 48–51; *see also* 2021 Crandell Schill Emails, Ex. 47 (MPI-0002008); Beckstead 2018 Mapping Email; Ralston ¶ 19. H0015 claims, in contrast, require intensive outpatient treatment for at least *3 hours* per day as part of an overall weekly

12

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

program. RPC ¶¶ 11, 50. Accordingly, H0015 requires far more intense treatment for a far longer period of time. In addition, and like the H0015 claims data in OPSAF, APC ███ relates to only the *facility* component of services and provides no compensation for professional services—resulting in categorical underpayment for all-inclusive per diem H0015 claims. RPC ¶ 51. It is therefore qualitatively and quantitatively unlike H0015 and paid at only a fraction of the price. It is simply not appropriate to crosswalk the two codes. *See* RPC ¶¶ 45–52.

Not surprisingly, the decision to crosswalk H0015 to APC ███ was an arbitrary one. MultiPlan performed no actual analysis to determine whether crosswalking to APC ███ was appropriate. *See* MultiPlan 2021 DOL Emails; Crandell 125:1–128:4, 137:3–16. In fact, Thomas Ralston, then Assistant Vice President of Data Analytics and Product Development for MultiPlan in the OON division, made the decision because APC ███ had "████████" in the name and resulted in payment rates similar to the First Method. Ralston ¶ 21; *see also id.* ¶¶ 20–36; Crandell 123:10–124:35, 137:8–16. Later, in response to this litigation, Kevin Williams, Manager of National Accounts at MultiPlan, stated that he "████████████████████ ████████████████████████████████████ ████████████████". *See* MultiPlan 2021 DOL Emails.

The decision to develop the Second Method was motivated by provider complaints about the First Method. Ralston ¶¶ 14–16; MultiPlan 2021 DOL Emails. Not surprisingly, providers complained to Defendants that the Viant rate for H0015 under the First Method was undervalued and not localized. Defendants developed the Second Method to address only the latter: APC ███ data *can* produce local rates, unlike the First Method. *See* Crandell 123:23–124:3. But the Second Method did not meaningfully address the greater issue of underpricing. Indeed, Karen Beckstead, a MultiPlan healthcare economist, determined that the transition to the Second Method *would* raise the Viant H0015 rate, but from $██ to only $██ on average—still a fraction of any legitimate UCR for H0015 and an increase in the average percentage of allowed charges of █.█% to █.█%. *See* Beckstead 2018 Mapping Email. Beckstead acknowledged that Viant had other data which demonstrated that actual H0015 claims showed rates "████████ ████████████████" *See* Beckstead Crandell Email, Ex. 48 (MPI-0014299).

13

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 1000
Washington, DC 20037
Telephone: 202.677.4040

Like the First Method, the Second Method was used to underprice thousands of H0015 claims resulting in over $100 million in underpayments and tens of millions worth of "savings fees." *See* RPC ¶¶ 40, 76, 78. But APC ███ is not an appropriate analogue to crosswalk H0015 claims and cannot be used to determine a UCR for IOP claims. RPC ¶¶ 2, 51, 68.

c. *Both Viant methods produced invalid usual and customary rates.*

Neither Viant method was capable of producing a legitimate UCR for H0015 per diem claims. *See* RPC ¶ 2. If a UCR is accurately derived from an appropriate database, one would expect this rate to approximate the rate determined from any other appropriate and sufficiently large claims sample. This is due to the inherent consistency of a usual and customary rate, which—as the name implies—should reflect a stable market average when drawn from appropriate and large-enough data samples. In other words, UCR should be replicable: Any significant deviation between rates calculated from different databases suggests an issue with the representativeness or relevance of the datasets or a flawed methodology in calculating the rate.

Neither Viant method produces a replicable UCR. *See* Ohsfeldt ¶¶ 6.5–6.12; RPC ¶¶ 39–44. Plaintiffs' expert, Dr. Ohsfeldt, performed an analysis comparing the Viant UCR with the UCR generated from Defendants' *own claim data*, which included a large sample of over 50,000 H0015 claims. One would expect that approximately 60% of all Defendants' H0015 claims would be below Viant's 60th percentile UCR. Dr. Ohsfeldt found, however, that 99% of the claims were above Viant's 60th percentile UCR—"well beyond any outcome that could be attributed to chance in such a large sample." Ohsfeldt ¶ 7.2–7.4. Plaintiffs' other expert, RPC, made similar findings. RPC ¶¶ 39–44.

Defendants knew or should have known that Viant did not create a UCR rate for H0015 *per diem* claims. *See* Crandell 65:6–18 (noting ████████████████████████████████ ████████████████████████████████████ ███); Paradise 223:20–224:8; RPC ¶ 41. A comparison to a UCR rate created from FAIR Health data, United claims data, or MultiPlan claims data all would and did show a vast discrepancy between Viant's purported UCR rate and what any legitimate sample would produce. Indeed, in 2018, Michael McEttrick, Vice President of Healthcare Economics for

14

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1   MultiPlan, noted that claims data from providers within MuliPlan's *own network* did not support

2   reimbursement rates for Viant-priced H0015. Instead, claims data submitted to MultiPlan

3   supported a rate ██ *times* higher. *See* MultiPlan 2018 H0015 Emails (noting typical

4   reimbursement rate of $ ██ not supported by claims data showing rate of $ █.██ ).

