# EXHIBIT 2

# Filed Redacted/Under Seal

# Combined Expert Reports of Mark A. Hall

Retained by attorneys for the Plaintiffs in the matter of

LD, DB, BW, RH, and CJ and others similarly situated

v.

UnitedHealthcare Insurance Company, et al.

in the

U.S. District Court for the Northern District of California, Oakland Division

Case No. 4:20-cv-02254-YGR

July 10, 2023

1

This Combined Report interweaves the initial Report that I filed in this case, dated August 16, 2022, with the Supplemental Report that I filed November 22, 2022. This Combined Report contains no new information. It alters my previous report only to the extent of textual edits that weave the Supplemental Report into the structure of my original Report, and to make a few wording corrections.

**QUALIFICATIONS**

I am the Fred and Elizabeth Turnage Professor of Law and Public Health at Wake Forest University, where I have been a tenured full professor since 1993 in both the School of Law and at the School of Medicine in in the Division of Public Health Sciences. I also was an adjunct professor in the School of Business from 1993-2018. Currently, I am also a Nonresident Senior Fellow in Economic Studies at the Brookings Institution, with its Center for Health Policy.

My B.A. degree is from Middle Tennessee State University, and my law degree is from University of Chicago. I completed a post-graduate fellowship in health care finance at Johns Hopkins University in 1991, including six months at the Health Insurance Association of America, the leading trade association for commercial health insurers.

My full resume is attached as Exhibit A. In summary: I have been a professor of health law and public policy since 1985, during which time I have also taught or researched at Yale, Stanford, Duke, University of Pennsylvania, and Arizona State, among other places. Prior to teaching, I practiced health care law for three years (representing hospitals) with the health law group that is now at King & Spalding in Atlanta.

I am an elected member of the American Law Institute (ALI) and the National Academy of Medicine (formerly, Institute of Medicine) at the National Academies of Science. With the ALI, I was recently appointed as the lead Reporter for the Restatement of Medical Liability Law.

I have received various awards of distinction during my academic career, and I serve on the editorial boards of two leading health policy journals: Milbank Quarterly, and the Journal of Health Politics, Policy & Law.

I have served as an advisor or reviewer on matters relating to commercial health insurance or health care finance for the U.S. Senate Finance Committee, the U.S. Department of Health and Human Service (DHHS), the National Academies of Science, the National Institutes of Health, and the U.S. Health Services Research Administration, among many other national health policy organizations, as well as advising similar institutions in North Carolina and several other states.

I have directed a number of major peer-reviewed scientific research grants to study the commercial health insurance industry, funded by the National Institutes of Health, the U.S. Agency for Healthcare Research and Quality, Robert Wood Johnson Foundation, and the Commonwealth Fund, among other funders. I also regularly review academic manuscripts for leading publishers, such as Harvard University Press, Oxford University Press, the *American Journal of Public Health*, *JAMA* (Journal of the American Medical Association), and the *New England Journal of Medicine*, among others.

In the academic positions I have held for over thirty years, I study health care law and public policy, both as a legal and public policy scholar and as a social scientist, with a particular focus on

economic and regulatory aspects of the health insurance markets and industry. I have authored more than two dozen books related to these fields of study, and over 200 academic articles or chapters, including many published with the nation's best journals and presses. I am one of the most highly cited health law and public policy scholars nationally.

Relating specifically to the issues in this case, I have conducted in-depth public policy and empirical studies of health insurance payment methods and the pricing of out-of-network health care. Of particular note:

- Working with colleagues at the Brookings Institution, I have coauthored a series of reports and other publications over the past five years regarding billing and payment for out-of-network health care services.
- Earlier in my career, I did a series of in-depth empirical and public policy analyses of how health insurance disputes are framed and resolved and of how insurance payments rates are determined.
- In my academic research and consulting work over the last three decades, I have studied or reviewed medical bills, charges, costs, reimbursements and the reasonableness of charges for well over 100 specific out-of-network patients and for many dozens of different facilities across the country. I have also studied or reviewed more aggregated facility financial data of this type that encompasses well over 100,000 patients.
- As lead author of the original casebook in the field of health care law, *Health Care Law and Ethics* (Aspen, 9th ed. 2018), I have primary responsibility for the materials on health insurance and on provider payment methods.
- I was the lead author of a 4-volume treatise *Health Care Corporate Law* (Little, Brown/Aspen, now out of print), which covered health insurance and provider payment methods.

I have been retained as an expert in this matter on commercial health insurance – in particular, on determining payment amounts for covered services, especially out-of-network services. Beyond these areas of expertise, I also am an expert in various aspects of health care law. However, my involvement here is in my capacity as a Professor of Public Health Sciences, as an expert on commercial health insurance and determination of payment amounts, especially for out-of-network services. While the information and opinions I present touch on legal topics, they do so only to provide context and factual information to inform legal deliberation, rather than to opine on ultimate legal resolution. I have not been asked to, nor do I intend to, offer any opinions on the ultimate questions of law in this case. Instead, my intention is to address factual matters that might help to inform the issues in this case.

In preparing my initial and supplemental Reports, in addition to drawing from my existing knowledge of and background with the issues addressed, I reviewed the following:

- The Plaintiff's Third Amended Complaint
- The depositions and related exhibits of:  Sean Crandell, Prof. Kessler, Jacqueline Kienzle, Rebecca Paradise, and Denise Strait

3

- Judicial decisions in the Wit v. United Behavioral Health litigation
- Published literature cited in my Report

Also, I submit this understanding that Plaintiffs recently submitted an Analysis of Underpayment expert report from Research and Planning Consultants, as a basis for determining damages, but I have not studied or evaluated that report.

**OPINION:**  The primary issues in this case are subject to resolution in a manner that applies consistently to a large number of similarly situated individuals.

**BASES**: This opinion is based on the following points.

**1).  *If, as alleged, the Defendants used an inappropriate data source and methodology for determining payment amounts, this defect likely affected insurance claims for all (or almost all) out-of-network care for intensive out-patient (IOP) treatment that the Defendants processed.***

The Defendants, consistent with other major health plans and claims administrators, use their core data sources and rate-determination methodologies systematically across a large number of different health plans they sell or administer. Therefore, significant defects in either the data source or the calculation methods are almost certain to affect a large number of similar cases. This commonality is particularly true for the methods and data the defendants used for out-of-network facility services such as those at issue here.  Under these methods, once a particular treatment is determined to be covered, the specifics of individual patients' conditions do not require judgmental assessment in order to determine an appropriate payment rate. Instead, rate-determination methods and data are based on standard, objective factors captured mechanically through computerized systems, such as: geographic location, type of provider, type of treatment, and a specified benchmark point within the relevant established range of rates. Describing this, see, e.g., Bates UHC 309956-61.

**2). *If, as alleged, the Defendants misinformed the named Plaintiffs or their agents about how much of their treatment costs would be covered or how payment rates are determined, that misinformation likely was widespread for many others similarly situated.***

Customer service representatives at UnitedHealthcare, as with commercial health plans more generally, rely on standardized protocols and scripts to respond to inquiries by health plan members or their providers. Also, mailings that go to health plan members or providers use standardized templates. Therefore, if a number of members or their agents received incorrect information from or through Defendants, it is almost certain that others who faced similar issues also received the same incorrect information.

***3). The forms of self-dealing or conflicted interests alleged to affect the Defendants'
determination of payment rates involved in this case would apply to the resolution of payment
amounts for all members of similar health plans who received the same kind of services.***

The self-dealing or conflicted interests Plaintiffs allege apply to large categories of insurance
claims and claimants, rather than isolated individuals. This is because these aspects go to the
heart of the validity and legitimacy of the data sources and methods the Defendants are alleged
to have used in determining the claims amounts at issue in this case and claims like them.  The
Defendants, as with other major health plans and plan administrators, use their payment data
and rate-determination methods systematically across all types of health plans they sell or
administer, including both fully-insured and self-funded plans. They also use these data sources
and rate-determination methods consistently across different states. Therefore, if a financial or
institutional bias exists in the source of the data or the design or application of the rate-
determination methodology, that bias would systematically apply to claims that arise under
many different health plans.

***4). Various aspects of the health coverage plans that are likely relevant to or determinative of
the legality of the Defendants' claims payments at issue here apply to all of the Plaintiffs.***

Professor Ceminara has noted in an extensive analysis[1] that standardization and systematizing of
health insurance claims processing has made class action lawsuits a viable mechanism for
enforcing rights and correcting wrongs under managed care insurance. Prof. Ceminara explains
that class actions are especially appropriate regarding ERISA-governed health plans, owing to the
fact that ERISA applies a uniform set of substantive and procedural standards.  Thus, "[t]o the
extent ERISA governs, courts addressing health care claims need not concern themselves with
the choice of law issues that often plague class action cases in which plaintiffs are citizens of
several states."[2] Accordingly, "[t]he existence of national uniform standards for benefits plans,
and their governance by a single statute (ERISA), make it more likely that class treatment of
questions arising about them will be appropriate."[3]  Prof. Ceminara continues:

> Receipt of treatment in larger, integrated settings with a cost-containment focus fosters
> conditions ripe for the emergence of class actions. Administrators make more decisions
> on a global basis, in accordance with guidelines that affect large groups of people in
> virtually the same way. . . . Finally, the larger an entity is, the more likely it is to use form
> documents and standardized procedures.[4] . . . Patients can and have begun to take
> advantage of this unity through the class action device.

The aspects of this case previously discussed support and confirm Prof. Ceminara's analysis. In
addition, the record indicates that all of the Plaintiffs share in common the following features
that likely are highly relevant to determining the legality of the claims payments at issue here:

---

[1] Kathy L. Cerminara, *The Class Action Suit As A Method of Patient Empowerment in the Managed Care Setting*,
24 Am. J.L. & Med. 7 (1998).
[2] Id. at 30.
[3] Id.
[4] Id. at 32.

- All of the health coverage plans are governed by ERISA
- All of the claims arise from the same therapy, provided on an out-of-network basis, and billed under the same service billing code.
- All of the Plaintiffs' health coverage plans available for review refer to usual and customary fees or similar "UCR" terminology[5] as a basis for determining how much to pay for these out-of-network services.

### 5). "*UCR" terminology has a recognized and widely accepted meaning*.

Relating to the last prior bullet point, despite some variation in the wording of the plan documents, they consistently convey that data regarding usual and customary fees is to be used to determine payment amounts for out-of-network claims of the type at issue here. Moreover, usual and customary reimbursement has a recognized and widely accepted meaning that applies across the industry of health coverage and claims administration. Confirming, and further discussing, these points, see Bates UHC 309956-61.

Defendants' rebuttal expert, Prof. Kessler, however, states (p. 20) that my position on the accepted meaning of UCR terminology[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮" And, despite my referencing and attaching United's own verification of my position, he asserts that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" their position on the meaning of UCR terminology.

Further, in his deposition Prof. Kessler maintains that usual, customary and reasonable (UCR) and equivalent terms have no core established meaning. Instead, he adopts what the Ninth Circuit has called an Alice-in-Wonderland position[6] that the meaning of UCR "▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and that "▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮".[7]

Recognizing that this disagreement over the meaning of UCR terminology is central to this litigation, I will discuss it extensively.

Prof. Kessler bases his position on a single, very brief source: a glossary entry in a textbook stating that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮" of using UCR "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮".

---

[5] UCR stands for "usual, customary, and reasonable," which is equivalent to various similar phrases such as "usual and customary" or "reasonable and customary."  See Appendix to this report.

[6] See *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 905 (9th Cir. 2001), which explains that, in a "battle over the meaning of words," one lawyer "has drawn our attention to an apt quote from Lewis Carroll, whose depictions of the reverse-logic of childhood fantasy worlds all too often resemble adult reality. Describing a confrontation between Alice and Humpty Dumpty as to the extent of language's elasticity, Carroll wrote:

"I don't know what you mean by 'glory,' " Alice said.

Humpty Dumpty smiled contemptuously. "Of course you don't-till I tell you.... When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean-neither more nor less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

Quoting Lewis Carroll, Through the Looking Glass*, in *The Complete Works of Lewis Carroll* 154, 196 (1994).

[7] Kessler depo. 127-128, 132-133.

There are several notable defects in this position.[8] First, Prof. Kessler's only authority contradicts rather than supports his position. The authority does *not* say UCR has lost its core meaning. Instead, Prof. Kessler omits quoting the lead sentence in that textbook definition, which correctly states that UCR means: **"Profiling prevailing fees in an area and reimbursing providers on the basis of the resulting profile."** Elsewhere in that same textbook, and in other of that author's writings, that author uses the term UCR with the clear assumption that it ***does* convey a core meaning** that is well understood. The same shared understanding is also used by other respected health economists writing in another source that Prof. Kessler cites (Appendix items 35, 36), and by thousands of other testifying experts (Appendix items 37-4000).

The textbook Prof. Kessler cites, rather than questioning whether UCR has continued meaning, says only that one particular use of UCR is "archaic." That is true with respect to health plans' general range of core coverage, since most coverage previously was indemnity-based but no longer is. Instead, core coverage now is provided through provider networks that negotiate payment on terms other than UCR. However, for *out-of-network services*, coverage still is frequently on an indemnity basis, and so UCR remains in active use -- **as discussed in United's own document** and as documented below. Nothing in the cited textbook (Prof. Kessler's single authority) indicates to the contrary.

Regardless, even if one source regards UCR as archaic, that does not rob the term of meaning, as Prof. Kessler appears to claim.[9] Instead, the simple claim that insurers use UCR much less often than previously recognizes: a) that it is still used to some extent (mainly for out-of-network payment); and b) that **regardless of how often UCR is used, the term has an understood meaning**.

Indeed, Prof. Kessler's own report supports the core meaning I have explained. At pp. 30-31 (emphasis added), he documents that in a presentation to ▆▆▆▆▆▆:



.

He then goes on to describe:

---

[8] In addition to the points in text, Prof. Kessler argues that I undercut my position by acknowledging that, in some contexts, UCR terminology can be "▆▆▆▆▆▆▆▆▆▆▆▆▆▆."  Kessler report fn. 62, quoting my deposition at pp. 99-100.  It should be obvious that acknowledging some potential for ambiguity does not equate to saying that a term is *entirely* ambiguous or that it has *no* core meaning. Quite the contrary, essentially all words can have some element of ambiguity in some context -- for instance, "night" and "day". In any event, although I do not offer a legal opinion on the matter, a court might well conclude that any ambiguity works *in favor of*, rather than against, an insured member's interpretive understanding.

[9] Prof. Kessler's failure to recognize UCR's core and widely understood meaning may arise from his unfamiliarity with the term's history. When asked about his "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆," he responded: "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆."  Kessler depo. 131:13-18. Discussing this history, which is well-known to most experts in health insurance, see, for instance, the excerpts in this Report's Appendix items 35 and 36, from the *Handbook of Health Economics* -- the same authoritative source Prof. Kessler cites in fn. 50.

[REDACTED]

"

Importantly, United's presentations of its out-of-network coverage programs give essentially the same meaning to its "Facility R&C" or "Facility Reasonable & Customary" programs that I document as being widely and commonly understood for UCR and its equivalents.

Of particular note, in the passages Kessler quotes above, United applies this terminology and its meaning to payment for "*facility*" services, not just for *professional* services.[10] Doing so entirely undercuts the suggestion that United's webpage extensively discussing UCR for out-of-network services has no meaning here simply because that page is limited to professional services. There is no reason in logic or common usage and understanding to suggest that UCR's well-established, widely shared understanding suddenly loses content or relevance when applied to a somewhat different kind of health or medical service than professional fees. To the contrary, UCR terminology is commonly applied, with the same meaning, to facility services. This is documented both in sources quoted in the Appendix (e.g. items 6, 32), and by United's very own "Facility R & C" program that is the focus of this litigation.[11]

Adding to these clear indications from United, the Appendix to this Supplemental Report documents a multitude of various influential or authoritative sources that use, define, or recognize the core understanding of UCR or its equivalents, following the meaning I have describe (and that Prof. Kessler rejects). Among these sources are:

a) The authoritative glossary at Healthcare.gov, the primary website to purchase subsidized coverage under the Affordable Care Act (Appendix item 10).

b) U.S. Department of Labor's glossary (Appendix item 11)

c) U.S. Bureau of Labor Statistics, in its "Definition of Health Insurance Terms," "for use in Federal surveys collecting employer-based health insurance data" (Appendix item 12).

d) The IRS (Appendix item 14).

e) California Department of Insurance (Appendix item 16).

f) California State Auditor (which Prof. Kessler also cites, at p. 15) (Appendix item 17).

g) FAIR Health, the leading source for data to determine UCR rates. (Appendix item 4).

h) Anthem, the second largest U.S. health insurer and the largest in California (Appendix item 5).

i) Several other leading and influential insurance industry sources (Appendix items 6-9).

j) Various federal and state statutes, including those prescribing insurance payments:

---

[10] See also Kessler report p. 32: " [REDACTED] "

[11] See note 10.

- o   for out-of-network emergency services, or

- o   when networks lack adequate access to a needed provider (Appendix items 13, 20-29).

k)   Judicial decisions addressing health plan members' ERISA claims (Appendix items 30-34).

l)   Pre-eminent health economists writing in the same authoritative treatise that Prof. Kessler cites (Appendix items 35, 36).

m)   Thousands of other testifying experts (Appendix items 37-4000).

Of particular note, proper calculation of UCR was at the center of the extended legal controversy over the Ingenix database that United previously maintained to determine UCR rates. Throughout that entire controversy, multiple courts, government investigations, and parties involved used UCR terminology repeatedly to describe the purpose and use of the disputed database. None of the many parties or authorities involved questioned the descriptive use of those terms or indicated that UCR had no core meaning. Instead, consistent with my opinion, these parties, courts and agencies either gave those terms the meaning I describe, or they used them without needing to define them, in apparent recognition that their meaning is well and broadly understood. See Appendix Items 3, 15, 29-31.

Of particular note, the leading judicial decision in the Ingenix controversy explained that the "central argument is **not hinged on a specific UCR definition**," despite the fact that the precise "definition of UCR varies between plans, [and] different methods of determining reimbursements are used in different situations . . . ."[12] Instead, the court noted that one of the insurers instructed its customer service employees that the "'**meaning is the same,' even though 'the wording does differ somewhat according to the contract**.'" (Appendix item 31). That explanation is entirely consistent with United's own explanation of UCR on its previous webpage (Appendix item 1).


### 6.) Defendants' expert mischaracterizes UCR contract language, and my prior statements and writing.

Defendants' rebuttal expert, Prof. Kessler, devotes Appendix D and Exhibit 1 of his report to categorizing sample plan documents according to terms used to describe out-of-network payment.   He concludes (at p. 25) that "███████████████████████" or its equivalents. This conclusion is both wrong and misleading.

---

[12] Wachtel v. Guardian Life Ins. Co., 223 F.R.D. 196, 215–16 (D.N.J. 2004), vacated and remanded sub nom. Wachtel v. Guardian Life Ins. Co., 453 F.3d 179 (3d Cir. 2006).  The Third Circuit's decision vacating this decision did not disagree with these characterizations, which the district court essentially ratified in subsequent rulings.  See, e.g., McCoy v. Health Net, 569 F. Supp. 2d 448, 454 (D.N.J. 2008); Scharfman v. Health Net, No. 2:05-CV-0301, 2008 WL 9485472, at *2 (D.N.J. Apr. 25, 2008). In any event, I quote these and other judicial excerpts not as controlling legal rulings, but instead merely as additional factual instances of recognizing the widely shared understanding of the core concept of UCR and its equivalents.

The conclusion is misleading because, whatever language these plans used, it was sufficient to authorize the defendants' use of their **"Facility Reasonable and Customary (R & C)" program**, and, use of that program is how Plaintiffs seek to define their class. As discussed above and referenced by Prof. Kessler (pp. 30-31), United itself appears to regard its Facility R & C program as being "based on" a UCR approach to determining out-of-network payment.

In addition to plan language, Prof. Kessler analyzed the administrative service agreements that plan sponsors (employers) had with United.  He reports (in his Exhibit 2) that all of those agreements he reviewed describe or mention the Facility R & C program that was used to determine out-of-network payment.

Turning then to the health plan documents, Prof. Kessler's categorization contains some errors and misrepresentations. Some of the plans he categorizes as not having UCR language in fact do have such language. For instance, he classifies sample number  as referencing only "_____," but in fact it also describes "_____" as those that are "_____." Likewise, sample P11, which he also puts in the "_____" group, "_____" (emphasis added) in the same clause that Kessler quotes.

