LAUREN M. BLAS, SBN 296823
    lblas@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

GEOFFREY SIGLER (*pro hac vice*)
    gsigler@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  202.995.8500
Facsimile:   202.467.0539

Attorneys for Defendants
UNITED HEALTHCARE INSURANCE COMPANY
and UNITED BEHAVIORAL HEALTH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LD, DB, BW, RH, and CJ, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, a Connecticut Corporation, UNITED BEHAVIORAL HEALTH, a California Corporation, and MULTIPLAN, INC., a New York Corporation,<br><br>　　　　　　　Defendants. | Case No. 4:20-cv-02254-YGR<br><br>**DECLARATION OF JEFF SCHNEEWIND IN SUPPORT OF OMNIBUS SEALING MOTION** |

I, Jeff Schneewind, state and declare as follows:

1. I make this declaration in connection with the above-captioned litigation and the omnibus sealing motion regarding Plaintiffs' Renewed Motion for Class Certification. I have personal knowledge of the facts set forth in this Declaration, and, if called as a witness, could and would testify competently to such facts under oath.

2. I am employed as Director of Contracts Legal for UnitedHealthcare. In this role, I am familiar with the matters and documents discussed in this Declaration.

3. Defendants United Behavioral Health ("UBH") and United Healthcare Insurance Company ("UHC") (together, "United" or "United Defendants") submit the information contained in this declaration in further support of their requests to seal Exhibit 25 to the Declaration of Matt Lavin in support of Plaintiffs' Motion (Dkt 397-24) ("Exhibit 25 to Plaintiffs' Motion") and Exhibits 48 to 57 to the Declaration of Jeff Schneewind in Support of Defendants' Opposition to Plaintiffs' Renewed Motion for Class Certification (Dkt. 406) ("my Declaration").

4. The materials contained within these exhibits include ASAs and amendments between United entities and ten different plan sponsors. These agreements are individually negotiated between United and each plan sponsor and contain plan sponsor-specific pricing and rate information, performance guarantees, audit procedures, security procedures, proprietary program offerings, indemnification provisions, and dispute resolution mechanisms as between United and a plan sponsor, including mediation, litigation, and settlement arrangements. Information can change from year to year depending on the plan sponsor's and United's contract negotiations and overall business relationship.

5. As a general matter, United does not share the information contained within a given ASA outside of those involved in the relationship with the associated plan sponsor, and in particular, it does not share the ASA of one plan sponsor with another plan sponsor. That is because each ASA contains unique terms and provisions that not every plan sponsor receives. For example, plan sponsors come in many different sizes and have different requirements and needs with respect to the purpose a health plan serves for their employee populations. As such, they may contract with United for a different bundle of services, performance guarantees, or rates for particular services than other

plan sponsors receive. Public disclosure of these details could therefore cause existing plan sponsors to seek to renegotiate long-standing contracts based on provisions that were carefully negotiated for another plan sponsor with the specific considerations for that plan sponsor's business in mind.

6. All ASAs also include provisions on data security and privacy that could be exploited by bad actors if publicly disclosed. Maintaining confidentiality over these security protocols is particularly important given the sensitive nature of personal data and health information that United has access to as part of its role as a managed care company.

7. Finally, ASAs may include provisions relating to indemnification or dispute resolution mechanisms as between United and a plan sponsor, including mediation, litigation, and settlement arrangements. Public disclosure of these provisions could give United's or a given plan sponsor's adversaries an unfair advantage in any potential legal action brought against them.

8. Based on my years of experience in my role and from years of working with these agreements, I understand that plan sponsors also view the ASAs and amendments thereto as containing competitively sensitive information about their respective relationships with United, as well as their respective benefits programs. For example, many plan sponsors keep their ASAs and amendments closely guarded because they view the negotiation of service provider relationships as critical to their ability to provide competitive benefits offerings to their employees, which in turn impacts the plan sponsor's ability to attract and retain employees. For such plan sponsors, maintaining confidentiality over ASAs and related documents allows the plan sponsors to negotiate the best benefits packages they can for their employees, while ensuring their competitors cannot readily undercut their benefits offerings and interfere with employee recruitment and retention. For these reasons, in my experience, plan sponsors take the public disclosure of their ASAs and related information very seriously. United's business relationship with certain of its plan sponsors could thus be harmed, if confidential materials like these ASAs and their amendments become public.

