**SEALED DOCKET No. 414-1**
**PUBLIC VERSION OF DOCKET No. 404**

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

***PUBLIC***
***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

LAUREN M. BLAS, SBN 296823
  lblas@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

GEOFFREY SIGLER (*pro hac vice*)
  gsigler@gibsondunn.com
DEREK K. KRAFT (*pro hac vice*)
  dkraft@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  202.887.3752
Facsimile:  202.530.9635

Attorneys for Defendants UNITED
BEHAVIORAL HEALTH and
UNITEDHEALTHCARE INSURANCE
COMPANY

ERROL J. KING, JR. (*pro hac vice*)
  errol.king@phelps.com
CRAIG L. CAESAR (*pro hac vice*)
  craig.caesar@phelps.com
KATHERINE C. MANNINO (*pro hac vice*)
  katie.mannino@phelps.com
TAYLOR J. CROUSILLAC (*pro hac vice*)
  taylor.crousillac@phelps.com
BRITTANY H. ALEXANDER (*pro hac vice*)
  brittany.alexander@phelps.com
PHELPS DUNBAR LLP
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, Louisiana 70802
Telephone:  225.376.0207

Attorneys for Defendant MULTIPLAN, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| LD, DB, BW, RH, and CJ, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH, a California Corporation, UNITEDHEALTHCARE INSURANCE COMPANY, a Connecticut Corporation, and MULTIPLAN, INC., a New York Corporation,<br><br>Defendants. | Case No. 4:20-cv-02254-YGR<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>*[Proposed] Order Denying Plaintiffs' Motion Lodged Concurrently Herewith*<br><br>Hon. Yvonne Gonzalez Rogers<br><br>Date: May 22, 2024<br><br>Time: 2:00 p.m.<br><br>Complaint filed:  April 2, 2020<br>Third Amended Complaint filed:  Sept. 10, 2021 |

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

PROCEDURAL BACKGROUND ......................................................................................... 2

FACTUAL BACKGROUND ................................................................................................. 4

    I.      Plan Variations Within The Putative Class ................................................ 4

    II.     Plaintiffs' Challenges To Viant ................................................................. 5

    III.    Balance Billing ........................................................................................... 7

    IV.    Verification Of Benefits Calls .................................................................... 9

    V.     Defendants' Compensation For Their Services ........................................ 10

LEGAL STANDARD ........................................................................................................... 10

ARGUMENT ........................................................................................................................ 11

    I.      Plaintiffs Fail To Establish Commonality, Because All Litigation-Driving Issues Require Individualized Inquiry. ........................................................ 11

         A.    Plaintiffs Cannot Establish Commonality On Their ERISA Claims. ............. 11

         B.    Plaintiffs Cannot Establish Commonality On Their RICO Claims. ............... 20

    II.     The Named Plaintiffs' Claims Are Not Typical Of The Putative Class, And They And Their Counsel Are Not Adequate Representatives. ................................... 24

    II.     Plaintiffs Fail To Satisfy 23(b)(1), (b)(2), or (b)(3). ................................... 26

         A.    Plaintiffs' Claims Do Not Satisfy Rule 23(b)(3), Because Numerous Individualized Issues Predominate Over Any Common Issues. ..................... 26

         B.    Plaintiffs' Claims Do Not Satisfy Rule 23(b)(2). ........................................... 31

         C.    Plaintiffs' Claims Do Not Satisfy Rule 23(b)(1) ........................................... 35

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.A. Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
 938 F.3d 1170 (11th Cir. 2019)................................................................31, 32, 33

*Abatie v. Alta Health & Life Ins. Co.*,
 458 F.3d 955 (9th Cir. 2006)................................................................................32

*Acosta v. Brain*,
 910 F.3d 502 (9th Cir. 2018)................................................................................35

*In re Aetna UCR Litig.*,
 2015 WL 3970168 (D.N.J. June 30, 2015) ..........................................................24

*In re Aetna UCR Litig.*,
 2018 WL 10419839 (D.N.J. June 30, 2018) ..........................................13, 14, 16

*Agostino v. Quest Diagnostics Inc.*,
 256 F.R.D. 437 (D.N.J. 2009)..............................................................................23

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997)..............................................................................................26

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
 155 F.3d 331 (4th Cir. 1998)................................................................................24

*Castillo v. Metro. Life Ins. Co.*,
 970 F.3d 1224 (9th Cir. 2020)..............................................................................27

*Christ v. Beneficial Corp.*,
 547 F.3d 1292 (11th Cir. 2008).............................................................................31

*Comcast v. Behrend*,
 569 U.S. 27 (2013) ...................................................................................10, 28, 29

*Corcoran v. CVS Health*,
 2017 WL 1065135 (N.D. Cal. Mar. 21, 2017) .....................................................14

*Corcoran v. CVS Health Corp.*,
 779 F. App'x 431 (9th Cir. 2019) .........................................................................14

*Dan C. v. Anthem Blue Cross Life & Health Ins. Co.*,
 2023 WL 9019064 (C.D. Cal. Oct. 27, 2023) ......................................................35

*Davidson v. O'Reilly Auto Enters., LLC*,
 968 F.3d 955 (9th Cir. 2020).......................................................................10, 18

*Deman v. Allied Adm'rs, Inc.*,
 2012 WL 215227 (N.D. Cal. Jan. 24, 2012) .............................................................35

*Diaz v. United Agric. Emp. Welfare Benefit Plan*,
 50 F.3d 1478 (9th Cir. 1995).....................................................................................27

*Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*,
 2016 WL 5938722 (C.D. Cal. May 16, 2016) ...........................................................16

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011).....................................................................................31

*Englert v. Prudential Ins. Co. of Am.*,
 186 F. Supp. 3d 1044 (N.D. Cal. 2016) ....................................................................35

*Espenscheid v. DirectSat USA, LLC*,
 705 F.3d 770 (7th Cir. 2013)......................................................................................22

*FPX, LLC v. Google, Inc.*,
 276 F.R.D. 543 (E.D. Tex. 2011)...............................................................................32

*Franco v. CIGNA*,
 299 F.R.D. 417 (D.N.J. 2014) ...................................................................................13

*Franco v. CIGNA*,
 818 F. Supp. 2d 792 (D.N.J. 2011) ...........................................................................24

*Franco v. Connecticut Gen. Life Ins. Co.*,
 289 F.R.D. 121 (D.N.J. 2013) ...................................................................................17

*Fuller v. Fruehauf Trailer Corp.*,
 168 F.R.D. 588 (E.D. Mich. 1996) ............................................................................15

*Haley v. Teachers Ins. & Annuity Ass'n of Am.*,
 337 F.R.D. 462 (S.D.N.Y. 2020) ...............................................................................35

*Hanon v. Dataproducts Corp.*,
 976 F.2d 497 (9th Cir. 1992)......................................................................................25

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
 571 U.S. 99 (2013)......................................................................................................27

*Hilao v. Estate of Marcos*,
 103 F.3d 767 (9th Cir. 1996)......................................................................................22

*Jones v. Rossides*,
 256 F.R.D. 274 (D.D.C. 2009) ..................................................................................32

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
 634 F.3d 883 (7th Cir. 2011)......................................................................................33

iii

*La Mar v. H & B Novelty & Loan Co.*,
   489 F.2d 461 (9th Cir. 1973)..................................................................35

*LaRocca v. Borden, Inc.*,
   276 F.3d 22 (1st Cir. 2002) ..................................................................18

*Lipstein v. UnitedHealth Grp.*,
   296 F.R.D. 279 (D.N.J. 2013) ...................................................12, 14, 17

*Maldonado v. Ochsner Clinic Found.*,
   493 F.3d 521 (5th Cir. 2007)..................................................................33

*Martin v. Dahlberg, Inc.*,
   156 F.R.D. 207 (N.D. Cal. 1994) ...........................................................23

*Martinelli v. Petland, Inc.*,
   274 F.R.D. 658 (D. Ariz. 2011) .............................................................23

*Mass. Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985)...............................................................................34

*Mckinnon v. Dollar Thrifty Auto. Grp., Inc.*,
   2016 WL 879784 (N.D. Cal. Mar. 8, 2016)...........................................25

*McPhail v. First Command Fin. Planning, Inc.*,
   247 F.R.D. 598 (S.D. Cal. 2007)............................................................25

*Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*,
   2019 WL 6888613 (S.D.N.Y. Dec. 18, 2019) .......................................16

*Misic v. Building Serv. Emps. Health & Welfare Tr.*,
   789 F.2d 1374 (9th Cir. 1986)................................................................28

*Monreal v. Potter*,
   367 F.3d 1224 (10th Cir. 2004)..............................................................32

*In re Monster Worldwide, Inc. Sec. Litig.*,
   251 F.R.D. 132 (S.D.N.Y. 2008) ...........................................................25

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002).................................................................21

*MSP Recovery Claims, Series LLC v. Actelion Pharms. US, Inc.*,
   2023 WL 5725517 (N.D. Cal. Sept. 5, 2023) ........................................28

*Nationwide Life Ins. Co. v. Haddock*,
   460 F. App'x 26 (2d Cir. 2012)..............................................................32

*Negrete v. Allianz Life Ins. Co.*,
   2011 WL 4852314 (C.D. Cal. Oct. 13, 2011) ........................................23

iv

*Negron v. Cigna Health & Life Ins. Co.*,
   2021 WL 2010788 (D. Conn. May 20, 2021) ..............................................................15

*Neufeld v. Cigna Health & Life Ins. Co.*,
   2023 WL 4366137 (D. Conn. July 6, 2023)................................................................12

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) (en banc)......................................................................21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc)..................................................................26, 27

*Pac. Recovery Sols. v. United Behavioral Health*,
   No. 4:20-cv-2249 (N.D. Cal.) ......................................................................................2

*Peters v. Aetna*,
   2 F.4th 199 (4th Cir. 2021)..........................................................................................16

*Poulos v. Caesars World, Inc.*,
   379 F.3d 654 (9th Cir. 2004)........................................................................................23

*RJ v. Cigna Health & Life Ins. Co.*,
   2024 WL 1107826 (N.D. Cal. Feb. 12, 2024).................................1, 11, 12, 14, 15, 16, 17, 21, 22

*Rose v. PSA Airlines, Inc.*,
   80 F.4th 488 (4th Cir. 2023)........................................................................................30

*Saffle v. Sierra Pac. Power Co.*,
   85 F.3d 455 (9th Cir. 1996)....................................................................................30, 32

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
   770 F.3d 1282 (9th Cir. 2014)......................................................................................28

*Stahl v. ExteNet Sys., Inc.*,
   561 F. Supp. 3d 173 (D.N.H. 2021) ............................................................................35

*Steele v. Hosp. Corp. of Am.*,
   36 F.3d 69 (9th Cir. 1994)............................................................................................24

*Stitt v. Citibank, N.A.*,
   2015 WL 75237 (N.D. Cal. Jan. 6, 2015) ...................................................................21

*Swanigan v. City of Chicago*,
   881 F.3d 577 (7th Cir. 2018)........................................................................................33

*Tigbao v. QBE Fin. Inst. Risk Servs., Inc.*,
   2014 WL 5033236 (C.D. Cal. July 24, 2014) .............................................................26

*B.K. ex rel. Tinsley v. Snyder*,
   922 F.3d 957 (9th Cir. 2019)........................................................................................26

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .................................................................................................18, 31

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ............................................................................................................22

*U.S. Airways, Inc. v. McCutchen*,
  569 U.S. 88 (2013) ..............................................................................................................12

*United States v. Brugnara*,
  856 F.3d 1198 (9th Cir. 2017).............................................................................................21

*United States v. Kail*,
  2021 WL 3773613 (N.D. Cal. Aug. 25, 2021) ...................................................................23

*Vaught v. Scottsdale Healthcare Corp. Health Plan*,
  546 F.3d 620 (9th Cir. 2008)...............................................................................................27

*Wachtel v. Guardian Life Ins.*,
  223 F.R.D. 196 (D.N.J. Aug. 5, 2004) ................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................10, 11, 13, 16, 18, 20, 32, 33, 34

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  2014 WL 6888549 (C.D. Cal. Sept. 3, 2014)..............................................12, 13, 14, 15, 16, 22

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  903 F. Supp. 2d 880 (C.D. Cal. 2012)..................................................................................23

*Williamson v. UNUM Life Ins. Co. of Am.*,
  160 F.3d 1247 (9th Cir. 1998).............................................................................................33

*Wise v. Verizon Commc'ns, Inc.*,
  600 F.3d 1180 (9th Cir. 2010).............................................................................................35

*Wit v. UBH*,
  58 F.4th 1080 (9th Cir. 2023)...............................................................................................3

*Wit v. UBH*,
  79 F.4th 1068 (9th Cir. 2023).....................................................................3, 16, 27, 33, 34

*Zurich Am. Ins. Co. v. O'Hara*,
  604 F.3d 1232 (11th Cir. 2010)...........................................................................................27

**STATUTES**

29 U.S.C. § 1132(a)(1)(B).................................................................................................12, 27, 33

29 U.S.C. § 1132(a)(2)...............................................................................................................34

29 U.S.C. § 1132(a)(3) ................................................................................................12

**OTHER AUTHORITIES**

Lauren Goldberg, *Dealing in Debt:  The High-Stakes World of Debt Collection After FDCPA*, 79 S. Cal. L. Rev. 711 (2006) ...............................................................................19

**RULES**

Fed. R. Civ. P. 23 Adv. Comm. Notes .........................................................................32

Fed. R. Civ. P. 23 ........................................................................................................35

## **STATEMENT OF ISSUES TO BE DECIDED**

1.      Have Plaintiffs established commonality under Rule 23(a), given that all litigation-driving issues require individualized inquiry?

