**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **LD, ET AL.,** | **Case No. 4:20-CV-2254-YGR** |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION** |
| v. | Re: Dkt. No. 396. |
| **UNITED BEHAVIORAL HEALTH, INC., ET AL,** | |
| Defendants. | |

Plaintiffs in this action seek to represent thousands of patients who utilized out-of-network ("OON") intensive outpatient program ("IOP") services through their employer-sponsored healthcare plans. Those plans were sponsored by several different employers but were entirely administered by defendant United Healthcare.[1] Relevant here, United treated all claims similarly by outsourcing the pricing process to Multiplan, whose wholly-owned subsidiary Viant priced claims using an eponymously named "cost-containment tool." (Dkt. No. 397-1, Plaintiffs' Renewed Motion for Class Certification ("Mtn.") at 1; TAC, ¶ 41.)

As alleged, the Viant pricing methodology inappropriately and systematically underpriced claims, thereby shifting out-of-pocket costs back to plaintiffs in violation of both the Employee Retirement Income Security Act ("ERISA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Here, plaintiffs filed a renewed motion to certify a class under Federal Rule of Civil Procedure 23.

In short, plaintiffs' renewed motion[2] posits that United was contractually obligated to price all relevant claims at a specific, calculable "uniform, customary, and reasonable" ("UCR") rate, but

---

[1] According to the operative third amended complaint, United Behavioral Health "is responsible for payment of claims related to . . . covered . . . health plans," while UnitedHealthcare Insurance Company is an insurance provider. (Dkt. No. 91, Third Amended Complaint ("TAC"), ¶¶ 37-38.) The Court refers to the United entities collectively as "United."

[2] The Court denied plaintiffs' first motion at Dkt. No. 301, Order Denying Motion for Class Certification ("Prior Order").

instead, with the help of Viant, significantly underpriced all claims by using an unreliable data set and ignoring several components of care provided. Plaintiffs allege that United promised to uphold this obligation in communications with providers and patients, while disguising the real method through which it underpriced claims, leaving plaintiffs and the putative class members to pay the difference before finally applying an additional fee that was passed on to plan members, called a "savings fee".

Ultimately, the Court finds plaintiffs again fail to demonstrate named plaintiffs' standing to pursue prospective injunctive relief. Thus, the motion under Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2) is denied with prejudice.[3] With respect to a damages class under Rule 23(b)(3), plaintiffs fail to provide evidence that demonstrates putative class members outside of named plaintiffs were actually balanced billed. Without that evidence, the motion for a damages class fails. Here, however, the ruling is without prejudice.

The Court's ruling is based upon careful consideration of the filings and the pleadings in this action as further explained below.

## I.   LEGAL STANDARD

The standard for class certification is well known. A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979)). Because of this, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 348-49 (quoting *East Tex. Motor Freight Syst., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)).

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

United States District Court
Northern District of California

---

[3] As explained below, fn. 4, the Court takes no position on plaintiffs' claim for reprocessing.

982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981. Importantly, "Rule 23 does not set forth a mere pleading standard." *Dukes,* 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the rule" and "be prepared to prove" as much. *Id.*

Rule 23 is satisfied when a party demonstrates meeting all four prerequisites of Rule 23(a) plus one of three factors in Rule 23(b). In short, Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. Rule 23(b) offers three avenues to certification each of which is discussed below and which are dispositive of the pending motion.

## II.    PROPOSED CLASS AND SUB-CLASSES

Plaintiffs move for certification once again, alleging violations of ERISA (i) § 502(a)(1)(B) and (ii) § 502(a)(3); and (iii) civil RICO (18 U.S.C. § 1962(c)–(d)).  Initially, plaintiffs proposed a class defined as follows:

> Any member of a health benefit plan administered or issued by United and governed by ERISA, where the member's plan utilized United's "Reasonable and Customary" program for out-of-network benefits, and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, during the class period from January 1, 2015, to the present.

(Mtn. at 2.) In reply, plaintiffs revised the class definitions by subdividing them in two ways and creating four subclasses.  One, plaintiffs subdivided the class into an ERISA class and a RICO class (corresponding to the causes of action pled), and within each of those two, further subdivided between those plans using "UCR" language in the plans versus "competitive fees" language.  More specifically, plaintiffs created subclasses corresponding to the language used in each plan to identify required reimbursement rates. See Appendix A with the text of each (differences are italicized for the reader's convenience).

Each subclass sought either injunctive relief or damages.

## III.    MOTION RE CLASSES FOR INJUNCTIVE RELIEF UNDER RULE 23(B)(1) AND RULE 23(B)(2)

The Court will not repeat the entire contents of its Prior Order here.  Relevant here, the Court held that "[n]o . . . injunctive relief is available to plaintiffs because they do not and,

United States District Court
Northern District of California

ostensibly, cannot, allege a threat of imminent harm." (Prior Order at 7.) This finding was based on the fact that each named plaintiff no longer works for an employer whose plan is subject to Viant's methodology, nor does any named plaintiff allege that they "are in, seeking, or plan to seek IOP treatment in the future." *Id.* Plaintiffs' renewed briefing offers nothing to change this calculus.[4]

The Court analyzes plaintiffs' Rule 23(b)(1) and 23(b)(2) claims together, as both concern injunctive relief.[5] The Ninth Circuit has instructed:

> A plaintiff must demonstrate constitutional standing separately for each form of relief requested. . . . For injunctive relief, which is a prospective remedy, the threat of injury must be actual and imminent, not conjectural or hypothetical. . . . In other words, the threatened injury must be *certainly impending* to constitute injury in fact and allegations of *possible* future injury are not sufficient. . . . Past wrongs, though insufficient by themselves to grant standing, are evidence bearing on whether there is a real and immediate threat of repeated injury. . . . Where standing is premised entirely on the threat of repeated injury, a plaintiff must show a sufficient likelihood that he will again be wronged in a similar way.