5   **C.  Defendants profited off their scheme through disguised "savings" fees.**

6   Defendants' use of Viant was designed to generate additional administrative fees for their

7   benefit under the guise of "saving" its clients' money. Paradise 191:3–192:6; Ex. 49 (United Fee

8   Percentage Data) (UHC000296122). The R&C program provided for the payment of "savings

9   fees" to Defendants calculated as a percentage of the difference between billed charges and what

10  Defendants actually paid on the claim. Peterson 122:5–11; Ex. 25 (composite ASAs); Crandell

11  91:3–9; Paradise 70:19–71:2, 106:23–107:18 (percentage of savings fee paid to MultiPlan). This

12  meant that the less money Defendants paid to providers relative to their billed charges, the more

13  Defendants earned in "savings" fees. *See* Paradise 191:4–20; Praxmarer 177:4–178:5.

14  This raises several problems. First, Defendants know that patients are financially liable

15  for the unpaid portion of billed OON charges. *See*, *e.g.*, Lopez Email 3/31/20; Praxmarer 177:4–

16  9, 183:22–183:1, 185:6–21; Kienzle 41:13-43:20, 116:3–17. This means that any "savings" to

17  the plan is offset by the plan members saddled with this financial liability. As a result, the

18  "savings" program does not represent actual savings, only the reallocation of costs from the plan

19  to particular members—the opposite of what plan members bargained for when they paid for

20  insurance with OON coverage. *See* Praxmarer 177:4–9. In fact, the savings fee creates a net loss

21  to both the plan and its members to the extent members pay the unpaid balance of billed charges

22  and the plan pays a fee representing a percentage of the unpaid balance. Second, Defendants

23  stand as fiduciaries for the plan and its members. Accordingly, Defendants must act in the best

24  interest of the plan and its members. The Viant-scheme, however, is for only Defendants' benefit

25  and entirely against the interest of the plan and its members. Third, the savings fees reflect

26  payment for a service Defendants did not actual provide. In the absence of the Viant scheme,

27  Defendants would have paid a percentile of the usual and customary rate for H0015—not

28  provider's billed charges—as required by plan language. Accordingly, "savings" calculated as

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone 202.677.4040

15

1    difference between billed charges and bogus Viant rates are not real savings at all. They are a

2    phantom delta determined arbitrarily and unilaterally by Defendants' use of Viant.

3           Despite these issues, Defendants have wrongfully obtained hundreds of millions of

4    dollars from "savings" fees through its use of Viant—knowing these "savings" ultimately

5    became the financial responsibility of patients for whom Defendants were supposed to insure.

6    RPC ¶ 78; Ex. 26 (Viant savings composite); Ex. 50 (Shared Savings Fee Revenue) (MPI-

7    0009603). Here, Defendants used Viant to price more than 88,484 disputed H0015 claims for

8    United between the first quarter of 2016 and the fourth quarter of 2021. *See* RPC ¶¶ 14–15. This

9    scheme has been continuous since at least 2015 and will continue into the future without court

10   intervention. *See* Lopez 225:9–19; Paradise 28:10–12, 73:8–74:2; Crandell 34:14–17.

## III.    <u>Legal Standard</u>

12          To qualify for class certification, a class must meet the requirements of Rule 23(a) and

13   one of three alternatives of Rule 23(b). *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591,

14   614 (1997). A party seeking class certification must affirmatively demonstrate compliance with

15   Rule 23 based on a preponderance of evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble

16   Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022). "Accordingly, before certifying a class, the

17   trial court must conduct a rigorous analysis to determine whether the party seeking certification

18   has met the prerequisites of Rule 23." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th

19   Cir. 2018) (cleaned up). Nevertheless, at this stage of the litigation, a full merits review is

20   unwarranted. *See, e.g.*, *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466

21   (2013) (warning against "free-ranging merits inquiries at the certification stage"). A district

22   court's "rigorous analysis" should not be a "mini-trial" because a district court's class

23   certification order is "preliminary." *Id.*; *see Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469

24   (1978) (describing certification as "inherently tentative"). Indeed, "[n]either the possibility that a

25   plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit

26   might unforeseeably prove the original decision to certify the class wrong, is a basis for declining

27   to certify a class which apparently satisfies Rule 23." *Sali*, 909 F.3d at 1004–05 (quotations

28   omitted). Plaintiffs must enable the Court to make only a "reasonable judgment" that the class

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

satisfies Rule 23, *id*. at 1005, and the Court need not weigh competing evidence. *See Chun-Hoon v. McKee Foods Corp.*, 2006 WL 3093764, at *4 (N.D. Cal. Oct. 31, 2006) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)).

## IV.   Analysis

### A.  Plaintiffs satisfy the requirements of Rule 23(a).

#### 1.   Plaintiffs have established commonality.

Commonality requires a plaintiff to demonstrate a "common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "By contrast, an individual question is one where members of a proposed class will need to present evidence that varies from member to member." *Olean*, 31 F.4th at 663. Only one basis for commonality is required. *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 102 F.R.D. 457, 462 (N.D. Cal. 1983).