For the plans that do not reference UCR explicitly, Prof. Kessler notes that the majority of them reference "_____" (see his Exhibit 1). As just documented in the previous paragraph, that language is consistent with, and appears to be intended as embodying, a UCR-based methodology.

To make the contrary argument, Prof. Kessler (in fn. 84) references part of my deposition where I acknowledged (under argumentative questioning) that "__________" that this phrase refers to average in-network rates. Prof. Kessler, however, replaces (at p. 25) my carefully selected "could be" with loosely stated "____" -- creating the misleading impression that I believe this contract language, in Kessler's characterization, "_____." That is not my opinion. Instead, while agreeing that, in isolation, Prof. Kessler's interpretation might be plausible, in fact, based on information just presented, it is **much more likely** in this context to be intended to **refer to a UCR-based method**.  At a minimum, there is a solid factual basis in both United's own use of various contract wordings and in reasonable industry and lay understanding of that terminology, to maintain these contracts contemplate UCR data and methods.

Reinforcing this conclusion are various influential or authoritative statements in the Appendix, to the effect that the UCR approach was developed as a way of measuring "market" rates. For instance the agreement that United signed to settle its dispute with the NY Attorney General over Ingenix UCR data recites that the "'Usual and customary rate' is a **form of market rate** designed to reflect how much doctors typically charge for the healthcare service in question" (Appendix item 3). Because "competitive rates" is often a synonym for "market rates," it is reasonable to believe that "competitive rates" references UCR data and methods, even if actual market conditions might not reflect what a health economist considers to be truly competitive.

Prof. Kessler attempts to fortify his view of UCR and contract wording by citing to some of my previous writings,[13] in which I criticize the use of UCR as a method to determine "reasonable" fees. This is a misapplication and misinterpretation of my prior work and my actual position. In portions of my deposition not cited by Prof. Kessler, I explained that my prior work discussed determination of payment rates in two contexts entirely different than that of this case:

a) What a *patient* owes a provider when they have *no specified contract*

b) Appropriate *regulatory* policy in out-of-network *emergency situations*

This case differs in several ways, but the two most obvious are that Plaintiffs allege that:

c) It is governed by agreements or arrangements that call for use of UCR, which, by widely shared understanding, refers to prevailing list charges.

d) Plaintiffs chose to seek care out of network.

My previous writings quoted or cited do not apply to the current circumstances, for obvious reasons. First, it is a "red herring" argument to suggest that my position on the term "reasonable" in isolation also applies to the term UCR, any more than, for instance, a particular definition of "common" applies to "common law" or a college "class" defines "class action."   Although UCR includes the term reasonable, that is not understood to call for an ab initio assessment of whether list prices on the whole are too high. Instead, as described in sources the Appendix quotes (such as items 4, 7, 8, 12, 30, 34, 35), "reasonable" in the UCR context addresses whether a particular charge category reasonably fits the services and circumstances at issue.

Second, although I have criticized "chargemaster" (list price) rates for usually being too high, I have not said that is *always* the case, or that payment should always be determined in reference to negotiated rates. To argue that one rate method is usually superior is not to say that the other is always wrong. For some medical services, list prices *are* based on market dynamics.

Even when prices are too high, my prior writings criticized list prices in the context of a) and b) above – when there is no governing contract, or when regulators are considering how to address a market failure problem.  My prior writings do not argue against, and are not inconsistent with, recognizing the accepted meaning and common understanding of UCR methods when they are called for by enforceable insurance arrangements intended to protect patients from excessive costs.


***7). If the court determines that the insurance claims at issue here were incorrectly paid, it is feasible to determine an appropriate payment methodology that applies consistently to a large number of cases.***

Just as the Defendants' use of an inappropriate data source and methodology would systematically affect large groups of claims and claimants, so too could defects in payment data and methodology be corrected on a systematic basis. The most straightforward way would be to identify a fair and accurate source of payment data to replace the source(s) that Plaintiffs claim

---

[13] Kessler report at 20, 21.

are inappropriate. Such sources exist and are readily available to replace deficient data sources. One such data source that is well-regarded and widely-used is Fair Health. UnitedHealth helped to create Fair Health and they already use Fair Health data to determine physician out-of-network claims from physicians.

Defendants' rebuttal expert, Prof. Kessler, takes issue "███████████████████████ █████" as a source for properly determining Plaintiffs' insurance claims, noting that this database may have relevant gaps. In reference to my report, he notes correctly that I say appropriate data sources "exist and are readily available to replace deficient data sources," but he fails to acknowledge that I mention FAIR Health as only "*[o]ne such* data source" (emphasis added).[14]

By focusing his attention solely on the FAIR Health example, Prof. Kessler fails to acknowledge that other similar data sources exist that are in some ways more inclusive. One of those, that Prof. Kessler himself has used in several of his studies, is known as MarketScan.[15] Similar to FAIR Health, it collects and sells access to insurance claims information from a large number of commercially insured plans nationally. As demonstrated by Prof. Kessler's own use of this data source, it includes claims from health care facilities, not just professionals.

Other researchers have used similar commercial-claims data sources to study behavioral health services in particular, including facility-based outpatient treatment.[16] Moreover, an independent data source is not necessarily required to resolve these claims. UnitedHealthcare, as the largest commercial insurer in the country, itself has direct access internally to a very large amount of its own data from which UCR payments could, with the correct methodology, be calculated.

Finally, any data source, even the best available, will inevitably have gaps -- for instance, in less populated areas or for more specialized services. Therefore, valid UCR methods inevitably will entail "gap analyses." These methods can be used to fill gaps either in FAIR Health's dataset, or in others. For instance, data for one time period can be trended to another based on standard inflation metrics. Or, UCR rates for a service that is missing sufficient data can be benchmarked to another service that has similar components and complexity.

For these reasons, there is not a data deficiency that would make proper resolution of the Plaintiff's insurance claims infeasible.

---

[14] Kessler report at 19.

[15] Baker LC, Bundorf MK, **Kessler** DP, Vertical Integration: Hospital Ownership of Physician Practices is Associated with Higher Prices and Spending, 33 Health Aff. 756-63 (2014); Baker LC, Bundorf MK, **Kessler** DP, Why Are Medicare and Commercial Insurance Spending Weakly Correlated?, 20 Am. J. Manag. Care. e8-14 (2014); Baker LC, Bundorf MK, **Kessler** DP, Does Health Plan Generosity Enhance Hospital Market Power?, 44 J. Health Econ. 54 (2015).

[16] Stoddard Davenport, et al., Impact of Mental Health Parity and Addiction Equity Act (Milliman, Nov. 2017), https://www.milliman.com/insight/2017/Impact-of-Mental-Health-Parity-and-Addiction-Equity-Act/; Beil H, et al., Behavioral Health Integration With Primary Care: Implementation Experience and Impacts From the State Innovation Model, 97 Milbank Q. 543-582 (2019); Geissler KH, Cooper MI, Zeber JE, Association of Follow-Up After an Emergency Department Visit for Mental Illness with Utilization Based Outcomes, 48 Adm. Policy Mental Health 718-728 (2021).

Also readily amenable to systematic correction is the method used to calculate appropriate rates once valid data is accessed. Appropriate methods are well established and in common use that use objective measures to identify the payment rate appropriate for a particular case in a manner that is readily automated. These objective rate-calibration factors include: geographic location, type of provider, type of treatment, and a specified benchmark point within the relevant established range of rates.

Following standard practice for health insurance claims, claims submitted for less than the specified benchmark would be allowed in full. Claims for more than the specified benchmark would be capped at that benchmark. Additional, case-specific factors or individualized investigation are not needed to resolve particular claims (absent unusual circumstances such as significant clerical error or fraud in submitting claims).

In rebuttal, the Defendants' expert, Prof. Kessler notes how complicated it can be to fully calculate a particular person's claim, owing to the fact that proper calculation depends not only on the allowed payment amount, but also on whether that patient or others in the household have met, or will eventually meet, their annual deductible or cap on out-of-pocket expenses. Prof. Kessler stresses this complexity as follows (Kessler Report fn. 145, original emphasis):



This explanation is correct, but rather than supporting the efficiency of individualized adjudication, it demonstrates just the opposite – that class resolution through automated calculation of claims would be hugely more efficient than individualized adjudication. This is because all of the factors Prof. Kessler mentions, which he notes in his deposition (p. 174) he would have to laboriously calculate "█████," are routinely done by United and other health insurers automatically – in the blink of an eye as it were – based on information in their standardized data systems.

When asked about this point in his deposition (pp. 172-174), Prof. Kessler expressed complete unfamiliarity with this very basic and universal aspect of health insurance claims processing.[17]

---

[17] Kessler depo. at 172-174 (omitting attorney objections, emphasis added):

***8). Defendants' expert misstates or misapplies health economics concepts.***

The Defendant's rebuttal expert, Prof. Kessler, advances two economic arguments suggesting that Plaintiffs do not necessarily suffer harm from having their out-of-network claims underpaid. According to Kessler (emphasis added):

a) Higher payments "would result in a *dollar-for-dollar* increase in the *premiums of the Class members'* plans"[18]

b) "Plan participants -- not sponsors -- *ultimately* bear the burden of higher employer premiums . . . through lower wages" or reduced benefits.[19]

Each of these points either misstates or misapplies health economics concepts. First, although higher payments in one year can increase premiums in subsequent years, this does not at all necessarily happen on a "dollar-for-dollar" basis. The extent to which one year's claims experience affects the next year's premiums is subject to a host of factors that often do not translate into a dollar-for-dollar increase. According to two prominent health economists who summarize the standard factors:[20]

> The magnitude of the effects of increases in benefit costs on employment, wages, and health insurance coverage will be driven by **the elasticities of labor supply and demand, institutional constraints on wages and compensation packages, and how much workers value the increase in health insurance costs**.

Moreover, self-funded employers do not pay a "premium." Instead, they budget an estimated expense and then charge each worker his or her share of a premium equivalent. Thus, in this context, reference to "premiums" is taken to mean the amount paid on a *per person* basis. With that understood, then it certainly is *not* the case that paying a particular batch of claims will cause a dollar-for-dollar increase in premiums for those particular employees' premiums. Instead, the



---

[18] Kessler report at 7, 22.
[19] Id. at 17.
[20] Katherine Baicker and Amitabh Chandra, The Labor Market Effects of Rising Health Insurance Premiums, 24 J. Labor Econ. 609, 611 (2006).

cost incurred is distributed across the *entire pool* of insured members.  Prof. Kessler likely did not intend to create the misleading contrary impression; nevertheless, it is important to clarify the misimpression by clearly stating that any increase from a particular claim or set of claims will *not* be born dollar-for-dollar by the premiums that *Class members* pay.

Even though increased payments do not cause an immediate dollar-for-dollar increase in workers' premiums, Prof. Kessler argues that workers "ultimately" will bear the burden because labor market dynamics will inevitably lead to employers passing these costs on to workers through either increased wages or reduced benefits. This is a contested claim among health economists, for which the actual evidence is decidedly mixed. According to one summary of the literature (which is more recent and comprehensive that Kessler's selective references): "A **long line of empirical research** . . . has **failed to find clear evidence that health insurance costs are borne by employees**, which **calls into question the long-standing views most economists hold** about the incidence of rising health insurance costs . . . ."[21]

Moreover, when econometric studies do show some wage or benefit effects from increases in employers' costs, the studies often fail to find a *full* offset, meaning that workers bear only a *portion* of increased costs. More importantly, these studies rarely find that the effects are borne by individual groups based on each employer's particular costs.  Instead, any impact on workers typically is reflected only in more diffused market-wide or sector-wide averages. For instance, a national study done by two prominent health economists reported finding "**no evidence of a significant wage offset** at either the individual or group level" for particular firms or workers.[22]

Assessing Prof. Kessler's position more broadly, while the "but-for" world he discusses is not perfectly clear, such clarity can seldom be had. Regardless, the two economic principles he invokes provide no basis for concluding that Plaintiffs would be no better off if their claims were paid in a manner they contend is required.

---

[21] Darren Lubotsky and Craig A. Olson, Premium Copayments and the Trade-Off Between Wages and Employer-Provided Health Insurance, 44 J. Health Econ. 63, 64 (2015).
[22] Helen Levy & Roger Feldman, Does the Incidence of Group Health Insurance Fall on Individual Workers?, 1 Int. J. Health Care Finance Econ. 227, 227 (2001).

Reservation of Rights

I reserve the right to revise or expand my expert report to make necessary clarifications, to reflect additional information acquired, or to respond to additional developments in this case.

Compensation

I have charged $500 per hour for my professional services.

I hold all of these opinions within a reasonable degree of professional certainty.

Executed in Winston-Salem, NC on July 10, 2023.

Mark A. Hall

**Appendix A**

**Sources Confirming Widely Shared and Commonly Understood Meaning**

**of "UCR" and its Equivalents**

This compilation documents a wide variety of influential or authoritative sources that either define UCR and its equivalents consistent with my opinions, or that use these terms in a manner that clearly reflects that they are commonly understood as I have described them. (Unless otherwise indicated, emphases are added.)

### *UnitedHealthcare*

1. In recent years, UnitedHealthcare hosted <u>a web page providing "Information on Payment of Out-of-Network Benefits,</u>" which stated as follows:[23]

> The UnitedHealth Group affiliate will pay based on the terms of the member's health care benefit plan that in many cases provides for payment for amounts that are the lower of either:  the out-of-network provider's actual charge billed to the member, or **"the reasonable and customary amount," "the usual, customary, and reasonable amount," "the prevailing rate," or other similar terms that base payment on what other healthcare professionals in a geographic area charge for their services**.

> What Do These Terms Mean?

> The terms "the reasonable and customary amount," "the usual, customary, and reasonable amount," and "the prevailing rate" are among the standards that various health care benefit plans may use to pay out-of-network benefits.  Such plans determine the amounts payable under these standards by reference to . . .  **what other health care professionals in the relevant geographic areas or regions charge for their services**.  . . .

The web page goes on to describe at some length how this UCR calculation is made and the history and current status of the data sources typically used.

2. <u>UnitedHealthcare's expert</u>, Prof. Kessler, states the following in his report (pp. 30-31):

> In a 2015 presentation to JP Morgan regarding out-of-network programs, United indicated that the Facility R&C [reasonable and customary] component of JP Morgan's plan benefits was "based on a **geographically compared Usual and Customary amount** . . .". Additional United communications related to the Facility Reasonable & Customary program provide similar information, indicating that the program "evaluates non-

---

[23] Bates UHC 309956-61.

network facility charges by **applying a reasonable and customary formula for like services in similar geographic areas** . . . ."

Prof. Kessler's quotation of these excerpts suggests that he recognizes these terms to have the same core meaning that United and many others understand.

3. In 2009, UnitedHealthcare reached <u>agreement with New York's Office of Attorney General</u> bringing an end to an investigation of how United constructed and maintained the "Ingenix" database it and other insurers previously used to determine UCR rates.  The consent resolution of that matter that United signed includes these findings by the Attorney General:[24]

"Usual and customary rate" is a **form of market rate** designed to reflect **how much doctors typically charge for the healthcare service in question**.

Further, the consent agreement notes that this concept is

currently referred to as the "reasonable and customary," "usual, customary and reasonable," **"prevailing" rate, and "average, prevailing," or similar language**.

### *Other Industry Sources*

4.  <u>FAIR Health</u>, the entity created as a result of the NY Attorney General's investigation of UnitedHealthcare noted above, is now the primary source for determining UCR rates. It's explanatory document "Types of Out-of-Network Reimbursement" provides the following explanation of "UCR charges":[25]

Most plans pay for out-of-network care based on a percentage of UCR charges. Those reflect **what providers typically charge for a specific procedure in a given geographic area**.

Further, it explains:

plans may reimburse for out-of-network care based on a percentage of usual, customary, and reasonable (UCR) charges based on FAIR Health data that **reflect what providers typically charge for a specific procedure in a given geographic area**.

---

[24] In the Matter of Investigation No. 2008- I6I, UnitedHealth Group Incorporated, Assurance of Discontinuance Under Executive Law § 63(15) (Jan. 13, 2009), at p. 2, 6.
[25] https://www.fairhealthprovider.org/download/choosing-your-healthcare-provider/Types%20of%20Out-of-Network%20Reimbursement.pdf [copy and paste to see the document].

5.  Anthem (also known as Elevance Health) is the second largest health insurer in the country, and the largest in California. The glossary its California affiliate provides,[26] like Anthem's glossaries nationally,[27] states:

> Reasonable charge: The amount that's **considered normal for a doctor or hospital to charge for a health care service**.

6.  The CEO of Horizon Blue Cross Blue Shield of New Jersey in 2009 wrote the following to the Senate committee investigating UnitedHealthcare's data source for determining UCR rates:[28]

> Concepts like usual and customary charges were designed to permit payment amounts that would be predictable, change **with market-based changes in prevailing payments**, and keep insurance costs in check by eliminating excessive charges from the insurance pool.

7.  E-Health Insurance is the leading private source for on-line purchase of insurance. It's Health Insurance Glossary states:[29]

> Usual, Customary and Reasonable (UCR) Charge: This refers to the **standard or most common charge for a particular medical service when rendered in a particular geographic area**.

8.  Insure.com, another source used by many on-line insurance shoppers, explains:[30]

> "usual, customary, and reasonable" (UCR) . . . is one way health insurers determine how much of a claim they will pay. As the name says, these charges are **the "going rate" that health care providers in your area charge**.
>
> - Usual: A charge is considered "usual" if it is a physician's usual charge for a procedure.
>
> - Customary: A charge is considered "customary" if it is within a range of **fees that most physicians in the area charge** for a given procedure.

---

[26] https://www.anthem.com/ca/glossary/

[27] See, e.g., https://www.empireblue.com/glossary/ ; https://www.anthem.com/glossary/

[28] Senate Committee on Commerce, Science, and Transportation Staff Report, Underpayments to Consumers by the Health Insurance Industry (June 2009), at 2, https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54

[29] https://www.ehealthinsurance.com/health-insurance-glossary/terms-u/

[30] https://www.insure.com/health-insurance-faq/ucr.html

- Reasonable: A charge **is considered "reasonable" if it's usual and customary** or if it's justified because of a special condition such as a difficult procedure.

9. The Employee Benefit Research Institute is a well-respected think tank that conducts public policy studies. According to its document "The Future of Medical Benefits" at p. 14, note 3 (1998):[31]

> coinsurance is often based on usual, customary, and reasonable (UCR) charges. UCR charges are defined as follows: The covered amount is the provider's usual fee for the service, the customary or **prevailing fee for the service or product in that geographic region,** and a reasonable amount based on the circumstances involved.

### *Federal Sources*

10. Healthcare.gov, the primary website to purchase subsidized coverage under the Affordable Care Act, provides the following definition in its authoritative glossary:[32]

> UCR (usual, customary, and reasonable) -- The amount paid for a medical service in a geographic area **based on what providers in the area usually charge for the same or similar medical service.**

11. The Department of Labor, which governs employer-sponsored ERISA plans, has precisely the same definition as healthcare.gov in item 10.[33]

12. The US Bureau of Labor Statistics conducts a widely used National Compensation Survey.[34] The primary webpages for that survey[35] provide a "Useful Link" to Definitions of Health Insurance Terms developed and approved by the Federal Government's Interdepartmental Committee on Employment-based Health Insurance Surveys "for use in Federal surveys collecting employer-based health insurance data." That authoritative glossary states:[36]

> Usual, customary, and reasonable (UCR) charges - . . . UCR charges mean that the charge is the provider's usual fee for a service that does not exceed **the customary fee in that**

---

[31] www.ebri.org/docs/default-source/policy-forum-documents/6_future_of_medical_benefits.pdf?sfvrsn=f48a302f_2.

[32] https://www.healthcare.gov/glossary/ucr-usual-customary-and-reasonable/

[33] https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/affordable-care-act/for-employers-and-advisers/sbc-uniform-glossary-of-coverage-and-medical-terms-final.pdf

[34] This survey that provides "comprehensive data on the incidence (the percentage of workers with access to and participation in employer provided benefit plans) and provisions of selected employee benefit plans."

[35] https://www.bls.gov/ncs/ebs/  and  https://www.bls.gov/ncs/.

[36] https://www.bls.gov/ncs/ebs/sp/healthterms.pdf

**geographic area**, and is reasonable based on the circumstances.

13.  The Code of Federal Regulations, 26 C.F.R. § 54.9815-2719A(b)(3)(i), prescribes how health plans must pay for out-of-network emergency services.  One basis specified is:

> the same method the plan generally uses to determine payments for out-of-network services (**such as the usual, customary, and reasonable amount**) . . . . Thus, for example, if a plan generally pays 70 percent of the **usual, customary, and reasonable amount** for out-of-network services, the amount . . . for an emergency service is the total (that is, 100 percent) of **the usual, customary, and reasonable amount** for the service,

By not defining the bolded phrase, this provision indicates that the phrase has a commonly understood meaning.