9. The sensitive nature of these documents and the competitive harm that would result to United and its plan sponsors from the public disclosure of these documents is not negated with respect to documents that are unexecuted, in draft form, or older than a certain number of years. This is true for a number of reasons.

10. With respect to ASAs that appear to be in non-final form with redlines (such as portions of Exhibits 49, 51, 53, 55, and 57 to my Declaration), as explained above, United often negotiates the terms of the ASAs with each plan sponsor. This means that each ASA can contain unique provisions, terms, and arrangements that differ between plan sponsors and even between years for the same plan sponsor. If information or negotiations unique to one plan sponsor were disclosed to another plan sponsor, it could interfere with United's business relationship with other plan sponsors, insofar as it might prompt them to renegotiate their ASAs to include provisions or terms they would not otherwise be aware of had these documents not been publicly filed—even if those terms or provisions aren't fully final—or give them an unfair advantage in future negotiations with United. It could also cause a plan sponsor competitive harm in relation to employee retention and recruitment, as discussed above. Moreover, to the extent a plan sponsor ASA contains a term or provision that is no longer used in certain ASAs, that, too, could prompt renegotiation.

11. An unsigned ASA (such as portions of Exhibits 48 to 49, 51, 52, 53, 55, and 57 to my Declaration) may still reflect the final, governing document between United and a plan sponsor. In some cases—for example, due to a long-standing business relationship—United and a plan sponsor treat the ASA as operative and binding without formally signing the ASA. In other cases, a final executed version of the ASA may exist, but the version in United's records and produced in litigation is the unsigned, but otherwise identical version. And in other situations, a document will not require a signature from the parties to take effect, for example, with respect to certain letters memorializing renewal service rates or performance guarantees. *See, e.g.*, portions of Exhibit 49 to my Declaration and portions of Exhibit 25 to Plaintiffs' Motion. The fact that an ASA lacks a signature does not negate the sensitivity of the ASA or change the harm that would result to United or a plan sponsor if the ASA were publicly disclosed.

12. The same goes for ASAs that were executed or concern effective periods from more than three years ago (such as portions of Exhibits 48 to 51, 52, 53, 54, 55, 56 and 57 to my Declaration). Often an ASA executed years ago remains the operative agreement between United and a plan sponsor, with modifications to exhibits and other provisions each year. Therefore, many of the terms and provisions in an ASA executed years ago remain in effect and binding today and

remain competitively sensitive for all the reasons listed above. For example, even if the fees listed in certain exhibits or fee schedules are re-negotiated every year, the component parts of those exhibits often remain the same from year to year for a particular plan sponsor.

13. For these reasons, older, redlined, or unexecuted ASAs can nonetheless contain competitively sensitive information that would harm United and the respective plan sponsor if publicly disclosed. The paragraphs that follow provide additional, specific information about the competitively sensitive nature of the ASAs and related documents that are the subject of this Declaration:

14. **Exhibit 48 to my Declaration and Exhibit 25 to Plaintiffs' Motion at UHC000007610-7646**: These documents consist of compilations of excerpts of ASAs and amendments thereto executed between Apple, Inc. (or its affiliates) ("Apple") and United entity(ies). Apple has been a United plan sponsor since July 2001. Though portions of Apple's ASAs and amendments thereto in Exhibits 48 and 25 are unsigned and/or were executed more than three years ago or concern effective periods from more than three years ago, they still remain sensitive for the reasons I mentioned above. Because Apple and United have had a business relationship for more than twenty years, public disclosure of Apple's ASAs also poses an acute competitive risk to United to the extent that still-operative terms in Apple's ASAs are not used in United's contracts with newer customers. Moreover, it is my understanding that Apple vigorously negotiates its contracts with United, such that Apple's ASAs and amendments contain unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, security procedures, and proprietary program offerings).