2.      Have Plaintiffs established typicality and adequacy under Rule 23(a), given their unique affiliation with Summit, their lack of knowledge of the case, and numerous individualized issues that render them unique among the class they purport to represent?

3.      Have Plaintiffs established that common issues predominate under Rule 23(b)(3), given the existence of numerous individualized issues and their failure to prove that damages are capable of measurement on a classwide basis?

4.      Have Plaintiffs established that final injunctive relief or corresponding declaratory relief under Rule 23(b)(2) is appropriate, given that their cursory references to equitable relief are merely incidental to their claim for damages?

5.      Have Plaintiffs established that certification of an injunctive relief class under Rule 23(b)(1)(A) is appropriate, given that they lack standing to seek any injunctive relief?

**INTRODUCTION**

The theory at the heart of Plaintiffs' case—and their second request for class certification—is that Defendants United Behavioral Health and UnitedHealthcare Insurance Company (collectively, "United") reimbursed below a "usual, customary and reasonable" ("UCR") rate by routing claims to Defendant MultiPlan, Inc. ("MultiPlan") for processing through MultiPlan's "Viant OPR" ("Viant") reimbursement methodology.  This Court already declined to certify a class based on this theory be-cause Plaintiffs failed to present a damages model and their requested relief—reprocessing—was una-vailable on a classwide basis.  Although Plaintiffs now purport to offer a damages model, they still cannot overcome the individualized issues that preclude certification.

Plaintiffs argue that their critiques of the Viant methodology and data present common, over-riding issues that warrant certification.  But courts have considered "bad data" theories like these before and repeatedly have denied certification of similar classes.  That line of precedent culminates with Judge Davila's recent decision in *RJ v. Cigna Health & Life Ins. Co.*, 2024 WL 1107826 (N.D. Cal. Feb. 12, 2024) (slip op.) (Defs.' Ex. 235).  There, Judge Davila denied certification of a near-identical case brought by the same counsel, under the same theory, against MultiPlan and another health plan administrator for their pricing of the exact same intensive outpatient ("IOP") treatment.  Judge Davila recognized the pervasive problems with Plaintiffs' theories, reasoning that the "dissimilarities across the various plans' UCR language" and the varying standard of review precluded certification because there was no "common answer to the question of whether Viant failed to produce a valid UCR under every plan's terms."  *Id.* at *8.  That same logic applies with equal force here:  Plaintiffs' challenges to Viant require both plan-by-plan and claim-by-claim analyses, including medical record review.

If *Cigna* alone were not enough to deny class certification, Plaintiffs still have not addressed (let alone eliminated) the numerous other individualized issues that Defendants have now raised twice.  Putative class members' experiences differed substantially in terms of whether they received or paid any balance bill for the difference between the provider's billed charge and the plan's allowed amount.  Many members thus haven't been injured and would not gain anything (and could end up worse off) from the relief Plaintiffs seek.  Some *providers* presumably might benefit if their list prices were paid in full, but these providers are not Plaintiffs or putative class members—and many of the providers

obtained assignments so that they could sue directly, foreclosing claims by these members.  Further, putative class members were required, but many failed, to exhaust their administrative remedies, which is a necessary prerequisite to court-ordered relief.  Members' experiences likewise varied in relation to Plaintiffs' RICO fraud theory—*e.g.*, what United supposedly told their providers, what members' providers told them, and whether members or their providers relied on any representations.

Together, these individualized issues defeat commonality under Rule 23(a)(2), typicality under Rule 23(a)(3), and predominance under Rule 23(b)(3), which is the only class-action type that allows for the individualized monetary relief Plaintiffs seek here.  Plaintiffs' new damages model also fails under Rule 23(b)(3) because it presents additional individualized issues and Plaintiffs' own experts acknowledge that they provide no means of evaluating several unanswered questions.  Nor can Plaintiffs get around Rule 23(b)(3)'s requirements through cursory references to other forms of equitable relief that are merely incidental to their claim for money damages, inadequately preserved or developed in their briefs, independently deficient, and insufficient to support a (b)(1) or (b)(2) class in any event.

Finally, class certification is inappropriate because Plaintiffs and their counsel are inadequate representatives of the putative class.  Plaintiffs all received treatment from the same provider, which recruited these individual Plaintiffs (as well as Plaintiffs' counsel) and deviated from its ordinary billing practices as part of a coordinated litigation strategy to "get rid of Viant."  While the relief sought stands to benefit that provider, it likely would harm many putative class members by increasing their coinsurance and premiums without reducing any of their out-of-pocket expenses.

After two rounds of briefing, the parties haven't moved far from their original positions:  Plaintiffs seek to certify a class that cannot be certified based on theories that cannot be resolved on a class-wide basis.  This Court should again deny class certification.

## PROCEDURAL BACKGROUND

Plaintiffs and their counsel filed this case on April 2, 2020.  The same day, Plaintiffs' counsel also filed:  (1) a case on behalf of Plaintiffs' provider, Summit Estate ("Summit"), asserting many of the same challenges to United's use of Viant's database to reprice out-of-network IOP claims (*Pac. Recovery Sols. v. United Behavioral Health*, No. 4:20-cv-2249 (N.D. Cal.)); and (2) two other cases asserting these same claims and challenges against MultiPlan and one of United's competitors, Cigna,

which also uses Viant (*RJ v. Cigna Health & Life Ins. Co.*, No. 5:20-cv-2255 (N.D. Cal.)).  The *Cigna* cases were assigned to Judge Davila and have proceeded in parallel to Plaintiffs' cases against United.

In 2021, after multiple rounds of motion-to-dismiss briefing in the United cases, this Court dismissed the provider case with prejudice and allowed a subset of Plaintiffs' member claims to proceed.  Dkts. 73, 80; *Pac. Recovery*, Dkt. 91.  Judge Davila followed suit in the Cigna case, citing and relying on this Court's dismissal orders.  *RJ v. Cigna*, Dkt. 116 at 15-18.

The parties then conducted extensive fact and expert discovery, including production of voluminous claim data and more than 450,000 pages of documents, as well as 34 fact and expert depositions and third-party discovery, including subpoenas to a few dozen third-party plan sponsors and providers with information relevant to Plaintiffs' claims.  Fact discovery closed on July 15, 2022.  Dkt. 130.

Plaintiffs moved for class certification in August 2022, and the Court held a hearing in January 2023.  The day before the hearing, the Ninth Circuit issued its second appellate decision in *Wit v. UBH*, a case on which Plaintiffs had relied in seeking class certification.  The parties addressed the impact of that decision, 58 F.4th 1080 (9th Cir. 2023) ("*Wit II*") at oral argument and again in supplemental briefing after the argument.  Dkts. 289, 292.  The Court denied class certification in March 2023, citing the Ninth Circuit's decision in *Wit II* and Plaintiffs' failure to present any classwide damages model.  Dkt. 301.  Because the Court viewed Plaintiffs' failure to provide a damages model and improper request for reprocessing as dispositive, the Court did not address other class certification issues.  *Id.* at 6.

The Court denied a stay while Plaintiffs sought interlocutory review of the class certification decision.  Dkt. 318.  Meanwhile, the Ninth Circuit *Wit* panel issued an amended opinion, 79 F.4th 1068 (9th Cir. 2023) ("*Wit III*").  In December 2023, after the parties completed expert discovery and filed their pre-summary judgment letters, the Court granted Plaintiffs' request to file a renewed motion for class certification and Plaintiffs withdrew their petition for appellate review.  Dkt. 386.

Plaintiffs' renewed class certification motion in this case tracks their parallel motion in *Cigna*.  *RJ v. Cigna*, Dkts. 148, 179.  There, Plaintiffs completed class certification briefing *after Wit II*, so they presented a damages model.  Plaintiffs here invoke materially the same damages model, the same arguments, and the same experts as in *Cigna*.  Weeks after Plaintiffs filed their motion here, however, Judge Davila issued a 29-page, carefully reasoned decision denying class certification in *Cigna*, based

3

in large part on the variations in health plans governing the *Cigna* putative class members' claims.

## FACTUAL BACKGROUND

### I.      Plan Variations Within The Putative Class

The proposed class in this case includes members of nearly 1,300 health plans for which United provides administrative services.  Most of these plans (97%) are self-funded, meaning that the plan sponsors (generally large employers) are financially responsible for the costs of all covered services. Dkt. 213 ("Kessler I") ¶ 33 & n.48.  Because the plan sponsors are financially responsible, they also control the terms of coverage, decide which out-of-network programs to participate in, and make many other plan-specific decisions that result in widespread variation.  Declaration of Rebecca Paradise ("Paradise Decl.") ¶¶ 11-16; *see* Declaration of Jeff Schneewind ("Schneewind Decl.").

Plaintiffs gloss over these vast plan variations by asserting that the plans each "reimburse [out-of-network] services based on the 'usual, customary, and reasonable' amount" or "UCR."  Mot. 4. Although their experts acknowledge that "UCR" can mean different things at different times,[1] Plaintiffs ask the Court to adopt a single classwide definition of "UCR":  "a percentile value—usually the 80th percentile—calculated from the billed charges of providers in the same geographic area."  Mot. 5.

Contrary to Plaintiffs' assertions, however, the plans' out-of-network reimbursement provisions vary widely.  That is apparent even focusing just on the sample of claims on which the parties conducted discovery.[2]  The plans governing those claims reflect *at least* three different categories of reimbursement provisions, plus widespread, material variation within each category.

**"UCR" Plans:**  Only a fraction of the sample claims had plans (21%, 8 out of 39) that require reimbursement of a "usual, customary, and reasonable" (or other terms using "usual," "customary," or "reasonable") rate.  *E.g.*, Defs.' Ex. 2 at *4; Defs.' Ex. 18 at *12.  And even the plans in this bucket define "UCR" differently.  One, for instance, gives United broad discretion to calculate reimbursements based on "selected data resources which, in [its] judgment . . . represent competitive fees in that

---

[1] Pls.' Ex. 3 ¶ 5.1; Defs.' Ex. 188; *see* Third Expert Report of Prof. Dan Kessler ("Kessler III") ¶ 33.

[2] Both sides selected 25 samples: (1) Plaintiffs hand selected theirs based on undisclosed criteria and (2) Defendants selected theirs using a random number generator.  Declaration of Geoffrey Sigler ("Sigler Decl.") ¶ 132; Defs.' Ex. 230.  7 were removed because no claims associated with the plans for those claims are included in the class definition.  4 additional claims were removed because no Summary Plan Description was available.  The analysis of plan language is based on the remaining 39 claims, representing less than 5% of the nearly 1,300 plans at issue in this case.

geographic area." Defs.' Ex. 23 at *12.  Another states that UCR is determined based on United consulting the amounts reimbursed by other plans.  Defs.' Ex. 28 at *29.  Experts on both sides agreed that UCR does *not* have a universal definition.  *See, e.g.*, Kessler III ¶ 33; Defs.' Ex. 104 at 91:8-25.

**"Competitive Fee" Plans:**  A second, larger bucket of sample claims had plans (54%, 21 of 39) requiring reimbursement based on a materially different standard: "competitive fees."  *E.g.*, Defs.' Ex. 2 at *34.  Plaintiffs' expert admitted that this standard is different from the "UCR" standard discussed above, and that it could be interpreted as requiring reimbursement at *in-network* rates, as distinct from Plaintiffs' definition of "UCR" based on "billed charges."  Defs.' Ex. 187 231:3-232:1; Kessler III ¶ 32; Defs.' Ex. 104 at 103:25-104:9.  Another expert conceded that the cost in the "competitive environment" will "obviously vary and be different" based on locales.  Defs.' Ex. 197 at 115:1-13.  There was also variation among the "competitive fee" plans.  One, for instance, provides that payment is "based on the competitive fees in [a] provider's facility's geographic area *or* an amount permitted by law."  Defs.' Ex. 27 at *3 (emphasis added).  Another provides that payment is "based on available data resources of competitive fees in that geographic area."  Defs.' Ex. 3 at *10.