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (cleaned up) (italics in original). Here, and again, none of the named plaintiffs' coverage status has changed. Further, none of the legal arguments raised to the contrary persuade.

Plaintiffs argue that they "could resume prior employment" and thus "plausibly" could suffer harm. (Reply at 14.) The argument is too tenuous to confer standing for injunctive relief on the grounds of imminent harm, even with a lens not "too narrow or technical." *See Davidson,* 889 F.3d at 967 (quoting *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other*

---

4   The parties disagree whether reprocessing is an available remedy notwithstanding plaintiffs' lack of standing to pursue prospective injunctive relief. The parties issued supplemental briefing to the Court as to the status of this question in the circuit following *Wit v. United Behav. Health, Inc.*, 79 F.4th 1068 (9th Cir. 2023). Plaintiffs only move for reprocessing in the event a damages class is not certified. As the Court's order denying damages class certification is without prejudice, the Court takes no position at this juncture on plaintiffs' claim that they have standing to seek retrospective injunctive relief. *See Kazda v. Aetna Life Ins.,* 2023 WL 7305038 (N.D. Cal. Nov. 6, 2023).

5   Mtn. at 22 ("Plaintiffs seek certification under Rule 23(b)(1)(A) solely with respect to their claims under ERISA seeking primarily injunctive relief."); *Id*. at 23 (identifying the proposed 23(b)(2) class an "injunctive class.").

United States District Court
Northern District of California

1  *grounds by Johnson v. California*, 543 U.S. 499 (2005)). To do so would read the imminence

2  requirement out of standing doctrine altogether.

3      Plaintiffs identify three examples to support their position.  Each is distinguishable.

4      *First*, in a case challenging other United billing practices, a District of New Jersey court

5  allowed the claims of putative class members to proceed in seeking injunctive relief despite the fact

6  that the relevant patients were "no longer United insureds [and could] not submit future benefit

7  claims to United that would be subject to future repayment demands." *Premier Health Ctr., P.C. v.*

8  *UnitedHealth Grp.*, 2014 WL 7073439 at *5 (D.N.J. 2014). However in that case, there were

9  relevant "*pending* repayment demands regarding claims while [putative class members] were

10  United-insureds." *Id.* (emphasis supplied). Thus, an injunction requiring United to apply a different

11  pricing methodology would provide relief to class members at imminent risk of future harm. Here,

12  named class members allege that United underpaid *previously* priced claims. Absent a showing of

13  imminent future injury, there is no standing to seek injunctive relief.

14      *Second,* in *Owen v. Regence Bluecross Blueshield of Utah*, a district court entertained a

15  class certification motion despite the named plaintiffs' lack of standing to seek injunctive relief.

16  388 F. Supp. 2d 1318, 1332 (D. Utah 2005). However there, the court began by explicitly

17  reaffirming the principal this Court does today: standing for injunctive relief against an insurance

18  defendant's allegedly harmful pricing practices is lost when a plaintiff is no longer insured under

19  the relevant plan. *Id.* at 1327-28. The court then enumerated five exceptions to the "general rule

20  [that] a suit brought as a class action must be dismissed for mootness when the personal claims of

21  the named plaintiffs are satisfied and no class has been properly certified." *Id.* at 1330. Those

22  exceptions came from the Supreme Court's decision in *U.S. Parole Comm'n v. Geraghty*, 445 U.S.

23  388 (1980), and plaintiffs do not argue that any apply.[6] More importantly, the question here is one

24

25

26      [6] As recounted in *Owen*, those exceptions are: one, certification prior to the named
    plaintiff's individual claim becoming moot; two, where "where the claim is capable of repetition,

27  yet evading review;" three, "claims [that] are so inherently transitory that the trial court will not
    have enough time to rule on a motion for class certification before the proposed representative's

28  individual interest expires;" and the fourth and fifth relate to one's standing to appeal the denial of a
    class certification.  388 F. Supp. 2d at 1330.

of standing, not mootness. The Supreme Court has explicitly ruled on how the *Geraghty* factors are distinct from questions of standing:

> [I]f mootness were simply "standing set in a time frame," the exception to mootness for acts that are capable of repetition, yet evading review could not exist. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs., (TOC), Inc.*, 528 U.S. 167, 170 (2000) (internal cites omitted). The Ninth Circuit therefore notes that no "mootness exception stands for the proposition that a class can be certified if the class representative lacked standing as to its individual claim." *NEI Contracting and Eng., Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019). Because the Court's finding is based on standing, not mootness, *Owen* does nothing to change the analysis.