The core common thread in this case is that Viant did not produce a legitimate UCR as required by each plan through its participation in United's R&C program. Underlying this thread are several common *facts*, including: (1) every proposed class member's plan participated in United's R&C program; (2) that program required localized UCR pricing for all OON claims; (3) every claim in this litigation was related to IOP claims billed *per diem* under H0015 and/or 0906 and processed as an H0015 claim; (4) every claim was valid, payable, and medically necessary, as evidenced by United's payment of the claims; (5) every claim was priced by Viant and no additional payments, adjustments, or negotiations occurred; (6) every claim was categorized by Defendants with the same Viant "CY" remark code; and (7) Viant calculated its payment rates based on illegitimate, invalid samples of claims that could not produce UCR. These common threads also include several common *legal* issues, including, for example: (1) whether the data used in Viant's First and Second Method were capable of producing UCR as required by the R&C program; (2) whether class members are entitled to monetary and/or equitable damages; (3) whether there was collusion between Defendants or a breach of fiduciary duties in using Viant while pocketing the "savings" fee; and (4) whether Defendants' conduct created a RICO

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

17

1    enterprise or otherwise met the requirements of the RICO.[7]

2         These common issues are the same for each class member and central to the validity of

3    their claims. The ERISA and RICO claims for relief depend on the question of whether the Viant

4    methods, which were used to determine each class member's OON benefit, were consistent with

5    the UCR rates United promised through the R&C program. Resolving whether Viant produced a

6    legitimate UCR price for H0015 claims would establish a primary aspect of liability in "one

7    stroke" for all class members.[8]

8              a.   *The key issue is Viant's inability to produce a usual and customary rate, which*
                    *does not require individualized plan analysis.*

9

10        Nobody disputes that the putative class members were entitled to reimbursement for their

11   claims. Nobody disputes that United applied Viant to all these claims without regard to plan

12   language based on their inclusion in the R&C program. The core common issue in this case is the

     uniform, indiscriminate use of Viant to price H0015 claims using data that could not produce a

13   usual and customary rate. *See, e.g.*, RPC ¶¶ 35–38; Ralston ¶ 9; MultiPlan 2018 H0015 Emails.

14        A common issue is the use of bad data that could not produce a UCR. *See* Ralston ¶ 9

15   (Viant data is "at its core, incompatible for use in pricing [IOP] claim."); Beckstead Decl. Draft,

16   Ex. 34 ¶ 5 (MPI-0016593) (Viant cannot price professional component). That issue does not turn

17   on plan language. *See Waters Corp. v. Millipore Corp.*, 2 F. Supp. 2d 66, 79 (D. Mass. 1997)

18   (where both parties agreed on plan application, court addressed only "method of calcula[tion]"),

19   *aff'd*, 140 F.3d 324 (1st Cir. 1998); *Brooks v. Educators Mut. Life Ins.*, 206 F.R.D. 96, 101 (E.D.

20   Pa. 2002) (improper methodology for calculating UCR supported certification over other

21   individual issues). The specific wordings of each plan are not relevant to determining whether it

22   is appropriate to price H0015 *per diem* claims based on data that has nothing to do with H0015

23   per diem claims. To hold otherwise and permit the use of such irrelevant data under the plans

24

25   _____

     [7] There are also other common issues that could independently establish commonality, including,
26   for example, whether Plaintiffs establish RICO reliance based on standardized VOB calls,
     whether these calls misrepresented the UCR providers were entitled to, and whether there existed
27   a conspiracy. *Negrete v. Allianz Life Ins.*, 238 F.R.D. 482, 492 (C.D. Cal. 2006) (plaintiffs may
     establish reliance on classwide basis).
28   [8] In addition, this Court could divide the proposed class into appropriate subclasses. *See, e.g.*,
     *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1072 (N.D. Cal. 2005); Fed. R. Civ. P. 23(c)(5).

                                              18

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave. NW
Suite 1000
Washington, DC 20037
Telephone: 202.677.4040

1    would render the R&C program requirements "virtually meaningless," and by definition,

2    arbitrary and capricious. *See Geddes v. United Staffing All. Emp. Med. Plan*, 469 F.3d 919, 930

3    (10th Cir. 2006) ("meaningless" application of "usual and customary" that "depart[ed] from

4    industry" and harmed beneficiaries was "arbitrary and capricious"). Courts often find

5    commonality in similar situations. *See, e.g.*, *Wachtel v. Guardian Life Ins.*, 223 F.R.D. 196, 213

6    (D.N.J. Aug. 5, 2004) (citing cases and finding "existence of different plans does not outweigh

7    the predominance of the common questions"), *vacated and remanded on other grounds*, 453

8    F.3d 179 (3d Cir. 2006); *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 596 (E.D. Mich.

9    1996) ("Common questions are present [if plans] consistent on key points."); *Smith v. United*

10   *HealthCare Servs., Inc.*, 2002 WL 192565, at *3 (D. Minn. Feb. 5, 2002) (similar); *Churchill v.*

11   *Cigna Corp.*, 2011 WL 3563489, at *4 (E.D. Pa. Aug. 12, 2011) (similar). Indeed, this is not a

12   line drawing case: It is a "yes-no" question of whether, under *any* plan, Viant can price H0015

13   *per diem* claims based on source data that has nothing to do with H0015 *per diem* claims and

14   cannot produce an H0015 UCR price. *See Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014)

15   (yes-no questions establish commonality over "dissimilarities among class members"). It is not

16   simply that Viant is using artificially depressed but otherwise relevant data to price H0015 *per*

17   *diem* claims—like in the Ingenix cases—or applying an unfavorable, but theoretically

18   permissible methodology that Plaintiffs don't like and think strays too far from plan

19   requirements. *Compare Franco v. Connecticut Gen. Life Ins.*, 289 F.R.D. 121, 136–37 (D.N.J.