14.  The Internal Revenue Service, in a question-and-answer publication addressing tax-advantaged "health savings accounts," refers to UCR limits on health insurance benefits in a matter-of-fact manner that indicates the term has a commonly understood meaning:[37]

> Q-16. If a plan limits benefits to **usual, customary and reasonable (UCR) amounts**, are amounts paid by covered individuals in excess of UCR included in determining the maximum out-of-pocket expenses paid?

> A-16. Restricting benefits to **UCR is a reasonable restriction on benefits**. Thus, amounts paid by covered individuals in excess of UCR that are not paid by an HDHP are not included in determining maximum out-of-pocket expenses.

15.  The Senate Committee on Commerce, Science, and Transportation investigated the database (Ingenix) that UnitedHealthcare and other insurers previously used to determine UCR. The staff report that completed the investigation refers to the UCR concept repeatedly without any notable qualification or elaboration.  For instance:[38]

> **"Usual and Customary" Rates in the Health Insurance Industry**

> Over the past few decades, insurance companies have developed the practice of basing their payments for out-of-network claims on what they call the "usual, customary, and

---

[37] IRS, Notice 2004-50, 2004-33 I.R.B. 196, 2004-2 C.B. 196, https://www.irs.gov/irb/2004-33_IRB
[38] U.S. Senate Committee on Commerce, Science, and Transportation Staff Report, Underpayments to Consumers by the Health Insurance Industry I, ii, 1 (June 2009), https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54

reasonable" (UCR) charge for a service, rather than on a doctor's or other provider's actual charge for the service. . . . . Ingenix provided the insurance industry with data it claimed were the **prevailing, "usual and customary" market rates for medical services in specific geographic regions**. Ingenix's "usual and customary" data tables were used to pay tens of millions of medical claims for out-of-network services. . . . The results of these questionable statistical methods were estimates of "usual and customary" charges that consistently skewed reimbursement rates downwards – in a direction that allowed insurers to reduce their claims payments.

## *California Sources*

16.  The California Department of Insurance's glossary of "Common Health Insurance Terms" provides:[39]

> UCR (Usual, Customary, and Reasonable): The amount that **providers in an area usually charge for the same or similar Service**.

17.  California State Auditor.  Prof. Kessler's report at one point cites California's State Auditor (fn. 40). In a different publication on dental services, that same authority refers to UCR without further elaboration,[40] suggesting that the meaning is well understood.

> [The California Department of] Health Care services stated that Medi-Cal pays an average of 31.5 percent of the statewide average for **commercial usual, customary, and reasonable rates (UCR rates)**, which the report defined as provider fees established for noninsured clients [i.e., non-discounted list prices].

18-19.  Statutory text.  In several places, California statutory law uses UCR or its equivalents in a manner that indicates UCR terms have a core commonly understood meaning. For instance, the Cal. Welf. & Inst. Code § 14021.6 provides that, in certain circumstances, "the State Department of Health Care Services shall establish rates for [Medi-Cal Drug Treatment Program] . . . based upon the **usual, customary, and reasonable charge for the services** to be provided."  And, the Cal. Ins. Code § 10233.2 states that "Long-term care insurance may not . . . (d) Provide for payment of benefits based on a **standard described as 'usual and customary,' 'reasonable and customary,' or words of similar import."**

---

[39] http://www.insurance.ca.gov/01-consumers/110-health/10-basics/terms.cfm
[40] The California Department of Health Care Services Has Failed to Monitor the Medi-Cal Dental Program Adequately (2014), at 41, https://www.kff.org/wp-content/uploads/sites/3/2015/01/2013-125.pdf

### *Other State Statutory Sources*

<u>20-23</u>. Several states have a statute that reads as follows,[41] which refers to UCR and its equivalents as an <u>understood way to define how dental benefits are calculated</u> (rather than a term that, itself, requires definition):

> Any health insurance policy or employee benefit plan which is delivered, renewed, issued for delivery, or otherwise contracted for in this state shall, to the extent that it provides benefits for dental care expenses: . . . **Define and explain** the standard upon which the payment of benefits or reimbursement for the cost of dental care services is based, **such as "usual and customary," "reasonable and customary," "usual, customary, and reasonable," fees or words of similar import** or specify in dollars and cents the amount of the payment or reimbursement for dental care services to be provided

<u>24</u>. Several states refer to UCR as the <u>basis for paying out-of-network providers for emergency services</u>. For example, in Texas:[42]

> If an insured cannot reasonably reach a preferred provider, the insurer must fully reimburse a nonpreferred provider for the following emergency care services **at the usual and customary rate** or at a rate agreed to by the insurer and the nonpreferred provider until the insured can reasonably be expected to transfer to a preferred provider.

<u>25</u>. And, in Florida:[43]

> Reimbursement for [emergency] services . . . by a provider who does not have a contract with the health maintenance organization shall be the lesser of:
>
> (a) The provider's charges;
>
> (b) The **usual and customary provider charges for similar services in the community** where the services were provided; or
>
> (c) The charge mutually agreed to by the health maintenance organization and the provider within 60 days of the submittal of the claim.

<u>26</u>.  Several states refer to UCR as the method insurers must pay providers if subscribers need to seek <u>out-of-network care because the insurance network has inadequate access</u> to contracted providers.  For instance, in Colorado:[44]

---

[41] AL Stat. §  27-19A-4; LA R.S. 22:1154; MS Stat. §  83-51-5; TX Ins. Code §  1451.205.
[42] 28 Tex. Admin. Code § 3.3725.
[43] Fla. Stat. Ann. § 641.513.
[44] Colo. Rev. Stat. Ann. § 10-16-704.

> In cases where . . . a covered person is required to travel [beyond] a reasonable distance . . . for an adequate network in order to receive services from a participating provider, and the covered person knowingly seeks services from a nonparticipating provider, the carrier shall be responsible to pay to the provider the lesser of:
>
> (A) The nonparticipating provider's bill charges;
>
> (B) A negotiated rate; or
>
> (C) In the absence of a negotiated rate, the greater of the carrier's average in-network rate for the relevant geographic area or the **usual, customary, and reasonable rate for such geographic area**.

27. And, in Texas,[45]

> If medically necessary covered services . . . are not available through a preferred provider . . . , an insurer must issue payment to the nonpreferred provider **at the usual and customary rate** or at a rate agreed to by the insurer and the nonpreferred provider.

The Texas regulation goes on to require that:

> Any methodology utilized by an insurer to calculate reimbursements of nonpreferred [i.e., out of network] providers for services that are covered under the health insurance policy must comply with the following:  (1) if based on **usual, reasonable, or customary charges**, the methodology must be based on **generally accepted industry standards and practices for determining the customary billed charge for a service and fairly and accurately reflect market rates**, including geographic differences in costs.

28, 29. Additional sources that discuss state statutes referencing UCR or similar terms, either without a definition, or by defining the terms consistently with the common understanding discussed here, are: U.S. Senate Committee on Commerce, Science, and Transportation Staff Report, Underpayments to Consumers by the Health Insurance Industry (June 2009) at 12, 18-19, https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-59261240d54; Barbara G. Quackenbos and Linda V. Tiano, The Evolution of Coverage and Payment for the Services of Out-of-Network (ONET) Providers in Managed Care Plans, AHLA Seminar Papers (October 26, 2009) (available on WestLaw).

---

[45] 28 Tex. Admin. Code § 3.3725.

*Judicial Sources*

30. In extended <u>class action litigation under ERISA</u> and RICO over the source (Ingenix) that most health insurers previously used to determine UCR rates, a federal district court wrote:[46]

> If a subscriber decides to go to an out-of-network provider, the subscriber is subject to deductible, coinsurance, allowable amounts, reasonable and customary amounts, and/or **usual, customary, and reasonable charge limitations**. . . . [I]f each member of the potential class were to bring an individual action, each would be required to prove that Health Net's UCR and other policies violated ERISA. The issues of law and fact relating to whether Health Net fully disclosed and properly applied its reimbursement mechanisms for out-of-network provider services are common to the class members and predominate over individual questions. . . .

> The question addressed . . . was whether these [Ingenix] databases satisfied the two **"core concepts" of UCR**. That is, whether the Ingenix databases provided accurate data as to the reasonable charge for a particular service, and the geographical area where the service was performed. To assess a reasonable charge for a particular medical service, it is essential to know the **actual charges billed by similar providers for reasonably similar services in a relevant geographic are**a. In order to determine the set of reasonably similar services, the database would need to contain information on those factors which would affect the cost of the services, such as: (I) significant differences in provider qualifications, (ii) significant differences in type of medical service provided, and (iii) significant differences in medical market area. . . . The method Ingenix uses to create a database from the collected data also undermines **the "core concepts" of UCR**.

31. In another part of the same litigation, the court wrote:[47]

> Here, the predominant legal allegation is that the method of calculating allowed amounts was undisclosed, self-serving, and based on outdated and/or otherwise improper data. This central argument **is not hinged on a specific UCR definition**. . . . Health Net [the insurer] also **asserts that . . . the definition of UCR varies between plans**, different methods of determining reimbursements are used in different situations, and different defenses may apply to different Plaintiffs. This argument is not persuasive. Health Net's

---

[46] McCoy v. Health Net, 569 F. Supp. 2d 448, 450, 456, 464, 466  (D.N.J. 2008)

[47] Wachtel v. Guardian Life Ins. Co., 223 F.R.D. 196, 215–16 (D.N.J. 2004), vacated and remanded sub nom. Wachtel v. Guardian Life Ins. Co., 453 F.3d 179 (3d Cir. 2006).  The Third Circuit's decision vacating this decision did not disagree with these characterizations, which the district court essentially ratified in subsequent rulings.  See, e.g., McCoy v. Health Net, 569 F. Supp. 2d 448, 454 (D.N.J. 2008); Scharfman v. Health Net, No. 2:05-CV-0301, 2008 WL 9485472, at *2 (D.N.J. Apr. 25, 2008). In any event, I quote these and other judicial excerpts not as controlling legal rulings, but instead merely as additional factual instances of recognizing the widely shared understanding of the core concept of UCR and its equivalents.

own Q & A sheet about UCR issues tells its employees to be sure to quote the UCR definition from the appropriate contract, noting, **"[t]he meaning is the same, but the wording does differ somewhat** according to the contract."

32. In a health plan member's suit for underpayment of an out-of-network claim, a federal district court wrote that the insurer (Oxford):[48]

> did not have absolute discretion to choose how much of [the patient] Schwartz's medical expenses to reimburse; rather**, it was required to cover usual, customary, and reasonable charges**. Second, Oxford used data based on rates charged by individual physicians for services provided in their offices. This decision was not reasonable, for Schwartz was not receiving medical care at the hands of an individual physician in a private office. Rather, her cancer required out-patient hospital services and procedures that are **usually and customarily provided at comprehensive cancer centers** like Sloan–Kettering. . . . Hence, in Schwartz's case, it would have made much more sense for Oxford to have based its determination of the UCR rates on **what other comprehensive cancer centers in New York City charged for similar out-patient service**s. Indeed, as the other three comprehensive cancer centers in New York were part of Oxford's network, their fee schedules were readily available to Oxford, and it **would only have been reasonable for Oxford to look at what these other facilities charged**. Third, Oxford did not even use the most applicable PHCS data. Oxford chose to use data for individual physicians, even though there was hospital data available . . . .

> In short, I do not believe it was reasonable for Oxford to determine that Sloan–Kettering's rates exceeded UCR rates based on a **comparison of Sloan–Kettering's rates, for services provided by a comprehensive cancer center**, with rates charged by individual physicians for services provided in their private offices. The rates charged by individual physicians were simply not **the usual or customary rates charged by facilities comparable to Sloan–Kettering**, where Schwartz could have obtained treatment and services comparable to what she received at Sloan–Kettering. . . . Oxford used **rates that were not usual, customary, or reasonable for the services and procedures in question**.

33. In a class action suit by health plan members under ERISA, a federal appeals court affirmed a district court finding that:[49]

> the fact that the policy states that Gem [the insurer] will pay the lesser of the billed charges or the **Usual and Customary charges** as set forth in the Schedule of Benefits **does not introduce ambiguity**. . . . [A] **reasonable person in the position of a plan participant would interpret the language to mean** that Gem will pay the lesser of either the billed

---

[48] Schwartz v. Oxford Health Plans, 175 F. Supp. 2d 581, 589-91 (S.D.N.Y. 2001).
[49] Hickman v. GEM Ins. Co., 299 F.3d 1208, 1213 (10th Cir. 2002).

charges or the Usual and Customary charges subject to or as stated in the schedule of benefits, e.g. **Gem would pay the 70% of the Usual and Customary charge** after the deductible was paid, with a lifetime maximum of a certain amount and an out-of-pocket annual maximum of a certain amount.

34. In a provider's suit asserting a <u>patient's claim for inadequate reimbursement under ERISA</u>, another federal court of appeals wrote:[50]

> Although the amount of the bill **was consonant with the usual and customary fee charged for such services**, the insurance company reduced the bill by 25% and paid the medical center 80% of the reduced bill. . . . Common sense dictates that **the fee recognized by a prudent person is the usual and customary fee in the industry**. . . . A prudent person would assume that the fee for a service is the reasonable, usual and customary fee. . . . **The usual and customary fee is the reasonable fee and, as such, is the fee recognized by a prudent person**.

### Health Economists and Other Experts

35, 36. The <u>Handbook of Health Economics</u>, which Prof. Kessler relies on (fn. 50), is written and edited by the field's most eminent health economists, is highly cited, and is the single most influential such reference book in the field.  In each of two different chapters (other than the one Kessler cites), a prominent health economist discusses UCR as follows:

> <u>Thomas McGuire (p. 481)</u>: The first widespread regulation of physician charges . . . supported by local medical societies, was by Blue Shield plans, which systematically collected information on the **prices charged by physicians in their service areas** and allowed payment to a physician if the price fell within the "usual, customary, and reasonable" (UCR) fee limits. (Usual refers to what this physician regularly charges**, customary to the 75th percentile of charges for similar fees in the area** (last year), and **reasonable to other factors, such as complicating conditions, which may justify higher fees**.)

> <u>Mark Pauly (p. 546)</u>:  In US health insurance, public and private, three factors potentially limited reimbursement to a level below the total amount billed. For reimbursement to be made, the **payment had to be usual, customary, and reasonable (UCR)**. While the **terminology here is somewhat variable**, these terms usually meant that the price had to be no higher than charged to other payers (usual), at or below **some percentile of the**

---

[50] HCA Health Servs. of Georgia, v. Emps. Health Ins. Co., 240 F.3d 982, 985, 997 (11th Cir. 2001).

**distribution of prices in the market area (customary)**, and only moderately increased over the previous years' charges (reasonable).

<u>37-4000.</u>  <u>Other Experts</u>. A WestLaw search revealed that, since the year 2000, there are almost 4,000 expert litigation reports, affidavits or depositions that have used "UCR" within close proximity of "customary" and that also refer to "insurance" in some way.[51] A sampling review of these hits confirmed that this search identified other experts who also use these terms with the core meaning and understanding I describe.

---

[51] The search was conducted Nov. 21, 2022 was run in all U.S. jurisdictions, and the search terms were: (ucr /10 customary) and insur! and DATE(aft 1999).

**CURRICULUM VITAE**

NAME:     Mark A. Hall

ADDRESS:  Wake Forest University School of Medicine
             Department of Social Science and Health Policy
             Medical Center Boulevard
             Winston-Salem, NC  27157-1063
             336/716-9807, mhall@wakehealth.edu

EDUCATION:

             Postdoctoral Fellowship, Johns Hopkins School of Public Health, 1991-1992.  Robert Wood Johnson Health Finance Fellowship, directed by Susan Horn, Ph.D.

             University of Chicago Law School - J.D. 1981
             - Graduated with highest honors and Order of the Coif.
             - Associate Editor, University of Chicago Law Review.
             - Awarded Jerome N. Frank Prize for second article.

             Middle Tennessee State Univ. - B.A. 1977, English, Philosophy, and Science. Graduated summa cum laude.  Awarded "Outstanding Honors Student."

EMPLOYMENT:

             Law clerk, Hon. John C. Godbold, Chief Judge, 11th and 5th Circuits Court of Appeals, 1981-82.

             Associate, Bondurant Mixson & Elmore, Atlanta 1982-1985.  I practiced hospital law and was active in pro bono work for the ACLU.

             Prof. of Law, Arizona State Univ., 1989 to 1993; Assoc. Prof., 1985 to 1989.  Taught health care law, contracts, torts, administrative law, and insurance law.

             Professor of Law and Public Health, Wake Forest University, 1993 - present.  Joint appointment between the School of Law and the Department of Public Health Sciences in the School of Medicine. Additional appointments in the Center for Bioethics, Health, and Society and, until 2018, in the School of Business.

             Fred D. and Elizabeth L. Turnage Professor, Wake Forest University, 2003 – present.

Mark A. Hall

Founding Director and Steering Committee Chair, Center for Bioethics, Health & Society, Wake Forest University, 2010-present. Co-Director and Founder, Master of Arts in Bioethics Program, Wake Forest University, 2009-present.

Founding Director, Health Law and Policy Program, Wake Forest School of Law, 2015-present.

PROFESSIONAL AWARDS, ACTIVITIES, AND APPOINTMENTS:

Associate Reporter for Medical Liability, American Law Institute, Restatement (Third) of Torts, 2019 – present.

Member, National Academy of Medicine (formerly, Institute of Medicine), 2014-present

Brookings Institution, Nonresident Senior Fellow in Economic Studies, 2016-present.

Wake Forest School of Medicine Faculty Team Science Research Award as a member of the Community Research Partnership, 2020

Ranked by HeinOnline as among the all-time top 500 authors of law journal articles overall, based on citations by courts and by other articles.

Ranked #4 among most highly cited health law professors (based on data compiled by Gregory Sisk).

Ranked by ExpertScape in top 0.25% of scholars writing about health insurance

Member, Agency for Healthcare Research and Quality, Scientific Review "Study Section" on Healthcare Systems and Value Research (HSVR), 2015-2019.

Established Team Science Award, Wake Forest Univ., 2020

Established Investigator in Clinical Sciences Award, Wake Forest Univ., 2012.

Mark A. Hall

Council Member of the Hastings Center Fellows (Bioethics)

Member, Advisory Board to DHHS on Consumer-Owned Health Insurance Co-Ops, 2011-2012.

Distinguished Health Law Teacher's Award, Am. Society of Law, Medicine and Ethics, 2009.

Visiting Fellow, University of Pennsylvania, Leonard Davis Institute, 2018-2019

Scientific Advisory Board, Eaton-Vinya, 2017-present
Member, Task Force on Health Insurance Exchange Implementation, North Carolina, 2010-2012.

Investigator in Health Policy Research, Robert Wood Johnson Foundation, 2005-2008

Scholar in Residence, Stanford Univ. Law School, Jan-Feb. 2018

Florence Rogatz Visiting Professor of Law, Yale University, Fall 2015.

Visiting Researcher, University of Melbourne, April 2011.

Visiting Scholar, University of British Columbia, April 2009.

Scholar in Residence, Duke University School of Law, Spring 2001.

Visiting Professor, University of Pennsylvania Law School, Spring 1998.

Member, American Law Institute, 2005 - present.

Merck Distinguished Health Law Teacher, Seton Hall, Fall 1995.

Visiting Professor of Law, Univ. North Carolina, Summer 1990.

Visiting Scholar, Vermont Law School, summers 1987, 1988, 1989, 1992.

Visiting Faculty, London Law Consortium, University of London, Fall 1986.

Mark A. Hall

Editorial Advisory Board, Milbank Quarterly, 2000 – present.

Board of Editors, J. Health Politics Policy and Law, 2005 – present.

Editorial Board, Oxford J. of Law and the Biosciences, 2015 - present

Editorial Advisory Board, Health Care Law & Policy (SSRN journal).

Member, Board of Visitors, Middle Tennessee State University Honors College, 2007-2010, and recipient of Distinguished Alumni Achievement in Education Award from MTSU, 2018.

President's Volunteer Service Award, 2013

President and Executive Committee Member, Law & Medicine Section of the American Assoc. of Law Schools, 1990-1994.

Editor-in-Chief, Jurimetrics J. Law, Science and Technology, 1989-1991.