15. **Exhibit 49 to my Declaration and Exhibit 25 to Plaintiffs' Motion at UHC000209094-UHC000209119**: These documents consist of compilations of excerpts of ASAs and amendments thereto entered into between Cisco Systems, Inc. ("Cisco") and United entity(ies). Cisco has been a United plan sponsor since January 2000. Though portions of Cisco's ASAs and amendments thereto in Exhibits 49 and 25 are unsigned, contain redlines, and/or were executed more than three years ago or concern effective periods from more than three years ago, they still remain sensitive for the reasons I mentioned above. Because Cisco and United have had a business

relationship for more than twenty years, public disclosure of Cisco's ASAs also poses an acute competitive risk to United to the extent that still-operative terms in Cisco's ASAs are not used in United's contracts with newer customers. Moreover, it is my understanding that Cisco vigorously negotiates its contracts with United, such that Cisco's ASAs and amendments contain unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, security procedures, and proprietary program offerings).

16.     **Exhibit 50 to my Declaration**:  These documents consist of compilations of excerpts of ASAs and amendments thereto entered into between Delta Air Lines (or its affiliates) ("Delta") and United entity(ies).  Delta has been a United or United-affiliate plan sponsor since January 2001.  Though portions of Delta's ASAs and amendments thereto in Exhibit 50 were executed more than three years ago or concern effective periods from more than three years ago, they still remain sensitive for the reasons I mentioned above.  Because Delta and United have had a business relationship for more than twenty years, public disclosure of Delta's ASAs also poses an acute competitive risk to United to the extent that still-operative terms in Delta's ASAs are not used in United's contracts with newer customers.  Moreover, it is my understanding that Delta vigorously negotiates its contracts with United, such that Delta's ASAs and amendments contain unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, security procedures, and proprietary program offerings).

17.     **Exhibit 51 to my Declaration and Exhibit 25 to Plaintiffs' Motion at UHC000227920-228031**:  This document consists of compilations of excerpts of ASAs and amendments thereto entered into between General Dynamics Corporation ("General Dynamics") and United entity(ies).  General Dynamics has been a plan sponsor since January 2000.  Though portions of General Dynamics' ASAs and amendments thereto in Exhibit 51 are unsigned, contain redlines, and/or were executed more than three years ago or concern effective periods from more than three years ago, they still remain sensitive for the reasons I mentioned above.  Moreover, some of the exhibits to General Dynamics' ASAs were in effect in November 2022, when Plaintiffs first filed the

ASAs as exhibits in this action. Because General Dynamics and United have had a business relationship for more than twenty years, public disclosure of General Dynamics' ASAs also poses an acute competitive risk to United to the extent that still-operative terms in General Dynamics' ASAs are not used in United's contracts with newer customers. Moreover, it is my understanding that General Dynamics vigorously negotiates its contracts with United, such that General Dynamics' ASAs and amendments contain unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, and proprietary program offerings).

18.     **Exhibit 52 to my Declaration**: This document consists of compilations of excerpts of ASAs and amendments thereto executed between JP Morgan Chase Bank, N.A. (or its affiliates) ("JP Morgan") and United entity(ies). JP Morgan was a United plan sponsor from January 2002 to December 2019. Though portions of JP Morgan's ASAs and amendments thereto in Exhibit 52 are unsigned and/or were executed more than three years ago or concern effective periods from more than three years ago, they still remain sensitive for the reasons I mentioned above. Because JP Morgan and United had a business relationship for seventeen years, public disclosure of JP Morgan's ASAs also poses an acute competitive risk to United to the extent that terms in JP Morgan's ASAs are not used in United's contracts with newer customers. Moreover, it is my understanding that JP Morgan vigorously negotiated its contracts with United, such that JP Morgan's ASAs and amendments contain unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, security procedures, and proprietary program offerings).

19.     **Exhibit 53 to my Declaration**: These documents consist of excerpts of a 2012 ASA and supplemental agreements thereto entered into between McMaster-Carr Supply Company ("McMaster-Carr") and United entity(ies). McMaster-Carr has been a plan sponsor since January 2012. Though portions of McMaster-Carr's ASA in Exhibit 53 and 25 are unsigned, contain redlines, and/or were executed more than three years ago or concern effective periods from more than three years ago, they still remain sensitive for the reasons I mentioned above. Because McMaster-Carr and United have had a business relationship for more than ten years, public disclosure of McMaster-

1  Carr's ASAs also poses an acute competitive risk to United to the extent that still-operative terms in
2  McMaster-Carr's ASAs are not used in United's contracts with newer customers.  Moreover, it is my
3  understanding that McMaster-Carr vigorously negotiates its contracts with United, such that
4  McMaster-Carr's ASA and supplemental agreements contain unique provisions in addition to all of
5  the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and
6  rate information, performance guarantees, security procedures, and proprietary program offerings).