**Plans With Other Terms:**  The remaining sample claims had plans (26%, 10 of 39) with a smattering of different formulations that do not track either "UCR" or "competitive fees."  *E.g.*, Defs.' Ex. 22 at *8.  One plan, for example, states that out-of-network reimbursements will be "a specific amount required by law (when required by law), or an amount UnitedHealthcare has determined is typically accepted by a healthcare provider for the same or similar service."  Defs.' Ex. 21 at *9.  Another states that rates are "calculated according to the allowed amount for a given service or item, as determined by UnitedHealthcare."  Defs.' Ex. 38 at *12.  Another states that rates will be "an amount negotiated by UnitedHealthcare or an amount permitted by law."  Defs.' Ex. 17 at *7.

Other plan variations—including with respect to exhaustion requirements, assignments, and coinsurance/deductibles—are further addressed *infra* at 27-29.

## II.  Plaintiffs' Challenges To Viant

Plaintiffs challenge United's reliance on Viant—an outside vendor—to calculate reimbursement rates for IOP services billed by out-of-network facilities for plans that elect to participate in United's "Facility R&C" program.  Paradise Decl. ¶¶ 11, 17.  Viant calculates those rates based

on a database of outpatient facility charge data collected by the Centers for Medicare & Medicaid Services ("CMS"), CMS's code grouping logic ("APCs"), and Viant's proprietary logic.  Plaintiffs claim Viant's rates fall short of a proper "UCR" due to three alleged flaws.  Those challenges are misguided, but they also require individualized inquiries precluding class certification.

██████████████  █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ Dec-laration of Sean Crandell ("Crandell Decl.") n.9 & Ex. E at 4; Pls.' Ex 62.  Plaintiffs' experts also could not quantify the impact of these supposed errors on reimbursements. Defs.' Ex. 195 at 140:24-141:11. This "First Method" only impacted a minority of the putative class claims from 2015 to 2018.

Plaintiffs also rely on an unreliable telephone "survey" conducted by one of their experts, Dr. Piper, to argue that some IOP claims were miscoded.  Mot. 8; Pls.' Ex. 1 ¶ 27.  At his deposition, however, Dr. Piper acknowledged that he had no experience conducting surveys, and that he did not know whether his assistant (who made the calls) called the correct numbers or verified that the facility representative understood the question or had the relevant information. Defs.' Ex. 195 at 123:10-19, 138:10-140:17.  When presented with information on the facilities' websites contradicting his survey results, Dr. Piper backed away from the survey.  *Id.* 132:16-133:7 (dismissing survey as "an incredibly minor point"), 141:2-11 ("I'm not trying to hang my hat on every [survey response] being correct"); *see also* Expert Report of Jessica Schmor ("Schmor Rep.") ¶¶ 27-34.

**APC Grouping Method:**  In 2018, Viant began pricing IOP claims using CMS's "APC" code grouping logic.  At the time, CMS did not have an APC grouping for IOP, so Viant used a grouping (APC 5823) that covered services with similar cost and resource intensity.  Schmor Rep. ¶ 17.  In challenging this method—which they call the "Second Method"—Plaintiffs argue that Viant should have only used IOP data, and the services Viant grouped with IOP were not sufficiently similar.  Mot. 10.  But many of the sample plans (10 of 39) state that reimbursements will be calculated based on "similar services," and CMS (which many plans follow for reimbursement rules) has since adopted a

similar APC grouping for IOP.  Kessler III ¶¶ 32-33; Schmor Rep. ¶ 16; *e.g.*, Defs.' Ex. 21 at *9; Defs.' Ex. 10 at *17.  Plaintiffs' expert admits that APC grouping requires "judgment" and it is up to the plan to decide its own plan design and reimbursement programs.  Defs.' Ex. 197 at 48:7-22, 131:22-133:11.

**Use Of Facility Data**:  Plaintiffs also challenge both methods by arguing that it was improper for Viant to rely on Medicare facility charge data and not include additional compensation for professional charges.  Mot. 8-9.  Under Medicare rules, when certain high-level professionals, like physicians, provide services at a facility, the professional and the facility submit separate claims.  By contrast, services of some lower-level professionals, like social workers, are not separately reimbursable—they are bundled into the facility charge.  Schmor Rep. ¶ 8.  As a result, charges for the services of these lower-level professionals are included in the Medicare data that Viant used to price IOP claims.  *Id.* ¶¶ 15-17.  Plaintiffs also claim that "Viant is programmed to identify and exclude professional charges when calculating UCR," Mot. 20, but Viant cannot remove bundled charges from lower-level professionals because those charges "and the facility charges are bundled together into a single line charge." Schmor Rep. ¶ 25.  And although some professional charges are separately reimbursable, neither Plaintiffs nor their experts have identified *any* professional services provided to *any* class members that would have been separately billable and not already included in facility charges if submitted to Medicare.  Indeed, Plaintiffs' medical records show that the services provided by their facility (Summit) did not include any separately billable professional services.  *Id.* ¶ 52.

Moreover, Plaintiffs and their experts have not offered any model, database, or other method to determine which putative class members received separately reimbursable professional services, and Plaintiffs' experts acknowledged at their depositions that doing so would require a claim-by-claim review of providers' underlying medical records.  Defs.' Ex. 195 at 159:23-163:2; Defs.' Ex. 197 at 195:21-196:14 ("I'd have to have medical records . . . claims data.  There's a lot of different things.").

## III.    Balance Billing

Plaintiffs' motion barely addresses the injury that they allegedly suffered: balance-billing by providers, which allegedly was caused by United's under-reimbursements.  Mot. 13.  Plaintiffs cite no evidence of this alleged harm, let alone any classwide evidence.  That is because the evidence actually shows that providers' balance-billing practices vary widely, and most putative class members ***never***

*received a balance bill or paid a single dollar out-of-pocket* for any balance bill.

Indeed, of the 29 providers for putative class members that United subpoenaed, only 2 presented evidence that they collected any balance bills from *any* patient.  Kessler III ¶¶ 48-52 & App'x G.  Four admitted that they accept United's reimbursement as payment in full, and do not balance bill their patients.  *See* Compendium of Provider Documents ("Provider Comp."), Ex. 1 ¶ 4, Ex. 7 ¶ 4, Ex. 28 ¶ 6, Ex. 30 ¶ 3.  Six others produced no evidence documenting any balance bill.  And the rest failed to show that they balance billed consistently or that any balance bill was ever collected.  *Id.* Exs. 11-15, 18-19, 21-22, 29, 31-32.  The named Plaintiffs did not produce any evidence that class members paid balance bills, and Plaintiffs only partially paid balance bills solely to bring this action.[3]

A key feature of United's Facility R&C program—fee negotiation—also makes it unlikely that any substantial number of putative class members received and paid balance bills.  Fee negotiation is designed to resolve reimbursement disputes and eliminate balance bills of members.  Praxmarer Decl. ¶¶ 12-13.  Through this service, any provider that is dissatisfied with its reimbursements (or any member that receives a balance bill) is instructed to call Viant to negotiate a resolution, using a phone number listed on the Explanations of Benefits ("EOBs") and Patient Advocacy Department ("PAD") letters that each member receives from United.  *E.g.*, Defs.' Exs. 140, 141.[4]  The majority of providers do not dispute the reimbursement rate, and accept the amount allowed by the plan as payment in full.  Paradise Decl. ¶ 25.  A small number of rates are challenged, but Viant still is able to resolve 99% of those disputes through negotiation with these providers, eliminating any potential balance bill.  *Id.* ¶¶ 24-26 & Ex. 73; Defs.' Ex. 229:20-230:12.  Although Plaintiffs have excluded these "adjusted" claims from the class definition, Mot. 2, that still leaves only a tiny fraction of claims that were challenged unsuccessfully, in addition to claims that were never negotiated because no member or provider complained.  For the vast majority of claims at issue, in other words, there is no reason to believe the member was balance billed; instead, the evidence shows providers accepted United's reimbursements.

---

[3]  *Compare, e.g.*, Defs.' Exs. 194, 196, 198, 200, 202 (showing balance billing tab for the five named Plaintiffs), *with* Defs.' Exs. 205-208 (no balance billing tab for putative class member).

[4]  Members receive from United an EOB document that summarizes the benefits paid and from Viant a PAD letter inviting them to contact Viant in case they receive a balance bill.  Providers receive a Provider Remittance Advice, *see* Pls.' Ex. 22, and may also receive an Explanation of Methodology for the pricing, *e.g.*, Pls.' Ex. 24.  Despite Plaintiffs' assertion to the contrary, Mot. 6-7, none of these documents suggests that Facility R&C or IOP treatment would be reimbursed at "UCR."

In any event, Plaintiffs offer no model or method to identify whether any putative class members received balance bills, paid balance bills, or how much, without an individualized inquiry.

## IV.     Verification Of Benefits Calls

Plaintiffs' RICO claims also depend on allegations about another service that United provides for its members—verification-of-benefits ("VOB") calls.  When a patient seeks out-of-network services, such as IOP, the providers of those services may call United to confirm the patient's coverage through a VOB call.  Pls.' Ex. 12 at 50:22-51:6.  Plaintiffs' fraud theory is that United uniformly misled providers on these VOB calls about how IOP services would be reimbursed, and that these misrepresentations to providers resulted in plan members also being misled and paying balance bills.  Mot. 19.

Plaintiffs attempt to establish commonality by claiming United representatives conduct these VOB calls using a "script" generated by United's "IBAAG" tool.  Mot. 6.  But the testimony and summary chart Plaintiffs cite confirm the opposite:  IBAAG is not a script, and its content varies from plan to plan.  Pls.' Ex. 12 at 35:24-36:4; Pls.' Ex. 14 at 244:3-12; Pls.' Ex. 9 at 129:14-22, 131:2-25.

Records of the VOB calls themselves—including call recordings and contemporaneous documentation produced by both sides—also refute Plaintiffs' assertions that the calls are uniform.  Instead, they show that what United said on any VOB call—and what providers understood or relied on from the calls—varied from call to call.  Some providers, for example, did not have ***any*** discussions about out-of-network reimbursement rates, methodologies, or "UCR" on these calls.  Provider Comp., Ex. 7 ¶ 9, Ex. 28 ¶ 10, Ex. 42 ¶ 9.  Plaintiffs' provider Summit, on the other hand, initiated discussions about reimbursement on several calls, and made contemporaneous notations showing it understood from the calls that United would use a third party to reprice claims, *see* Defs.' Exs. 131, 136, 194, 202, specifically referring to "MultiPlan or Viant," Defs.' Exs. 200, 205-207.

Plaintiffs also assert (without evidence) that providers shared the alleged VOB misrepresentations with their patients, and the patients, in turn, relied on those misrepresentations in electing to proceed with treatment.  Mot. 6.  Of the five named Plaintiffs, however:  (1) two testified that they did not recall any specific statements by Summit about the extent of their coverage before receiving treatment, Defs.' Ex. 138 at 35:14-21; Defs.' Ex. 172 at 25:9-26:10; (2) two others testified they believed their treatment would be fully covered, but did not recall any such representation from Summit, Defs.' Ex.

155 at 27:16-28:14, 134:9-24; Defs.' Ex. 163 at 136:24-137:18, 150:24-151:8; and (3) the fifth testified that Summit said his treatment would be fully covered, Defs.' Ex. 146 at 56:24-57:5, even though there is no evidence United ever told Summit this.  Moreover, all five Plaintiffs testified that location and/or quality of treatment—not cost—were their primary motivation for seeking treatment from Summit.[5] Plaintiffs submitted no evidence of other members' interactions with their providers.

## V.    Defendants' Compensation For Their Services

Plaintiffs allege that part of Defendants' illegal "scheme" is that they "profited" through "disguised 'savings' fees."  Mot. 13.  What plan sponsors pay for United's services is delineated in the contract between United and the sponsor.  Nothing is "disguised" in these contracts, Kessler III ¶¶ 38-40, and there are no plan sponsor plaintiffs or claims on behalf of plan sponsors in this case.

What sponsors pay for these services also is often the subject of negotiation and varies from plan to plan, so any dispute about this compensation structure would require a plan-specific inquiry.  Pls.' Ex. 14 at 194:5-9, 292:23-293:2. ███████████████████████████████████ ████████████████████████████████████████████████████████████. *Id.* at 70:25-71:2, 194:5-9; *e.g.*, Pls.' Ex. 25 at NUSA-UBH-0000025 (████████████████████ ████████████████████████████████████, *e.g.*, Defs.' Ex. 48 at *13-14, or ████████████████████████████, *see* Paradise Decl. ¶ 28.  As Plaintiffs' own exhibit confirms, the fee percentages and PEPM caps vary by plan.  Pls.' Ex. 49.