*Third,* in Rhode Island, a magistrate judge did recommend certification of an injunctive class whose named plaintiffs included at least some ERISA plan members no longer covered by the relevant plan. *See Caranci v. Blue Cross & Blue Shield of Rhode Island*, 1999 WL 766974 (D.R.I. 1999.) There, the opinion's cursory standing analysis does not indicate that the judge even considered possible issues arising in the specific context of seeking injunctive relief. *See id.* at *11. Further, the opinion notes that in the operative complaint, "paragraph 1 state[d] that the plaintiffs *are* participants or beneficiaries in ERISA covered plans." *Id.* (emphasis supplied). Thus, given the use of the present tense, the named plaintiffs in that case were still covered by the relevant ERISA plans and subject to ongoing pricing schemes which they challenged.

In sum, plaintiffs fail to demonstrate named plaintiffs' standing to pursue injunctive relief. The motion for certification of a prospective injunctive relief class under Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2) is **DENIED** for the second time, and this time, with prejudice.

## IV.   MOTION RE CLASS FOR DAMAGES UNDER RULE 23(B)(3)

In its Prior Order, the Court declined to certify a damages class because plaintiffs' own experts admitted to not having a damages model. (Prior Order at 6.)

United States District Court
Northern District of California

1    Here, the question of whether to certify a damages class implicates whether plaintiffs can

2   satisfy the predominance prong under Rule 23(b)(3).  That subsection requires a finding "that the

3   questions of law or fact common to class members predominate over any questions affecting only

4   individual members." Although the 23(a) commonality and predominance inquiries are similar, the

5   former has been described as "less rigorous than the companion requirements of Rule 23(b)(3)."

6   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (overruling on other grounds

7   recognized in *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223 (9th Cir. 2024) *cert. denied* (Jan. 13,

8   2025) (No. 24-384)). This is because the commonality requirement "has been construed

9   permissively," *id.*, whereas the "predominance inquiry asks whether the common, aggregation-

10  enabling, issues in the case are more prevalent or important than the non-common, aggregation-

11  defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal

12  cites omitted).

**A. Factual Background: United's Reasonable and Customary (R&C) Program**

13

14   The Court outlines here the factual background relevant to the motion for a damages class:

15   By way of background, health insurance companies such as United contract with specific

16  health providers to offer in-network services for individuals receiving health coverage through one

17  of their plans. (*See* Dkt. No. 407, Declaration of Rebecca Paradise ("Paradise Decl."), ¶ 5.) Should

18  a United-insured patient decide to accept services from an OON provider, United will pay the

19  provider an amount to be determined by the company in accordance with the patient's plan, and the

20  provider may bill the patient for any remaining balance. (*See id.,* ¶¶ 11, 25.) This case concerns

21  patients who sought IOP care via OON providers because, according to plaintiffs, in-network

22  options can be limited.

23   Medical services are billed using a five-character Healthcare Common Procedure Coding

24  System ("HCPCS") code. (Dkt. No. 397-5, Expert Report of Lamon Willis ("Willis Report"), ¶¶ 4,

25  11, 19.) Ideally, the coding system accounts for the precise nature of the corresponding medical

26  service. This may be complicated, however, by services which contain both professional and

27  facility components, the former corresponding to services performed by the actual healthcare

28  provider, and the latter associated with the facility where the services are performed. (*See* Willis

Report, ¶ 7.) Coding IOP services can be complicated as they are often hybrids of facility and professional services. (*See* Dkt. No. 397-55, Rebuttal Report of Jessica Schmor ("Schmor Report"), ¶¶ 16, 52-53.) Thus, plaintiffs argue, one HCPCS code corresponding solely to one discrete service may not be sufficiently holistic to capture the "multidisciplinary" nature of the IOP service at issue.

Here, plaintiffs proffer that for all relevant claims, United mandated the use of HCPCS code H0015, defined as:

> Alcohol and/or drug services; intensive outpatient treatment (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment . . . .

(Schmor Report, ¶ 15.)[7]   In order to determine the amount to be paid in accordance with the patient's company's plan, the parties focus on the members' plan language.  They dispute the extent and significance of variation in the putative class members' plan language, but importantly, all agree that United treated all relevant plans identically.

Relevant here, United's internal classification system sorts relevant plans into different "programs." (*See, e.g.,* Dkt. No. 397-14, Deposition of Rebeca Paradise ("Paradise Depo.") at 22:25-23:6.) At issue is United's "R&C" program, which stands for "Reasonable & Customary." (*See id.* at 163:6-10.) That program, in turn, has two subparts: physician R&C and professional R&C. (*Id.* at 165:10-14.) As one would expect, each of these corresponds to the professional and facility services represented by the charge. (*Id.*) Although IOP services contain both elements, United priced all relevant claims using its facility R&C program. (Dkt. No. 397-11 at 32:2-6.) These facts are undisputed.

Plaintiffs allege that all relevant plans contained some formulation of the term "usual & customary," also known as UCR, as a means of describing the rate at which United would pay for the OON IOP services. (Mtn. at 18-19.) According to plaintiffs:

> "Usual and customary" is a term of art, regularly used and commonly understood within the industry. . . . It means what it sounds like: A UCR amount represents a percentile value—usually the 80th percentile— calculated from the billed charges of providers in the same geographic area. . . . A percentile value indicates a specific point within a dataset

---

[7] Some providers in this case used a different code, but Viant automatically recoded all IOP services at issue here as H0015. (Mtn. at 3.)

expressed as a percentage. For example, a median is the 50th percentile—50 percent of the values in the data fall below it, 50 percent above it.