20   2013) ("*Franco I*"). Here Defendants are using bad data that make their payment calculations

21   *categorically* incorrect. It is no different than if Defendants chose to price claims based on lottery

22   numbers or astrological readings. Such a practice would undoubtedly create common issues that

23   do not require a case-by-case analysis of plan language. *In re U.S. Foodservice Inc. Pricing*

24   *Litig.*, 729 F.3d 108, 119 (2d Cir. 2013) (arbitrary and capricious pricing scheme warrants

25   certification despite different contracts). Defendants cannot shield themselves from liability by

26   tinkering with a few words that have nothing to do with their conduct or how *they* treat plans.

27        Indeed, Plaintiffs ask the Court to do as Defendants' do and treat the plans uniformly.

28   Defendants treated every plan in the R&C program as having the same substantive requirements

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

regarding the pricing of OON claims. Ralston ¶ 11 ("All H0015 claims priced by Viant . . . were priced in exactly this same way using an identical methodology regardless of plan language."); Paradise 227:7–228:2; *see also* Strait 81:24–82:4. Indeed, MultiPlan did not have access to any plan language and applied Viant uniformly. Praxmarer 64:11–21; Paradise 226:17–19; Strait 87:15–88:5; 2021 MultiPlan Talking Points, Ex. 35 (MPI-0016794). The Court here can similarly treat claims uniformly: Defendants' unvarying application of Viant to all putative members' claims warrants class treatment here. *See Postawko v. Missouri Dep't of Corr.*, 2017 WL 3185155, at *10 (W.D. Mo. July 26, 2017) (individually administered treatment did not defeat commonality where defendants' policy rejected treatment uniformly), *aff'd*, 910 F.3d 1030 (8th Cir. 2018); *Med. Soc'y of New York v. UnitedHealth Grp. Inc.*, 2019 WL 6888613, at *2 (S.D.N.Y. Dec. 18, 2019) ("uniform policy of denying . . . facility fee claims without interpreting plan language" creates common question); *see also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (uniform treatment "bear[s] heavily" on predominance and superiority). In fact, Plaintiffs do not even oppose the application of Viant to class members' claims: Their damages model recreates the Viant methodology with appropriate data sources—United's own H0015 claims data. RPC Report ¶¶ 73–78; *infra* IV.C.[9]

Plan language is also not relevant for another reason: One key common aspect of this case is that it is specific to H0015 *per diem* claims for treatment provided by OON providers. *Compare In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 2014 WL 6888549, at *3 (C.D. Cal. Sept. 3, 2014) (plaintiffs "weld together the claims of millions of subscribers and providers"). The key issue of H0015 pricing data is one the Court can resolve without looking into plan language because plan language will not address it: No plan document includes language regarding the pricing of H0015 services specifically. *See* SPD composite. The parties, plans, and common sense all agree that UCR reimbursement must relate in some meaningful way to the kinds of services provided. Plaintiffs say Defendants failed to do that, and Defendants disagree. The Court can resolve that dispute for tens of thousands of class members in "one

---

[9] Of course, that is only one method for calculating damages here and it accords with Defendants' methodology, claims data, and interpretation of the plan requirements of the R&C program. Plaintiffs are open to other methodologies that this Court deems just and proper.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1  stroke"—without having to consider plan language.[10] *See Olean*, 31 F.4th at 663.

2     b.  *Even if plan language were relevant, all plans have substantially similar*
        *language regarding OON reimbursement.*

3

4     Although the Court does not need to assess plan language to resolve common issues here,

5  the plans at issue are nevertheless "substantial[ly] similar[]" to warrant class treatment. *See*

6  *Franco I*, 289 F.R.D. at 135. Any differences do not impact the common issues because every

7  plan was written to fit within United's R&C program. *See* Paradise 55:7–21 (noting United

8  audits plan language to "ensure" proper "plan language is . . . there" to match the client's

9  selected program); Hall ¶ 6; *see Peters v. Aetna*, 2 F.4th 199, 243 (4th Cir. 2021) (varying plans

10 "do not reflexively defeat class certification when the underlying harm derives from the same

11 common contention"). Even if there are superficial differences in some plans regarding their

12 articulations of OON pricing, these differences are immaterial to the common issues here

13 because every plan included the same substance: OON claims must be priced based on UCR. *See*

14 Hall ¶¶ 4–5; SPD composite.

15    Accordingly, the Court need not consider differences in the specific wordings of each

16 plan to describe UCR.[11] *See, e.g.*, *Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*, 2016 WL

17 5938722, at *1 (C.D. Cal. May 16, 2016) (concept of UCR same despite "slight or minor

18 variations" in how described). What matters is that each plan required Defendants to reimburse

19 based on similar claims and Defendants failed to do so: (1) the First Method used statistically

20 invalid and unrepresentative H0015 claims data from OPSAF; and (2) the Second Method used

21 an arbitrary and illegitimate crosswalking method. *See* II.B.2. Indeed, Plaintiffs acknowledge

22 that there could be multiple ways to produce UCR: The point of UCR pricing is that it represents

23 _____

[10] Plan language is also not necessarily required to adjudicate Plaintiffs' common RICO claims,
24 which turn primarily on misrepresentations made during VOB calls.