Manuscript or Proposal Reviewer for:  Aspen Publishers; Duke Univ. Press; Harvard Univ. Press; Oxford Univ. Press; Jossey-Bass Press; Am. J. Pub. Health; Health Affairs; Health Services Research; Inquiry; JAMA; J. Health & Social Behavior; Medical Care; Milbank Q.; New England Journal of Medicine, Journal of Health Politics, Policy and Law; Health Affairs; Jurimetrics; Am. J. Hum. Genetics; J. L. Med. & Ethics; Annals of Health Law; Institute of Medicine; National Institutes of Health; Robert Wood Johnson Foundation; Health Services Research Impact Committee, AcademyHealth; Am. College Legal Medicine; J. Health & Social Behavior; Social Science & Medicine.

RESEARCH INTERESTS:

I work at the intersection of health law and health care policy, with a focus on economic, regulatory, ethical, and institutional issues.  At present, my major projects include:

Health Insurance.  I am exploring the economic, operational, and social effects of various types of health insurance laws and regulations.

Safety-Net Access for the Uninsured.  Despite comprehensive insurance reforms, tens of millions will remain uninsured.  This line

4

Mark A. Hall

of research studies the continuing role of the safety net for those who remain uninsured.

Doctor-Patient Relationship.  I study various aspects of the doctor-patient relationship, including patients' trust in physicians and medical institutions, and patient-centered approaches to health care law and ethics.

Health Care Law and Policy.  I am the lead author of the oldest textbook in the field, and I am the lead reporter for the American Law Institute's Restatement of Medical Liability Law.  Also, I am a Nonresident Senior Fellow in Health Policy at the Brookings Institution.

GRANTS:     Principal Investigator. Lessons for State Regulators Learned from Hospital Market Consolidation in Asheville NC.  Arthur Foundation. $85,000. 2023.

Principal Investigator of Subcontract, The public health impacts of state laws pre-empting local authority. NIH. $250,000. 2021-2025.

Co-Investigator. Increasing COVID-19 testing and vaccination among Spanish speakers in the USA. NIH $1.5 million, 2022-2024

Principal Investigator, Evaluating Health Insurers' Financial Performance, Commonwealth Fund, $800,000, 2016-2022.

Investigator, Assessing the Effects of State Alcohol Exclusion Laws on Alcohol-Related Behaviors and Outcomes, NIH, $300,000, 2019-2022

Principal Investigator of Subcontract, Evaluating the prevalence, drivers, and policy implications of surprise medical billing, Brookings Institution and Arnold Foundation, $50,000, 2018-2020

Co-Principal Investigator, How State Pre-emption of "Sanctuary City" Laws and Policies Affect Immigrant Health, Robert Wood Johnson Foundation, $150,000, 2019-2020

Principal Investigator, States' Strategies to Stabilize Health Insurance Markets, Robert Wood Johnson Foundation, $150,000, 2018.

Mark A. Hall

Investigator, State and Local Laws Affecting Immigrant Health, Centers for Disease Control, $120,000, 2015-2017.

Principal Investigator, Characteristics of Uninsured North Carolinians eligible for subsidized enrollment under the ACA, Kate B. Reynolds Charitable Trust, $15,000, 2015.

Principal Investigator, Medicaid Expansion and Reform in North Carolina, Blue Cross Blue Shield Research Fund, Wake Forest University, $50,000, 2015, and $50,000 2016.

Principal Investigator, Private Health Insurance Exchanges, $200,000, Robert Wood Johnson Foundation, 2014-2016.

Principal Investigator, The Safety Net in Forsyth County, $35,000, Kate B. Reynolds Charitable Trust, 2013-2014.

Principal Investigator, Evaluating Health Insurers' Rate Increases Using National Data, Commonwealth Fund, $250,000, 2013-2014.

Co-Principal Investigator, and subcontractor:  Evaluating Implementation of Health Insurance Exchanges, Commonwealth Fund, $300,000 ($100,000 subcontract from Washington & Lee), 2011-2014.

Principal Investigator, Employers' Use of Health Insurance Exchanges Robert Wood Johnson Foundation, $135,000, 2012 - 2013.

Principal Investigator, Using Medical Loss Ratio Data to Evaluate Insurance Reform, Commonwealth Fund, $135,000, 2012 - 2014.

Investigator, The Impact of Immigration Laws on Use of Public Health Services (Rhodes PI), Robert Wood Johnson Foundation, $100,000, Jan  - Dec. 2012

Principal Investigator, Developing and Evaluating an Adequate National Safety Net to Complement Expansions Of Public And Private Insurance, Robert Wood Johnson Foundation, $400,000, 2009-2011.

Principal Investigator, Using "Section 125 Plans" to Shelter Employee's Individual Insurance Premiums from Tax, Robert Wood Johnson Foundation, $225,000, 2007-2009.

Mark A. Hall

Principal Investigator, Subcontract to Johns Hopkins University, Disclosing Conflicts of Interest in Research, $250,000, NIH, 2004-2009.

Principal Investigator, Investigator Award in Health Policy Research, The Law and Ethics of Consumer-Driven Health Care, $275,000, Robert Wood Johnson Foundation, 2005-2008.

Principal Investigator, Subcontract to Duke University, The Costs of Health Services Regulation, $100,000, AHRQ (HHS), 2004-2005.

Investigator and Chair of Ethics Committee, Type-1 Diabetes Genetics Consortium, NIH-NIDDK, 2003-07.

Investigator and Chair of Ethics Committee, Hereditary Hemochromatosis and Iron Overload, NIH-NHLBI/NHGRI, 2000-2005.

Principal Investigator, Evaluating Managed Care Patient Protection Laws, $584,000, Robert Wood Johnson Foundation, 2001-2004.

Principal Investigator, Patient Trust in Managed Care: The Effects of Disclosing Financial Incentives, $400,000, Robert Wood Johnson Foundation, 1998-2001.

Principal Investigator, The Effects of Health Insurance Market Reforms, $500,000, Robert Wood Johnson Foundation, 1996-99.

Principal Investigator, The Effects of Laws Restricting Insurers' Use of Genetic Information, $175,000, NIH, 1997-99.

Principal Investigator, Health Insurers' Use of Practice Guidelines, AHRQ (HHS), $120,000, 1994-95.

Principal Investigator, The Ethics and Economics of Bedside Rationing, 1992, Robert Wood Johnson Foundation, $ 15,000.

Principal Investigator, Faculty Fellowship in Health Care Finance, 1990-91, Robert Wood Johnson Foundation, $ 55,000.

Principal Investigator, Symposium, Interdisciplinary Perspectives on Health Care Financing Reform, 1990, National Health Lawyers Association and Flinn Foundation, $ 10,000.

Mark A. Hall

Arizona State University, Faculty Grant-in-Aid Program, 1986, 1987, and 1988, $ 15,000.

PROFESSIONAL MEMBERSHIPS:

American Society of Law, Medicine and Ethics
Academy Health (Health Services Research)
American Health Lawyers Association
ABA Sections on Science and Technology and Health Law
Am. Association of Law Schools Law and Medicine Section
Biotechnology, Health and Environment International Network

BIBLIOGRAPHY:

**Books**

1.  Hall MA & Orentlicher D.  Health care law and ethics in a nutshell.  4th ed. Minneapolis: West Publishing, 2020.

2.  Hall MA, Bobinski MA, Orentlicher D, et al., eds.  Health care law and ethics. 9th ed. New York: Wolters Kluwer, 2018.

3.  Hall MA, Bobinski MA, Orentlicher D, et al., eds.  Medical Liability and Treatment Relationships.  4th ed. New York: Wolters Kluwer, 2018.

4.  Hall MA, Bobinski MA, Orentlicher D, et al., eds.  The Law of Health Care Finance and Regulation. 4th ed.  New York: Wolters Kluwer, 2018.

5.  Orentlicher D, Bobinski MA, ... Hall MA, et al., eds.  Bioethics and Public Health Law.  4th ed. New York: Wolters Kluwer, 2018.

6.  Allhoff F, Hall M, eds.  The Affordable Care Act Decision: Philosophical and Legal Implications (Routledge Press, 2014).

7.  Hall MA, Bobinski MA, Orentlicher D, eds.  Health care law and ethics.  8th ed. New York: Wolters Kluwer, 2013.

8.  Hall MA, Bobinski MA, Orentlicher D, eds.  Medical Liability and Treatment Relationships.  3rd ed. New York: Wolters Kluwer, 2013.

8

Mark A. Hall

9. Hall MA, Bobinski MA, Orentlicher D, eds.  The Law of Health Care Finance and Regulation. 3rd ed.  New York: Wolters Kluwer, 2013.

10. Orentlicher D, Bobinski MA, Hall MA, eds.  Bioethics and Public Health Law. 3rd ed. New York: Wolters Kluwer, 2013.

11. Hall MA, Rosenbaum S, eds.  The Health Care Safety Net in a Post-Reform World.  Rutgers Univ. Press, 2012.

12. Hall MA, Orentlicher D, Ellman IM.  Health care law and ethics in a nutshell. 3rd ed.  Minneapolis: West Publishing, 2011.

13. Hall MA, Bobinski MA, Orentlicher D, eds.  Health care law and ethics.  7th ed. New York: Aspen, 2007.

14. Hall MA, Bobinski MA, Orentlicher D, eds.  Medical Liability and Treatment Relationships.  2nd ed. New York: Aspen, 2008.

15. Hall MA, Bobinski MA, Orentlicher D, eds.  The Law of Health Care Finance and Regulation. 2nd ed.  New York: Aspen, 2008.

16. Orentlicher D, Bobinski MA, Hall MA, eds.  Bioethics and Public Health Law. 2nd ed. New York: Aspen, 2008.

17. Hall MA, Bobinski MA, Orentlicher D, eds.  Medical Liability and Treatment Relationships.  New York: Aspen, 2005.

18. Hall MA, Bobinski MA, Orentlicher D, eds.  The Law of Health Care Finance and Regulation. New York: Aspen, 2005.

19. Hall MA, Bobinski MA, Orentlicher D, eds.  Bioethics and Public Health Law. New York: Aspen, 2005.

20. Hall MA, Bobinski MA, Orentlicher D, eds.  Health care law and ethics.  6th ed. New York: Aspen, 2003.

21. Curran WJ, Hall MA, Bobinski MA, Orentlicher D, eds.  Health care law and ethics.  5th ed. New York: Aspen, 1998.

22. Hall MA, Bobinski MA, Orentlicher D, Teachers' Manuals (ten in all) for Health Care Law and Ethics casebook series  (Aspen, 1991, 1998, 2003, 2005)

Mark A. Hall

23.   Hall MA, Ellman IM, Strouse D.  Health care law and ethics in a nutshell. 2nd ed.  Minneapolis: West Publishing, 1999.  Japanese translation published by Prof. Kunihiko Yoshida, Haikkado University.

24.   Hall MA.  Making medical spending decisions: The law, ethics, and economics of rationing mechanisms.  New York: Oxford Univ. Press, 1997.

25.   Hall MA & Brewbaker WS, eds.  Health care corporate law: facilities and transactions.  Gaithersburg MD: Aspen Publishers 1996.

26.   Hall MA & Brewbaker WS, eds.  Health care corporate law: managed care. Gaithersburg MD: Aspen Publishers, 1996.

27.   Colombo JD, Hall MA.  The charitable tax exemption.  Boulder: Westview Press, 1995.

28.   Hall MA.  Reforming private health insurance.  Washington, D.C.: AEI Press, 1994.

29.   Hall MA, ed.  Health care corporate law: financing and liability. Gaithersburg MD: Aspen Publishers, 1994.

30.   Hall MA, ed.  Health care corporate law: formation and regulation. Gaithersburg MD: Aspen Publishers, 1993.

31.   Curran WJ, Hall MA, Kaye DH, eds.  Health care law, forensic science, and public policy. 4th ed. Boston: Little, Brown, 1991.

32.   Hall MA, Ellman IM.  Health care law and ethics in a nutshell.  Minneapolis: West Publishing, 1990.

**Book Chapters and Short Monographs**

33.   Hall MA, et al.  Immigrant Health, in A. L. Plough, ed. *Necessary Conversations: Understanding Racism as a Barrier to Achieving Health Equity* (Oxford Univ. Press, 2022).

34.   Hoffman A & MA Hall. The American Pathology of Inequitable Access to Medical Care, in D. Orentlicher & T. Hervey eds., *Oxford Handbook of Comparative Health Law* (Oxford Univ. Press, 2022).

35.   Hall MA. Fiduciary Principles in Health Care, in E. Criddle, et al., eds., *The*

Mark A. Hall

*Oxford Handbook of Fiduciary Law* (Oxford Univ. Press, 2019-2020).

36.   Hall MA & L. Mann-Jackson. Health Insurance Reform and the Latinx Population, in Airin Martinez & Scott Rhodes eds., New and Emerging Issues in Latinx Health (Springer 2020).

37.   Hall MA.  Solving Surprise Medical Bills, in Holly Lynch, et al., eds., *Transparency in Health and Health Care in the US* (Cambridge Univ. Press, 2019).

38.   Hall MA.  Employment-Based Health Coverage, in *The Oxford Handbook of U.S. Healthcare Law,* Glenn Cohen, Allison K. Hoffman, and William M. Sage, eds. (Oxford Univ. Press, 2016).

39.   Hall MA.  Coding Case Law for Public Health Law Evaluation, in A. Wagenaar & S. Burris, eds. Public Health Law Research: Theory and Methods (Jossey-Bass, 2013)

40.   Hall MA, Rosenbaum S, eds.  The Health Care Safety Net in a Post-Reform World.  Rutgers Univ. Press, 2012 (2 chapters).

41.   Hall MA & King NMP.  Legal Methods, in J. Sugarman & D. Sulmasy, eds., Methods in Medical Ethics (2d ed. 2010).

42.   Madison K & Hall MA.  Quality Regulation in the Information Age: Challenges for Medical Professionalism, in Rothman D & Blumenthal D eds., *Medical Professionalism in the New Information Age* (Rutgers Univ. Press, 2010).

43.   Hall MA & Schulman K.  Property, Privacy, and the Pursuit of Integrated Electronic Medical Records, in *The Fragmentation of U.S. Health Care: Causes and Solutions*, E. Elhauge ed. (Harvard Univ. Press, 2010).

44.   Hall MA.  Discrimination in Insurance: Experience in the United States. *Encyclopedia of the Human Genome*.  London: Nature Publishing Group; 2009.

45.   Hall MA.  Insurance and Genetic Discrimination, in Neil F. Sharpe & Ronald F. Carter, eds.  *Genetic Testing: Care, Consent, and Liability* (Wiley-Liss, New York, 2006).

46.   Hall MA.  The Ethics and Empirics of Trust, in Wm. Bondeson & James Jones, eds., *The Ethics of Managed Care: Professional Integrity and Patient*

Mark A. Hall

*Rights* (Dordrecht, The Netherlands: Kluwer Academic Publishers, 2002), pp. 109-126.

47. Anderson GF, Hall MA. The Management of Conflict over Health Insurance Coverage. In: G. Bloche, ed. *The Privatization of Health Care Reform.* New York: Oxford Univ. Press, 2002.

48. Hall MA. Referral Practices under Capitation. In: K. Gervais, et al. eds. *Ethical Challenges in Managed Care: A Casebook*. Georgetown Univ. Press 1999.

49. Hall, MA. Motivating physicians through financial incentives: an agency theory perspective. In: Spece R, Buchanan A, Shimm, M, eds. *Physician conflicts of interest*. New York: Oxford Univ. Press, 1997.

50. Hall MA. Liberal and communitarian ethics of insurance selection. In: *Health care crisis? A search for answers*. Univ. Press of America, 1995.

51. Hall MA. Is community rating essential to managed competition? Washington, D.C.: AEI Press, 1994.

52. Gosfield A, Batalden P, Hall M, et al. Institutional transformations. In: Rolph E, ed. *Health care delivery and tort: systems on a collision course*? Santa Monica: RAND Institute for Civil Justice, 1991.

53. Hall MA, Vaughn J. The corporate practice of medicine doctrine. In: Hall, MA, ed. *Health care corporate law: formation and regulation*. Boston: Little, Brown, 1993.

54. Hall MA. Private health insurance. In: Hall, MA, ed. *Health care corporate law: financing and liability*. Boston: Little, Brown, 1993.

**Peer-Reviewed Journals**

55. Tanner AE, Hall MA, et al. Understanding uptake of COVID-19 testing, vaccination, and boosters among Spanish-speaking Latines in the United States: Insights from Spanish speakers and key informants. Under review, 2023.

56. Taha AE, Saks M, Hall MA. Improving Consumer Understanding of Short-Term Health Insurance: An Experiment. Med. Care Res & Rev., May 2023.

Mark A. Hall

57.    Azagba S., Jensen J. K., Ebling T., & Hall M. (2023). E-cigarette preemption laws: Limiting local communities from protecting youth. Preventive medicine, 170, 107462 (Feb. 2023).

58.    Adler L., Ly B., Duffy E., Hannick K., Hall M., and Trish E. Ground Ambulance Billing and Prices Differ by Ownership Structure, Health Affairs 42(2): 227-236 (Jan. 2023).

59.    Rhodes SD, Tanner AE, Mann-Jackson L, Alonzo J, Hall MA,et al. Increasing COVID-19 testing and vaccination among Spanish speakers in the USA. BMJ Open. 2022 Nov 16;12(11):e066585.

60.    Studdert DM & Hall MA. Medical Malpractice Law: Doctrine and Dynamics, 387 New Eng. J. Med. 387:1533-37 (Oct. 2022).

61.    Azagba, S., Shan, L., Hall, M., Wolfson, M., & Chaloupka, F. Repeal of state laws permitting denial of health claims resulting from alcohol impairment: Impact on treatment utilization. *International J. Drug Policy.* 2022; 100, 103530.

62.    Mann-Jackson L, Simán FM, Hall MA, et al. State Preemption of Municipal Laws and Policies that Protect Immigrant Communities: Impact on Latine Health and Well-Being in North Carolina. Inquiry. 59: 1-11 (March 2022).

63.    Richman BD, Hall MA, Schulman K. The No Surprises Act and Informed Financial Consent. New Engl. J. Med.  New Engl. J. Med. 385:1348 (Dec. 2021).

64.    Hall MA. A 'Surprise' Health Policy Legislative Victory.  Hastings Center Rep. 51(6):3 (Dec. 2021).

65.    Oguro N, .... Hall MA, Kurita N. The Impact That Family Members' Health Care Experiences Have on Patients' Trust in Physicians.  BMC Health Services Research. 21(1):1122  (2021).

66.    Azagba S, Shan L, Wolfson M, Hall M. Problem Drinking as Intentional Risky Behavior: Examining the Association Between State Health Insurance Coverage and Excessive Alcohol Consumption. Preventive Med. Rep. 24: 10155 (Dec. 2021).

67.    Hall MA, Studdert DM. Vaccine "Passport" Certification: Policy and Ethical Considerations. New Engl. J. Med. 385:e32 (Sept. 2021).

Mark A. Hall

68.  Hall MA, Studdert DM. U.S. Public Views about COVID-19 "Immunity Passports." J. Law Biosciences. 8:1(2021), medRxiv 2021.01.26.21250184 .

69.  Hall MA, Mann-Jackson L, Rhodes SD. State Preemption of Local Immigration "Sanctuary" Policies: Legal Considerations. Am J Public Health. 2021 Feb;111(2):259-264 (Dec. 2020).

70.  Fuse Brown EC, Trish E, Ly B, **Hall M**, Adler L. Out-of-Network Air Ambulance Bills: Prevalence, Magnitude, and Policy Solutions. Milbank Q. Sep;98(3):747-774 (Sept. 2020).

71.  Studdert DM, Hall MA, Mello M. Partitioning the Curve—Interstate Travel Restrictions During the COVID-19 Pandemic. New Eng. J. Med. (Aug. 2020).

72.  McCue M, Hall MA, Palazzolo J. Key drivers of financial performance of insurers in the Affordable Care Act market exchange.  Health Services Management Research, Vol. 33(3) 130–135 (2020).

73.  Hall MA, Mello M, Studdert DM. The Legal Authority for States' Stay-at-Home Orders, New Engl. J. Med. (July 2020).

74.  Hall MA, Studdert DM. Privileges and Immunity Certificates Under COVID-19.  JAMA (2020).

75.  Studdert DM, Hall MA. Disease Control, Civil Liberties, and Mass Testing: Calibrating Restrictions during the Covid-19 Pandemic. New Engl. J. Med. April 2020.