7         20.    **Exhibit 54 to my Declaration and Exhibit 25 to Plaintiffs' Motion at NUSA-UBH-
8  00000001-60**: This document consists of a 2016 ASA entered into between Nestle USA (or its
9  affiliates) ("Nestle") and United entity(ies).  Nestle was a plan sponsor between January 1997 and
10 December 2019.  Though Nestle's ASA in Exhibit 54 was executed more than three years ago, it still
11 remains sensitive for the reasons I mentioned above.  Because Nestle and United had a business
12 relationship for more than 20 years before Nestle stopped using United's services, public disclosure
13 of Nestle's ASAs also poses an acute competitive risk to United to the extent that terms in Nestle's
14 ASAs are not used in United's contracts with newer customers.  Moreover, it is my understanding
15 that Nestle vigorously negotiated its contracts with United before Nestle stopped using United's
16 services, such that Nestle's ASA and supplemental agreements contain unique provisions in addition
17 to all of the sensitive types of information typically found in ASAs that I reference above (e.g.,
18 pricing and rate information, performance guarantees, security procedures, and proprietary program
19 offerings).

20         21.    **Exhibit 55 to my Declaration**: This document consists of compilations of excerpts of
21 ASAs and amendments thereto entered into between Oracle Corporation ("Oracle") and United
22 entity(ies).  Oracle has been a plan sponsor since January 2001.  Though portions of Oracle's ASAs
23 and amendments thereto in Exhibit 55 are unsigned and/or were executed more than three years ago
24 or concern effective periods from more than three years ago, they still remain sensitive for the
25 reasons I mentioned above.  Because Oracle and United have had a business relationship for more
26 than twenty years, public disclosure of Oracle's ASAs also poses an acute competitive risk to United
27 to the extent that still-operative terms in Oracle's ASAs are not used in United's contracts with newer
28 customers.  Moreover, it is my understanding that Oracle vigorously negotiates its contracts with

United, such that Oracle's ASAs and amendments contain unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, and proprietary program offerings).

22. **Exhibit 56 to my Declaration and Exhibit 25 to Plaintiffs' Motion at UHC000258819-258885**: This document consists of a 2016 ASA entered into between Raytheon Company ("Raytheon") and United entity(ies). Raytheon has been a United or United-affiliate plan sponsor since January 1999. Though Raytheon's ASA in Exhibit 34 was executed more than three years ago, it remains sensitive for the reasons I mentioned above. Because Raytheon and United have had a business relationship for more than 20 years, public disclosure of Raytheon's ASAs also poses an acute competitive risk to United to the extent that still-operative terms in Raytheon's ASA are not used in United's contracts with newer customers. Moreover, it is my understanding that Raytheon vigorously negotiates its contracts with United, such that Raytheon's ASA contains unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, security procedures, and proprietary program offerings).

23. **Exhibit 57 to my Declaration and Exhibit 25 to Plaintiffs' Motion at UHC000008308-8388**: These documents consist of a draft ASA between Tesla, Inc. ("Tesla") and United entity(ies) with an effective date of January 1, 2018. Tesla was a plan sponsor between January 2018 and December 2021. Though Tesla's ASA in Exhibit 57 was not executed and contains redlines and comments, it remains sensitive for the reasons I mentioned above. Moreover, it is my understanding that Tesla vigorously negotiated its contracts with United before it stopped using United's services, such that Tesla's ASA contains unique provisions in addition to all of the sensitive types of information typically found in ASAs that I reference above (e.g., pricing and rate information, performance guarantees, security procedures, and proprietary program offerings).

24. For all of the reasons mentioned above, Exhibit 25 to Plaintiffs' Motion and Exhibits 48 to 57 to my Declaration contain competitively sensitive, proprietary information that would harm United Defendants and its plan sponsors if publicly disclosed, regardless of the document's age or draft status.

DocuSign Envelope ID: CCB357FF-0243-45F8-9GE0-82C536F1DB77

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

19-Jun-2024 | 9:11 AM PDT

Date

DocuSigned by:

*Jeff Schneewind*

9B2E54005E4145D...

Jeff Schneewind