## LEGAL STANDARD

The party seeking class certification bears the burden of proof at all steps in the analysis.  *See Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 967 (9th Cir. 2020).  To meet that burden, a plaintiff must satisfy all four threshold requirements under Rule 23(a)—numerosity, commonality, typicality, and adequacy—plus one of the three conditions of Rule 23(b).  *Id.*  Rule 23 is not "a mere pleading standard"; rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Plaintiffs must satisfy Rule 23 "through evidentiary proof," *Comcast v. Behrend*, 569 U.S. 27, 33 (2013), which

---

[5] *See* Defs.' Ex. 138 at 25:21-26:19; Defs.' Ex. 146 at 38:17-40:4, 42:4-10; Defs.' Ex. 155 at 23:19-24:7; Defs.' Ex. 162 at 104:11-24, 111:11-17; Defs.' Ex. 172 at 24:7-25:5; *see also* Defs.' Ex. 162 at 110:15-19 (no recollection of considering cost in selecting facility); *id.* at 213:5-10 (same).

"[f]requently . . . will entail some overlap with the merits," *Dukes*, 564 U.S. at 350-51.

## ARGUMENT

Plaintiffs' motion should be denied, because they cannot establish commonality, typicality, or adequacy under Rules 23(a)(2)-(4).  All of the litigation-driving issues in this case—as well as multiple defenses—require individualized inquiry.  Plaintiffs are also inadequate class representatives because they took various steps to manufacture standing, making them unique within the putative class and subjecting them to unique defenses.  The same individualized issues also bar class certification under Rule 23(b)(3)'s predominance requirement.  And Plaintiffs cannot avoid that requirement by invoking Rule 23(b)(1) or (b)(2), because Plaintiffs predominantly seek damages and the incidental equitable relief they seek is all either unavailable or insufficient to satisfy Rule 23(b)(1) or (b)(2) anyway.

## I.     Plaintiffs Fail To Establish Commonality, Because All Litigation-Driving Issues Require Individualized Inquiry.

Plaintiffs' purported common contention is that United underpaid their claims because Viant did not produce legitimate UCR amounts for each claim.  But that claim depends on "the ERISA plans' specific terms and language," the "central relevance" of which is "enshrined in [ERISA's] express language . . . and has been repeatedly highlighted by the U.S. Supreme Court."  *Cigna* (Defs.' Ex. 235) at *10.  To satisfy commonality, therefore, "Rule 23(a)(2) and *Dukes* demand" that Plaintiffs show "that a *single* interpretation of UCR obligations can apply to all of these plans 'in one stroke.'"  *Id.* at *17.  *Cigna* thus rejected an identical argument "that commonality is met simply because all [class members'] claims were priced using the same Viant OPR method," and numerous "courts considering motions to certify an ERISA class have consistently rejected plaintiffs' invitations to gloss over differences in plan language and have enforced a fidelity to the specific plan terms."  *Id.* at *20.  Those principles defeat commonality here, just as they did in *Cigna*.  Further, Plaintiffs fail to establish class-wide injury; their specific challenges to Viant also cannot be resolved without individualized inquiries; and these obstacles and others mean that they also cannot satisfy commonality for their RICO claims.

### A.     Plaintiffs Cannot Establish Commonality On Their ERISA Claims.

#### 1.     Variations In The Controlling Plan Terms That Govern Out-of-Network Reimbursement Preclude Commonality.

Plaintiffs claim that Viant does not satisfy "UCR" (as Plaintiffs' experts define this term),

regardless of the plan language used.  But the two cannot be separated.  United's duties depend on the "'written plan documents,'" *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013), and therefore United's use of Viant "is only impermissible if it conflicts with the language of the particular plan," *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 290 (D.N.J. 2013); *see Neufeld v. Cigna Health & Life Ins. Co.*, 2023 WL 4366137, at *6-9 (D. Conn. July 6, 2023) (no commonality because, *inter alia*, plan definitions varied, requiring individualized interpretation as to why "this-or-that variation is or is not consistent with" the class definition); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 2014 WL 6888549, at *10 (C.D. Cal. Sept. 3, 2014) ("any analysis of [defendants'] obligations . . . begin[s] with the text of its ERISA plans").  Unless United's payments violated the specific terms of a member's plan, the member has no claim for "benefits due . . . under [those] terms," 29 U.S.C. § 1132(a)(1)(B), there is no fiduciary breach, *id.* § 1132(a)(3), and the member lacks any injury in fact under Article III.  But Plaintiffs cannot make these showings on a class basis because the plan terms at issue vary widely.

Judge Davila's decision in *Cigna* is on all fours with this case.  The plaintiffs in both cases—represented by the same counsel—sought services at the same facility (Summit) and offer identical theories: that Cigna (or United) and MultiPlan violated ERISA and RICO when they used Viant to price out-of-network IOP claims.  Plaintiffs in both cases seek to certify identical classes—*i.e.*, ERISA health plan members whose claims for services billed under H0015 or revenue code 0906 were repriced using Viant—based on testimony from the same experts, and much of the same kind of evidence.

Judge Davila denied class certification on commonality grounds.  He reasoned that the "dissim-ilarities across the various plans' . . . language" make it impossible to determine on a classwide basis that Viant's "rate would either breach every one of the [plans'] terms or be permissible under all of these terms."  *Cigna* (Defs.' Ex. 235) at *8.  Instead, determining whether the use of Viant violated the plans' terms requires "reviewing or at least consulting" the applicable language "in the several hundred client-drafted health plans."  *Id.*  The denial of class certification was further bolstered by variation in the standard of review:  Some plans delegated the choice of database or reimbursement determination to Cigna and others did not.  Given "the variety of [plan] terms across a significant proportion of the class, [the plaintiffs had] not demonstrated" commonality.  *Id.* at *9.

That same variability in the plan language dooms Plaintiffs' would-be class here.  Even if

Plaintiffs posed the same questions classwide about whether Viant's methodology produced a valid UCR rate (which they do not for reasons discussed below), these questions would not generate any "common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. That is because, as a matter of law, under ERISA this Court would need to decide whether United's use of Viant was contrary to the terms of the class members' plans. For this reason, other courts have rejected similar "faulty data" theories because the data alone "would be 'patently insufficient to demonstrate underpayment of benefits . . . across class membership' and 'would not even establish a prima facie ERISA claim.'" *In re Aetna UCR Litig*., 2018 WL 10419839, at *19 (D.N.J. June 30, 2018) (quoting *Franco v. CIGNA*, 299 F.R.D. 417, 429 (D.N.J. 2014)); *see WellPoint*, 2014 WL 6888549, at *12.

By leaping straight into attacks on Viant, Plaintiffs ignore substantial variability in plan language across the nearly 1,300 plans at issue—each the product of negotiation between United and the plan sponsor, and many of which contain unique provisions. The parties' sample plans alone demonstrate the substantial differences in the plans' reimbursement provisions, how those reimbursement methodologies are defined, and the source of data that can be used to price claims, as shown below:

| Category | Description | Total Sample Claims |
|---|---|---|
| A | Competitive Fees | 21 |
| B | Gap Methodology Established by Third-Party Vendor that uses a relative value scale | 6 |
| C | Reasonable Charge, based on known provider reimbursement schedules, negotiated discount arrangements, and maximum allowables | 2 |
| D | 140 Percent of Medicare, or Amount Determined by United | 1 |
| E | Reasonable and Customary, based on available data for fees or other fee schedules | 1 |
| F | Amount typically accepted by a healthcare provider | 1 |
| G | Determined or Negotiated by United | 2 |
| H | UCR, as determined by United | 3 |
| I | Reasonable and Customary, as determined by FAIR Health or other benchmarks | 2 |
| N/A | No SPD Available | 4 |
| **Total** | | **43** |

*See* Kessler III ¶¶ 30-33 & Ex. 1. As this chart makes clear, most plans do not provide for reimbursement based on "UCR" or any arguably similar terms. "Competitive fees" is the most common formulation, appearing in 21 of 39 sample plans (54%). Ten of 39 plans (26%) contain a different formulation

13

that also does not involve "UCR."  Plans invoking "UCR" or any arguably similar terms (categories C, E, H, and I) are a minority, comprising only eight of 39 sample plans (21%).  *See supra* 4-5.

Within each of these categories, there is even more variation.  The plans that refer to "UCR," for example, allow United to use different data sources to determine reimbursement.  *See Kessler III* ¶ 33-34; *supra* 4-5.  Non-UCR plans take into account reimbursement rates "by like/similar providers," by Medicare, or make no reference to a data source at all.  And some "competitive fee" plans expressly contemplate the use of gap methodology when no "competitive fee" data is available, whereas others do not contemplate an alternative methodology at all.  Kessler III App. D at D7-9.

Those differences matter because Plaintiffs' entire theory hinges on comparing Viant to a particular definition of UCR—a rate equivalent to the 80th percentile of providers' billed charges (or list prices), Mot. 5—that is inconsistent with the terms of multiple plans.  Plaintiffs' definition is also inconsistent with the most common reimbursement standard—"competitive fees."  *See* Pls.' Ex. 17.  Billed charges are not "competitive" because they are "unconstrained by any market forces," Kessler III ¶ 19, as Plaintiffs' expert concedes:  They are "list" prices that providers set unilaterally and that do not represent "prevailing market rates"—in fact, Dr. Hall admitted that the difference between list prices and market rates is "obscene."  Defs.' Ex. 187 at 86:13.

As Judge Davila recognized in *Cigna*, these "dissimilarities across the various plans" make it impossible to determine whether Viant's rate "would either breach every one of these [plan] terms or be permissible under all of these terms."  *Cigna* (Defs.' Ex. 235) at *9.  Other courts considering similar challenges to "UCR" rates and methodologies over the last decade agree:  Plan variation precludes class certification.  *See id.* (citing cases).[6]  Similarly, this Court denied class certification in a case challenging the reimbursement of certain medications at the "usual and customary" rate, citing the "significant variation with how the different contracts [at issue] define [usual and customary]."  *Corcoran v. CVS Health*, 2017 WL 1065135, at *6 (N.D. Cal. Mar. 21, 2017).[7]  Plaintiffs still make no

---

[6] *See also, e.g., Aetna*, 2018 WL 10419839, at *14 ("[T]he varied nature of the terms poses insurmountable odds against class certification."); *Lipstein*, 296 F.R.D. at 289 (To assess liability, "the Court would need to make at least as many individual determinations as there are plans at issue across the broad class, after analyzing each plan's language and potentially other evidence relevant to each claim."); *WellPoint*, 2014 WL 6888549, at *7.

[7] The class in *Corcoran* was later narrowed to cover only contracts with five specific pharmacy benefits managers.  *Corcoran v. CVS Health Corp.*, 779 F. App'x 431, 434 (9th Cir. 2019).  The Ninth Circuit

14

effort to distinguish this case from those predecessors.

Plaintiffs counter that the variation in plan language is immaterial because all plans supposedly have "substantially similar language" and all plans use the Facility R&C program.  Mot. 18.  But Plaintiffs' own experts recognized that the various plans' terms, such as "competitive" and "usual and customary" can "have different meanings."  Defs.' Ex. 187 at 104:6-21, 220:16-22231:3-232:1; *see also* Defs.' Ex. 126 at 147:9-12 ("competitive fees" is vague), Defs.' Ex. 104 at 90:24-91:5 ("usual, customary and reasonable" is different than "usual and customary").  And multiple courts have rejected "plaintiffs' invitations to gloss over differences in plan language."  *E.g.*, *Cigna* (Defs.' Ex. 235) at *11; *Negron v. Cigna Health & Life Ins. Co.*, 2021 WL 2010788, at *21 (D. Conn. May 20, 2021).  In *Wellpoint*, for example, the court reasoned that even if the differing plan terms all amounted to a UCR rate (which is not the case here, *see supra* 4-5), it would still have to "determine what that rate *is*, under the specific terms of each plan."  2014 WL 6888549, at *10.  And because courts must begin with the "text of the relevant ERISA plans," plaintiffs cannot simply offer a purported standardized definition without reviewing "the actual text of [the] plans."  *Id.*  In other words, there are no shortcuts.