(*Id.* at 4-5.) Plaintiffs further contend that all variations of the term UCR are synonymous:

> To be sure, there are some superficial differences in plan language regarding their articulation of the OON payment. But those differences are immaterial. . . . Sometimes different words mean the same thing. United uses "reasonable and customary." Viant uses "usual and customary." There is no difference.

(*Id.* at 18-19.) Thus, plaintiffs attest that differences in plan language are immaterial where United's core obligation was dictated by the singular term UCR.

Defendants disagree, arguing that UCR is susceptible to multiple meanings and variations which plaintiffs "gloss over." (Dkt. No. 414-1, Defendants' Opposition to Plaintiffs' Renewed Motion for Class Certification ("Oppo.") at 4.)

**B. Common Evidence and Trial Theories Regarding United's R&C Program**

### 1. The Viant Methodology Re Damages

Regardless of the plan language, again, it is undisputed that United priced all claims using the Viant methodology. (*See* Paradise Depo. at 162:18-19.) In October 2018, Viant changed its method, and plaintiffs allege both the first and second Viant methods are facially unreasonable.

***First Method.*** Under the first method, Viant calculated reimbursement rates using a database of Medicare claims called the Medicare Outpatient Standard Analytical File ("OPSAF") database. (Dkt. No. 397-8, Deposition of Sean Crandell ("Crandell Depo.") at 34:14-17.) When providers submit claims for payment under Medicare, they submit charge data for services provided using one of two forms. (Dkt. No. 397-58, Deposition of Jessica Schmor ("Schmor Depo.") at 274:10-23.) Data from each type of form is stored in a database: facility charge data is stored in the OPSAF, and professional charge data stored in another. (*Id.* at 134:18-135:8; Willis Report, ¶ 94.) Until October 2018, Viant relied on data from H0015 claims in the OPSAF to pay the relevant H0015 claims. (Crandell Depo. at 34:14-17.) This much is again undisputed.

Plaintiffs argue this database did not, because it could not, provide accurate payment information for these claims for two primary reasons: First, because Medicare did not actually start covering IOP treatment until 2024 and has never covered H0015 claims, the database simply does not contain enough entries to accurately calculate payment rates. Allegedly, "out of OPSAF's more

than 500 million total claims, fewer than 300 are H0015 claims, and those claims are split across several years and multiple geographic areas." (Mtn. at 9.)  Plaintiffs assert that the sample size is too small to provide a UCR amount, much less one geographically localized as is required under the R&C program.  On this basis, plaintiffs find many of the 300 H0015 claims in the database likely "arise out of erroneous claim submissions." (*Id.*) Second, because OPSAF is a facility-only database, plaintiffs allege its use to calculate reimbursement rates for the provision of professional services resulted in systematic underpayment. For example, plaintiffs posit that the 80th percentile UCR from the 2017 OPSAF data was $350, compared to the 80th percentile UCR value of $1,995 yielded by the 2017 H0015 claims in United's own dataset. (*Id.*)

**Second Method.**  The second method priced claims using Medicare's ambulatory payment classification ("APC") system. Each APC represents "a group of services Medicare classifies as similar in clinical intensity, resource utilization, and cost." (*Id.* at 10; Schmor Report, ¶ 8.) Thus, when a provider submits charge data to Medicare, the services provided are assigned one singular APC and "Medicare pays for the services categorized into [that] APC based on a fixed daily composite rate to cover the facility component of services grouped within the APC." (Mtn. at 10; Schmor Report, ¶ 33.) Here, Viant assigned H0015 claims to APC 5823, the APC for "Level 3 Health and Behavioral Services." (Schmor Report, ¶¶ 8, 32.)

Plaintiffs attack this method on three grounds: one, the services categorized as H0015 services "have nothing to do with" APC 5823 services; two, as with the first method, APC data is facility-only and thus its use ignores relevant professional services; and three, "the codes grouped into APC 5823 are for services that generally involve less than an hour of counseling services." (Mtn. at 10.) Recall that by its own terms, HCPCS code H0015 represents at least three hours of care per unit. *See, supra*, Section IV.A.

### 2. United's Communication with Providers and Patients Re RICO

To support their RICO claims, plaintiffs also attach significance to the manner in which United communicated its coverage decisions to putative class members and their healthcare providers.

First, when seeking coverage information, providers made verification of benefits calls ("VOB calls") during which a United representative verified the patients' active insurance, their eligibility for benefits, and the payment method for authorized service. (Dkt. No. 397-13, Deposition of Denise C. Strait ("Strait Depo.") at 159:7-181:15.) Plaintiffs claim that United used a standardized program, called Internal Benefits at a Glance ("IBAAG") which acted as a "script" through which all United representatives made the same promises to providers on VOB calls. Importantly, United agents did not have access to specific plan language during the VOB calls. Rather, IBAAG informed the agent that where a patient's plan is categorized internally by United as a R&C plan, reimbursement should be set "according to a specified UCR percentile – usually 80th percentile." (Mtn. at 6; Strait Depo. at 87:22–88:5.) Defendants dispute the characterization of IBAAG as a script, and argue the content of VOB calls varied widely based on the specific service and plan language at issue. For their part, defendants rely on transcripts from some VOB calls which show that "[s]ome providers, for example, did not have *any* discussions about out-of-network reimbursement rates, methodologies, or 'UCR' on these calls." (Oppo. at 9 (emphasis in original).)