25 [11] Indeed, even if the Court accepts Defendants' argument that UCR does not have a uniform
   meaning in *some* sense, the Court could still find that whatever the variations of UCR, each
26 commonly required reference to a sufficiently appropriate database capable of producing UCR.
   In addition, to the extent some plans call for different percentiles of UCR, those variations can be
27 dealt with at the damages stage without any individualized analysis affecting the determination
   of liability. The Court can resolve the issue of whether Defendants' use of Viant was incapable
28 of producing a UCR rate as required by the R&C program without delving into percentile
   requirements of each plan.

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1    "usual and customary" prices, which can be determined by a sample of any sufficiently large and

2    relevant database of claims.[12] In other words, no matter what the plan says, or the method of

3    getting there, UCR pricing should be approximately the same. That is why Plaintiffs are willing

4    to accept that Viant can be used for determining reimbursement under the putative class

5    members' claims—as long as an appropriate dataset of claims is used. RPC Report ¶¶ 73–78; *see*

6    *also*, *infra*, IV.C.

7                        c.    *VOB calls independently establish commonality.*

8            Defendants' misrepresentations during VOB calls also raise common issues that

9    independently establish commonality, particularly with respect to Plaintiffs' RICO claims. A

10   "common course of conduct," including through oral representations, may satisfy Rule 23. *In re*

11   *First All. Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006). Courts have held that the existence of a

12   "script" governing a defendant's representations may justify class certification even where phone

13   calls underlying the claims may involve individualized variation. *Id.*; *see also Cole v. Asurion*

14   *Corp.*, 267 F.R.D. 322, 327 (C.D. Cal. 2010) (holding that where there is a "centrally

15   orchestrated strategy . . . the center of gravity of the fraud transcends the specific details of oral

16   communications."); *Joint Equity Comm. of Invs. v. Coldwell Banker Real Est.*, 281 F.R.D. 422,

17   431 (C.D. Cal. 2012) (certifying class involving individual cold calls to potential investors); *see*

18   *also* Fed. R. Civ. P. 23, Advis. Comm. Notes to 1966 Amendments, subd. (b)(3) ("[F]raud

19   perpetrated on numerous persons by the use of similar misrepresentations may be an appealing

20   situation for a class action.").

21           Here, Plaintiffs have provided record evidence establishing a "common course of

22   conduct" through United's VOB calls, including a script that provides a unifying thread to every

23   phone call at issue. *See*, *supra*, II.A.2. United's agents relied on a common software system—

24   IBAAG—that directed agents to inform providers that the putative class members' claims would

25   be priced at UCR. This representation was common across all the phone calls and ultimately

26   misleading: Defendants actually priced the claims through a Viant methodology that was

27

28   _____

     [12] The fact that Viant prices are often a tenth of UCR determined through other methods makes
     clear that Viant prices are not a legitimate UCR. *See* Ohsfeldt ¶ 7.2–7.4.

                                                    22

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1  incapable of producing a UCR. *See*, *supra*, II.B. Defendants knew that providers and patients

2  would rely on the representations made during these VOB calls in determining whether to

3  provide or seek treatment. Accordingly, Defendants engaged in a "common course of conduct"

4  that led to the underpayment of all claims in the same manner. *See, e.g.*, *First Alliance*, 471 F.3d

5  at 990–91. The fact that some phone calls may have varied in form does not defeat commonality.

6  *Id.* (rejecting "talismanic rule that a class action may not be maintained where a fraud is

7  consummated principally through oral misrepresentations, unless those representations are all but

8  identical" (quotations omitted)). Indeed, courts in the Ninth Circuit have routinely certified

9  classes where the claims involved varied oral interactions, where, as here, there was some

10  common thread—like a script, policy, or other "centrally orchestrated strategy." *See, e.g.*, *id.*;

11  *Yokoyama v. Midland Nat. Life Ins.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *see also Parra v.*

12  *Bashas', Inc.*, 536 F.3d 975, 979 (9th Cir. 2008) (finding commonality "even though . . .

13  individual factual situations differ"). Even under the more demanding predominance

14  requirement, individualized issues should not prevent class certification if common issues

15  predominate. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016); *see also Abdullah*

16  *v. U.S. Sec. Assocs.*, 731 F.3d 952, 963 (9th Cir. 2013). In particular, courts routinely certify

17  classes where a common *legal* theory predominates over individual *factual* differences. *See, e.g.*,

18  *Jimenez v. Allstate Ins.*, 765 F.3d 1161, 1168 (9th Cir. 2014).

19         Here, the potential individualized differences among the phone calls are the same kinds

20  of differences that exist in any case involving oral representations, and do not overcome the

21  common factual and legal issues.[13] *See, e.g.*, *Yokoyama*, 594 F.3d at 1094 (noting factfinder

22  would not necessarily have to "parse what oral representations each broker made to each

23  plaintiff" but could focus on "standardized . . . materials"); *see also Negrete v. Allianz Life Ins.*,

24  287 F.R.D. 590, 602 n.5 (C.D. Cal. 2012) (*First Alliance* and *Yokoyama* "show why variations in

25

---

26  [13] Notably, in similar non-class cases, courts in the Ninth Circuit have found that a pattern of
individualized oral representations between health insurers and providers may establish breach of

27  contract and promissory estoppel. *See, e.g.*, *Out-of-Network Substance Use Disorder Claims*,
2023 WL 2808747 at *28–*29 (C.D. Cal. Jan. 13, 2023); *Bristol SL Holdings, Inc. v. Cigna*

28  *Health & Life Ins.*, 2022 WL 137547, at *1 (9th Cir. Jan. 14, 2022).

the language used by a defendant may be immaterial for purposes of class certification"). Any individualized differences in the phone calls do not relate to the core issue in this case. Whatever the superficial details of the calls, a single common course of conduct emerges: Defendants misleadingly represented to providers, as part of a "centrally orchestrated strategy," that their claims would be reimbursed at UCR when, in fact, Defendants knew otherwise. *See*, *supra*, II.A.2; *see also, e.g.*, *Cole*, 267 F.R.D. at 327.