76.  Chang Q., Long C., Hall MA, Duan Z.  Research characteristics on health law in China: Social network analysis.  J. Academic Librarianship 45 (2019): 126–136.

77.  Hall MA, Adler L., et al.  Reducing Unfair Out-of-Network Billing — Integrated Approaches to Protecting Patients.  New Engl. J. Med., Jan. 19, 2019.

78.  Hall, MA.  A Study of Affordable Care Act Competitiveness in North Carolina.  Risk Management & Ins. Rev. 20(2):153-172 (2017).

79.  Morrisey MA, Rivlin AM, Nathan RP, Hall MA.  Five-State Study of ACA Marketplace Competition.  Risk Management & Ins. Rev. 20(2):233-47 (2017).

Mark A. Hall

80.   Hall, MA.  The Role of Courts in Shaping Health Equity.  Journal of Health Politics, Policy and Law 42(5): 749-770 (2017).

81.   Arcury TA, Jensen A, … Hall MA, Quandt SA.  Providing Health Information to Latino Farmworkers: The Case of the Affordable Care Act. J Agromedicine. 2017;22(3):275-281.

82.   Hall, MA, McCue MJ, Palazzolo JR. Financial Performance of Health Insurers: State-Run Versus Federal-Run Exchanges, Medical Care Res. Rev. (March 2017).

83.   Hall MA and Nancy M. P. King. Conscience, Courage, and 'Consent,' Hastings Center Report 46, no. 2 (March 2016): 30-32.

84.   Hall MA.  Justice Roberts Gets It.  Hastings Center Rep.  45(5):7-8 (Oct. 2015).

85.   Hall MA.  King v. Burwell--ACA Armageddon Averted. N Engl J Med. 6;373(6):497-9 (2015).

86.   Hall MA, Perrin J.  Irregular Migrant Access to Care: Mapping Public Policy Rationales. Pub. Health Ethics; 8:130-38 (2015).

87.   Rhodes SD, et al., Hall MA (senior author).  The impact of local immigration enforcement policies on the health of immigrant Hispanics/Latinos in the USA.  Am J Pub Health; 105(2):329-37 (2015).

88.   McCue MJ & Hall MA.  Health Insurers' Financial Performance and Quality Improvement Expenditures in the Affordable Care Act's Second Year, Med Care Res Rev; 72:113-122 (2015).

89.   Hall MA.  Obamacare: What the Affordable Care Act Means for Patients and Physicians.  British Med. J., 349:g5376 (2014), with Richard Lord.

90.   Hall MA.  Disingenuous:  The Latest Legal Challenges to Health Insurance Reform. Hastings Center Rep. 44(5):6-7  (Sept. 2014).

91.   McCue M, Hall M, Liu X.  Impact of medical loss regulation on the financial performance of health insurers.  Health Aff. 32(9):1546-51 (2013).

92.   Hall MA. There Oughta Be a Law. Hastings Center Rep. 43(3):1 (Aug. 2013).

93.   Hall MA.  Organizing Uninsured Safety-Net Access to Specialist Physician

Mark A. Hall

Services.  J. Health Care Poor Underserv.  24:741-52 (April 2013).

94.   Hall MA. Health Care Law Versus Constitutional Law. J. Health Pol. Pol'y & L. 38(2):267-72 (April 2013).

95.   Hall MA.  The Affordable Care Act Survives, for Now. Hastings Center Rep. 42(5): 12-14 (2012).

96.   Richman BD, Hall MA, Schulman KA.  Overbilling and Informed Financial Consent — A Contractual Solution.  New Eng. J. Med. 367:396-97 (2012).

97.   Hall MA.  Supreme Court Arguments on the ACA:  A Clash of two World Views.  New Eng. J. Med. 366:1462-63 (2012).

98.   Hall MA, Schneider CE.  Can Consumers Control Health Care Costs?  Forum for Health Economics and Policy. 15 (3): 23–52 (2012).

99.   Hwang W, Griffin L, Liao K, Hall MA.  The Cost of Medicaid Coverage for the Uninsured: Evidence from Buncombe County, NC.  NC Med J. 73(4): 263-268 (2012).

100.   Hall MA, Hamacher  L, Johnson JM.  The Costs and Adequacy of Safety Net Access for the Uninsured in Genesee County, Michigan.  J. Health Care Poor & Underserved 23:327-338 (2012).

101.   Hall MA.  Regulating Stop-Loss Coverage may be Needed to Deter Self-Insuring Small Employers from Undermining Market Reforms.  Health Aff. 31(2):316-323 (Feb. 2012).

102.   Jost TS & Hall MA.  Not So Fast — Jurisdictional Barriers to the ACA Litigation.  New Eng. J. Med., Oct. 5, 2011.

103.   Hall MA, Jones AS, Hwang W.  Model Safety-Net Programs Could Care for the Uninsured at One-Half the Cost of Medicaid or Private Insurance, Health Affairs 30(9):1698-1707; Sept. 2011.

104.   Hall MA.  Access to Care Provided by Better Safety Net Systems for the Uninsured: Measuring and Conceptualizing Adequacy, Medical Care Res. & Rev. 68(4):441-461; Aug. 2011.

105.   Hall MA.  The mission of safety net organizations following national insurance reform. J Gen Intern Med. 2011 Jul;26(7):802-5.

Mark A. Hall

106.  Hall MA.  Getting to Universal Coverage with Better Safety-Net Programs for the Uninsured, J. Health Politics Pol'y & L. 36:521-26 (2011).

107.  Hall MA.  Constitutional Challenges to Compulsory Insurance:  A Guide through the Gauntlet.  Hastings Center Report.  41(2):14-15; 2011.

108.  Hall MA. Rethinking safety-net access for the uninsured. N Engl J Med. 6;364(1):7-9; 2011

109.  Hall MA. The Sausage-making of Insurance Reform, Hastings Center Rep., 41(1):9-10; Jan. 2011.

110.  Hall MA. Health care reform--what went wrong on the way to the courthouse. N Engl J Med. 2011 Jan 27;364(4):295-7; 2011.

111.  Hall MA. Clearing Out the Underbrush in Constitutional Challenges to Health Insurance Reform.  N Engl J Med. 364:793-795; 2011.

112.  Hall MA, Hager CL, Orentlicher D. Using Payroll Deduction to Shelter Individual Health Insurance from Income Tax. Health Serv Res. 46: 348–364; Nov. 2010.

113.  Hall MA and Amy B. Monahan.  Paying for Individual Health Insurance Through Tax-Sheltered Cafeteria Plans.  Inquiry Fall 2010, Vol. 47, No. 3: 252-261.

114.  Hall MA, Friedman JY, et al.  Per Capita Payments in Clinical Trials: Reasonable Costs versus Bounty Hunting.  Acad. Med. 85(10):1554-56 (2010).

115.  Richardson C, Hall MA, Madjd-Dadjadi Z.  Lessons from Credit Bureaus for Improving the Market for Electronic Medical Records.  J. Consumer Aff. 44(3): 546-556 (2010).

116.  Hall MA, Nancy M.P. King, Letitia H. Perdue, et al. Biobanking, Consent, and Commercialization in International Genetics Research: The Type 1 Diabetes Genetics Consortium (T1DGC).   Clinical Trials. 7(1 supp.): S33-S45  (2010).

117.  Hall MA.  The Three Types of Reinsurance Created By Federal Health Reform.  Health Aff. 29 (6): 1168–1172; 2010.

118.  Weinfurt KP, Hall MA, Chantelle Hardy N, Friedman JY, Schulman KA, Sugarman J.  Oversight of Financial Conflicts of Interest in Commercially

17

Mark A. Hall

Sponsored Research in Academic and Nonacademic Settings. J Gen Intern Med. 2010 Feb 26.

119.    Alice K. Fortune-Greeley, et al.  Patient Reactions to Confidentiality, Liability, and Financial Aspects of Informed Consent in Cardiology Research.  Circ Cardiovasc Qual Outcomes  3(2):151-8; 2010.  (7th author).

120.    Hall MA.  The Constitutionality of Mandates to Purchase Health Insurance, J. Law Med. Ethics 37:38-50; 2009, http://ssrn.com/abstract=1334955.

121.    Weinfurt KP, Hall MA, King NMP, Friedman JY, et al. Disclosure of Financial Relationships to Clinical Research Participants: Goals, Evidence, and Recommendations.  New Engl J Med 361:916-921; 2009.

122.    Hall MA, Schulman KA. Ownership of medical information.  JAMA. 301(12):1282-4; 2009.

123.    Hall MA.  After Insurance Reform: An Adequate Safety Net Can Bring Us to Universal Coverage.  Hastings Center Rep.  39 (6): 9-10; Nov. 2009.

124.    Arrow K, Auerback A, . . . . Hall MA, et al. (group authors).  Toward a 21st Century Health Care System: Recommendations for Health Care Reform. Ann Intern Med.  150:493-495; 2009.

125.    Hall MA, Kevin P Weinfurt, Janice S Lawlor, et al.  Community Hospitals' Oversight of Clinical Investigators' Financial Relationships.  IRB: Ethics Hum Res.  31(1): 7-13; 2009.

126.    Harrison HF, Harrison BW, Walker AP, Lohman K, Ellis SD, Hall MA, et al. Screening for Hemochromatosis and Iron Overload: Satisfaction with Results Notification and Understanding of Mailed Results in Unaffected Participants of the HEIRS Study.  Genet Test. Dec;12(4):491-500; 2009.

127.    Hall MA, Schneider CE.  Professional obligations when patients pay out of pocket.  J Fam Prac 58(11):E—E4; 2009.

128.    Hall MA, Schneider CE.  Learning from the legal history of billing for medical fees.  J Gen Intern Med 23(8): 1257-60; 2008.

129.    Hall MA, Schneider CE.  The professional ethics of billing and collections. JAMA 300(15):1806-08; 2008.

130.    Weinfurt KP, Hall MA, Friedman JY, et al. Effects of disclosing financial

Mark A. Hall

interests on participation in medical research: a randomized vignette trial. Am Heart J. 2008 Oct;156(4):689-97.

131.   Weinfurt KP, Hall MA, Dinan MA, et al.  Effects of disclosing financial interests on attitudes toward clinical research.  J Gen Intern Med. 2008 Jun;23(6):860-6.

132.   Weinfurt, Kevin P., Mark A. Hall, Joelle Y. Friedman, Michaela A. Dinan, Jennifer S. Allsbrook, Jatinder Dhillon, Jeremy Sugarman. The Effects of Disclosing Financial Conflicts of Interest in Clinical Research: Evidence from a Large National Survey.  J. Gen. Intern. Med. 23(6): 1525-1497; 2007.

133.   Walker AP, Tucker DC, Hall MA, et al.  Results communication and patient education after screening for possible hemochromatosis and iron overload. Genet Med. 9(11):778-791; 2007.

134.   Anderson RT, Wenzel L, Walker AP, Ruggiero A, Acton RT, Hall MA, et al. Impact of hemochromatosis screening in patients with indeterminate results.  Genet Med. 8(11):681-7; 2006.

135.   Hall MA, et al.  Genetic Screening for Iron Overload: No Evidence of Discrimination at 1 Year. J. Fam. Prac.  56(10); 829-834. 2007.

136.   Sloan FA, Rattliff JR, Hall MA. Effects of state managed care patient protection laws on physician satisfaction.  Med Care Res Rev. Oct;64(5):585-99. 2007

137.   Weinfurt, Kevin P., Jennifer S. Allsbrook, Joelle Y. Friedman, Michaela A. Dinan, Mark A. Hall,  Kevin A. Schulman, Jeremy Sugarman. Developing Model Language for Disclosing Financial Interests to Potential  Clinical Research Participants. IRB Ethics & Human Research. 29(1):1-5; Feb. 2007.

138.   Farmer, Deborah F., Sharon A. Jackson, Fabian Camacho, & Mark A. Hall. Attitude of African American and Low Socioeconomic Status White Women Toward Medical Research. J. Health Care for Poor Underserved. 18:85-99 (2007).

139.   Alexander, G. Caleb, Mark A. Hall, & John Lantos.  Rethinking Professional Ethics In The Cost-Sharing Era. Am. J. Bioethics. 6(4):W17-22; 2006.

140.   Hall MA, Camacho F, Lawlor JS, et al. Measuring Trust in Medical Research, Medical Care, 44(11):1048-1053; 2006.

Mark A. Hall

141.   Dinan, Michaela A., Kevin P. Weinfurt, Joelle Freidman, Jennifer Allsbrook, Julie Gottlieb, Kevin Schulman, Mark Hall, Jatinder Dhillon, & Jeremy Sugarman.  Comparison of Conflict of Interest Policies and Reported Practices in Academic Medical Centers in the United States, Accountability in Research.  13:325-342; 2006.

142.   Weinfurt, Kevin P., Joelle Y. Friedman, Jennifer S. Allsbrook, Michaela A. Dinan, Mark A. Hall, and Jeremy Sugarman. Views of Potential Research Participants on Financial Conflicts of Interest: Barriers and Opportunities for Effective Disclosure. J. Gen. Intern. Med. 21:901-906; 2006.

143.   Weinfurt, Kevin P., Joelle Y. Friedman, Michaela A. Dinan, Jennifer S. Allsbrook, Mark A. Hall, Jatinder Dhillon, Jeremy Sugarman.  Disclosing Conflicts of Interest in Research: Views of IRBs, Conflict of Interest Committees, and Investigators.  J. Law Med. Ethics. 34(3): 581-591; 2006.

144.   Weinfurt, Kevin P., Michaela A. Dinan, Jennifer S. Allsbrook, Joelle Y. Friedman, Mark A. Hall, Kevin A. Schulman, and Jeremy Sugarman. Policies of Academic Medical Centers for Disclosing Financial Conflicts of Interest to Potential Research Participants.  Academic Med. 81(2): 113-18; 2006.

145.   Hall MA.  Employers' Liability Risk for Managed Care Injuries.  Benefits Q. 22(1):45-48; 2006.

146.   Hall MA, Conover CJ.  Privatization of Blue Cross Plans: Public Benefit or Public Harm? Annu. Rev. Public Health 27:443-463; 2006.

147.   Hall MA.  Researching Medical Trust in the United States.  J. Health Organization & Mgt.   20(5): 456-67; 2006.

148.   Hall MA, Trachtenberg F, Dugan E.  The Impact on Patient Trust of Legalizing Physician Aid in Dying.  J. Med. Ethics 31:693-697; 2005.

149.   Hall MA, Havighurst, CC. Reviving Managed Care with Health Savings Accounts, Health Affairs 24(6): 1490-1500; Nov/Dec 2005.

150.   Roger T. Anderson, Nancy Press, Diane Tucker, Beverly Snively, Lari Wenzel, Shellie D. Ellis, Mark A. Hall, et al. Patient acceptability of genotypic testing for hemochromatosis in primary care, Genetics in Medicine. 7(8):557-563; 2005.

151.   Dugan, E., M. Hall, F. Trachtenberg.  Development of Abbreviated Measures

Mark A. Hall

to Assess Patient Trust in a Physician, a Health Insurer, and the Medical
Profession. BMC Health Services Research 5:64; 2005,
http://www.biomedcentral.com/1472-6963/5/64

152.   Hall MA.  The Importance of Trust for Ethics, Law, and Public Policy.
Cambridge Q Healthcare Ethics 14:156-167 (March 2005).

153.   Hall MA.  The "Death" of Managed Care: A Regulatory Autopsy.  J Health
Politics Policy & Law, 30(2): 427-452; 2005.

154.   Sloan FA, Rattliff JR, Hall MA.  Impacts of Managed Care Patient Protection
Laws on Health Services Utilization and Patient Satisfaction with Care.
Health Services Res. 40(3):647-667; 2005.

155.   Hall MA, Jean E. McEwen, James C. Barton, et al.  Concerns In A Primary
Care Population About Genetic Discrimination By Insurers. Genetics in Med.
7(5):311-16; 2005.

156.   Felicia Trachtenberg, Elizabeth Dugan, and Mark Hall. How patients' trust
relates to their involvement in medical care.  J Fam Pract. 54(4):344-52; Apr.
2005.

157.   Hall MA.  Health Insurers' Medical Necessity Determinations for Bariatric
Surgery.  Surg for Obesity Related Disorders 1(2): 86–90 (March 2005).

158.   Hall MA, Peeples R, Lord R.  Liability Implications of Physician-Directed Care
Coordination.  Ann Fam Med 3:115-120 (2005).

159.   Conover CJ, Hall MA, Ostermann J.  The Impact of Blue Cross Conversions
on Health Expenditures and the Uninsured.  Health Affairs.  24(2):473-82;
April 2005.

160.   Lawlor JS and Hall MA.  Do Employers Voluntarily Include Patient
Protections in Self-Insured Health Plans?  Managed Care Interface.  Jan.
2005: 76-80.

161.   Hall MA.  Managed Care Patient Protection or Provider Protection? A
Qualitative Assessment.  Am J Med. 117(12):932-937; Dec. 2004.

162.   Shenolikar, Rahul A, Rajesh Balkrishnan and Mark A Hall. How patient-
physician encounters in critical medical situations affect trust: results of a
national survey. BMC Health Services Research, 4:24; 2004.

Mark A. Hall

163.   Furberg CD, Hall MA, Sevick MA.  Balancing commercial and public interests. Current Controlled Trials in Cardiovascular Medicine, 5:6; 2004.

164.   Bonds DE, KL Foley, E Dugan, M Hall, P Extrom. Do Patients Trust Physicians in Training? An Exploratory Study to Determine Patients' Trust in Resident Physicians. Journal of Health Care for the Poor and Underserved. 2004;15:294-306.

165.   Hall MA, Green MD. Malpractice Litigation Reform: Empirical Approaches to Establishing the Legal Standard of Care. Medical Practice Mgt. 19(5):279-82; 2004.

166.   Thom DH, Hall MA, Pawlson LG.  Measuring Patients' Trust in their Physicians When Assessing Quality of Care.  Health Affairs. 23(4):124-132; 2004.

167.   Balkrishnan R, Hall MA, Blackwelder S, Bradley D.  Trust in Insurers and Access to Physicians: Associated Enrollee Behaviors and Changes Over Time.  Health Services Research. 39:813-23; 2004.

168.   Adams P, Arthur MJ, Boyer TD, et al., Hall MA (6th author).  Screening in Liver Disease.  Hepatology. 39:1204-1212; 2004.

169.   Hall MA.  The Impact and Enforcement of Prudent Layperson Laws.  Annals of Emergency Medicine.  43(5): 558-566; 2003.

170.   Barkin S, Balkrishnan R, Manuel J, Hall MA.  Effect of Language Immersion on Communication with Latino Patients.  NC Med J,  64(6)258-263; 2003.

171.   Hall MA, Conover CJ.  The Impact of Blue Cross Conversions on Accessibility, Affordability, and the Public Interest.  Milbank Q.  81:509-543;2003.

172.   Hall MA, Agrawal GB.  The Impact Of State Managed Care Liability Statutes.  Health Affairs.  22(5):138-45; 2003.

173.   Balkrishnan R, Dugan E, Camacho FT, Hall MA. Trust and satisfaction with physicians, insurers, and the medical profession.  Medical Care 41:1058-64; 2003.

174.   Hall MA. The scope and limits of public health law. Perspect Biol Med. 2003 Summer;46(3 Suppl):S199-209.

Mark A. Hall

175.    Hall MA.  Of Magic Wands and Kaleidoscopes: Fixing Problems in the Individual Market.  Health Affairs W353-358; 2002.

176.    Hall, MA, Fabian Camacho, Elizabeth Dugan & Rajesh Balkrishnan, Trust in the Medical Profession: Conceptual and Measurement Issues. Health Serv. Res. 37: 1436-39; 2002.

177.    Hall, M. A., B. Zheng, E. Dugan, K. E. Kidd, A. Mishra, R. Balkrishnan, and F. Camacho. Measuring Patients' Trust in Their Primary Care Providers. Medical Care Research & Review, 59(3):293-318; 2002.

178.    Zheng, B., M. A. Hall, E. Dugan, K. E. Kidd, and D. Levine. Development of a Scale to Measure Patients' Trust in Health Insurers.  Health Services Research 37:187-204; 2002.

179.    Rajesh Balkrishnan, Mark A. Hall, Don Mehrabi, et al. Capitation Payment, Length of Visit, and Preventive Services: Evidence from a National Sample of Outpatient Physicians   Am. J. Managed Care, 8(4) 332-40; 2002.

180.    Hall, M.A., E. Dugan, R. Balkrishnan, and D. Bradley.   How Disclosing HMO Physician Incentives Affects Trust.  Health Affairs 21(2): 197-206; March 2002.