The truism that "different words" *can* sometimes "mean the same thing," Mot. 19, is thus unavailing.  Whether the words here *do* mean the same thing requires individualized inquiries into each plan.  As *Cigna* acknowledged, this Court may not "simply accept" Plaintiffs' assertion that "explicitly different [plan] terms actually impose 'substantially similar' obligations," because Plaintiffs bear the burden of proof.  *Cigna* (Defs.' Ex. 235) at *9 (citing cases).  Their failure to even try to reconcile the "self-evident" plan variations with their theory of the case thus defeats commonality.  *Id.* at *8.[8]

The few cases Plaintiffs cite as supposedly "find[ing] commonality in similar situations," Mot. 17, are each distinguishable.  *Wachtel v. Guardian Life Insurance*, 223 F.R.D. 196 (D.N.J. Aug. 5, 2004), and *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588 (E.D. Mich. 1996), turn on those courts' "factual determinations that the ERISA plans at issue had terms that were common across the proposed

---

allowed certification of the narrowed class only after determining there was no "meaningful differences" between the remaining contracts.  Taking these decisions as a whole, *Corcoran* shows that "meaningful differences" in key contract language (such as the meaning of UCR) bar class certification.

[8] Plaintiffs' assertion that one of Defendants' experts conceded that any differences are "immaterial," Mot. 19, is baseless.  The expert made no such concession.  He stated only that in some circumstances, the same methodology *could* be consistent with different plans—but ultimately, whether a methodology is consistent with a plan "depend[s] on . . . the plan language."  Pls.' Ex. 61 147:4-7, 147:23-25.

class," as *WellPoint* recognized.  2014 WL 6888549, at *11.[9]  Here, by contrast, the terms are plainly *not* common.  And *Cigna* distinguished Plaintiffs' remaining cases:  *Peters v. Aetna*, 2 F.4th 199 (4th Cir. 2021) "only addresses circumstances where a common contention has *already* been established" and the plan terms are relevant only to the "'available remedies.'"  *Cigna* (Defs.' Ex. 235) at *13.  *Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*, 2016 WL 5938722 (C.D. Cal. May 16, 2016)  addressed approval of a class settlement, not class certification.  *Cigna* (Defs.' Ex. 235) at *9.  And *Medical Society of New York v. UnitedHealth Group Inc.*, 2019 WL 6888613 (S.D.N.Y. Dec. 18, 2019), focused solely on whether claim assignment defeated commonality—it "did not analyze the specific wording each plan uses to describe the term at issue."  *Cigna* (Defs.' Ex. 235) at *10.

Ultimately, parroting their reply in *Cigna*, Plaintiffs' proposed common question—"whether, under *any* plan, Viant can price H0015 per diem claims based on bad data," Mot. 17—gets things exactly backwards.  As Judge Davila reasoned, that question "contemplates what Defendants *can* do, which is determined and circumscribed by the terms of the individual plans."  *Cigna* (Defs.' Ex. 235) at *10.  Put another way, this question "skips the preliminary inquiry of whether class members were underpaid at all," which requires "a plan-by-plan analysis."  *Aetna*, 2018 WL 10419839, at *16.  Despite multiple attempts to do so, Plaintiffs cannot untangle their claims from the plan language.

### 2.   Variations In The Plan Terms Governing The Standard of Review Preclude Commonality.

As in *Cigna*, the parties' dispute over the appropriate standard of review—which is driven by the language of each plan—further defeats Plaintiffs' ability to "generate common answers" to their claims that United underpaid IOP services.  *Dukes*, 564 U.S. at 350.  Despite the parties briefing this issue in the initial round of class certification and discussing this issue in their pre-summary judgment letters, Dkt. 377 at 3; Dkt. 378 at 1, Plaintiffs ignore this critical issue in their class certification motion.

As this Court has recognized, Dkt. 116 at 3-4, 7, whether the Court reviews United decisions *de novo* (as Plaintiffs seek) or for abuse of discretion (as Defendants seek) depends mainly on whether each plan granted the correct United affiliate "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Wit III*, 79 F.4th at 1087.  The named Plaintiffs' and sample

---

[9] *Wachtel* also was decided "before the Supreme Court revised the law concerning commonality in *Dukes*." *WellPoint*, 2014 WL 6888549, at *11.

class members' plans unambiguously grant United or its affiliates discretion to interpret plan provisions.  Dkt. 106 at 12-13; Dkt. 116 at 5-6.  But they address that authority in different provisions with different terms that bear on Plaintiffs' argument to the contrary.

Of the 39 sample plans addressed in discovery, for example:  (1) 34 plans specify in the section of the plan governing out-of-network reimbursement that United has discretion in selecting particular out-of-network reimbursement methodologies, data sources, and/or rates; whereas (2) 28 plans (including some of the 34 just referenced) address United's discretion in another plan section by stating that "UnitedHealthcare" and its "affiliates" have discretion to interpret and apply the plan.  *E.g.*, Defs.' Ex. 7 at 321; Defs.' Ex. 10 at *9; Defs.' Ex. 32 at *13; Defs.' Ex. 37 at *7.  Some plans also expressly authorize UnitedHealthcare to further "delegate [its] discretionary authority to other persons or entities that provide services in regard to the administration of the Plan."  *E.g.*, Defs.' Ex. 1 at *13; Defs' Ex. 5 at *11; Defs.' Ex. 13 at *13; Defs.' Ex. 16 at *13.  These variations mean Plaintiffs' standard of review arguments cannot be determined on a classwide basis.  *E.g.*, *Cigna* (Defs.' Ex. 235) at *8; *Franco v. Connecticut Gen. Life Ins. Co.*, 289 F.R.D. 121, 136-37 (D.N.J. 2013) (standard of review precluded certification of ERISA claims); *Lipstein*, 296 F.R.D. at 288 ("Determining what discretion United enjoys under each plan will require a separate determination, based on each individual plan.").

Even if Plaintiffs were to accept that this court's review is deferential—as their motion implies in referencing the "arbitrary and capricious" standard, Mot. 16—individualized questions would remain as to the proper level of deference.  *Cf. Cigna* (Defs.' Ex. 235) at *8 ("[J]ust because there are only two buckets that the plans may fall into does not mean that the Court need only make two inquiries.").  Plaintiffs claim, for example, that United has a conflict of interest because plan sponsors paid it a percentage of savings, creating an incentive for United to underpay claims.  Dkt. 98 at 16-17. But United's compensation varies from plan to plan—███████████████████████████████████████████████████████.  *See supra* 10.  The differing payment schemes further undermine the ability of the court to generate common answers because these schemes, under Plaintiffs' own theory, alter the degree of deference afforded United.

### 3.   Plaintiffs Fail To Establish Classwide Injury.

Plaintiffs also fall far short of proving the "common injury" required for commonality.

17

*Davidson*, 968 F.3d at 967; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."). Commonality "requires the plaintiff demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 349-50. But Plaintiffs cannot make that showing because most members never paid any balance bill. And Plaintiffs' challenges to Viant—even if accepted—do not mean (and Plaintiffs have not proved) that United underpaid each claim. Plaintiffs thus lack a common injury.

**Balance Billing:** Plaintiffs previously recognized that "the vast majority" of the putative class "did not" pay any balance bills. Dkt. 69 at 14. This concession is critical because balance billing "is needed to confer injury in fact," *Wellpoint*, 2016 WL 6645789, at *3-4 (collecting cases), as well as to establish a right to benefits under particular plans.[10] And whether putative class members were balance billed cannot be resolved on a classwide basis.

The evidence confirms that most putative class members did not pay balance bills. Of the 29 providers subpoenaed by United, only two presented evidence of actual collections of balance bills, and the rest either admitted that they accept United's rate as payment in full (four providers), did not submit evidence of balance bills (six providers), or did not submit evidence that any balance bills were collected. *See supra* 7-8. Plaintiffs' experts also recognized that determining whether someone was balance billed requires reviewing "correspondence" or "documentation" between a patient and provider, which had not done. Defs.' Ex. 119 at 96:24-97:12. Instead, they simply ignored balance billing altogether. *See* Defs.' Ex. 195 at 50:3-51:9.

Even if incurring a potential financial obligation that was never billed or collected were enough to establish Article III standing (as Plaintiffs previously asserted, Dkt. 171 at 17), Plaintiffs still face several barriers to establishing classwide injury. Any obligation putative class members may have had in the past may have been written off, eliminating their injury and mooting their claims. *E.g.*, Provider Comp., Exs. 35, 38. Or the statute of limitations on that obligation—which varies by jurisdiction— may have expired. State limitations for debt collection "typically rang[e] from three to six years, after which a debtor is no longer legally obligated to pay the debt." Lauren Goldberg, *Dealing in Debt: The*

---

[10] Many putative class members' plans expressly exclude coverage for "services . . . for which the [member] is not legally required to pay." Defs.' Ex. 28, at *18; *see* Defs.' Exs. 23 at *11, 30 at *11; *LaRocca v. Borden, Inc.*, 276 F.3d 22, 31 (1st Cir. 2002) (reversing benefits award).

*High-Stakes World of Debt Collection After FDCPA*, 79 S. Cal. L. Rev. 711, 750 (2006).

The lack of classwide Article III standing is especially pronounced here because the relief Plaintiffs seek may make many putative class members worse off. Any increase in the reimbursement rate for a plan member's claim will also increase that member's corresponding coinsurance and deductible payments (which members must pay as a condition of coverage) and drive up future premiums. *See* Kessler III ¶¶ 20, 59-65. Members who paid no balance bills therefore stand to gain nothing from this litigation except increased costs. And identifying those members requires individualized review.

**Alternative Methodologies:** Plaintiffs also cannot establish classwide injury because they cannot prove their claims were underpaid. Even if Plaintiffs were to prevail on their challenges to the Viant methodology, it does not follow the methodology resulted in underpayments in each instance.

Plaintiffs address this issue only obliquely through their first damages model, which purports to measure the difference between United's reimbursement under and Plaintiffs' "correct" UCR rate (the "UCR model"). But as explained *infra* at 28-30, that model in irreparably flawed. And even if it provided *one* lawful way to calculate reimbursement, it would not follow that United is required to use that method. Instead, as Plaintiffs and their experts recognize, their proposed methodology is but one possible alternative methodology. *See* Mot. 25; Pls.' Ex. 1; Defs.' Ex. 185 at 7 (paper by Dr. Ohsfeldt endorsing "Context4Healthcare" as valid "UCR" database); Defs.' Ex. 188 (papers by Professor Hall endorsing use of average in-network and Medicare rate as "best proxy" for "usual" or "customary" or "prevailing market rates," and rejecting use of "list prices"); Defs.' Ex. 104 at 79:17-82:6. Other valid out-of-network benchmarks were available at the time, and some of those benchmarks would have led to *lower* reimbursements than Viant for some of the claims at issue. *See* Defs.' Ex. 184 at 216:18-217:1, 232:23-233:12, 234:17-235:15 (Ohsfeldt checked "Context4Healthcare" and it indicated around $250 for IOP); *see also* Kessler III ¶ 36 (██████████████████████████████████████ ██████). Because many plans reserved for United the discretion to interpret the plans or determine the reimbursement rate, *see supra* 16-17, United could have lawfully adopted these alternative methods and thereby paid *less* for at least some of the claims now at issue. Indeed, United could *still* do so—rather than paying pursuant to Plaintiffs' first damages model—if Plaintiffs' challenges to Viant prevail but the Court determines that reprocessing is the appropriate remedy. Plaintiffs thus have no way of

showing that each putative class member had their claim underpaid or is owed any additional benefits. Without that showing, Plaintiffs cannot establish liability or injury on a classwide basis.

### 4.     Plaintiffs' Data Critiques Also Create Commonality Issues.

Plaintiffs' specific challenges to Viant's methodologies further highlight the lack of any common questions that could resolve an issue central to each claim in one stroke. *Dukes*, 564 U.S. at 350.

*First*, Plaintiffs' challenge to the Viant "Second Method" requires a plan-by-plan review.[11] Plaintiffs complain this method improperly groups IOP services with similar behavioral health services. But a significant portion of even the sample plans expressly contemplate such grouping by stating reimbursement will be calculated based on "similar services." *See supra* 6-7. Determining whether this methodology was flawed (irrespective of whether any members were actually underpaid) thus requires a plan-by-plan analysis into whether the plans contemplate such grouping.

*Second*, individualized inquiries are also needed to evaluate Plaintiffs' claim that it was improper for Viant to calculate rates based solely on Medicare data for claims submitted by facilities rather than increasing reimbursement to account for the separate claims that Medicare permits certain professionals to submit in addition to the facility claims. Mot. 3-4. As explained *supra* at 7, Medicare rules typically include the services of lower-level professionals like social workers in the reimbursement provided to their facilities—those are not separately reimbursable. To prevail on this theory, therefore, Plaintiffs at a minimum would have to show that their claims included services by other types of (high-level) professionals that would have been separately billable under Medicare and not already included in the facility charges Viant used to calculate its rates. Yet Plaintiffs have not identified any such services that were provided to them or any other putative class members. And identifying claims that include such services would require individualized review of underlying medical records, as Plaintiffs' experts acknowledge. Defs.' Ex. 195 at 159:23-163:2; Defs.' Ex. 197 at 195:21-196:14.