Second, plaintiffs note that patients and providers did not even learn of Viant's existence until they received written communication after the provision of the covered service.[8]  Though this communication informed recipients of the relevant charges, plaintiffs assert it lacked sufficient information for the plaintiffs to understand that a claim had been underpriced.

### 3. United's "Savings Fees" Re Damages

Finally, plaintiffs argue United charged a "savings fee" to member health plans calculated as a percentage of the difference between billed charges and what United paid.  (Paradise Depo. at 70:25-71:2.) Plaintiffs characterize this as a perverse scheme in which United first set the reimbursement at an artificially low rate, and then added an additional fee on top where no savings was actually achieved. Relevant here, plaintiffs then argue that because the fee is billed to the plan,

---

[8] Plaintiffs identify three such forms of written communication: Explanation of Benefits statements, Provider Remittance Advices, and Patient Advocacy Department letters.

patients ultimately pick up the tab, constituting a violation of United's fiduciary duty to both the plan and its members and creating damage.

Defendants note that the "savings fees" across plans are not identical.  Each plan contains different terms with regard to how the savings fee is calculated:

> What sponsors pay for these services also is often the subject of negotiation and varies from plan to plan, so any dispute about this compensation structure would require a plan-specific inquiry. . . . Some plans pay a contractually specified percentage of savings—i.e., of the difference between the provider's billed charges and what was actually paid on the claim. . . . But others cap claim payments at a per-employee per-month ("PEPM") amount, . . . or on a per-employee or per-claim basis . . . . As Plaintiffs' own exhibit confirms, the fee percentages and PEPM caps vary by plan.

(Oppo. at 10.)

**C. LEGAL ANALYSIS**

### 1.  Rule 23(a) Factors

The Court initially notes that plaintiffs have met their burden as regards adequacy and commonality. The Court recognizes that named plaintiffs and their counsel have poured hours into this case already and have no reason to believe either is inadequate.

With respect to commonality, plaintiffs have demonstrated the existence of a common issue. Commonality is interpreted permissively. "[F]or purposes of Rule 23(a)(2), even a single common question will do." *Dukes*, 564 U.S. at 359 (alteration and internal citations omitted). Plaintiffs contend that Viant is "*per se* arbitrary and capricious." (Reply at 3.) Despite different wording across plans, the core issue is the establishment of the rate. Here, plaintiffs provide common evidence to determine whether United's reimbursement rate is based on a "meaningful connection between (1) the charges used to calculate percentile values and (2) the charges for the specific services rendered (here, IOP)." (*Id.*) Whether or not Viant as a methodology is so connected is a singular question a factfinder may answer.

Defendants' arguments to the contrary do not dictate denial of class certification.  The arguments made can be addressed at trial. First, United urges that variations in the standard of review are wide enough to defeat commonality as to the ERISA claims. The argument is better analyzed pursuant to the predominance inquiry, which the Court addresses below. Even were

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1  defendants correct that such wide variations exist, it would not mean that plaintiffs have failed to

2  identify a single question for classwide resolution.

3  Second, defendants assert that variation in the plan language precludes commonality.

4  Plaintiffs accurately note that there are requirements common to all class members plans such that

5  ascertaining whether Viant is *per se* arbitrary and capricious can be done "in one stroke." *Dukes*,

6  564 U.S. at 350. The Court also notes that United had no problem treating the plans identically in

7  utilizing Viant to price all claims regardless of those differences in plan language. The litigation

8  argument to the contrary thus rings hollow and can be asserted at trial.

9  Third, defendants argue that the existence of hypothetical alternative pricing methodologies

10 United could have used, other than Viant, defeats commonality. This is true, they urge, for two

11 reasons: one, "[e]ven if Plaintiffs were to prevail on their challenges to the Viant methodology, it

12 does not follow the methodology resulted in underpayments in each instance," and two, "[b]ecause

13 many plans reserved for United the discretion to interpret the plans or determine the reimbursement

14 rate, . . . United could have lawfully adopted these alternative methods and thereby paid less for at

15 least some of the claims now at issue." (Oppo. at 19.) Whether Viant does ultimately underpay

16 claims that are supposed to be tethered to a statistical index is part of the fact question plaintiffs

17 seek to try and defendants are free to raise the argument before a jury. Further, that there exists

18 some theoretical alternative United could have used has no bearing on whether plaintiffs have

19 presented a common issue for trial.

20 Fourth, United argues that as to the RICO claims, the IBAAG calls vary widely and thus

21 preclude a finding of commonality. Having reviewed the sample transcripts provided, the Court

22 does not agree.  Plaintiffs offer nine transcript excerpts from VOB calls, eight of which promise to

23 pay according to a reasonable and customary or usual and customary amount (i.e., an amount

24 tethered to a geographic sample). (*See* Dkt. No. 397-19, Plaintiffs' Exhibit 20.) Plaintiffs further

25 offered an internal United document titled "OON Reimbursement Standard Operating Procedure

26 (SOP)." (Dkt. No. 397-40, Plaintiffs Exhibit 41.) The document is a step-by-step instruction manual

27 advising call center representatives on which precise steps they should go through in order to

28 answer calls received attempting to verify benefits. Though the details of patients' individual plans

United States District Court
Northern District of California

may vary, the instructions leave no room for nuance: they dictate exactly what information the call center representative should ask for from the caller and advise them precisely on what to say next. This is sufficient common evidence. The Court notes once again that United tries to have it both ways: it treated all relevant claims identically including on VOB calls, wherein callers were told their claims were being processed pursuant to a usual and customary or reasonable and customary rate, and now it argues the opposite.