### 2. Plaintiffs are sufficiently numerous.

The proposed class meets the numerosity requirements of Rule 23(a)(1). Numerosity may be satisfied in classes with fewer than 100 members and as few as 39. *See, e.g.*, *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 836 (9th Cir. 2022). Here, the putative class consists of 11,280 patients and almost 90,000 claims. *See* RPC Report ¶¶ 14–16; Ohsfeldt ¶¶ 3.1–3.4. The class is objectively determinable, easily ascertained, and administratively feasible. *See Williams v. Oberon Media, Inc.*, 468 F. App'x 768, 770 (9th Cir. 2012).

### 3. Plaintiffs are typical and adequate.

The named Plaintiffs satisfy the typicality and adequacy requirements. "Typicality asks whether the claims or defenses of the representative parties are typical of the class." *Johnson v. City of Grants Pass*, 50 F.4th 787, 805 (9th Cir. 2022). It is a "permissive standard." *Id.* (quoting *Staton*, 327 F.3d at 957). "It refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id*. Here, Plaintiffs are typical because they suffered the same injury (their OON H0015 claims were underpriced), which arose from the same conduct (Defendants' use of a Viant method that was incapable of producing UCR as required by the R&C program). *See Kazda v. Aetna Life Ins.*, 2022 WL 1225032, at *4 (N.D. Cal. Apr. 26, 2022); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Indeed, in ERISA cases, "the proposed class representative's claims are generally held to be typical of the class members' claims even if the proposed representatives' particular benefit plan is distinct from that of the class, they have not suffered equally as a result of alleged fiduciary breaches, or they have a derivative claim." 1 Newberg and Rubenstein on Class Actions § 3:39 (6th ed. 2023) ("Newberg"). Here, the class members share

all the common threads discussed above and—to the extent relevant, if at all—have substantially similar plans. *See*, *supra*, IV.A.1.b.

The adequacy inquiry has been interpreted to include two prongs: the adequacy of the class representatives and the adequacy of class counsel. *In re Mersho*, 6 F.4th 891, 899–900 (9th Cir. 2021). Courts consider whether there exist conflicts of interest and whether the movants and counsel will "vigorously" pursue the action on behalf of the class. *Id.* No conflicts exist in this case and Plaintiffs and counsel have already amply demonstrated their willingness and ability to prosecute this case vigorously. All class members are plan beneficiaries seeking the same relief: They seek equitable and monetary damages, including, for example, compensation for the underpricing of their H0015 claims, disgorgement of profits relating to the bogus "savings fees," and an injunction to prevent future harm. There is no benefit that one claimant can seek at the expense of another, even if they receive different damages amounts. *See In re Lithium Ion Batteries Antitrust Litig.*, 853 Fed. Appx. 56, 57 (9th Cir. 2021). As to ability to pursue the litigation, class representatives have been deposed and participated in discovery, and there have been no concerns about class representatives' willingness to participate. *See, e.g.*, *Arredondo v. Univ. of La Verne*, 341 F.R.D. 47, 52 (C.D. Cal. 2022).

**B.  Plaintiffs satisfy the requirements of Rule 23(b).**

Plaintiffs seek class certification under three categories of Rule 23(b). They seek: (1) equitable and injunctive relief, primarily under Rule 23(b)(1)(A) and (b)(2); and (2) money damages under Rule 23(b)(3).[14] As for equitable and injunctive relief, Plaintiffs seek: (1) declaratory relief that Defendants violated the terms of the class members' plans, arbitrarily underpaid OON benefits, and/or breached their fiduciary duties; (2) injunctive relief prohibiting Defendants from violating RICO and/or from pricing OON per diem H0015 claims based on the First and Second Methods of the Viant methodology or any other unsuitable sample of claims; (3) removal of the Defendants as breaching fiduciaries; (4) disgorgement of the savings fees

---

[14] Courts routinely granted classes under multiple Rule 23(b) categories simultaneously, including in ERISA cases. *See, e.g.*, *Raffin v. Medicredit, Inc.*, 2017 WL 131745, at *10 (C.D. Cal. Jan. 3, 2017) (certifying under (b)(2) and (b)(3)); 2 Newberg § 4:12. Given this Court's decision on Plaintiffs' first motion to certify, Plaintiffs seek monetary damages—incidental or otherwise—primarily through Rule 23(b)(3). *See* Dkt. No. 301.

25

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

Defendants collected in breach of their fiduciary duties or an accounting of their profits and the underpayment of benefits; and (5) any other remedies the Court deems appropriate.

As for money damages, the primary relief sought, Plaintiffs seek damages compensating class members for the difference between how their H0015 claims should have been reimbursed under a legitimate UCR methodology and how their H0015 claims were reimbursed under the First and Second Methods—that is, the difference between how their claims should have been paid under the R&C program and how they were actually paid. Plaintiffs also seek money damages with respect to their equitable claims—like disgorgement and accounting—to the extent they are not certified under (b)(1) or (b)(2), and any other relief the Court deems appropriate.