181.    Hall MA, Dugan E, Zheng B, & Mishra AK.  Trust in physicians and medical institutions: What is it, can it be measured, and does it matter?  Milbank Quarterly, 79(4): 613-639; 2001.

182.    Hall MA.  Arrow on trust.  Journal of Health Politics, Policy and Law. October 26(4); 1131-1144; 2001.

183.    Hall MA, Lawlor JS.  Reinsurance Pools for Small-Group Health Insurance. J. Ins. Reg. 19(4):638-55; 2001.

184.    Hall MA.The Structure and Enforcement of Health Insurance Rating Reforms.  Inquiry 2000/2001; 37:376-388.

185.    Hall MA, Rich SS. Genetic Privacy Laws and Patients' Fear of Discrimination by Health Insurers: The View from Genetic Counselors.  J Law Med Ethics 2001; 28(3):245-57.

186.    Hall MA, Wicks EK, Lawlor JS.  HealthMarts, HIPCs, MEWAs and Association Health Plans (AHPs): A Guide for the Perplexed.  Health Affairs, 20(1): 142-53; Jan. 2001.

Mark A. Hall

187.   Hall MA. Rich SS. Patients' fear of genetic discrimination by health insurers: the impact of legal protections.  Genetics in Medicine. 2(4):214-21, 2000 Jul-Aug.

188.   Hall MA, Kidd KE, Dugan E.  Disclosure of Physicians Incentives: Do Practices Satisfy Purposes?  Health Affairs, 2000; 19(4):156-64.

189.   Wicks EK, Hall MA.  Purchasing Cooperatives for Health Insurance:  Their Performance and Prospects.  Milbank Q. 2000; 25(4).

190.   Hall MA.  An Evaluation of New York's Health Insurance Reform Law.  J. Health Politics Policy & Law, 2000; 25:71-99.

191.   Hall MA.  An Evaluation of Vermont's Health Insurance Reform Law.  J. Health Politics Policy & Law, 2000; 25:101-131.

192.   Richardson, C and Hall MA.  Agents' Behavior under Health Insurance Market Reforms.  J. Ins. Reg., 2000; 18:341-361.  Awarded "best article of the year" by the National Association of Insurance Commissioners.

193.   Hall MA.  The Role of Independent Agents in the Success of Health Insurance Market Reforms.  Milbank Q., 2000; 78:23-45.

194.   Hall MA.  The Geography of Health Insurance Regulation: A Guide to Identifying, Exploiting, and Policing Market Boundaries.  Health Affairs, 2000; 19(2):173-184.

195.   Hall MA.  The Impact of Health Insurance Market Reforms on Market Competition.  Am. J. Managed Care, 2000; 6:57-68.

196.   Hall MA, Rich SS.  Laws Restricting Health Insurers' Use of Genetic Information:  Impact on Genetic Discrimination.  Am. J. Human Genetics, 2000; 66:293-307.

197.   Hall MA.  Legal Rules and Industry Norms: The Impact of Laws Restricting Health Insurers' Use of Genetic Information.  Jurimetrics, 1999; 40:93-122.

198.   Hall MA.  Restricting insurers use of genetic information: a guide to public policy.  No. Am. Actuarial J., 1999; 3:34-46 (awarded the James C.H. Anderson Memorial Award from the Actuarial Education and Research Fund).

199.   Anderson GF, Hall MA.  When courts review medical appropriateness. Medical Care, 1998; 36:1295-1302.

200.   Hall MA, Berenson R.  Managed care medical ethics: a dose of realism. Ann. Intern Med, 1998;128:395-402.

201.   Hall MA.  Insurers' use of genetic information.  Jurimetrics J 1996;37:13-22.

202.   Hall MA. Managed competition meets tax-neutrality.  Health Aff 1995;14(2):274.

203.   Hall MA.  The problems with rule-based rationing. J Med Philo 1994; 19:315-332.

204.   Hall MA.  Disclosing rationing decisions:  A reply to Paul S. Appelbaum. Milbank Q 1994; 72(2):211-215.

205.   Hall MA.  The ethics of physician bedside rationing. Public Affairs Q 1994;8(1):33-50.

206.   Hall MA.  Informed consent to rationing decisions. Milbank Q 1993;71(4):645-668.

207.   Anderson GF, Hall MA, Steinberg, P.  Medical technology assessment and practice guidelines:  their day in court.  Am J Pub H 1993;83(11):1635-1639.

208.   Hall MA.  Reforming the health insurance market for small businesses.  N Engl J Med 1992; 326:565-70.

209.   Hall MA.  The political economics of health insurance market reform. Health Aff 1992 (summer); 11(2):108-124.

210.   Hall MA.  Making sense of referral fee statutes, J Health Politics, Policy & Law 1988; 13:623-32.

211.   Hall MA.  The unlikely case in favor of patient dumping, Jurimetrics J 1988; 28:389-97.

 Law Journal Articles

212.   Brown EF and Hall MA. Private Equity and the Corporatization of Health Care. Stanford Law Rev. 76:___ (2024).

Mark A. Hall

213.    Wright Ronald F. & Mark A. Hall, Collaborate Construction of a New Legal
        Field, Duke Law J. Online, 68:72-78 (Sept. 2018).

214.    Hall MA.  The Affordable Care Act's Day(s) in Court.  J. Law, Med. & Ethics
        44(4):576-79 (2016).

215.    Hall MA.  How Insurers Are Competing Under the Affordable Care Act.
        Hous. J. Health L. & Policy 15:17-41 (2015).

216.    Hall MA.  Toward Relationship-Centered Health Law.  Wake Forest L. Rev.
        50:233-50 (2015).

217.    Hall MA.  States' Decisions Not to Expand Medicaid. N.C. Law Rev. 92:1459-
        79 (2014).

218.    Hall MA.  Evaluating the Affordable Care Act: The Eye of the Beholder.
        Houston Law Rev. 51(4):1029-1056 (2014).

219.    Jost TS & Hall MA.  Self-Insurance for Small Employers Under the
        Affordable Care Act.  N.Y.U. Ann. Survey Am. Law. 68(3):539-565 (2013).

220.    Hall MA.  Employers' Use of Health Insurance Exchanges: Lessons From
        Massachusetts. St. Louis U. Law J. 6(2):355-388 (2013).

221.    Hall MA. A Healthcare Case for the Ages. J. Health & Life Sci. Law. 6(1):1-15
        (Oct. 2012).

222.    Hall MA. Constitutional Mortality: Precedential Effects of Striking the
        Individual Mandate, Law & Contemp. Prob. 75:107-14 (2012).

223.    Hall MA. Commerce Clause Challenges to Health Care Reform. U. Penn.
        Law Rev. 159:1825-1872 (June 2011).

224.    Hall MA.  The Factual Bases for Constitutional Challenges to Federal Health
        Insurance Reform. No. Ky. L. Rev. 38:457 (2011).

225.    Hall MA.  Risk Adjustment Under the Affordable Care Act: Issues and
        Options, Kansas J. Law & Public Policy 20:222-36 (2011).

226.    Hall MA.  Individual Versus State Constitutional Rights Under Health Care
        Reform. Ariz. St. Law J. 42: 1233-43 (2011).

227.    Hall MA.  Approaching Universal Coverage with Better Safety Net Programs

Mark A. Hall

for the Uninsured.  Yale J. Health Policy, Law & Ethics.  11(1):9-19 (2011).

228.  Hall MA.  Government-Sponsored Reinsurance.  Ann. Health L. 19:465-78 (2010).

229.  Hall MA.  Property, Privacy, and the Pursuit of Integrated Electronic Medical Records, 95 Iowa L. Rev., Iowa L. Rev. 95:631-665 (2010), http://www.uiowa.edu/~ilr/issues/ILR_95-2_Hall.pdf

230.  Hall MA, Schneider CE.  When Patients Say No (To Save Money): An Essay on the Tectonics of Health Law.  Conn. L. Rev.  41(3): 743-80 (2009).

231.  Schneider CE, Hall MA.  The Patient Life: Can Consumers Direct Health Care?  Am. J. L. & Med.  35(1): 7-65 (2009).

232.  Hall MA.  The Legal and Historical Foundations of Patients as Medical Consumers. *Georgetown Law J.* 96: 583-597 (2008).

233.  Hall MA & CE Schneider.  Patients as Consumers: Courts, Contracts, and the New Medical Marketplace. *Mich. Law Rev.* 106(4):643-90 (2008),  *reprinted in* Avraham, Hyman & Silver*, Economics of Health Law* (2015).

234.  Hall MA, Wright RF.  Systematic Content Analysis of Judicial Opinions. *Calif. Law Rev.*  96: 63-122  (2008).

235.  Hall MA.  Paying For What You Get And Getting What You Pay For: Legal Responses To Consumer-Driven Health Care. Law & Contemp. Prob's, 69:159-180 (Autumn 2006).

236.  Hall MA, Schneider C, Shepherd L.  Rethinking Health Law.  Wake Forest L. Rev. 41: 341 (2006).

237.  Hall MA. The History and Future of Health Care Law: An Essentialist View. Wake Forest L. Rev. 41:347 (2006).

238.  Jost, Timothy S., & Mark A. Hall. The Role of State Regulation in Consumer-Driven Health Care, Am. J. L. & Med., 31:395-418; 2005.

239.  Hall MA. Can You Trust a Doctor You Can't Sue?  A Patient-Centered Perspective on Medical Malpractice Reforms. Can You Trust a Doctor You Can't Sue? DePaul Law Review.  54(2): 303-13; 2005.

240.  Hall MA.  A Corporate Ethic of 'Care' in Health Care. Seattle J. Social Justice

Mark A. Hall

3:417-28; 2004.

241.    Hall MA, Schneider CE.  Where Is The "There" In Health Law? Can It
        Become A Coherent Field? Health Matrix. 14;101-05; 2004.

242.    Hall MA. Caring, Curing and Trust: A Response to Gatter. Wake Forest L.
        Rev. 39:447-451; 2004.

243.    Hall, MA.  State Regulation of Medical Necessity: The Case of Weight-
        Reduction Surgery.  Duke University Law Journal. 53:653-672; 2004.

244.    Agrawal GB, Hall MA.  What if you *Could* Sue your HMO?  Managed Care
        Liability Beyond the ERISA Shield.  St. Louis U. Law J. 47:235-298; 2003.

245.    Hall MA.  Ideology and Trust:  A Reply to Bloche, Stanford L. Rev.  55: 955-
        967; 2002.

246.    Hall MA.  Trust, Law & Medicine.  Stanford Law Rev.  55:463-527; 2002.

247.    Hyman DA, Hall MA.  Two Cheers for Employment-Based Health Insurance,
        Yale J. Health Pol'y Law & Ethics.  2:23-57; 2002.

248.    Hall MA, Green MD.  Introduction: Empirical Approaches to Proving the
        Medical Malpractice Standard of Care.  Wake Forest L. Rev. 37(3):663-
        74;2002.

249.    Hall MA, Balkrishnan J, Anderson RT, et al.  Measuring Medical Practice
        Patterns: Sources of Evidence from Health Services Research.  Wake Forest
        L. Rev. 37(3):779-820;2002.

250.    Hall MA.  The Theory and Practice of Disclosing HMO Physician Incentives.
        Law & Contemp. Probs.  64(4):207-240; 2002.

251.    Sloan FA, Hall MA.  Market Failures and the Evolution of State Regulation of
        Managed Care. Law & Contemp. Probs.  64(4):169-206; 2002.

252.    Hall MA.  HIPAA's Small-Group Access Laws: Win, Loss, or Draw?  Cato J.
        22(1):71-83; 2002.

253.    Hall MA. Genetic Enhancement, Distributive Justice and the Goals of
        Medicine.  San Diego L. Rev. 39(3):669-681 (2002).

Mark A. Hall

254.    Sloan FA, Conover CF, Hall MA. State Strategies to Reduce the Growing Numbers of People without Health Insurance.  Regulation, 22(3):; 1999.

255.    Hall MA.  The competitive impact of small group health insurance reform laws.  Univ. Michigan J. Law Reform, 32(4):685-726; 1999.

256.    Hall MA.  Public choice and private insurance.  Univ. Illinois Law Rev., 1998: 757-776.

257.    Hall MA.  Insurers use of genetic information.  Jurimetrics J 1996;37:13-22.

258.    Hall MA, Smith RS, Naughton M, Ebbers A.  Judicial protection of managed care consumers: an empirical study of insurance coverage disputes.  Seton Hall Law Rev 1996;26:1055-68

259.    Overbay A & Hall MA.  Insurance regulation of providers that bear risk.  Am J Law & Med 1996;22:361.

260.    Hall MA. Tough questions, hard choices. Jurist 1996;26(2):12-17

261.    Hall MA, Dadakis DS. Character of guidelines evolves, concern lingers over protection. Medical Malpractice Law & Strategy 1996;13(4):1-4

262.    Hall MA.  Rationing health care at the bedside.  New York Univ L Rev 1994; 69:693-780.

263.    Ellman IM, Hall MA.  Determining health insurance benefits through risk preference groups.  Am J Law Med 1994.

264.    Hall MA.  Managed competition and integrated health care delivery systems.  Wake Forest Law Review 1994; 29:1-13.

265.    Hall MA, Anderson GF.  Health insurers' assessment of medical necessity. U Penn Law Rev 1992; 140:1637-1712.  Reprinted in Nat'l Ins L Rev 1992; 6:173-244.

266.    Hall MA.  Health insurance: community-rating or experience-rating? Responsive Commun 2(4):79-82; 1992.

267.    Hall MA, Colombo JD.  The donative theory of the charitable tax exemption, Ohio St Law J 1992; 52:1379-1476.

Mark A. Hall

268.  Colombo JD, Hall MA.  The future of tax-exemption for nonprofit hospitals, Health Matrix: J of Law-Med 1992; 2:1-34, reprinted in Exempt Org Tax Rev 1993; 6:395-412.

269.  Hall MA, Colombo JD.  The charitable status of nonprofit hospitals:  towards a donative theory of tax exemption, U Wash L Rev 1991; 66:301-406.

270.  Anderson GF, Hall MA.  The adequacy of hospital reimbursement under Medicaid's Boren Amendment, J Leg Med 1992; 13:205-236.

271.  Hall MA.  The defensive effect of medical practice policies in malpractice litigation, 54 Law & Contemp Problems No 2, Spring 1991; 54:119-46.

272.  Hall MA.  Health care cost containment and the stratification of malpractice law, Jurimetrics J 1990; 30:501-08.

273.  Hall MA.  The medical malpractice standard under health care cost containment, 17 Law, Med & Health Care 1989; 17:347-62.

274.  Hall MA.  Institutional control of physician behavior: legal barriers to health care cost containment, Univ Penn L Rev 1988; 137:431-536.

275.  Hall MA.  Rate appeals under medicare's new prospective payment system: reflections on the meaning of 'prospectivity,' U Fla L Rev 1986; 38:407-47.

276.  Hall MA.  Hospital and physician disclosure of patient crimes, U of Det L Rev 1985; 62:145-182.

277.  Hall MA.  The jurisdictional nature of the time to appeal, U Ga L Rev 1986; 21:299-427.

278.  Hall MA.  Intergovernmental cooperation and the transfer of powers, U Ill L Rev 1981; 775.

279.  Hall MA.  Common carriers under the communications act, U Chi L Rev 1981; 48:409.

280.  Hall MA.  Lawful domicile under Section 212 of the immigration and nationality act, U Chi L Rev 1980; 47:771.

**Miscellaneous (Reports, Blog Posts, Book Reviews, etc. Sole author unless otherwise noted)**

Mark A. Hall

1. Private Equity and the Corporatization of Health Care.  Harvard Law School Forum on Corporate Governance, April 19, 2023, with Erin C. Fuse Brown

2. Does Making Health Insurance Enrollment Easier Cause Adverse Selection? Commonwealth Fund, April 2022, with Michael McCue.

3. Short-Term Health Insurance and the ACA Market. Commonwealth Fund, March 2022, with Michael McCue.

4. Expanding Consumer Health Insurance Options by Easing the Boundaries Between Individual and Small-Group Markets.  Commonwealth Fund, Oct. 2021, with Michael McCue.

5. Private equity investment as a divining rod for market failure: Policy responses to harmful physician practice acquisitions.  Brookings Institution Oct. 2021, with Erin C. Fuse Brown et al.

6. Reaching Agreement on COVID-19 Immunity "Passports" will be Difficult, Brookings Institution, Feb. 2021, with David Studdert

7. Understanding the No Surprises Act, Brookings Institution, Brookings Institution, Feb. 2021, 4th author with Loren Adler, et al.

8. Countering Threats to the Small-Business Health Insurance Market, Commonwealth Fund, Nov. 25, 2020, with Michael McCue.

9. How the Small-Business Health Insurance Market Is Faring, Commonwealth Fund, April 22, 2020, 2nd author with Michael McCue.

10. The Individual Health Insurance Market Is Looking More Like the Group Market Under the Affordable Care Act, Commonwealth Fund, August 26, 2019.  First author with Michael McCue.

11. How the ACA's Medical Loss Ratio Rule Protects Consumers and Insurers Against Ongoing Uncertainty, Commonwealth Fund, August 26, 2019. First author with Michael McCue.

12. Rep. Ruiz's Arbitration Proposal For Surprise Billing (H.R. 3502) Would Lead To Much Higher Costs And Deficits, Health Affairs Blog, July 2019, fourth author with Loren Adler, et al.

13. Breaking Down the Bipartisan Senate Group's New Proposal to Address

Mark A. Hall

Surprise Billing, Health Affairs Blog, May 2019, third author with Loren Adler, et al.

14. Analyzing the House E&C Committee's Bipartisan Surprise Out-Of-Network Billing Proposal,  Health Affairs Blog, May 2019, third author with Loren Adler, et al.

15. From Replicability to Replication in Systematic Coding of Legal Decisions, 36 Yale J. on Reg.: Notice & Comment (2019), with Ronald F. Wright.

16. State Approaches to Mitigating Surprise Out-of-Network Billing, Brookings Institution (Feb. 2019), 4th author with Loren Adler, Matthew Fiedler, et al.

17. Experiences Under the ACA Suggest Association Health Plans Could Harm the Small-Group Insurance Market, Commonwealth Fund (Dec. 2018), with Michael McCue.

18. The Health of the Small-Group Insurance Market, Commonwealth Fund (Oct. 2018), with Michael McCue

19. Analyzing Senator Hassan's binding arbitration approach to preventing surprise medical bills, Health Affairs, Oct. 2018, third author with Loren Adler, et al.

20. Analyzing New Bipartisan Federal Legislation Limiting Surprise Medical Bills, Health Affairs, Oct. 2018, third author with Loren Adler, et al.

21. Stabilizing and Strengthening the Individual Health Insurance Market, Brookings, July 2018 (50-page research report).

22. Would North Carolina Regret Expanding Medicaid?, Capitol Broadcasting (WRAL), April 2018.

23. Do States Regret Expanding Medicaid?, Brookings Institution, March 2018. Also published by Raleigh News and Observer.

24. On the Road to Recovery: Health Insurers' 2016 Financial Performance in the Individual Market, Commonwealth Fund, March 2018, with Michael McCue.

25. Health Insurance Markets Perform Better in States That Run Their Own Marketplaces, Commonwealth Fund, March 2018, with Michael McCue.

Mark A. Hall

26.   Comments on U.S. Department of Labor Proposed Rule on Association Health Plans, Feb. 2018.

27.   Hall MA & McCue MJ, How Do Noncompliant Health Plans Affect the Market?, Commonwealth Fund (Nov. 2017).

28.   Hall MA. States have already tried Trump's health-care order. It went badly, Washington Post, Oct. 13, 2017.

29.   McCue M, Hall M.  How Have Health Insurers Performed Financially Under the ACA's Market Rules? (Commonwealth Fund, Oct. 2017).

30.   Mark Hall and Paul Ginsburg, A Better Approach to Regulating Provider Network Adequacy (Brookings Institution, Sept. 2017).

31.   Margaret Darling, Caitlin Brandt, Loren Adler, and Mark Hall.  Receive a surprise medical bill? Here are three federal actions that may address surprise bills (Brookings Institution, Aug. 2017).