### B.     Plaintiffs Cannot Establish Commonality On Their RICO Claims.

Plaintiffs' RICO claims allege that United's agents misrepresented United's reimbursement

---

[11] The "First Method" only impacted a minority of the putative class claims. *See supra* 6.

20

rates on VOB calls to IOP providers, and patients indirectly relied on those representations in proceeding with treatment. Mot. 6. Those claims first require proof of "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Stitt v. Citibank, N.A.*, 2015 WL 75237, at *3 (N.D. Cal. Jan. 6, 2015) (Gonzalez Rogers, J.), *aff'd*, 748 F. App'x 99 (9th Cir. 2018) (citing *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc)). The racketeering activity alleged here—mail and wire fraud, 18 U.S.C. §§ 1341, 1343—further requires "(1) a scheme to defraud, (2) the use of either the mail or wire, radio, or television to further the scheme, and (3) the specific intent to defraud." *United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017). Numerous individualized issues with these elements, including those recognized in *Cigna*, preclude commonality.

### 1.      The RICO Claims Fail For The Reasons Laid Out In *Cigna*

Judge Davila recognized at least three hurdles to the *Cigna* plaintiffs' attempt to prove commonality on the RICO claims. All three are applicable here.

**First**, Plaintiffs cannot establish commonality on the RICO claims for the same reason as the ERISA claims: Their common contention that United "made common verbal promises to reimburse providers at a UCR rate . . . cannot be evaluated without reference to what the particular member's plan requires"—that is, what "UCR" means in the context of that plan. *Cigna* (Defs.' Ex. 235) at *14.

**Second**, "the record evidence does not support the contention that [United] uniformly promised to pay a 'UCR' rate" on the VOB calls. *Id.* The mere *existence* of VOB calls with each provider, Mot. 19, does not satisfy commonality. Instead, "plaintiffs will need to submit proof of the statements made to each" provider, as "oral misrepresentations are presumptively individualized." *Moore v. PaineWeber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). Judge White also recently denied class certification for that exact reason: Plaintiffs could not show, on a classwide basis, what representations United made on VOB calls. *See Desert Cove Recovery, LLC v. UBH* (Defs.' Ex. 236) at *4-5.

The evidence here confirms that the VOB calls varied. That is clear even from Plaintiffs' own chart purporting to summarize recordings of nine VOB calls for the named Plaintiffs. Pls.' Ex. 20. On one call, for instance, United's employee referred to Medicare-based methodologies (not UCR) and stated that reimbursement would be "reasonable and customary, if it's a professional claim." *Id.* at *6-7. But this case concerns all-inclusive facility claims, not separately submitted professional claims.

Some calls, meanwhile, refer simply to "reasonable and customary," others mention a specific percentile, and yet others make no reference to "UCR" language whatsoever.  *See supra* 9. In any event, Plaintiffs present no evidence that their small "hand picked" sample of VOB calls—all between a single provider (Summit) and United—is "genuinely representative" of calls with other providers or statistically significant, as would be required to draw inferences about the rest of the class.  *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013).[12]  To the contrary, multiple providers testified they were *not* aware of any such representations.  Provider Comp. Ex. 7 ¶ 9, Ex. 28 ¶ 10, Ex. 42 ¶ 9.  And Plaintiffs left recordings from their own sample out of their summary chart because those calls did not use any "UCR" terms or involve any alleged fraud.  Kessler III ¶ 41 & App. F.

Plaintiffs also misrepresent the evidence by claiming United uses a standardized "script" for VOB calls, pointing to the IBAAG tool United's representatives use when they receive calls from providers.  Mot. 19.  This is incorrect.  *See supra* 9.  But even if this tool were intended to be a script (despite no such evidence), Plaintiffs' self-selected sampling of VOB call recordings refute Plaintiffs' assertion that this supposed script resulted in uniform representations.  *See supra* 9.

***Third***, even if United's call center representatives simply recited the specific reimbursement obligations in a particular member's plan or made uniform representations about UCR, whether those representations were misleading still cannot be answered in one stroke.  "UCR" and its "congeners" are "relatively open to interpretation."  *WellPoint*, 2014 WL 6888549, at *4.[13]  Therefore, "the variances in the specific UCR terms would also preclude a finding that [United] made uniform and common UCR representations over the VOB calls."  *Cigna* (Defs.' Ex. 235) at *14.

Irrespective of what any particular use of the term UCR may objectively mean, moreover, there is no evidence of how any provider other than Summit understood that term—and thus ultimately no evidence that providers were uniformly misled.  Further, whether the particular United employees that

---

[12] Accepting that non-random sample as representative also would "rais[e] serious questions" about "due process."  *Hilao v. Estate of Marcos*, 103 F.3d 767, 782, 785-86 (9th Cir. 1996).  "[R]epresentative evidence" can be used to "prov[e] classwide liability" only if "each class member could have relied on that [evidence] in an individual action."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016).

[13] *See* Defs.' Ex. 188 (publication by Plaintiffs' expert stating that terms like "usual" and "customary" are ambiguous); Defs.' Ex. 104 at 64:24-65:21 (admitting "some variation" in how the term "usual, customary, and reasonable" is used in the healthcare industry).

1  participated in each call believed that they were accurately describing any given plan's terms also im-

2  pacts whether the alleged representations were made in good faith, which is a complete defense to the

3  wire and mail fraud allegations underlying Plaintiffs' RICO claims. *United States v. Kail*, 2021 WL

4  3773613, at *9 (N.D. Cal. Aug. 25, 2021). The need for individualized evidence of scienter thus also

5  precludes class certification, *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 457 (D.N.J. 2009).

   **2. Plaintiffs Cannot Prove Causation Or RICO Injury On a Classwide Basis.**

7    Beyond the bases laid out in *Cigna*, Plaintiffs' RICO claims suffer from three additional hurdles

8  that preclude a finding of commonality.

9    **<u>Variation as to Causation:</u>** Plaintiffs' fraud theory depend on two causal links: (1) the provid-

10  ers "rely on the information from VOB calls" with United to provide treatment and (2) the providers

11  share those representations with patients, who "rely on [them] to determine whether to proceed with

12  treatment." Mot. 6; *see Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th Cir. 2004) (under RICO,

13  "individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bear

14  heavily on the causation analysis").[14] But both links require individualized inquiries.

15    ***First***, whether a given provider relied on United's representations is an individualized question.

16  Repeat providers, like Summit, understood that United would use MultiPlan/Viant to price claims, as

17  shown by Summit's notes. *See supra* 9. Summit, in fact, knew that Viant priced IOP claims at a

18  particular percentage of billed charges, yet *still* proceeded to treat the named Plaintiffs. *See, e.g.*, Pls.'

19  Ex. 1, Attachment 5 at *11. There is no evidence showing that any other provider relied (let alone

20  reasonably relied) on any VOB representations to conclude they would instead receive list prices.

21    ***Second***, determining what providers in turn told putative class members—and whether and how

22  those members relied on these statements—also requires individualized inquiries. *See supra* 9-10

23  (summarizing Plaintiffs' recollections). And there is *no* evidence in the record as to what any absent

---

24  [14] While first-party reliance on a misrepresentation is not strictly required, there must be some reliance
25  sufficient to establish a causal relationship between the alleged fraud and the claimed harm. *See Pou-los*, 379 F.3d at 664; *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 915
26  (C.D. Cal. 2012) (causation depends on a decision based on misrepresentations); *Negrete v. Allianz Life Ins. Co.*, 2011 WL 4852314, at *11 n.8 (C.D. Cal. Oct. 13, 2011) (same). Each class member
27  would have to make this showing. *See Martinelli v. Petland, Inc.*, 274 F.R.D. 658, 662 (D. Ariz. 2011)
(denying certification because "class members may have purchased [the relevant product] for a variety
28  of reasons"); *Martin v. Dahlberg, Inc.*, 156 F.R.D. 207, 215 (N.D. Cal. 1994) (no commonality where
"a myriad of factors may have influenced" the putative class).

putative class members were told by their providers or how that affected their choice of treatment.

**Variations as to RICO Injury:**  RICO imposes an even more demanding standard for proving injury than Article III, requiring "concrete financial loss, and not mere injury to a valuable intangible property interest." *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (quotation marks omitted) (no RICO injury for allegedly fraudulent health care billings because "the patients failed to show that they ever paid out any of their own money").  A member that is not balance billed has suffered no injury actionable under RICO.  *See, e.g.*, *In re Aetna UCR Litig.*, 2015 WL 3970168, at *34 (D.N.J. June 30, 2015) (no standing to press claim under RICO in the absence of balance billing); *Franco v. CIGNA*, 818 F. Supp. 2d 792, 815 (D.N.J. 2011) (same).  Plaintiffs never have addressed how this could be proven without individualized inquiries.

**Variations as to Plaintiffs' Data Critiques:**  Finally, the variations in Plaintiffs' challenges to the Viant methodology discussed *supra* at 5-7 also preclude commonality as to their RICO claims.

## II.  The Named Plaintiffs' Claims Are Not Typical Of The Putative Class, And They And Their Counsel Are Not Adequate Representatives.

Plaintiffs fail to satisfy typicality and adequacy for multiple reasons, including their unique affiliation with Summit, Plaintiffs' lack of knowledge of the case, and the numerous individualized issues that render them unique among the class they purport to represent.

**Affiliation with Summit:**  Plaintiffs are differently situated from the rest of the class because they joined this lawsuit through the same provider, Summit, that has been on a multi-year quest to "get rid of Viant." Defs.' Ex. 189 at 156:15-157:4.  Plaintiffs incurred balance bills from Summit just before the providers' action and this action were initiated, and made nominal payments on those bills once the providers' action was dismissed, to preserve their ability to pursue this action.  They thus have an interest in recovering those payments that puts them at odds with absent class members who were not balance billed and thus have no such interest and who may be worse off if United reprocessed their claims at a higher reimbursement rate, driving up their coinsurance, deductibles, and premiums.  *See supra* 19.  Plaintiffs' (and Summit's) gamesmanship thus leaves Plaintiffs ill-suited to represent a class of plan members due to differences "with respect to the appropriate relief." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998).  And the contrived nature of their

balance bills could subject them to "unique defenses," that would further undercut typicality. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (collecting cases); *see also Mckinnon v. Dollar Thrifty Auto. Grp., Inc*., 2016 WL 879784 (N.D. Cal. Mar. 8, 2016) (Gonzalez Rogers, J.) (plaintiff was inadequate representative because she was "susceptible to different defenses").

Plaintiffs' ability to serve as class representatives is also undermined by their affiliation with Summit on the RICO claims. These claims depend on statements supposedly made to Summit by agents of United during VOB calls. But Summit is hardly a typical provider. Since 2017, it has treated at least 13 United patients for whom it claims "IOP services were underpaid." *Pacific Recovery* FAC (Dkt. 62) ¶ 348. And Summit's deponents admitted knowledge of United's use of Viant, as well as certain details regarding the methodology. Defs.' Ex. 189 at 131:23-132:10, 194:10-195:1; Defs.' Ex. 191 at 162:24-164:16. Summit therefore has known "for years" that it was not being paid billed charges, *Pacific Recovery* FAC (Dkt. 62) ¶ 349, and it sued United for similar claims as early as May 2017. To the extent Plaintiffs are claiming that Summit relied on United's purported representations, their claims will necessarily be atypical, too.

**<u>Lack of Knowledge of This Lawsuit</u>:** Plaintiffs also lack even the minimal "knowledge of the underlying facts of the lawsuit" needed to act as class representatives. *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 612 (S.D. Cal. 2007). Several did not even realize they were acting in that capacity, much less understand their resulting duties. Defs.' Ex. 146 at 153:17-154:1; Defs.' Ex. 172 at 95:21-97:12; Defs.' Ex. 138 at 157:15-25. Some admitted to having no involvement in the operation or decision-making in the case. Defs.' Ex. 172 at 104:5-7; Defs.' Ex. 138 at 160:24-161:4. And others conceded they understood little of Viant and its significance. *See* Defs.' Ex. 146 at 195:13-25; Defs.' Ex. 163 at 168:10-25. Without that critical knowledge, Plaintiffs' purported "willingness" to "pursue th[e] case vigorously," Mot. 21, is unavailing, *see In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (named plaintiffs must have a modest understanding of the case).