Fifth, for the RICO claims, United alleges that even if the VOB calls present no commonality problem, plaintiffs cannot show uniform reliance across the class sufficient to meet the certification requirements. As defendants put it, "[p]laintiffs' fraud theory depend on two causal links: (1) the providers rely on the information from VOB calls with United to provide treatment and (2) the providers share those representations with patients, who rely on [them] to determine whether to proceed with treatment. . . . But both links require individualized inquiries." (Oppo. at 23 (internal cites omitted).) The argument does not persuade. Even defendants acknowledge, first party reliance is not a prerequisite to class certification. (*See* Oppo. at 23; *see In re Juul Labs, Inc., Mktg. Sales Practices and Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 980 (N.D. Cal.2022).) Plaintiffs have adequately shown, as required, that "'someone' in the chain relied sufficient for purposes of showing common, predominate proof." *Juul*, 609 F. Supp. 3d at 981. In fact, the case for certification is even stronger here than in typical consumer products actions which defendants reference.  In the insurance context, patients and health care providers are not shopping in a broader, open market; hence, anyone who participates in a VOB call is calling for the precise purpose of determining the reimbursement rate, and is therefore by definition relying on that information when they ultimately make payment. When payment is made pursuant to United's pricing after a VOB call, the most reasonable conclusion is that the payment was made pursuant to the representation made on the call.[9]

---

[9] The Court notes here that it is not persuaded by many of defendants' arguments regarding the nature of the evidence gathered as it concerns the common manner in which United administers the various plans, communicates rates, and calculates payments, notwithstanding the terms used. That said, plaintiffs must be able to satisfy all of the Rule 23 requirements; not just some.

1    In sum, plaintiffs have met their burden on commonality by identifying a core, common

2 question to try that will have a significant impact on the litigation.

3                                    2.    Article III Injury

4    Next, defendants assert, as a threshold issue, that plaintiffs fail to show classwide Article III

5 injury.

6    To address the issue of injury or damages, the Court recognizes that it must "determine after

7 rigorous analysis whether the common question predominates over any individual questions,

8 including individualized questions about injury or entitlement to damages." *Olean Wholesale*

9 *Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). Though circuit

10 precedent holds that the need for determining individualized damages and the presence of some

11 uninjured class members may not alone preclude certification, district courts are ultimately tasked

12 with making a fact-specific determination regarding predominance for all putative members.

13    Plaintiffs ground their injury on the notion that because Viant's practices are *per se* illegal,

14 the underpricing of a claim is itself is an injury, whether or not a class member received a balance

15 bill. They also argue class members are injured by indirectly paying the cost of the "savings fee" as

16 passed down to them by the plan. Finally, they urge that if the Court were to decide that receipt of a

17 balance bill is needed, identification of such receipt is easily determined.

18    With respect to the issue of the receipt of balance bills, the evidence is as follows: plaintiffs

19 provide invoices purporting to show receipt of and payment on balance bills sent to the five named

20 plaintiffs. This tracks with the allegation in the TAC that all named plaintiffs did so pay. However,

21 despite plaintiffs' recitation that they can easily identify all patients with balance bills, no evidence

22 of actual payment on balance bills is provided for anyone other than the named plaintiffs.

23    Defendants' evidence in opposition on this issue is similarly not grounded in data specific to

24 individual class members. Rather, defendants draw the Court's attention to subpoenas issued to 29

25 health care providers in this action to ascertain the relative prominence of balance billing amongst

26 the putative class.[10] *Seven* providers submitted declarations, four of which indicated that the

27

28        [10] *Six* subpoenaed entities provided no information.

provider does not balance bill as a matter of practice. *Sixteen* providers submitted relevant documents, fourteen of which indicated that the provider never balance billed putative class members. Thus, eighteen of twenty-three providers for which United has some information did not balance bill in this matter. (Dkt. No. 415-25, Third Expert Report of Daniel P. Kessler at 25.) Mathematically, that means that five of those twenty-three providers did or may have balance billed.  The Court has been provided with insufficient information of the possible number of class members impacted by those five providers. *See id.*

Next, defendants note that Rebecca Paradise, United's Vice President for Out-of-Network Payment Strategy, stated in her declaration that even where a patient does receive a balance bill, "Viant's fee negotiation service provides the member with an opportunity to obtain a negotiated resolution by which the member is 'held harmless' (i.e., does not need to pay a balance bill)." (Paradise Decl., ¶ 25.) She provided documentation demonstrating that even amongst cases where a balance bill was disputed, over 99% of disputes resulted in a "successful negotiation," defined as a result where "the provider and the member [were] held harmless." (*Id.*, ¶ 26, Ex. 73.) Defendants thus provide affirmative evidence for this sample size suggesting that a vast majority of putative class members were not balance billed and suffered no out-of-pocket injury.  To this, plaintiffs reply that "all 16 providers who submitted documentation included documentation regarding their practice of balance billing," and therefore the evidence "shows that a majority of providers engage in balance billing and that at least some members pay their balances." (Reply at 8.)