### 1.   Plaintiffs satisfy Rule 23(b)(1) (incompatible standards class).

Plaintiffs seek certification under Rule 23(b)(1)(A) solely with respect to their claims under ERISA seeking primarily injunctive relief. Rule 23(b)(1)(A) requires a showing that "inconsistent or varying adjudications with respect to individual class members . . . would establish incompatible standards of conduct for the party opposing the class[.]" Although it is appropriate primarily for injunctive and declaratory relief, it can permit monetary damages in some instances. *See, e.g.*, *Ballas v. Anthem Blue Cross Life & Health Ins.*, 2013 WL 12119569, at *13 (C.D. Cal. Apr. 29, 2013) (citing cases and noting Rule 23(b)(1)(A) appropriate where there is a "breach of trust . . . similarly affecting the members of a large class of beneficiaries, requiring an accounting or similar procedure to restore the subject of the trust"); 2 Newberg § 4:14 (citing cases and noting "there is nothing in the language or history of Rule 23(b)(1)(A) that prohibits money damages").

Courts regularly certify ERISA class actions as (b)(1)(A) "incompatible standards class[es]." *See, e.g.*, *Ballas*, 2013 WL 12119569 at *13; *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111–12 (N.D. Cal. 2008); 2 Newberg § 4:12. The reason for this is the nature of ERISA itself. ERISA plans have a duty to treat all beneficiaries alike and it would be impossible for a plan to comply with conflicting awards. *See Des Roches v. California Physicians' Serv.*, 320 F.R.D. 486, 506 (N.D. Cal. 2017). Here, if two putative class members sued individually, different courts could order injunctive relief or damages based on different claims processing

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

methodologies. This would expose Defendants to incompatible standards as to how to determine appropriate rates for other plan participants. *See Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 965 (9th Cir. 2016), *as amended* (Aug. 18, 2016). Accordingly, a 23(b)(1)(A) class is appropriate.

### 2. *Plaintiffs satisfy Rule 23(b)(2) (injunctive class).*

A Rule 23(b)(2) class for injunctive relief is appropriate for both the ERISA and RICO claims. Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" The key common threads of this case involve Defendants' uniform actions, for example: (1) their inappropriate application of Viant to all class members' IOP claims; (2) their representations to providers in VOB calls; and (3) their collection of phantom "savings fees" at the expense of class members and their plans. *See*, *supra*, IV.A.1. Injunctive remedies can right these wrongs. For example, an injunction requiring Defendants to disgorge their savings fees, to account for their underpayment of benefits, and to adopt a proper methodology of calculating UCR under the R&C program would be appropriate respecting the putative class as a whole.

As under Rule 23(b)(1), incidental monetary damages may be appropriate under Rule 23(b)(2). Courts routinely permit at least incidental monetary relief, particularly where such relief is available under traditional equitable remedies—like disgorgement—and does not require individualized determinations. *See, e.g.*, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2013 WL 12333442, at *41 (N.D. Cal. Jan. 8, 2013) (finding disgorgement does not "involve individual monetary claims" and is "ancillary" to injunctive relief), *adopted* 2014 WL 12879520 (N.D. Cal. June 27, 2014). This is particularly true where there is no "individualized award of monetary damages" turning on individual facts— which applies to, for example, disgorgement even if not to Plaintiffs' individualized underpayment claims. *See Dukes*, 564 U.S. at 360–01.

### 3. *Plaintiffs satisfy Rule 23(b)(3) (money damages class).*

Finally, a Rule 23(b)(3) class is appropriate for both the ERISA and RICO claims. Rule

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

23(b)(3) requires that the plaintiffs demonstrate both that their common claims "predominate" over individual claims and that the class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." *See*, *e.g.*, *Fremont Gen. Corp. Litig.*, 2010 WL 3168088, at *7 (C.D. Cal. Apr. 15, 2010) (certifying ERISA 23(b)(3) class); *Brooks*, 206 F.R.D. at 108 (same); *Bauer v. Kraft Foods Glob.*, 277 F.R.D. 558, 563 (W.D. Wis. 2012); *see also Nationwide Life Ins. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012) (remanding ERISA class action for consideration under Rule 23(b)(3)); *id.*, 293 F.R.D. 272, 285 (D. Conn. 2013) (on remand).

    a. *Common issues predominate.*

  "In order for the plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." *Olean*, 31 F.4th at 665. Here, common issues predominate over individual issues, primarily for the reasons outlined above with respect to commonality. *See*, *supra*, IV.A.1; *see, e.g.*, *Jimenez*, 765 F.3d at 1165 n.4 (same reasons supporting commonality support predominance). Key common issues include: (1) whether the Viant methodology was capable of producing a UCR rate consistent with the requirements of the R&C program; (2) whether United's representations to providers on VOB calls were misrepresentations; (3) whether it was objectively reasonable for patients and providers to rely on United's uniform representations regarding coverage; and (4) what damages are appropriate for class members to remedy their common harms. The Court's decision on each of these will be the same for each class member and will require no individualized determinations. *See Abdullah*, 731 F.3d at 964. Indeed, the only conceivable difference among class members will be the amount of damages they are entitled to with respect to their underpayment claims, but this is true in most class actions. *Yokoyama*, 594 F.3d at 1089. As courts have repeatedly emphasized, individualized damages determinations do not defeat class certification. *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013). What matters is that the process of calculating class members' damages will be the same in every instance. *Middlesex Cnty. Ret. Sys. v. Semtech Corp.*, 2010 WL 11507255, at *7 (C.D. Cal. Aug. 27, 2010). As Plaintiffs' experts propose, every claim can be priced—as

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

Defendants did—through the Viant methodology. The only change Plaintiffs propose is the dataset used: Instead of the inappropriate data used by Defendants in the First and Second Method, the Plaintiffs propose using adequate samples that are actually capable of producing a UCR. *See*, *infra*, IV.C. Accordingly, determining how much plaintiffs were undercompensated is a matter of calculation, not fact finding.