32.   Hall MA.  All the King's Horses and All the King's Men: Reintroducing Fractured Risk Pools (Brookings Institution, May 11, 2017), https://www.brookings.edu/blog/up-front/2017/05/11/all-the-kings-horses-and-all-the-kings-men-reintroducing-fractured-risk-pools/

33.   Hall MA & Bagley N. Making Sense of Invisible Risk Sharing (Brookings Institution, April 2017) https://www.brookings.edu/blog/up-front/2017/04/12/making-sense-of-invisible-risk-sharing/

34.   Hall MA & McCue MJ, The Financial Consequences of Terminating the ACA's Cost-Sharing Reduction Payments (Commonwealth Fund, March 2017), http://www.commonwealthfund.org/publications/blog/2017/mar/terminating-aca-financial-consequences.

35.   Hall MA.  A Study of Affordable Care Act Competitiveness in North Carolina, The Brookings Institute (Feb. 2017), http://hlp.law.wfu.edu/files/2017/02/north-carolina-aca-competitiveness.pdf

36.   Morrisey MA, Rivlin AM, Nathan RP, Hall MA.  Five-State Study of ACA Marketplace Competition, The Brookings Institute (Feb. 2017), https://www.brookings.edu/wp-content/uploads/2017/02/summary-report-final.pdf

37.   Hall MA. How the Department of Labor Can Help End Surprise Medical Bills, Brookings Institute (Dec. 2016) https://www.brookings.edu/2016/12/14/how-the-department-of-labor-can-help-end-surprise-medical-bills/

Mark A. Hall

38.  Adler L, Hall MA, et al.  "Stopping Surprise Medical Bills: Federal Action Is Needed," *Health Affairs Blog*, Feb. 1, 2017, http://healthaffairs.org/blog/2017/02/01/stopping-surprise-medical-bills-federal-action-is-needed/

39.  Hall MA, Ginsburg PB, Lieberman SM.  How to Get Rid of Surprise Medical Bills,  *Fortune*, Oct. 13, 2016, http://fortune.com/2016/10/13/solution-to-surprise-medical-bills/

40.  Hall MA, Ginsburg PB, et al.  Solving Surprise Medical Bills, Brookings Institute (Oct. 2016) https://www.brookings.edu/wp-content/uploads/2016/10/sbb1.pdf

41.  Hall MA, Fronstin P. Narrow Provider Networks for Employer Plans (Dec. 2016).

42.  Mark Hall & Katherine E. Booth, Can Medicaid Help Military Veterans? (Oct. 2016), http://hlp.law.wfu.edu/files/2015/10/can-medicaid-h.pdf

43.  McCue MJ & Hall MA.  Promoting Value for Consumers: Comparing Individual Health Insurance Markets Inside and Outside the ACA's Exchanges (Commonwealth Fund, June 2016), http://www.commonwealthfund.org/publications/issue-briefs/2016/june/insurance-exchanges-promote-value

44.  Hall MA & McCue MJ, How Has the Affordable Care Act Affected Health Insurers' Financial Performance? (Commonwealth Fund, July 2016), http://www.commonwealthfund.org/publications/issue-briefs/2016/jul/the-affordable-care-act-and-health-insurers-financial-performance

45.  Hall MA & McCue MJ, How Reinsurance Limited Health Insurers' Financial Losses in the ACA's First Year (Commonwealth Fund, July 2016), http://www.commonwealthfund.org/publications/blog/2016/jul/how-reinsurance-limited-health-insurers-financial-losses

46.  Hall MA, Ginsburg P, Lieberman S, et al.  Solving Surprise Medical Bills (Brookings Institution, Oct. 2016), https://www.brookings.edu/wp-content/uploads/2016/10/sbb1.pdf

47.  Hall MA, Ginsburg P, Lieberman, How To Get Rid Of Surprise Medical Bills,  *Fortune*, Oct. 13, 2016, http://fortune.com/2016/10/13/solution-to-surprise-medical-bills/

48.  Hall MA & Shoaf E. Medicaid Expansion Costs in North Carolina: A Frank Discussion (Jan. 2016), http://hlp.law.wfu.edu/?attachment_id=170

Mark A. Hall

49. Hall MA.  Private Health Insurance Exchanges for Employers: Issues for Regulators and Public Policy.  Oct. 2015, http://www.hcfo.org/publications/private-health-insurance-exchanges-employers-issues-regulators-and-public-policy

50. Hall MA & Shoaf E. Enrollment Deficits under the Affordable Care Act (Oct. 2015), http://hlp.law.wfu.edu/files/2015/10/NC-Enrollment-deficit-Final.pdf

51. Hall MA, Shoaf E.  Assessment of Market Competition in North Carolina under the Affordable Care Act, August 2015, report prepared for the U.S. Department of Health and Human Services, http://hlp.law.wfu.edu/files/2016/02/NC-ASPE-Final-Draft-Document-Intro-and-Appendix-E.pdf

52. Hall MA & Shoaf E. Medicaid Reform Options for North Carolina (May 2015), http://bioethics.wfu.edu/wp-content/uploads/2015/04/Medicaid-Reform-Brief.pdf

53. McCue MJ & Hall MA, The Federal Medical Loss Ratio Rule: Implications for Consumers in Year 3, second author with Michael McCue (Commonwealth Fund, March 2015) http://www.commonwealthfund.org/publications/issue-briefs/2015/mar/medical-loss-ratio-year-three

54. McCue MJ & Hall MA, Comparing Individual Health Coverage On and Off the Affordable Care Act's Insurance Exchanges, second author with Michael McCue (Commonwealth Fund, Aug. 2015), http://www.commonwealthfund.org/publications/issue-briefs/2015/aug/comparing-coverage-on-off-aca-exchanges

55. McCue MJ & Hall MA, What's Behind Health Insurance Rate Increases? An Examination of What Insurers Reported to the Federal Government in 2013–2014, second author with Michael McCue (Commonwealth Fund, Jan. 2015), http://www.commonwealthfund.org/publications/issue-briefs/2015/jan/why-are-health-insurance-rates-increasing

56. Hall MA, McCue MJ.  Delivering Better Health Care Value to Consumers: The First Three Years of the Medical Loss Ratio.  Testimony before the Senate Commerce Committee, May 2014.

57. McCue MJ, Hall MA.  What's behind health insurance rate increases? an examination of what insurers reported to the federal government in 2012-2013. (Commonw Fund, Dec. 2013).

Mark A. Hall

58.   Hall MA, McCue MJ.  Insurers' medical loss ratios and quality improvement spending in 2011.  (Commonw Fund, March 2013).

59.   McCue MJ, Hall MA.  Insurers' responses to regulation of medical loss ratios.  (Commonw Fund, Dec. 2012).

60.   Hall MA, Swartz K.  Establishing health insurance exchanges: three states' progress.  (Commonw Fund, July 2012).

61.   Hall MA, McCue MJ.  Estimating the impact of the medical loss ratio rule: a state-by-state analysis. (Commonw Fund, April 2012).

62.   Brief to the U.S. Supreme Court on behalf of 104 Health Law Professors, supporting the constitutionality of the Affordable Care Act, Jan. 2012.

63.   Hall MA, Sugarman J, Weinfurt K.  Using Empirical Research to Inform Research Ethics: The Conflict of Interest Notification Study (COINS), SoCRA Source, Aug. 2011, pp. 12-18.

64.   Hall MA. Risk Adjustment Under the Affordable Care Act: A Guide for Federal and State Regulators, The Commonwealth Fund, May 2011, http://www.commonwealthfund.org/Content/Publications/Issue-Briefs/2011/May/Risk-Adjustment-Under-the-ACA.aspx

65.   Buettgens M & Hall MA.  Who will be Uninsured after Health Insurance Reform?  March 2011, http://www.rwjf.org/coverage/product.jsp?id=71998

66.   Hall MA.  The Costs and Adequacy of Safety Net Access for the Uninsured in Six Communities (six in-depth case study reports) (June 2010).

67.   Hall MA.  The Constitutionality of Mandates to Purchase Health Insurance (O'Neill Health Law Institute, Georgetown Univ., 2009), http://ssrn.com/abstract=1334955.

68.   Hall MA.  Book Review of *Patient, Health Thyself: How the New Medicine Puts the Patient in Charge*, by Robert M. Veatch.  New Engl. J. Med. 359(26): 2851-52 (2008).

69.   Hall MA.  47 Million & Counting: Why the Health Care Marketplace is Broken.  Senate Finance Committee, June 2008.

70.   Hall MA.  Book Review of *Health Care At Risk: A Critique of the Consumer-Driven Movement*, by Timothy Jost. J. Health Pol. Pol'y & L. 845 (2008).

Mark A. Hall

71.    Hall MA. The HIPAA Headache. Hastings Center Report 38(1):7 (Jan 2008).

72.    Hall MA.  Did Regulation Kill Managed Care? Law and Bioethics Report (Spring 2004).

73.    Hall MA, Green MD, Hartz A., Evidence-Based Medicine on Trial, JAMA. 2004;291:1697 (letter).

74.    Hall MA.  Book Review of Holding Health Care Accountable, by Haavi Morreim, J. Health Pol. Pol'y & L. 28:556-560 (2003).

75.    Hall MA, Conover CJ.  The Impact on Accessibility and Affordability of Blue Cross and Blue Shield's Proposed Conversion to For-Profit Status (6-part report submitted to N.C. Dept. of Insurance, 2002-2003), http://ushealthpolicygateway.wordpress.com/payer-trade-groups/l-health-care-regulation/health-insurance-regulation/health-plan-conversion/

76.    Hall MA.  An Evaluation of Health Insurance Market Reforms (10 research reports, available at: http://www.phs.wfubmc.edu/public/pub_insurance/pub_insurance.cfm).

77.    Wicks EK, Hall MA, Meyer JA.  Barriers to Small-Group Purchasing Cooperatives, March 2000 (research report).

78.    Hall MA, Schneider CE.  How Should Physicians Involve Patients in Medical Decisions?  JAMA 283, No. 18, May 10, 2000 (letter).

79.    Hall MA.  When Genes are Decoded, Who Should See the Results?  New York Times, Feb. 29, 2000, at D7.

80.    Hall MA.  Expanding Managed Care Liability. Health Affairs, 1999 (letter).

81.    Hall MA.  Exploring the Ethics of Clinical Role Conflicts. 282 JAMA 1999; 282:132 (letter).

82.    Hall MA.  Book Review of: Caldwell  D.  U.S. Health Law and Policy: A Guide to the Current Literature.  J. Leg. Med. 1999; 20:435-39.

83.    Hall MA, Kader D, Karjala D, et al.  Medical liberalism's past and future. Review of:  Emanuel EJ.  The ends of human life: medical ethics in a liberal polity.  Jurimetrics J 1994; 34:235-244.

Mark A. Hall

84.     Hall MA.  Health policy and the courts.  Health Affairs 1993 (Spring); 230
        (letter).

85.     Hall MA.  The regulation of HMO physician incentive plans 1993
        (commentary to HHS on proposed rules).

86.     Legal pitfalls for cost containment. Healthcare Trends Rep 1991 (July); 5(7)
        (interview).

87.     Colombo JD, Hall MA.  The tax-exempt status of nonprofit hospitals 1991
        (written testimony before House Ways and Means Committee).

88.     Hall MA.  Book review of Siegler M, et al. Medical innovation and bad
        outcomes.  Jurimetrics J 1988; 28:247-52.

89.     Hall MA.  Book review of Danzon, P. Medical malpractice: theory, evidence,
        and public policy. Jurimetrics J 1986; 26:203-209.

90.     Hall MA.  Introduction to: Greene DS. 79 ways to calm a crying baby.  New
        York: Pocket Books, 1988.


SELECTED SPEECHES, CONFERENCES:

    Speaker, "State Pre-emption of Municipal Sanctuary Policies for
    Undocumented Immigrants," Univ. California San Francisco, Department of
    Public Health Science, March 2023.

    Speaker, "The First Restatement of Medical Malpractice: What's Old, What's
    New," Univ. California Law, San Francisco (formerly Hastings Law School),
    March 2023.

    Speaker, "Regulating Private Equity in Health Care," Univ. of Miami, Dec.
    2022.

    Speaker, "Regulating Private Equity in Health Care," Univ. of Connecticut,
    Oct. 2022.

    Speaker, "The Growing Role of Private Equity in Health Services," Case
    Western Reserve Univ., Am. Society of Law, Medicine and & Ethics,
    Phoenix Aria., June 2022.

Mark A. Hall

Speaker, "State Pre-emption of Municipal Sanctuary Policies for Undocumented Immigrants," Assoc. of Public Policy and Management, Austin Texas, March 2022.

Speaker, "The Growing Role of Private Equity in Health Services," Case Western Reserve Univ., March 2022.

Speaker, "The Role of States in Addressing Surprise Medical Bills," Testimony before the NC Legislative Task Force on Improving Access to Health Care, March 2021

Speaker, "The Growing Role of Private Equity in Health Services," Harvard Medical School, Dec. 2021.

Organizer and Moderator, "Implementing Medical Resource Allocation Plans During a Public Health Crisis: Lessons Learned from COVID-19," Wake Forest Univ., April 2021.

Speaker, "Giving Disease a Passport? COVID-19 Certificates and the Law", Yale Univ., April 2021

Speaker, "Vaccine Certification Passports: Legal and Policy Issues," Rockefeller Foundation State Vaccination Action Network, April 2021.

Speaker, "Exposed: Why Our Health Insurance Is Incomplete and What Can Be Done about It," Harvard Univ., Dec. 2020

Speaker, "State preemption of local immigration sanctuary laws," Am. Public Health Assoc. Annual Meeting, Nov. 2020.

Speaker, "Economic Implications of Medicaid Expansion," Care4Carolina, Oct. 2020

Speaker, "State preemption of local immigration sanctuary laws," Robert Wood Johnson Foundation, Jackson MS, March 2020

Speaker, "Health care that matters: Real choices for real competition," American Enterprise Institute, Dec. 2018.

Speaker, "(De)stabilizing the Individual Insurance Market," Duke University, Nov. 2018.

Speaker, "(De)stabilizing the Individual Insurance Market, Brookings

Mark A. Hall

Institution, July 2018.

Speaker, "Stabilizing and Strengthening the Individual Insurance Market," Am. Soc'y Law Med. & Ethics, Cleveland, June 2018.

Speaker, "A Better Approach to Regulating Network Adequacy," Stanford Univ., Feb. 2018

Speaker, "The Status of the ACA," Stanford Univ., Jan. 2018

Panelist, "The Economics of U.S. Health Care," Am. Enterprise Institute, Jan. 2018

Speaker, "A Better Way to Regulate Network Adequacy," Texas A&M, Dec. 2017

Wrap-up Speaker, "Health Law and Poverty," Univ. Illinois, Nov. 2017

Commentator, "Health Law Junior Scholars Workshop," Am. Society L. Med. & Ethics, Oct. 2017

Speaker, "Unveiling Invisible Risk Sharing," Univ. of Pennsylvania, Sept. 2017.

Speaker, "Economic Impacts of Medicaid Expansion," Am. Soc'y Law Medicine and Ethics, Atlanta, June 2017.

Speaker, "Federal Solutions to Surprise Medical Billing," Congressional Briefing, Washington DC, Feb 2017.

Speaker, "Health Insurance and Access to Healthcare After the Affordable Care Act," Am. Assoc. Law Schools Annual Meeting, San Francisco, Jan. 2017.

Speaker, "Employers' Use of Narrow Provider Networks," Univ. of Tennessee, Nov. 2016.

Commentator, Conference on Empirical Legal Studies, Duke Univ., Nov. 2016.

Speaker, "Relationship-Centered Health Law," Health and Humanities Exchange, UNC Chapel Hill, Nov. 2016.

Mark A. Hall

Speaker, "How States Can Address Surprise Medical Billing," National Governor's Association, Nov. 2016.

Speaker, "The Economic Impacts of Medicaid Expansion," Care4Carolina, Campbell Univ., Oct. 2016.

Keynote Speaker, "Solving Surprise Medical Billing," Brookings Institute, Oct. 2016.

Speaker, "Individual Choice in the Group Insurance Market," Northeastern Univ. Law School, Boston, April 2016.

Speaker, "The Individual Insurance Market outside the ACA Marketplace Exchange," Univ. Penn. Law School, April 2016

Speaker, "Private Insurance Exchanges for Employer Groups:  Regulatory and Public Policy Issues," AcademyHealth Webinar, Jan. 2016, and Univ. Alabama Law School, March 2016.

Organizer, "Should Medicaid be Expanded in North Carolina," Wake Forest University, Jan. 2016.

Speaker, "How Health Law is Taught in Law Schools," Yale-New Haven Hospital and University legal departments, Nov. 2015.

Speaker, "Impact of Patient Cost-Sharing on Medical Decisions," Harvard Medical School, Nov. 2015.

Speaker, "Supreme Court Challenges to the Affordable Care Act," National Academy of Medicine Annual Meeting, Washington D.C., Oct. 2015.

Speaker, "Public Policy Issues Raised by Private Insurance Exchanges," Employee Benefits News conference, Chicago, July 2015.

Speaker, "King v. Burwell: Legal and Policy Implications," NC Health Care Attorneys, Raleigh, July 2015.

Speaker, "Affordable Care Act Scorecard," Health Law Teachers annual meeting, St. Louis, June 2015.

Speaker, "Private Health Insurance Exchanges," Health Insurance Exchange Summit, Washington D.C., May 2015.

Mark A. Hall

Speaker, "Implementation of the Affordable Care Act," Univ. Conn., April 2015.

Speaker, "Public Policy Issues Raised by Private Insurance Exchanges," Univ. of Pennsylvania, April 2015.

Speaker, "A Relational Theory of Health Law," Washington Univ. Law School, April 2015.

Speaker and Conference Organizer, "Implementation of the ACA," National Health Policy Conference, Washington D.C., Feb. 2015.

Speaker, "Medicaid Expansion: Truth and Consequences," Yale Law School, Nov. 2014.

Expert Testimony, N.C. General Assembly, Hospital Market Structure in North Carolina, April 2014.

Speaker, "How Health Insurance Reform is Shaping Market Competition," Univ. of Houston Law School, Oct. 2014.

Co-Organizer, Relationship-Centered Health Law and Ethics, Wake Forest University, Oct. 2014.

Distinguished Lecture, "Health Care Reform in the United States: What Obama Learned From the Netherlands,"  Univ. Amsterdam Medical School, July 2014.

Plenary Speaker, Implementation of Health Insurance Exchanges, Am. Society Law Med. & Ethics Health Law Teacher's Annual Meeting, San Francisco CA , June 2014.

Congressional Testimony, Delivering Better Health Care Value to Consumers: The First Three Years of the Medical Loss Ratio, May 2014.

Co-Organizer, Keeping it Fresh? Exploring the Relationship Between Food Laws and Their Impact on Public Health and Safety, Wake Forest Law School, April 2014.

Presenter, "The History and Purpose of Health Insurance Exchanges," Yale Health Law Society Conference, New Haven, Feb. 2014.

Presenter, "Employer-sponsored Health Insurance under the Affordable

Mark A. Hall

Care Act," Am. Assoc. Law Schools Annual Meeting, NY City, Jan. 2014.

Presenter, "The Role of Agents and Brokers under the Affordable Care Act: Lessons from Massachusetts," Health Insurance Exchange Congress, Los Angeles, Nov. 2013

Keynote Presenter, "Judging the Success of the Affordable Care Act: The Eye of the Beholder," University of Houston, Nov. 2013

Keynote Presenter, "Should the Young Subsidize the Old: Issues of Distributive Justice under the Affordable Care Act," Middle Tenn. State University, Oct. 2013

Presenter, "States' Decisions about Expanding Medicaid," University of North Carolina, Oct. 2013

Presenter, "The Role of the Safety Net Following Health Insurance Reform," NC Assoc. of Community Health Centers, Charlotte,  June 2013.

Presenter, "Regulation of Self-Insurance by Small Employers," Am. Society of Law, Med. & Ethics, Newark, June 2013.

Presenter, "Self-Funding by Small Employers," PHIA Group Annual Conference, Boston, June 2013.

Presenter, "Insurance Brokers' Role in Health Care Reform," Health Insurance Congress, Washington D.C., May 2013.

Presenter, "Monitoring Insurance Market Reforms," Univ. Pennsylvania, April 2013.

Presenter, "Should the Young Help Subsidize the Old: The Fairness of Community Rating," Univ. Montana, Mansfield Conference, March 2013.

Presenter, "What Health Care Reform Means for Elder Law," NC Bar Association, Elder Law Meeting, Feb. 2013

Presenter, "Small Employers' Use of Insurance Exchanges," AALS Annual Meeting, New Orleans, Jan. 2013.

Presenter, "Will Small Employers Use the New Insurance Exchanges," U.S. Government Accountability Office and Centers for Medicare & Medicaid Services, Jan. 2013.