Plaintiffs' lack of knowledge here is particularly problematic given that their counsel concurrently represents Summit, which has distinct incentives in pushing this case to "get rid of Viant." The Court raised a concern about a conflict between counsel's representation of Plaintiffs and Summit at a hearing on the motions to dismiss, Defs.' Ex. 229 at 4:24-7:7, and counsel have yet to address it.

**Individualized Issues:** Plaintiffs also fail to prove typicality and adequacy for largely the same reason that they fail commonality: This case presents numerous individualized issues regarding variations in plan terms, balance-billing, and the potential impact of Plaintiffs' critiques of Viant, *see supra* at 11-24 (lack of commonality), as well as administrative exhaustion and assignment, *see infra* at 27-28 (lack of predominance), and Plaintiffs are differently situated from the putative class on those issues.

Plaintiffs are also atypical and inadequate because they *cannot* seek prospective injunctive relief, Dkt. 301 at 7-8, and therefore they do not "possess the same interest and [did not] suffer the same injury" as the putative class members, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quotation marks omitted). Plaintiffs' claims arise from their Apple- and Tesla-sponsored benefits plans. Tesla's plan is no longer administered by United, Schneewind Decl. ¶ 4(j), and Apple's plan no longer uses Viant for reimbursement claims, Defs.' Ex. 209 at 26:12-27:4. Therefore, they cannot serve as class representatives because they do not "have Article III standing," *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 966 (9th Cir. 2019), "with respect to each form of relief sought," *Tigbao v. QBE Fin. Inst. Risk Servs., Inc.*, 2014 WL 5033236, at *3 (C.D. Cal. July 24, 2014).

## II.     Plaintiffs Fail To Satisfy 23(b)(1), (b)(2), or (b)(3).

Plaintiffs previously sought class certification under (b)(1), (2), and (3), based on a request for reprocessing of their claims, which they characterized as injunctive relief. Based on this Court's denial of class certification and the Ninth Circuit's decisions in *Wit*, however, Plaintiffs now expressly seek damages. Mot. 25-26. As a result, their motion should be evaluated under Rule 23(b)(3), which requires Plaintiffs to demonstrate predominance and superiority. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir. 2022) (en banc). Plaintiffs cannot do this here. Plaintiffs also purport to seek class certification under Rule 23(b)(1) and (2), but they cannot obtain certification for various reasons, including their lack of standing to seek injunctive relief.

### A.     Plaintiffs' Claims Do Not Satisfy Rule 23(b)(3), Because Numerous Individualized Issues Predominate Over Any Common Issues.

Plaintiffs' claim to satisfy predominance "for the reasons outlined above with respect to commonality," Mot. 24, gets the inquiry backwards. United has identified numerous individualized issues in this case, including with respect to: (1) plan terms governing reimbursement and the standard of

review; (2) putative class members' purported Article III and RICO injuries, based on whether they were balance billed and whether other alternative methodologies would have yielded higher rates; (3) Plaintiffs' specific challenges to Viant; (4) what United said and meant, and what providers understood, on VOB calls; and (5) reliance on those statements. Even now, after their second attempt to brief class certification, Plaintiffs still offer no way of resolving these issues on a classwide basis. As explained *supra* at 11-24, these individualized inquiries *defeat* commonality as well as typicality. But even if they did not, they would still preclude certification under Rule 23(b)(3) because they predominate over any possible common question in this case.[15]

Additional individualized issues regarding exhaustion requirements, assignments to providers, and flaws in Plaintiffs' damages models preclude predominance as well.

**Exhaustion:** Courts enforce two distinct types of exhaustion requirements, as a complete defense to ERISA claims (and potentially RICO claims as well), and both of them apply here: (1) as a matter of judicial prudence, *Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1228 (9th Cir. 2020); and (2) "as a matter of contract," *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 630, 632 n.4 (9th Cir. 2008). The first type applies to claims challenging benefits determinations, regardless of whether they arise under 29 U.S.C. § 1132(a)(1)(B) or some other provision. *Diaz v. United Agric. Emp. Welfare Benefit Plan*, 50 F.3d 1478, 1484 (9th Cir. 1995). The second type applies to any claims falling within the scope of each plan's exhaustion requirement, which varies from plan to plan and could sweep in RICO or other claims as well. *E.g.*, Defs.' Ex. 2 at *42-43; Defs. Ex. 12 at *12-13. This plan variation, as well as putative class members' varied compliance (or lack thereof) with their exhaustion requirements, requires individualized inquiry and precludes predominance.[16]

---

[15] The lack of injury, in particular, precludes certification given *Olean*'s recognition that class certification should be denied where (as here) "individualized inquiries [relating to the injury status of class members] would predominate over common questions." 31 F.4th at 668-69.

[16] Some courts have developed judge-made exceptions to exhaustion, but because courts must "enforc[e] plan terms as written," *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013), plan-imposed exhaustion requirements—the second type discussed above—are not subject to judge-made exceptions, *cf. Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1237 n.4 (11th Cir. 2010) ("applying federal common law doctrines to alter ERISA plans is inappropriate where [plan] terms" are "clear and unambiguous"). *Wit II* recognized this, expressly rejecting the argument that absent class members were not required to demonstrate exhaustion. 58 F.4th at 1098. Although *Wit III* withdrew that part of *Wit II* as mooted by the panel's resolution of other issues, the panel cast no doubt on its previous reasoning. *Wit III*, 79 F.4th at 1089. *Wit II* thus remains persuasive authority. Moreover, Plaintiffs have identified no evidence showing futility on a classwide basis, and the evidence squarely

**Assignments**:  The evidence also varies widely with respect to class members' assignment of their claims to providers, which (when a valid assignment exists) precludes a member from suing under ERISA or RICO.  *See Misic v. Building Serv. Emps. Health & Welfare Tr.*, 789 F.2d 1374, 1378 (9th Cir. 1986); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1297 (9th Cir. 2014) (participants who assigned their right to seek payment could not thereafter seek payment of those claims themselves); *MSP Recovery Claims, Series LLC v. Actelion Pharms. US, Inc.*, 2023 WL 5725517, at *5 (N.D. Cal. Sept. 5, 2023) (RICO).  Here, there is widespread variability in whether putative class members executed valid assignments to their providers, and Plaintiffs identify no way to address this issue on a classwide basis.  For example, documents produced by Summit show that named Plaintiff CJ executed an assignment of "all benefits and rights" and "any cause of action . . . under [their] health insurance plan" to Summit.  Defs.' Ex. 173 at *2.  Plaintiff CJ's plan allows assignments, Defs.' Ex. 28 at *31, so this assignment seemingly is valid and precludes CJ's claim.  But this analysis varies from member to member, based on whatever agreements they executed (or did not execute) with their provider, as well as whether their plans allow or prohibit assignments.  *See*, *e.g.*, Defs.' Ex. 19 at *13 (plan anti-assignment provision); Defs.' Ex. 33 at *9 (same).  Whether members assigned their claims and whether the applicable plans prohibit or permit assignments therefore require member-by-member, plan-by-plan analyses.

**Damages Models**:  Plaintiffs also fail to establish "through evidentiary proof" that damages are "capable of measurement on a classwide basis," as is critical in establishing predominance under Rule 23(b)(3).  *Comcast*, 569 U.S. at 33-34.  Plaintiffs present two damages models—a "UCR model" based on the difference between Plaintiffs' UCR rate and United's allowed amount, and a "disgorgement model" that attempts to disgorge the "savings fee" paid by plan sponsors to United (a portion of which United in turn paid to MultiPlan) as compensation for the Facility R&C program.  Pls.' Ex. 1 ¶ 90. Both models are flawed and do not avoid individualized inquiries, which "will inevitably overwhelm questions common to the class."  *Comcast*, 569 U.S. at 33-34.

*First*, as Plaintiffs' experts admit, neither model accounts for Plaintiffs' actual injuries, which

refutes this by showing that Defendants are willing to negotiate any disputes.  *See supra* 8-9.

would require them to address balance billing, as well as potential *increases* in members' deductible/coinsurance payments if the "UCR" rate increases. Defs.' Ex. 119 at 78:25-79:5 ("[Y]our [models] don't account for the possibility that other class members might have increases in patient responsibility as a result of RPC's UCR methodology, right? A: As stated."); Defs.' Ex. 195 at 55:19-56:5 ("RPC doesn't have the full information that would be necessary to calculate any change in patient responsibilities for anyone other than the named plaintiffs."). Deductible and coinsurance responsibilities (which members are required to pay as a condition of coverage) increase with claims' allowed amounts until out-of-pocket maximums are reached. Kessler III ¶ 59. The claims data in this case indicates that many class members did not exhaust their maximum out-of-pocket and therefore would incur additional patient responsibility under Plaintiffs' damages models. *Id.* ¶¶ 61, 64-65. As indicated above, many of these members likely never received or paid any balance bills, so they would be *worse off* under Plaintiffs' damages models, and even if an injury were to exist these factors necessarily would impact any damages calculation. Critically, identifying which members would be "winners" and which would be "losers" under Plaintiffs' models, or determining the impact of these factors on damages, would require an individualized analysis that Plaintiffs' experts concede they have not conducted. *Id.* ¶¶ 15-16, 63-65; Defs.' Ex. 119 at 92:9-94:4.

Plaintiff RH illustrates the level of individualized analysis needed to delve into these issues: even after months of discovery (including third-party productions from Summit) and detailed analysis by experts on both sides, there remains conflicting evidence over whether RH would be a "winner" or "loser" under Plaintiffs' models. *See* Kessler III ¶¶ 71-72, 76-78. For other absent class members whose claims cannot be subjected to this same level of individualized analysis, Plaintiffs have identified no way to determine whether the class member would end up as a "winner" or "loser," or to calculate any potential damages, because their models to do not account for these critical issues. *See id.* ¶ 79. In fact, Plaintiffs' damages experts admitted that their damages model does not accurately assess the putative class members' supposed "losses" and simply assumes that deductible and coinsurance responsibilities do not increase. *See* Pls.' Ex. 1 ¶¶ 49, 93. By failing to establish that the actual damages are capable of measurement on a classwide basis, questions of individual damages "overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.

***Second***, Plaintiffs' UCR model does not account for Plaintiffs' admission that there are other valid alternative methodologies, some of which would result in *lower* reimbursement for some members' claims. *See supra* 19-20. Even if this Court were to find that the Viant methodology was flawed, under ERISA and the terms of these plans, it would be for United—not the Court—to choose between these alternatives because the plans give United that discretion. *See supra* 16-17; *Saffle v. Sierra Pac. Power Co.*, 85 F.3d 455, 460 (9th Cir. 1996).

***Third***, Plaintiffs' disgorgement model is flawed and cannot satisfy Rule 23(b)(3)'s requirements for multiple reasons. As an initial matter, Plaintiffs lack standing to seek disgorgement of any "savings" fees paid by plan sponsors because Plaintiffs did not pay them. And Plaintiffs have not asserted any claims (nor could they) on behalf of their plans under ERISA Section 502(a)(2). Plaintiffs likewise cannot satisfy ERISA's traceability requirement for disgorgement claims, because they cannot "poin[t] to specific funds [they] rightfully owned" that United "possessed as a result of unjust enrichment." *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 500 (4th Cir. 2023).

Even if Plaintiffs could get past these threshold flaws in their disgorgement model, they ignore individualized, plan-specific issues that preclude its application on a classwide basis. Plaintiffs simply assume under this model that Defendants were paid a 35% savings fee across the board, for all claims and plans, but the evidence refutes this assumption, as already discussed above. *See supra* at 10 (discussing widely varying fee methodologies negotiated by plans, such as PEPM caps); Pls.' Ex. 1 ¶ 3(k) (showing unfounded assumption that all plans paid the same compensation); Defs.' Ex. 195 at 98:6-14 ("It does not incorporate any . . . cap limits"); Defs.' Ex. 119 at 110:11-111:2 (damages could be zero for some class members if savings fees were capped).[17] Given the varied fee methodologies that plan sponsors negotiated with Defendants, and the different contract terms governing them, determining

---

[17] A simplified hypothetical (tracking how many of the plans work) shows that these variations are material, because Plaintiffs' disgorgement theory (and related assumptions of a per-claim savings fee) would be inapplicable to may putative class members. In this example, the monthly shared savings fee cap for a 30,000-participant plan with a PEPM of $10.00 is $300,000. Plaintiffs' model would assume that the plan paid United 35% of savings on each claim, which (absent that cap) would equal $450,000 (including $100,000 for IOP services and $350,000 for other services). But based on the cap, United would only have been paid $300,000, and it would have received the same amount with or without the IOP claims at issue. Therefore, there would be no damages under the damages model from United's use of Viant for IOP services. Kessler III ¶92.

what fees Defendants were paid and could potentially be disgorged would require individualized re-view of each plan's documents, as well as United's other communications and interactions with the plan sponsor.  Kessler III ¶¶ 67-68.  Plaintiffs never explain how any "disgorgement" damages could be measured on a classwide basis despite these individualized issues. Defs.' Ex. 119 at 53:7-11, 107:1-81 (how a cap would work "would depend on the wording," and Plaintiffs' experts had not reviewed any ASAs for absent class members); Defs.' Ex. 195 at 95:14-96:7.