Given the context of this action, the Court finds that receipt of a balance bill is required for class members to demonstrate an Article III injury. More specifically, for the RICO claims, the law permits "[a]ny person injured *in his business or property*" to pursue civil remedies for relevant violations, 18 U.S.C. § 1964(c) (emphasis supplied); so, too, with the ERISA claims.

In the ERISA context, the Court is not persuaded by plaintiffs' argument that injury stems from the underpayment of the disputed claims is itself, regardless of balance billing. The Court grounds its rationale on three reasons.

United States District Court
Northern District of California

1    First, plaintiffs fail to identify any Ninth Circuit cases supporting their assertion.[11] Indeed,

2    though not binding, defendants point to the Ninth Circuit's opinion in *Bryant v. Am. Seafoods Co.*,

3    348 Fed. Appx. 256 (9th Cir. 2009), which held that because plaintiffs "did not receive balance

4    bills from their medical providers until after they filed their third amended complaint, the seamen

5    had suffered no injury-in-fact at the time the third amended complaint was filed and therefore

6    lacked standing to bring their complaint." This indicates that in the Ninth Circuit balance billing, at

7    a minimum, is required.

8    Second, beyond the Ninth Circuit, the proposition is, at best, divided. *See In re Wellpoint,*

9    *Inc., Out of Network "UCR" Rates Litig.*, 2016 WL 6645789 at *3 (2016 C.D. Cal.) (collecting

10    cases).

11    Third, even if underpayment itself constituted injury which entitled plaintiffs to some

12    remedy, plaintiffs do not present a model outlining how to calculate such underpayments.[12] *Cf*

---

13    [11] Plaintiffs refer to an Eighth Circuit opinion collecting cases to support the proposition
14    that "plan participants are injured not only when an underpaid healthcare provider charges them for
the balance of a bill; they are also injured when a plan administrator fails to pay a healthcare
15    provider in accordance with the terms of their benefits plan." *Mitchell v. Blue Cross Blue Shield of*
*North Dakota*, 953 F.3d 529, 536 (8th Cir. 2020). One such case comes from the Ninth Circuit,
16    *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282 (9th Cir.
17    2014), but it is readily distinguishable. There, ERISA plan beneficiaries assigned claims that United
denied to their provider. *Id.* at 1277. At the time of the assignment, the provider had not yet sought
18    payment from plaintiffs for the services received. *Id.* at 1278. Thus, defendant tried to argue,
because the provider never sought payment from the patients, the patients themselves suffered no
19    injury-in-fact, and thus had no standing that could be transferred to the provider via assignment. *Id.*
20    The Ninth Circuit rejected the argument, noting that at the time of assignment, the patients "had the
legal right to seek payment directly from the Plans for [denied] charges by non-network health care
21    providers," and that a legal victory would therefore bring the assigned provider financial remedy.
*Id.* at 1291. The differences between the cases are thus readily apparent: *Spinedex* involved an
22    outright claim denial rather than a challenge to the reimbursement rate, and victory there would
23    necessarily entitle plaintiffs to damages, a fact not true, in all likelihood, of most class members in
the instant case.
24

25    [12] Plaintiffs proffer two damages models, neither of which is sufficient. The first part seeks
to recalculate the patients' services using an appropriate UCR rate, and would award a plaintiff
26    damages equal to the extent to which they overpaid as a result of being balance billed. But the
model still assumes that this injury resulted from the provider charging the patient after being
27    overcharged themselves by United's savings fee program. The model is thus tethered only to the
injury felt by those who actually received balance bills. (*See* Dkt. No. 397-2, Expert Report of
28    Research and Planning Consultants, LP, ¶¶ 91, 98-102.)

*Comcast Corp. v. Behrend,* 569 U.S. 27, 35 (2013) (". . . a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").

This leaves the Court without a record upon which to rule that plaintiffs have met their burden of *proving* that any of its proposed classes (or subclasses) meet each of Rule 23's requirements. Plaintiffs accurately note that the Ninth Circuit has held that classes which "include[] more than a de minimis number of uninjured class members" may be certified. *Olean,* 31 F.4th at 669. Here though, the affirmative evidence suggests that a majority of the class received no balance bill, and were not injured. Without evidence to the contrary, the Court cannot determine whether the proposed class includes more than the *de minimus* number allowed under *Olean.* This is also why plaintiffs' reliance on sixteen providers engaging in balance billing as a matter of practice is misguided: fourteen of those providers acknowledged never doing so *in this case*. The Court cannot ignore this evidence and plaintiffs have simply not proven their case that classwide injury exists.

Plaintiffs in reply proposed a subclass defined to include only those class members who received balance bills. They further state that ascertaining precisely who these individuals are would be an easy task. At this juncture, that task remains uncompleted and the purported ease of the inquiry is murky. The Court is not willing to allow plaintiffs to bypass this task and explain, as best as possible, how many class members would meet the proposed subclass definition. Thus, the Court finds that for this possible subclass plaintiffs have not proven numerosity.

In sum, the record before the Court indicates that some, though not most, class members received balance bills. Certification would therefore be inappropriate based thereon, without any way to identify whether plaintiffs have proven numerosity.[13]

---

Plaintiffs' second model also fails. The model seeks to recoup (via disgorgement) what United improperly received from the plan in the form of a savings fee. But plaintiffs assume without evidence that class members were responsible for paying the extra fees charged to the plan. The Court cannot sanction this model, which rests on recouping money taken from the plan, without proof as to how much class members themselves were charged in this process.