> b. *The class action is superior and manageable.*

The class action is the superior method to resolving this dispute compared to individual lawsuits. *See Shuman v. SquareTrade, Inc.*, 2022 WL 10177658, at *2 (N.D. Cal. Oct. 17, 2022). First, individuals are unlikely to bring suit. Indeed, there are no suits pending that would compete with this class action. This is because the recovery for each individual is too small to merit a lawsuit, yet substantial enough that putative class members ought to be compensated. *See id.* In addition, both parties benefit from concentrating the litigation in a single forum. *See Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 271 (N.D. Cal. 2011). This is because United has an obligation to treat all class members the same, and the best way to do that is to decide United's obligations under ERISA in a single class action by a single judge.

This is also a manageable case. *See* Fed. R. Civ. P. 23(b)(3)(D). The many common questions can be resolved in one stroke, which saves the judicial system of potentially thousands of individual, largely identical lawsuits, all of which would involve the same evidence and issues. *See, e.g., Hilario v. Allstate Ins.*, 2022 WL 17170148, at *9 n.5 & *10 (N.D. Cal. Nov. 22, 2022). It will be efficient and fair to try these issues in a single forum, which will avoid duplicating judicial effort, prevent inconsistent outcomes, and facilitate a speedy and just resolution of this dispute for all class members. *See, e.g., Head v. Citibank*, 340 F.R.D. 145, 154 (D. Ariz. 2022).

## C.  Plaintiffs have provided an adequate damages model for determining putative class members' damages for underpayment of benefits.

Plaintiffs attach to this motion a proposed damages model that calculates two forms of money damages. *See* RPC Ex. Rep. The damages model starts with the parties underlying assumption—Viant may be applied to the claims at issue—but addresses Plaintiffs' common concern: the use of data incapable of producing a UCR rate for H0015 claims. Plaintiffs' model

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

29

uses United's *own* H0015 claims data to appropriately price the services. This model has two components: The first component calculates damages based on what Plaintiffs should have been paid,[15] and the second calculates the value of the improper savings fees collected by Defendants. This model is tied to Plaintiffs' theories of liability and the common classwide issues, which is all that is required at this stage. *Elkies v. Johnson & Johnson Servs.*, 2018 WL 11223465, at *9 (C.D. Cal. Oct. 18, 2018); *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Notably, the damages Plaintiffs propose do not involve any "reprocessing" remedy, as rejected in *Wit* and this Court. *See Wit v. United Behav. Health*, 58 F.4th 1080 (9th Cir. 2023).[16] Here, Plaintiffs seek damages primarily under Rule 23(b)(3), and Plaintiffs need nothing from Defendants to calculate damages. In addition, Plaintiffs can demonstrate that the remedy they seek for their ERISA (a)(3) claims comports with remedies typically available in equity—like disgorgement of profits or accounting. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011).

---

[15] RPC uses the standard 80th percentile UCR as quoted on VOB calls. RPC ¶¶ 74–76; *see* Ohsfeldt ¶¶ 1.3.8, 5.4–5.5. Viant improperly applied a lower percentile—first █th and then █th—without any documented analysis. Paradise 62:1–5, 73:12–74:23, 91:3–7; RPC ¶ 69. Although these lower percentiles were improper—a █th percentile rate is not, by definition, "usual and customary"—the difference between 80th UCR and █th or █th for H0015 claims is a few hundred dollars per claim only. RPC ¶ 66. That is, even █th or █th percentile UCR for H0015 is still many multiples of the Viant rate and hundreds of millions in damages. In any case, it is a simple exercise for RPC to calculate class member damages based on appropriate percentiles to the extent United believes another percentile is appropriate for any particular plan. RPC ¶ 70.

[16] To be sure, the decision in *Wit* is not applicable to this case for several reasons, as discussed in Plaintiffs' Rule 23(f) Petition and supplemental briefing. *See* Dkt. No. 292; Petition for Permission to Appeal Pursuant to Rule 23(f), No. 23-80032 (9th Cir.).

30

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1    **V.**      <u>**Conclusion**</u>

2          For all the reasons stated above, Plaintiffs respectfully request that the Court certify the

3    proposed class and grant any other relief that the Court deems just and proper.

4

5          Dated: July 16, 2023                    Arnall Golden Gregory LLP

6                                           By:    */s/ Matthew M. Lavin*
                                                  Matthew M. Lavin
7                                                 Aaron R. Modiano

8

9                                                 DL Law Group

10                                          By:    */s/ David M. Lilienstein*
                                                  David M. Lilienstein
11                                                Katie J. Spielman

12                                          Attorneys for Plaintiffs RJ, SJ, LW, MW, DS
                                            and the putative class
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

31