Mark A. Hall

Presenter, "Small Employers' Use of the Massachusetts Insurance Exchange," AcademyHealth Webinar, Jan. 2013.

Presenter, "Risk Adjustment under the Affordable Care Act," California Senate Hearing, Jan. 2013.

Presenter, "Risk Adjustment under the Affordable Care Act," National Governors' Conference, webinar, Dec. 2012.

Presenter, "Small Employers' Use of Insurance Exchanges," Health Insurance Exchange Congress, Chicago, Nov. 2012.

Presenter, "The History and Future of Health Care Law," Univ. Pittsburgh Law School, Oct. 2012.

Presenter, "The Ethics of Patient Cost-Sharing," UNC-Chapel Hill, Oct. 2012.

Presenter, "Implementing the Affordable Care Act," NC Association of Health Underwriters, Winston-Salem, Oct. 2012.

Presenter, "The Supreme Court on the Affordable Care Act: A Tale of Two World Views," Brooklyn Law School, Sept. 2012.

Presenter, "The Logic and Ethics of Health Care Reform," UNC-Charlotte, Sept. 2012.

Organizer and Presenter, "The Health Care Safety Net Post Reform," Washington D.C., Wake Forest Univ. Health Law and Ethics Policy Forum, Sept. 2012.

Keynote Presenter, "Will Obamacare Survive?", Willis Conclave, Chicago, July 2012.

Presenter, "Small Employers' Use of Health Insurance Exchanges," Am. Society Law Med. & Ethics, Tempe AZ, June 2012.

Keynote Presenter, "Managing Medical Loss Ratios," Trizetta, webinar, April 2012.

Presenter, "How Will the Supreme Court Rule in the Constitutional Challenges to Health Care Reform," Am. Health Lawyers Assoc. webinar, April 2012.

Mark A. Hall

Presenter, "Supreme Court Arguments in the Constitutional Challenges to Health Care Reform," U.S. Govt. Accountability Office, March 2012.

Speaker, "Achieving Universal Access without Universal Insurance: The Role of the Safety Net", Johns Hopkins Univ., May 2012.

Speaker, "Measuring Return on Investment in Safety Net Programs for the Uninsured," Center for Health Care Strategies, San Francisco, Feb. 2012

Keynote Speaker, "Predicting the Outcome of the Supreme Court Challenge to the ACA," N.C. Health Underwriters Assoc. Annual Meeting, April 2012, and Guilford County League of Women Voters, March 2012.

Debater, "The Constitutionality of the Affordable Care Act," Wake Forest Medical School and Law School, Winston-Salem NC, April 2012

Debater, "The Constitutionality of Health Care Reform," Federalist Society, Winston-Salem NC, Feb. 2012

Panel Organizer and Speaker, "Constitutional Challenges to Health Care Reform: What to Expect from the Supreme Court,"  AcademyHealth, National Health Policy Conference, D.C., Feb. 2012.

Speaker, "The Constitutionality of the Individual Mandate," NYU Law School, Feb. 2012.

Speaker, "Risk Adjustment under the Affordable Care Act," Tilburg University, The Netherlands, Dec. 2011.

Speaker, "Commerce Clause Challenges to Health Care Reform," Columbia Univ. Law School, Oct. 2011.

Speaker, "Commerce Clause Challenges to Health Care Reform," Petrie-Flom Center, Harvard Law School, Sept. 2011.

Commentator, "Constitutionality of the Affordable Care Act," Duke Univ. Law School, Sept. 2011.

Plenary Speaker, "Constitutional Challenges to Health Care Reform," Am. Society Law, Medicine & Ethics, Chicago, June 2011.

Speaker and Session Organizer, "Constitutional Challenges to Health Care

Mark A. Hall

Reform," Annual Meeting of AcademyHealth, Seattle WA, June 2011.

Speaker, "Consumer-driven health care: perspectives from a different hemisphere," University of Melbourne Medical School, Dean's Lecture, April 2011.

Speaker, "The Politics, Policy and Law of Obama's Health Care Reform," University of Melbourne Law School,  Sir Kenneth Bailey Memorial Lecture, April 2011.

Speaker, "Challenges to U.S. Health Care Reform: Rhetoric vs. Reality," University of Tasmania Law School,  March 2011.

Speaker, "Legal Issues in Health Care Reform," Univ. of Pennsylvania Law School, Philadelphia, Oct. 2010.

Speaker, "Constitutional Implications of the Patient Protection and Affordable Care Act," No. Kentucky Univ. College of Law, Oct. 2010.

Speaker, "Constitutional Challenges to Health Care Reform," Forsyth Memorial Hospital, Winston-Salem NC, Oct. 2010.

Speaker, Conflicts of Interest in Medical Research, Carilion Clinic, Roanoke VA, Sept. 2010.

Speaker, "Free Markets, Regulation and the Constitution," Hillsdale College Center for Constitutional Studies, Washington DC, Sept. 2010.

Lead Faculty, Workshop on Health Care Reform, WFU Translational Science Institute, Winston-Salem NC Aug. 2010.

Speaker, "Achieving Universal Coverage through Safety Net Expansion" ASLME Health Law Teacher's Conference, Austin TX, June 2010.

Speaker, "Implications for Employers of Health Insurance Exchanges," Greensboro NC, June 2010.

Speaker, "Constitutional Challenges to Health Care Reform," N.C. Bar Association, May 2010.

Commentator, Empirical Health Law Conference, Univ. Michigan, May 2010. Keynote Speaker, "Debating the Constitutionality of Health Care Reform," Am. Health Lawyers Assoc., D.C., May 2010.

Mark A. Hall

Organizer and Speaker, "Patient-Centered Law and Ethics," Wake Forest University, April 2010.

Speaker, "Can the 'Safety Net' Provide Adequate Access to Health Care for the Uninsured?,"   Loyola Law School, Chicago, Nov. 2009.

Speaker, "Regulatory and Corporate Law Update," ASLME Health Law Teacher's Conference, Cleveland, June 2009.

Speaker, "The Constitutionality of Mandates to Purchase Health Insurance," ASLME Health Law Teacher's Conference, Cleveland, June 2009.

Keynote Speaker, "The Constitutionality of Mandates to Purchase Health Insurance," O'Neill Institute for Health Law, Georgetown Univ., April 2009.

Speaker, "The Ethics and Practice of Consumer-Driven Health Care," Univ. British Columbia, Vancouver, April 2009.

Speaker, "An Essentialist View of Health Care Law," Univ. British Columbia, Vancouver, April 2009.

Speaker, "The Ethics and Practice of Consumer-Driven Health Care," Univ. of Montana, Missoula, March 2009.

Speaker, "Using Section 125 Cafeteria Plans to Shelter Employees' Premium Contributions," State Health Access Reform, Philadelphia, Feb. 2009.

Moderator, "Commercialization of Research in Regenerative Medicine," Wake Forest Univ., Feb. 2009.

Speaker, "An Essentialist Theory of Health Care Law," UNC Law School, Jan. 2009.

Speaker, "Advice to the President on Health Care Reform," Wake Forest Univ., Jan. 2009.

Organizer, Conflict of Interest Notification Study Workshop, Wash. D.C., Dec.  2008

Speaker, Legal and Ethical Issues in Responding to a Flu Pandemic, Forsyth County Medical Society, Nov. 2008

47

Mark A. Hall

Speaker, Health Care: Public or Private Good?, Phi Kappa Phi Honor Society Annual Form, UNC-Greenville, Oct. 2008

Speaker, "Government-Sponsored Reinsurance: Purposes and Prospects," Harvard Law School, Nov. 2008.

Speaker, Property Rights in Medical Information, WFU Translational Science Institute Annual Conference, Oct. 2008

Speaker, Content Analysis of Judicial Opinions, Univ. of Chicago and Northwestern Univ. Law Schools, Oct. 2008

Speaker, Insurance Discrimination and Huntington's Disease, Winston-Salem NC, Oct. 2008

Speaker, Property Rights in Medical Information, Univ. of Texas Law School, Sept. 2008

Speaker, Presidential Candidates' Health Care Reform Proposals,  Wake Forest Univ., Sept. 2008

Speaker, Managing Conflicts of Interest in Non-Academic Research Institutions, Am. Assoc. Medical Colleges FOCI Meeting, Rochester MN, Sept. 2008

Congressional Testimony, "47 Million & Counting: Why the Health Care Marketplace is Broken," Senate Finance Committee, June 2008.

Speaker, "Legal Rights in Electronic Medical Records," Harvard Law School, Cambridge MA, June 2008

Speaker, "Ownership of Electronic Medical Records," Am. Soc'y Law Medicine & Ethics, Philadelphia, June 2008

Speaker, "Trust, Disclosures, and Conflicts of Interest," Institute of Medicine, Washington, D.C., May 2008

Speaker, "Can Consumers Control Health Care Costs?," Brookings Institute, March 2008.

Commentator, "Health Policy: A Constitution-Free Zone," Stanford Univ. Center for Advanced Study for the Behavioral Science, Palo Alto, Dec. 2007.

Mark A. Hall

Speaker, "Patients as Consumers: The Law of Medical Billing," Harvard Univ. Law School, Cambridge, Mass., Nov. 2007.

Speaker, "An Essentialist View of Health Law," Canadian Health Law Assoc., Banff, Canada, Nov. 2007.

Speaker, "Community Hospitals' Oversight of Investigator's Financial Relationships," Health Care Compliance Assoc., Chicago, Nov. 2007.

Speaker, "Systematic Content Analysis of Judicial Opinions," Law & Society Association, Berlin, July 2007.

Speaker, "Government-Sponsored Reinsurance," Health Law Teacher's Conference, Boston, June 2007

Speaker, "An Essentialist View of Health Care Law," University of Toronto Law School, March 2007.

Speaker, "Patients' Legal Obligations to Pay their Medical Bills," Georgetown Univ. Law School, Feb. 2007.

Commentator, "Presumed Consent to Organ Donation," University of North Carolina Law School Faculty Workshop, Feb. 2007.

Fallon-Friedlander Endowed Lectureship, "The Law, History and Ethics of Medical Fees," University of Chicago Law and Medical Schools, Feb. 2007.

Speaker, "The Risks of Genetic Discrimination," National Society of Genetic Counselors, Nashville, Nov. 2006.

Speaker, "Measuring Trust in Medical Researchers," Public Responsibility in Medicine and Research (PRIMR) Annual Meeting, Washington, D.C., Oct. 2006.

Panelist, "Managing Medical Resources," Am. Board Internal Med., Philadelphia, June 2006.

Speaker, "Consumer-Driven Health Care and Moral Hazard," Am. Institute for Econ. Research, Great Barrington MA, June 2006.

Speaker, "An Essentialist View of Health Law," Am. Soc'y Law Med. & Ethics annual Health Law Teacher's meeting, Baltimore, June 2006.

Mark A. Hall

Speaker, "Disclosing Investigators' Conflicts of Interests to Research Participants," Assoc. Certified Research Professionals Annual Meeting, Phoenix, April 2006.

Organizer, "Rethinking Health Law," an invitation-only workshop of leading health law scholars, Wake Forest Univ., Dec. 2005.

Panelist, "American Health Care: Who Pays, Who Benefits?", Duke University, Nov. 2005.

Panelist, "Budgetary Approaches to Health Care Spending," Urban Institute, Washington, D.C., Nov. 2005.

Speaker, "The Law and Ethics of Consumer-Driven Health Care," Robert Wood Johnson Foundation, Annual Meeting of Investigators in Health Policy Research, San Diego, Oct. 2005

Speaker, "Measuring Patients' Trust in the U.S.", University of Bristol, England, workshop on trust in medical institutions, Sept. 2005.

Speaker, "Consumer Driven Health Care," Am. Society Law Medicine & Ethics Annual Health Law Teachers conference, Houston, June 2005.

Speaker, "Fundamentals of the Small Group Health Insurance Market," briefing for Congressional Staff organized by the National Health Policy Forum, May 2005.

Speaker, "Managed Care and Consumer-Driven Health Plans: The Potential for Unification," Kaiser Permanente Institute for Health Policy Roundtable, Washington DC, April 2005.

Speaker, "Trust in the Medical Setting: The Challenge of Corporate Interests," Boston Univ. Colloquium For Philosophy Of Science, Sept. 2004.

Speaker, "Empirical Studies of Health Care Law and Policy," Chinese Health Law Scholars Program, Temple Univ., July 2004.

Speaker, "Patients' Trust in Physicians and Medical Institutions," Office of Minority Health Conference on Strengthening the Informed Consent Process to Address Racial and Ethnic Health Disparities, Tuskegee AL, July 2004.

Mark A. Hall

Speaker, "The Impact of State Managed Care Regulation on Industry Evolution," Am. Society of Law Medicine and Ethics, Annual Health Law Teacher's Meeting, Newark, June 2004.

Speaker, "Redesigning the Medical Malpractice Liability System," Clifford Symposium on Tort Law and Policy, Depaul Univ., Chicago, April 2004.

Speaker, "Empirical Approaches to the Malpractice Standard of Care," Am. College of Legal Medicine, Annual Meeting, Las Vegas, March 2004.

Keynote Speaker, "Can Health Care Corporations be Caring?"  Northwest Consortium of Health Law Programs, Inaugural Meeting, Seattle, Feb. 2004.

Speaker, "IRBs and You," Am. Assoc. Law Schools, Annual Meeting, Atlanta Jan. 2004

Speaker, "Health Policy Impacts of Blue Cross Conversions," Protecting Community Health Assets (Consumers Union), Chicago, Nov. 2003.

Speaker, "Genetic Discrimination: Risks and Realities," National Society of Genetic Counselors, Charlotte NC, Sept. 2003.

Speaker, "Health Policy Implications of Blue Cross Conversions to For-Profit Status," Am. Society Law, Med. & Ethics, Wilmington DE, June 2003.

Speaker, "Genetic Discrimination and Screening for Liver Disease," Digestive Disease Week, Orlando, May 2003.

Speaker, "Medical Necessity and Surgery for Obesity," Law, Economics and Social Justice, Duke University, San Diego, April 2003.

Speaker, "Conflicts of Interest and Managed Care," Speas Symposium, Davidson Univ., March 2003.

Panelist, "Blue Cross Conversions to For-Profit Status," New York University, Nov. 2002.

Speaker, "The Scope and Limits of Public Health Law," McLean Symposium, Univ. of Chicago, Nov. 2002.

Speaker, "Fixing the Problems in the Individual Market," Center for Studying Health System Change Forum, Washington DC, Oct. 2002.

Mark A. Hall

Speaker, "Managed Care Patient Protection Laws," Mich. Assoc. of Health Plans, July 2002.

Organizer & Speaker, "Measuring Trust and Disclosing Incentives," Acad. Health Services Res. & Health Policy, Washington DC., June 2002.

Speaker, "Managed Care Liability after Rush v. Moran," Acad. Health Services Res. & Health Policy, Washington DC., June 2002.

Speaker, "Managed Care Regulation: Does Practice Meet Theory?"  Acad. Health Services Res. & Health Policy, Washington DC., June 2002.

Speaker, "Managed Care Regulation: Does Practice Meet Theory?" Am. Soc'y Law Med. & Ethics, Indianapolis, June 2002.

Speaker, "Assessing Managed Care Patient Protection Laws," St. Louis Univ., April 2002.

Organizer and Speaker, "Empirical Approaches to Proving the Medical Standard of Care," Wake Forest Univ., April 2002.

Speaker, "Legal Implications of Practice Guidelines," Am. College of Cardiology, Atlanta, March 2002.

Speaker, "The Role of Foundations in Insurance Market Reform," Grantmakers in Health, New York, Feb. 2002.

Speaker, "Patients' Trust in Physicians and Insurers: Conceptual and Measurement Issues," Univ. of Michigan, Feb. 2002.

Speaker, "Theory and Practice of Disclosing Physician Incentives," Duke University, Nov. 2001.

Speaker, "Health Care Law and Public Policy," Institute for State Court Judges, Orange CA., Oct. 2001.

Speaker, "HIPAA: Five Years Later," CATO Institute, Washington DC, July 2001.

Speaker,  "The effects on trust of disclosing HMO physician incentives," Academy for Health Services Research and Health Policy, Atlanta, June 2001.

Mark A. Hall

Speaker, "Trust, law, and medicine: Towards a therapeutic jurisprudence of health care delivery," Am. Society Law, Medicine & Ethics, June 2001.

Speaker, "Towards a therapeutic jurisprudence of health care delivery," International Conference on Therapeutic Jurisprudence, May 2001.

Speaker, "The ethics and empirics of trust," University of Missouri, Kansas City, May 2001.

Panelist, "Purchasing Pools and Tax Credits," Center for Studying Health System Change," Washington DC, April 2001.

Speaker, "Purchasing Pools for Medigap Insurance," Mellon Foundation Task Force on Academic Retirement, New York, April 2001.

Panelist, "Arrow on trust," Robert Wood Johnson Health Economics Cluster Group, Duke University, April 2001.

Speaker, "Insurance Market Reform: Track Record and Potential," National Conference of State Legislatures, Charlotte, Feb. 2001

Panelist, "Law, Human Rights, and Public Health" Temple Univ., Philadelphia, Dec. 2000.

Speaker, "Testing for the Breast Cancer Gene: Fear of Genetic Discrimination," Am. Jewish Congress, New York, Oct. 2000.

Speaker, "The Geography of Health Insurance Regulation," Am. Society of Law, Medicine, and Ethics, Cleveland, June 2000.

Speaker, "Disclosure of Financial Incentives," Medical Group Management Assoc., Winston-Salem NC, May 2000.
Panelist, "Factors Affecting Decisions to Seeking Genetic Testing," Arizona State Univ., Phoenix, April 2000.

Speaker, "Doctor-Patient Trust and Public Policy," U. Mich. Law School, Feb. 2000.

Speaker, "Genetic Enhancement, Distributive Justice and the Goals of Medicine," Univ. San Diego Law School, Jan. 2000.

Organizer and Moderator, "Genetic Enhancement and Public Policy," Wake Forest Univ., Nov. 1999.

Mark A. Hall

Speaker, "Doctor-Patient Trust and Public Policy," Am. Society of Bioethics and Humanities, Philadelphia, Oct. 1999.

Plenary Speaker, "Laws Restricting Health Insurers' Use of Genetic Information," Am. Society of Human Genetics, San Francisco, Oct. 1999.

Speaker, "Health Insurance Market Reforms: A Qualitative Evaluation," National Association of Insurance Commissioners, Atlanta, Sept. 1999.

## Courses Taught

Law Schools
    Health Care Law and Policy
    Law and Medicine (Including Medical Malpractice)
    Bioethics
    Health Care Rationing
    Comparative Health Care Law And Policy
    Administrative Law
    Contracts
    Insurance Law
    Nonprofit Organizations
    Torts
    Legal History
    Civil Law

Management (M.B.A.) School:  Health Care Law

Medical School (Lectured or Discussion Leader)
    Medicine as a Profession and Bioethics
    Medical Malpractice and Informed Consent
    Health Care Reform and Health Policy
    Simulated Practice Assessment.
    Qualitative Research Methods

Undergraduate:  Freshman Seminar on Death And Dying

## University Service

University-Wide
    Bioethics Task Force

Mark A. Hall

Health Benefits Committee
Computer Advisory Committee
Institutional Review Board
Created Joint Degree for Law and Masters in Health Administration
Ph.D. Dissertation Committee in Philosophy Department

Law Schools
Vice-Chair, Dean Search Committee
Chair, Appointments Committee
Chair, Faculty Development Committee (Speaker Series)
Student Admissions
Chair-Search Committee
Founder and Organizer of Faculty Reading Group
Information Technology Committee
Curriculum Committee
Center for Law, Science and Technology

Management (M.B.A.) School:  Joint M.B.A./Law Committee

Medical School-Wide
Hospital Ethics Committee
Conflicts of Interest Committee
Scientific Integrity and Research Ethics Committee
Faculty Research Advisory Committee
Health Policy Task Force
Medical Center Strategic Planning
Pre-implantation Genetic Diagnosis Ad Hoc Committee

Medical School Departmental
Executive Committee
Chair, Retreat Planning Committee
Chair, Faculty Appointments
Chair, Distinguished Visitor Series
Chair, Seminar Series
Strategic Planning
Professional Development
Harassment Policy
Health Services Research Center

**Consulting Work**

Mark A. Hall

I consult from time to time with various public and private-sector institutions and professionals. During 2020, I did significant paid consulting work ($5000 or more) for the following: Peoria Illinois Board of Education, RSM, Wayne Memorial Hospital,  and Vanderbilt University.