### B.      Plaintiffs' Claims Do Not Satisfy Rule 23(b)(2).

Plaintiffs' attempt to end run predominance by adding equitable claims and invoking Rule 23(b)(2) fares no better.  "[J]ustifying a class that is all about damages with a *de minimis* request for injunctive relief"—as Plaintiffs do here—"is like trying to prop up a tower with a toothpick."  *A.A. Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1176 (11th Cir. 2019); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986-87 (9th Cir. 2011) (certification under Rule 23(b)(2) "is appropriate only where the primary relief sought is declaratory or injunctive").  Plaintiffs originally only sought reprocessing and prospective injunctive relief, which this Court rejected.  Plain-tiffs' cursory references to additional equitable remedies should not change that outcome.

**Injunctive Relief**:  Rule 23(b)(2) is about "injunctive" relief.  But as this Court already recognized, the injunction Plaintiffs seek—prohibiting Defendants from violating RICO or from pricing certain IOP claims based on the Viant methodology—is unavailable to them, because Plaintiffs lack standing to seek injunctive relief.  "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not," *TransUnion*, 141 S. Ct. at 2208, and Plaintiffs face no future injury that an injunctive would redress because their plans either are not administered by United or no longer use Viant.  Dkt. 301 at 7; *see supra* 26.  Plaintiffs present no evidence that justifies reconsideration of that conclusion.

**Declaratory Relief**:  As this Court also previously recognized, Dkt. 301 at 8, because injunctive relief is unavailable, the only other remedy referenced in Rule 23(b)(2)—"*corresponding* declaratory relief"—is likewise unavailable.  *See Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 & n.11 (11th Cir. 2008) ((b)(2) certification is improper when injunctive relief is unavailable).  Declaratory relief

31

"corresponds" to injunctive relief when "it affords injunctive relief or serves as a basis for later injunctive relief." Fed. R. Civ. P. 23 Adv. Comm. Notes. The declaration sought here—that Defendants "violated the terms of the class members' plans, arbitrarily underpaid OON benefits, and/or breached their fiduciary duties," Mot. 21—does not do that. Nor could it, since the named Plaintiffs have no interest in an injunction. Instead, declaratory relief would at best lay the groundwork for a future claim for damages, which Plaintiffs admit is "the primary relief sought," Mot. 22. Rule 23(b)(2) does not apply when "the primary relief sought is monetary damages." *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004); *see, e.g.*, *A.A. Suncoast*, 938 F.3d at 1175; *Jones v. Rossides*, 256 F.R.D. 274, 277 (D.D.C. 2009). Plaintiffs thus lack a claim for standalone declaratory relief under Rule 23(b)(2).

**Disgorgement:** With no claim for injunctive or corresponding declaratory relief, Plaintiffs try to squeeze their monetary claims into 23(b)(2) using an "equitable" theory—disgorgement. Mot. 21. But whether monetary relief is "equitable" is "irrelevant." *Dukes*, 564 U.S. at 365. Whether legal or equitable, "individualized monetary claims belong in Rule 23(b)(3)." *Id.* at 362. Disgorgement claims "require the type of non-incidental, individualized proceedings for monetary awards that [*Dukes*] rejected under Rule 23(b)(2)," *Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012), so they must proceed under Rule 23(b)(3) or not at all, *FPX, LLC v. Google, Inc.*, 276 F.R.D. 543, 552 (E.D. Tex. 2011). Regardless, Plaintiffs' disgorgement model fails as explained *supra* at 29-31.

**Reprocessing:** This Court (and the Ninth Circuit in *Wit III*) already rejected reprocessing as a way to try to avoid individualized issues. Plaintiffs recognize this, so they have relegated reprocessing to a back-up and now seek damages under Rule 23(b)(3) as their primary relief, based on the deeply flawed damages models discussed above. Even as a back-up, reprocessing still fails to support certification.

As an initial matter, reprocessing is still incompatible with Plaintiffs' proposed standard of review (*de novo*) because it is available only when necessary—after reviewing a benefits determination for "abuse of discretion"—to preserve the "discretion" that a claims administrator retains in curing its abuse. *Saffle*, 85 F.3d at 460. By contrast, when *de novo* review applies, the Court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits"—and award benefits if appropriate. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION
CASE NO. 4:20-CV-2254

Even if available, reprocessing would fall outside of Rule 23(b)(2) for at least three reasons.

**First**, reprocessing is not "injunctive" relief within the meaning of Rule (b)(2). "[A]n injunction is a forward-looking remedy," *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018), and "must be geared toward preventing future harm," *A.A. Suncoast*, 938 F.3d at 1175-76. Accordingly, (b)(2) certification is "inappropriate when the majority of the class does not face future harm." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007). But reprocessing does not target (and the named Plaintiffs do not face) future harm; rather, it serves as the first step toward a "retrospective damages remedy." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 894 (7th Cir. 2011). The Ninth Circuit recognized as much in *Wit III*, when it rejected plaintiffs' request to certify a reprocessing class under (b)(2) because reprocessing is not "appropriate equitable relief" that was "typically available in equity" and thus available under § 502(a)(3). *Wit III*, 79 F.4th at 1086. In other words, reprocessing is a *legal* remedy under § 502(a)(1)(B), not an equitable remedy such as an injunction, because it is a step in the process of obtaining "benefits due" under ERISA. 29 U.S.C. § 1132(a)(1)(B). As a result, Plaintiffs cannot use reprocessing as an end-run around (b)(3).

**Second**, reprocessing is not "*final* injunctive relief" within the meaning of Rule 23(b)(2). As the Ninth Circuit has recognized, reprocessing of claims is not the ultimate endgame for ERISA plaintiffs, but rather one intermediate step—potentially followed by administrative appeal and further litigation—toward a "determination on the merits of whether [the claimant] is entitled to benefits." *Williamson v. UNUM Life Ins. Co. of Am.*, 160 F.3d 1247, 1251 (9th Cir. 1998). In *Williamson*, the Court reasoned that because the order for remand and reprocessing required the claims administrator only to "make the necessary determinations regarding disability and the amount of benefits," there was no final appealable order within the meaning of 28 U.S.C. § 1291. *Id.* (emphasis added). Courts thus refuse certification under Rule 23(b)(2) where the relief sought would "merely lay an evidentiary foundation for subsequent determinations of liability." *Kartman*, 634 F.3d at 893 (reversing certification of (b)(2) class seeking to compel insurer to reevaluate denied claims under new standard—essentially, reprocessing the claims).

**Third**, "claims for *individualized* relief . . . do not satisfy Rule [23(b)(2)]." *Dukes*, 564 U.S. at 360. Rather, Rule 23(b)(2) applies only where "the relief sought must perforce affect the entire class

33

at once" such that class treatment is in effect "mandatory," allowing the court to dispense with 23(b)(3)'s "greater procedural protections"—predominance, superiority, and notice/opt-out requirements. *Id.* at 361-62 (emphasis added). The "key" to "(b)(2)" is thus "the indivisible nature of the injunctive or declaratory remedy warranted," meaning certification is improper when each member "would be entitled" to their own "individualized" relief. *Id.* at 360-63.

Here, there is no question that a court could order United to reprocess one putative class member's coverage request without reprocessing another's—especially if their plan terms differed or if one assigned or failed to exhaust the claim at issue. Indeed, members who were not balance billed—and face higher coinsurance, deductible payments, or premiums if the reimbursement rate is increased, *see supra* 29—may prefer to be excluded from any reprocessing. Further, *Wit III* made clear—in reversing certification of classes seeking reprocessing—that a court may "orde[r] remand for claim reprocessing" only "where a plaintiff has shown that his or her claim was denied based on the wrong standard *and* that he or she might be entitled to benefits under the proper standard"—that is, "application of the wrong standard could have prejudiced the claimant." 79 F.4th at 1084. Here, Plaintiffs' claims were *allowed*—they are merely disputing the reimbursement rate—so they cannot show they were "denied" benefits or prejudiced without proof that the Viant methodology resulted in an underpayment. And they cannot make that showing because there are other viable alternative methodologies that could have resulted in a *lower* reimbursement rate for the putative class members, *see supra* 19-20. The traditional justification for excusing 23(b)(3)'s protections thus does not apply.

**Removal of Fiduciary:** As a last resort, Plaintiffs tack on a cursory claim to remove United as a fiduciary. Mot. 21. But that remedy (which would impact not just putative class members, but also plan sponsors and many other members who are not involved in this case) is available only through a claim on behalf of the plan as a whole under § 502(a)(2) of ERISA. *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985). That section creates a cause of action for "relief under [29 U.S.C. § ] 1109," *id.* § 1132(a)(2), which includes "removal [of] such fiduciary," *id.* § 1109(a). But Plaintiffs do not assert, and have never asserted, a § 502(a)(2) claim, *see* Mot. 2; Dkt. 91. They seek only benefits due under § 502(a)(1)(B), and appropriate equitable relief under § 502(a)(3)'s catchall provision. Mot. 2. Removing a fiduciary is not a plan "benefit." And under controlling precedent, plaintiffs "may not

34

resort to [§ 502(a)(3)'s] catchall provision" to seek "removal of [an] ERISA fiduciary." *Wise v. Verizon Commc'ns, Inc.*, 600 F.3d 1180, 1190 (9th Cir. 2010); *accord Acosta v. Brain*, 910 F.3d 502, 522 (9th Cir. 2018); *Dan C. v. Anthem Blue Cross Life & Health Ins. Co.*, 2023 WL 9019064, at *7 (C.D. Cal. Oct. 27, 2023); *Englert v. Prudential Ins. Co. of Am.*, 186 F. Supp. 3d 1044, 1048 (N.D. Cal. 2016).[18] Further, as already discussed above, there is no evidence of any ongoing harm to any named Plaintiff, so they lack standing to seek injunctive relief, including removal of United as a fiduciary under any plan. *See supra* 26. And removing United is not relief available here under Rule 23(b)(2) because it is not "appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), given the differences between the putative class members' plans.

### C.    Plaintiffs' Claims Do Not Satisfy Rule 23(b)(1).

Plaintiffs seek certification under Rule 23(b)(1)(A) "solely with respect to their claims under ERISA seeking primarily injunctive relief." Mot. 22. But as explained *supra* at 26, they lack standing to seek injunctive relief. Regardless, Rule 23(b)(1)(A) applies only where "the defendant [would] be required to follow inconsistent courses of continuing conduct." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973). Here, the class spans nearly 1,300 plans, and United is not required to treat different plans' members the same even if the plan language is similar. There is thus no risk that injunctive relief would subject United to inconsistent obligations. *See Haley v. Teachers Ins. & Annuity Ass'n of Am.*, 337 F.R.D. 462, 474 (S.D.N.Y. 2020) (denying certification under Rule 23(b)(1)(A) where plaintiff had "not shown how determinations that [the defendant's conduct] violated ERISA for one plan in the proposed class and did not do so for another plan would be 'incompatible'").

### CONCLUSION

Defendants respectfully request that the Court deny the renewed motion for class certification.

---

[18] Even if Plaintiffs had brought a § 502(a)(2) claim, such a claim requires "injuries to the ERISA plan as a whole"—"not . . . injuries suffered by individual participants." *Wise*, 600 F.3d at 1189. Plaintiffs only assert injuries to plan participants—not any injury to the plan as a whole—so they could not have brought a § 502(a)(2) claim even if they had tried. *See Stahl v. ExteNet Sys., Inc.*, 561 F. Supp. 3d 173, 179 (D.N.H. 2021); *Deman v. Allied Adm'rs, Inc.*, 2012 WL 215227, at *7 (N.D. Cal. Jan. 24, 2012).

Dated:  March 14, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:     */s/ Geoffrey Sigler*
         Geoffrey Sigler

*Attorneys for Defendants UnitedHealthcare Insurance Company and United Behavioral Health*

-AND-

PHELPS DUNBAR, LLP

By:     */s/ Errol J. King, Jr.*
         Errol J. King, Jr.

*Attorney for Defendant MULTIPLAN, INC*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION
CASE NO. 4:20-CV-2254

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1**

Pursuant to Civil Local Rule 5-1(i)(3) of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.


DATED: March 14, 2024                                GIBSON, DUNN & CRUTCHER LLP

By: */s/ Geoffrey Sigler*

Geoffrey Sigler