[13] The Court notes that a class of individuals all of whom paid on balance bills would resolve the commonality concerns defendants raise as to the injury question.

### 3.   Standard of Review Differences

The parties further dispute whether standard of review differences amongst the plans present predominance problems for plaintiffs' ERISA claims.

Under ERISA, a court's review of a coverage decision applies a *de novo* standard, unless "the plan provides to the contrary by granting the administrator or fiduciary *discretionary authority* to determine eligibility for benefits." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (internal cites omitted) (emphasis in original). Where the plan does so grant, a court's review is limited to an abuse of discretion standard. *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 112 (2013).

According to plaintiffs, "[a]ny individualized determinations regarding the appropriate standard of review, if any, are subordinate to the common factual core of the uniform and indiscriminate use of Viant," and "the Court 'will need to apply at most two different standards to the plans at issue.'" (Reply at 7-8 (quoting *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 502 (N.D. Cal. 2017).) Defendants, for their part, argue that "[d]etermining the standard of review would require a plan-by-plan analysis." (Dkt. No. 435-3, Defendants' Sur-Reply to Plaintiffs' Reply In Support Of The Renewed Motion for Class Certification at 3.) Because of this, defendants urge, the standard of review issue frustrates plaintiffs' ability to "resolv[e] these issues on a classwide basis." (Oppo. at 27.)

In light of the Court's ruling above on the issue of injury, there is no way to determine which of these arguments better applies to the unidentified number of class members who received balance bills. If the group – or the number of plans under which the group was insured – is small enough, plaintiffs may be correct that assigning one of two standards to each plan is a simple task. On the other hand, defendants may be correct that the requisite plan-by-plan analysis would render the case unfit for classwide resolution.

As the requirements for class certification are plaintiffs' burden to prove, the Court cannot conclude on the record before it that the standard of review issue presents no certification problem for plaintiffs.

**V.   CONCLUSION**

United States District Court
Northern District of California

For the reasons stated above, plaintiffs' motion is **DENIED WITH PREJUDICE** as to the class seeking prospective injunctive relief and **DENIED WITHOUT PREJUDICE** as to the damages class.

The parties shall meet and confer regarding a scheduling for the remainder of the action, including a briefing schedule for any renewed motion for class certification, and file a statement as appropriate no later than **MARCH 7, 2025**. Any renewed motion shall be limited solely to the issues of balance billing and standard of review identified above, and no party shall re-argue any point already decided in this order.

This terminates Docket No. 396.

**IT IS SO ORDERED**.

Date: February 6, 2025

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

**APPENDIX A**

**A.1. Proposed Alternative Competitive Fee ERISA Subclass**

Any member of a health benefit plan where the member's plan is a *Competitive Fees Plan,* and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, during the class period from January 1, 2015, to the present.

For purposes of this Class Definition, the term "Competitive Fees Plan" means a self-funded employer-sponsored health benefit plan, governed by ERISA and administered by United, that contains a written plan term providing, in substance, that the Allowed Amounts for out-of-network services will be based on *available data resources of "competitive fees"* in the geographic area.

**A.2. Proposed Alternative UCR ERISA Subclass**

Any member of a health benefit plan where the member's plan is a *UCR Plan,* and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, during the class period from January 1, 2015, to the present.

For purposes of this Class Definition, the term "UCR Plan" means a self-funded employer-sponsored health benefit plan, governed by ERISA and administered by United, that contains a written plan term providing, in substance, that the Allowed Amounts for out-of-network *IOP* services will be based on *"usual, customary, and reasonable rates"* for health care services *provided* in the geographic region.

**B.1. Proposed Alternative Competitive Fee RICO Subclass**

Any member of a health benefit plan where the member's plan is a *Competitive Fees Plan,* and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, whose provider(s) received representations from Defendants during verification of benefits calls that their claims would be reimbursed based on a UCR *amount,* and who paid amounts on a balance from their providers, during the class period from January 1, 2015, to the present.

For purposes of this Class Definition, the term "UCR" means a usual, customary, and reasonable amount, meaning, a percentile value of billed charges of similar providers for the same or similar service in the provider's geographic area. For purposes of this Class Definition, the term *"Competitive*

*Fees Plan"* means a self-funded employer-sponsored health benefit plan, governed by ERISA and administered by United, that contains a written plan term providing, in substance, that the Allowed Amounts for out-of-network services will be based on *available data resources of "competitive fees"* in the geographic area.

## B.2. Proposed Alternative UCR RICO Subclass

Any member of a health benefit plan where the member's plan is *a UCR Plan*, and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, whose provider(s) received representations from Defendants during verification of benefits calls that their claims would be reimbursed based on UCR, and who paid amounts on a balance from their providers, during the class period from January 1, 2015, to the present.

For purposes of this Class Definition, the term "UCR" means a usual, customary, and reasonable amount, meaning, a percentile value of billed charges of similar providers for the same or similar service in the provider's geographic area. For purposes of this Class Definition, the term *"UCR Plan"* means a self-funded employer-sponsored health benefit plan, governed by ERISA and administered by United, that contains a written plan term providing, in substance, that the Allowed Amounts for out-of-network *IOP* services will be based on *"usual, customary, and reasonable rates"* for health *care services* provided in the geographic region.