No. _____

**United States Court of Appeals
for the Ninth Circuit**

LD, DB, BW, RH, and CJ, on behalf of themselves and all others similarly
situated,
Plaintiffs-Petitioners,

v.

United Behavioral Health, United Healthcare Insurance Company, MultiPlan,
Inc.,
Defendants-Respondents.

On Petition for Leave to Appeal from the United States District Court for the
Northern District of California, 4:20-cv-02254-YGR,
Judge Yvonne Gonzalez Rogers, Presiding

From the November 25, 2025 Order Denying Defendants' Motion for Leave to File
Motion for Partial Reconsideration of Class Certification (ECF 529), and the
October 3, 2025 Order Granting Class Certification (ECF 516).

**Petition of Plaintiffs for Permission to Appeal under Fed. R. App. P. 5 & Fed.
R. Civ. P. 23(f) from Orders Granting Class Certification**

Matthew M. Lavin
Arnall Golden Gregory, LLP
2100 Pennsylvania Avenue,
NW Suite 350S
Washington, D.C. 20006
Tel: 202.677.4030
Fax: 202.677.4031
matt.lavin@agg.com

David M. Lilienstein
Katie J. Spielman
DL Law Group
345 Franklin St.
San Francisco, CA 94102
Tel: 415.678.5050
Fax: 415.358.8484
david@dllawgroup.com
katie@dllawgroup.com

*Attorneys for Plaintiffs-Petitioners*

### Rule 26.1 Disclosure Statement

Plaintiffs-Petitioners are not corporate parties, do not issue stock, and are not controlled by any publicly held corporation.

### Jurisdictional Statement

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(d) because the named Plaintiffs are citizens of different states than Defendants, and there is more than $5 million in controversy.

This Court has jurisdiction over this Petition under 28 U.S.C. § 1292(e), Fed. R. Civ. P. 23(f), and Fed. R. App. P. 5(a). The district court entered its class certification order (granting class) on October 3, 2025. *See* ECF 516. That order did not include a class definition. *Id.* On October 17, 2025, within 14 days of that order, Defendants moved for leave to file a motion for partial reconsideration under the Northern District of California's Civil Local Rule 7-9(a), including a request for a class definition.[1] *See* ECF 522. On November 25, 2025, the district court denied leave but treated the filing as an implied motion for clarification, which it granted, and entered a certified class definition. *See* ECF 529. Plaintiffs filed this Petition within 14 days of the November 25, 2025 order, so the Petition is timely under Fed. R. Civ. P. 23(f) as construed in *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 197 (2019).

---

[1] N.D. Cal. does not allow parties to file motions to reconsider directly. Instead, it requires parties to file motions for leave to file under L.R. 7-9(a).

**Table of Contents**

Introduction .................................................................................................1

Questions Presented ...................................................................................3

Relief Sought..............................................................................................3

Standard of Review ....................................................................................3

Factual Background ....................................................................................4

      A.     United plans provide OON coverage based on UCR pricing. ..............4

      B.     Defendants' methodology could not produce UCR pricing.................4

      C.     Defendants profited from their scheme through "savings" fees. ..........5

Procedural History and District Court's Order .........................................5

      A.     Initial Class Certification Briefing .......................................................5

      B.     First Order Denying Class (ECF 469)...................................................7

      C.     Second Class Certification Briefing......................................................8

      D.     Second Order Granting Class (ECF 516).............................................10

      E.     Third Order Providing Class Definition (ECF 529)............................12

Argument...................................................................................................12

      A.     Review is warranted because the district court's Article III analysis is manifestly erroneous.......................................................................12

           1.    *Wit 3* and the weight of authority hold that underpayment alone constitutes an Article III injury. .........................................................12

           2.    The district court cites no meaningful authority for its Article III analysis. ...............................................................................................15

3.    The district court's predominance ruling is wrong and erroneously preempts Plaintiffs' ability to expand the class. .............17

4.    The district court erred in refusing to consider Plaintiffs' reprocessing theory under Rules 23(b)(1) and 23(b)(2)......................18

B.    Review is warranted because the petition presents an important and fundamental issue of law relating to class actions. ......................................19

C.    Review is warranted because the district court's decision creates a death-knell situation for the plaintiffs. ..........................................................20

Conclusion ...........................................................................................................20

## Table of Authorities

**Page(s)**

**Cases**

*AMA v. United Healthcare Corp.*,
  2007 U.S. Dist. LEXIS 44196 (S.D.N.Y. June 15, 2007) ..................................16

*Bryant v. Am. Seafoods Co.*,
  348 F. App'x 256 (9th Cir. 2009) .......................................................................16

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) .....................................................................4, 5, 20

*Collins v. Anthem, Inc.*,
  20-cv-01969, 2024 U.S. Dist. LEXIS 48569 (E.D.N.Y. Mar. 19,
  2024) ..................................................................................................................14

*Dalton v. Lee Publications, Inc.*,
  625 F.3d 1220 (9th Cir. 2010) ...........................................................................20

*Fraser v. Team Health Holdings, Inc.*,
  20-cv-04600, 2022 U.S. Dist. LEXIS 60544 (N.D. Cal. Mar. 31,
  2022) ..................................................................................................................17

*HCA Health Servs. of Ga., Inc. v. Emplrs. Health Ins.*,
  240 F.3d 982 (11th Cir. 2001) ...........................................................................14

*Hendricks v. Aetna Life Ins.*,
  344 F.R.D. 237 (C.D. Cal. 2023) .......................................................................19

*Lacko v. United of Omaha Life Ins.*,
  926 F.3d 432 (7th Cir. 2019) .............................................................................19

*Microsoft Corp. v. Baker*,
  582 U.S. 23 (2017)................................................................................................3

*Mitchell v. BCBS of N.D.*,
  953 F.3d 529 (8th Cir. 2020) ..................................................................6, 13, 15

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
  781 F.3d 182 (5th Cir. 2015) .......................................................................14, 19

*Owen v. Regence BCBS of Utah*,
    388 F. Supp. 2d 1318 (D. Utah 2005)...................................................................16

*Raffin v. Medicredit, Inc.*,
    2017 U.S. Dist. LEXIS 5311 (C.D. Cal. Jan. 3, 2017)........................................18

*Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz.,
    Inc.*,
    770 F.3d 1282 (9th Cir. 2014) ...........................................................7, 11, 14, 15

*Springer v. Cleveland Clinic Emple. Health Plan Total Care*,
    900 F.3d 284 (6th Cir. 2018) ..............................................................................14

*In re Wellpoint, Inc.*,
    2016 U.S. Dist. LEXIS 194584 (C.D. Cal. July 19, 2016)......................6, 15, 16

*Wit v. United Behavioral Health*,
    79 F.4th 1068 (9th Cir. 2023) ....................................................................*passim*

**Table of Exhibits**

| | |
|---|---|
| **Exhibit 1** | **"First Order"** ECF 469 February 6, 2025 Order Denying Plaintiffs' Renewed Motion for Class Certification |
| **Exhibit 2** | **"Second Order"** ECF 516 October 3, 2025 Order Granting Motion for Class Certification |
| **Exhibit 3** | **"Third Order"** ECF 529 November 25, 2025 Order Denying Defendants' Motion For Leave to File Motion for Partial Reconsideration of Class Certification Order; Granting Implied Motion for Clarification |

**Introduction**

This interlocutory appeal presents a straightforward question: Whether the underpayment of ERISA plan benefits, standing alone, constitutes an Article III injury. The district court answered no, limiting its grant of class certification to members who made "balance bill" payments to their healthcare providers arising out of the underpayment of plan benefits. Plaintiffs therefore seek review to resolve this legal question and ensure the class proceeds with a proper scope.

Plaintiffs-Petitioners represent a class of members with health plans administered by Defendants United Behavioral Health and United Healthcare Insurance Company (together, "United"), who, together with Defendant MultiPlan, Inc., systematically underpaid out-of-network ("OON") intensive outpatient program ("IOP") claims for mental health or substance use disorder ("MH/SUD") treatment. Each class member received treatment that was paid based on amounts calculated through MultiPlan's Viant methodology within United's "Reasonable and Customary" ("R&C") program. That program provided payment for OON benefits at a usual, customary, and reasonable ("UCR") amount. Although Viant purports to be a UCR methodology, it was incapable of determining a UCR amount because it relied on inappropriate data that resulted in underpayment. Those underpayments left the patients' providers with uncompensated shortfalls, which providers may seek from patients through balance billing.

On October 3, 2025, the district court granted class certification but did not provide a class definition. *See* ECF 516 ("Second Order," Exhibit 2), *see also* ECF 469 ("First Order," Exhibit 1), 529 ("Third Order," Exhibit 3). The court's

reasoning indicated that the class was limited to only those members who paid balance bills attributable to underpayments. *Id.* at 4. On October 17, 2025, Defendants moved for leave to seek partial reconsideration under N.D. Cal. L.R. 7-9(b)(3). *See* ECF 522, *see also* ECF 524. On November 25, 2025, the district court denied leave, granted what the court construed as an implied motion for clarification, and provided a class definition limiting the class to members who paid balance bills. *See* ECF 529.

This was manifest error. The overwhelming weight of authority holds that the underpayment of ERISA benefits is a concrete injury by itself—as this Court's recent decision in *Wit* confirms. *See Wit v. United Behavioral Health*, 79 F.4th 1068, 1083 (9th Cir. 2023) ("*Wit 3*").

This petition warrants interlocutory review under all three Rule 23(f) factors. First, as stated, the court's order is manifestly erroneous: By holding that underpayment cannot itself establish Article III injury, the court contravened *Wit 3* and the prevailing line of cases. Second, even if not manifestly erroneous, the ruling turns on an unsettled and important legal question the district court itself recognized involves conflicting authority. Third, the order has a death-knell effect: Though technically a grant of certification, the order's payment-only class excludes the majority of underpaid members and thus functions as a denial of class relief as to those members, justifying interlocutory review.

More broadly, Rule 23(f) review is appropriate because the issue is purely one of law with recurring significance in ERISA benefits and healthcare litigation. The petition does not ask or require the Court to delve into or decipher case-

specific facts or evidence. Accordingly, Plaintiffs respectfully request the Court grant their Petition and permit review of the district court's ruling.

## Questions Presented

1. Whether the underpayment of ERISA plan benefits, standing alone, constitutes an Article III injury.

2. Whether the district court erred by predicating Fed. R. Civ. P. 23(b)(3) predominance on class size instead of the nature and weight of common questions.

3. Whether the district court erred by declining to certify or consider a class seeking reprocessing under Fed. R. Civ. P. 23(b)(1) and 23(b)(2).

## Relief Sought

Plaintiffs seek review and reversal of the portion of the district court's class certification ruling that limits the certified class to members who paid balance bills, and a remand directing the district court to reconsider class certification— including its Rule 23(b)(3) predominance analysis and Plaintiffs' request for reprocessing—under the correct Article III standard that does not require payment as a prerequisite to injury.

## Standard of Review

This Court "wields 'unfettered discretion'" under Rule 23(f) to grant review of a class certification order "on the basis of *any* consideration." *Microsoft Corp. v. Baker*, 582 U.S. 23, 31–32 (2017). Review is "most appropriate" when:

> (1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable;

3

(2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or

(3) the district court's class certification decision is manifestly erroneous.

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005).

## Factual Background

### A.    United plans provide OON coverage based on UCR pricing.

United administers health plans that set forth coverage. ECF 396/397-1 at 3–15 (containing factual background). In the healthcare market, in-network providers sign contracts agreeing to negotiated rates and typically cannot bill members beyond their patient responsibility (e.g., deductibles or copayments). OON providers have no contract. They set their own charges. For OON benefits, the plan pays the "allowed amount" set forth in the plan, and the provider may seek the unpaid remainder—the "balance bill"—from the patient. *Id.* at 3–5.

United administers its health plans through standardized "programs." This case involves United's R&C program. As relevant here, the R&C program requires payment for OON services based on a UCR amount. UCR is a charge-based payment methodology in which claims are priced based on a percentile of providers' charges for the same service in the same geographic area. *Id.*

### B.    Defendants' methodology could not produce UCR pricing.

Each class member here received OON IOP treatment and expected the OON benefits provided in their plans. ECF 396/397-1 at 8–13. Providers expected,

based on industry custom, the member's plan benefits, and communications with United that they would be paid at the plan's allowed amount (UCR).

UCR pricing requires appropriate data to determine a specified percentile. Here, Defendants used MultiPlan's Viant methodology, which relies on Medicare data. For several reasons, that data was not appropriate for or capable of producing a UCR amount for IOP claims. The reasons for this are described in briefing below, *see id.*, but the district court did not reach the merits of the issue. As relevant here, the use of Viant resulted in United paying the disputed claims at a fraction of a true UCR price. *See id.*

### C.    Defendants profited from their scheme through "savings" fees.

The R&C program required plans to pay "savings fees" to Defendants calculated as a percentage of the difference between billed charges and what Defendants actually paid on the claim, creating a conflict of interest. ECF 396/397-1 at 13–14 & n 11.

### Procedural History and District Court's Order

On September 10, 2021, Plaintiffs filed their third amended class complaint alleging violations of ERISA and RICO. *See* ECF 91 ¶¶ 21–23, 465–546.

### A.    Initial Class Certification Briefing

On January 25, 2025, Plaintiffs moved to certify the following class:

> Any member of a health benefit plan administered or issued by United ... where the member's plan utilized United's [R&C Program] for [OON] benefits, and whose [claims were] priced by MultiPlan's Viant methodology, and . . . .

*See* ECF 396/397-1 at 2. Plaintiffs argued that class certification was appropriate based on the Defendants' unvarying application of Viant to underpay each putative class members' claims. At that time, the putative class was at least 11,280 members based on data through 2021 only. *Id.* at 20.

In opposition, Defendants argued that Plaintiffs failed to show a classwide injury because "most members never paid any balance bill." ECF 404/414-1 at 18. Defendants acknowledged Plaintiffs' position that underpayment of benefits alone establishes Article III standing, *id.* (citing ECF 171 at 7), but offered no meaningful contrary authority. The only Article III case they cited was *WellPoint*, which the district court later relied on. *Id. WellPoint* states that "the existence (or likely future existence) of balance billing is needed to confer injury in fact," *In re Wellpoint, Inc.*, 2016 U.S. Dist. LEXIS 194584, at *11 (C.D. Cal. July 19, 2016). Defendants did *not* contest numerosity. *See*, *e.g.*, ECF 404/414-1 at viii, 18.

In reply, Plaintiffs argued that the underpayment of ERISA benefits is itself a classwide injury, independent of balance billing. ECF 426/427-2 at 8. Plaintiffs cited multiple decisions recognizing injury when administrators fail to pay benefits as promised, including the Eighth Circuit's *Mitchell* decision, which collected several circuit cases, including a Ninth Circuit case, and explained that "plan participants are injured not only when an underpaid . . . provider charges them for the balance of a bill; they are also injured when a plan administrator fails to pay a . . . provider in accordance with the terms of their benefits plan." *Mitchell v. BCBS of N.D.*, 953 F.3d 529, 536 (8th Cir. 2020) (citing, among others, *Spinedex*

*Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289–91 (9th Cir. 2014)).

### B.    First Order Denying Class (ECF 469)

On February 6, 2025, the district court denied Plaintiffs' first motion for class certification. *See* ECF 469. It did so for two reasons relevant here. First, it found that Article III standing required class members to "receive" balance bills, but Plaintiffs had not provided a sufficient record of payment to establish numerosity under Rule 23(a)(1). Specifically, the district court found that "receipt of a balance bill is required . . . to demonstrate an Article III injury." *See* ECF 469 at 16; *see also id.* at 2, 18 (including receipt language). Second, on predominance, the court found that because the record did not show how large the class was, the court could not tell whether variations in the ERISA standard of review would demand plan-by-plan adjudication defeating predominance. *Id.* at 19.

On the first point, the district court offered three reasons. First, it faulted Plaintiffs for failing to identify any Ninth Circuit cases supporting their position. *Id.* at 17. The district court addressed by footnote Plaintiffs' cited authorities and distinguished the Ninth Circuit's *Spinedex* decision on the grounds that it involved "outright claim denial" (rather than underpayments). *Id.* at 17 n.11. Second, it characterized the out-of-circuit authority as "divided," pointing to *WellPoint* without further analysis. *Id.* at 17. Third, it concluded that even if underpayment

could qualify as injury, Plaintiffs had not offered a damages model to measure underpayments.[2] *Id.*

From this reasoning, the court denied Rule 23(b)(3) certification without prejudice and invited a narrower renewed motion. *Id.* at 20. It directed Plaintiffs to focus that motion on the issues identified in the First Order—principally, numerosity and predominance (the ERISA standard of review issue)—and not to relitigate questions the court has already decided. *Id.* The district court also denied Plaintiffs' request for Rule 23(b)(1) and (b)(2) certification seeking prospective injunctive relief for lack of standing and declined to consider Plaintiffs' request for reprocessing, which supported certification outside Rule 23(b)(3). *Id.*

### C.    Second Class Certification Briefing

Following the First Order, the court authorized a limited period of discovery for Plaintiffs to obtain evidence of balance billing to address numerosity. *See* ECF 472. During this period, Plaintiffs obtained balance-billing evidence from a limited sample of providers, including evidence of class members who received balance bills and members who paid them. ECF 489/490-2 at 1.

After discovery, Plaintiffs filed a renewed class motion pursuant to the First Order. Plaintiffs revised their proposed class definition consistent with the ruling

---

[2] The court assumed for argument that underpayments constitute injury but then faulted Plaintiffs' model for measuring underpayment only and not balance billing. ECF 469 at 17 & n.12.

and limited the class to members "who received balance bills from their provider." *Id.* at 2.[3]

On numerosity, Plaintiffs submitted records of putative class members who received and paid balance bills, explaining that—even from a small slice of high-volume providers—this evidence comfortably cleared Rule 23(a)(1). *Id.* at 9–17.

On predominance, Plaintiffs raised several independent reasons the ERISA standard of review issue did not defeat certification. *Id.* at 17–23. Plaintiffs also noted that if the court addressed its reprocessing remedy, it could certify a class under Rule 23(b)(1) or (b)(2), and the predominance requirement would not apply. *Id.* at 23–25.

Defendants' opposition targeted both the receipt and payment theories, raising evidentiary objections to the balance-billing record. ECF 495/498-2 at 7–16. However, perhaps recognizing that Plaintiffs had receipt of balance billing evidence for the class that exceeded Rule 23(a)(1)'s requirements, Defendants focused their brief on the theory that only a payment class could be certified, if any. *Id.* at 10–11. The basis for this pivot was a few isolated lines from the First Order: (1) the statement that "balance billing, *at a minimum*, is required," *id.* at 10 (quoting ECF 469 at 17 (Defendants' emphasis)); and (2) a footnote suggesting that a "class of individuals all of whom paid on balance bills would resolve the

---

[3] Plaintiffs also noted that they were "open to modification" under Rule 23(c)(5), including, if necessary, a payment class for Plaintiffs' RICO claims. *Id.* n. 2. To avoid confusion, Plaintiffs are not contesting the court's RICO ruling or that the RICO class is limited to those who paid balance bills.

commonality concerns [D]efendants raise as to the injury question." *See id.* at 11; *see also* ECF 469 at 18 n.13.

In reply, Plaintiffs addressed Defendants' argument and their pivot to a payment class theory. *See* ECF 504/505-2 at 7–9. Although Plaintiffs were mindful of the court's instruction not to reargue what the First Order had resolved, Defendants' pivot to a payment-only theory necessitated response. Accordingly, Plaintiffs reiterated their argument that underpayment of the promised ERISA benefit is by itself an Article III injury affecting the entire putative class. And in light of the First Order finding a deficiency in Ninth Circuit case law, Plaintiffs relied heavily on this Court's recent decision in *Wit 3*, quoting almost the entirety of the Court's analysis on Article III, including:

> ERISA's core function is to "protect contractually defined benefits," and UBH's alleged fiduciary violation presents a material risk of harm to Plaintiffs' interest in their contractual benefits. . . . Plaintiffs alleged that UBH administered their Plans in UBH's financial self-interest and in conflict with Plan terms. This presents a material risk of harm to Plaintiffs' ERISA-defined right to have their contractual benefits interpreted and administered in their best interest and in accordance with their Plan terms. Their alleged harm further includes the risk that their claims will be administered [in a manner] that impermissibly narrows the scope of their benefits and also includes the present harm of not knowing the scope of the coverage their Plans provide. The latter implicates Plaintiffs' ability to make informed decisions about the need to purchase alternative coverage and the ability to know whether they are paying for unnecessary coverage.

*Wit 3*, 79 F.4th 1068, 1082–83; ECF 504/505-2 at 5 n.5.

### D.    Second Order Granting Class (ECF 516)

On October 3, 2025, the court granted Plaintiffs' class motion. It first addressed the parties' "differing interpretations" of its First Order regarding

whether receipt or payment is required for Article III. The court acknowledged that it had "at times used the phrase 'receipt of a balance bill.'" ECF 516 at 2. It nevertheless characterized Plaintiffs' reliance on that text as incorrectly "ascrib[ing]" an understanding that "payment on a balance bill is not required."[4] *Id.* at 4. The court then clarified that Article III injury requires payment, reasoning: (1) Plaintiffs "offer no explanation for what the concrete injury could possibly be as conferred by receipt . . . if not accompanied by payment," apart from the already rejected underpayment theory; and (2) the court could not identify a Ninth Circuit case "directly on point," noting its earlier distinction of *Spinedex*. *Id.* The court did not address *Wit 3* but acknowledged that "other courts have reached a different conclusion and general split on the issue exists." *Id.* at 6 n.4. The court also nevertheless continued to suggest that less than actual payment might suffice, noting that its numerosity analysis considered members who "actually paid" or "are required to do so." *Id.* at 6. That phrasing implied that incurred liability could qualify absent payment. The ruling did not include a class definition.

Having held that payment is required, the court evaluated the record and found Plaintiffs met their burden based on evidence of at least 37 members who paid balance bills. The court concluded it was more than reasonable to infer that the 40-member threshold is satisfied for a payment class. *Id.* at 10. On predominance, the court rejected Defendants' objections and determined that given

---

[4] This characterization surprised Plaintiffs because the First Order had repeatedly referred to "receipt," and Plaintiffs had tailored discovery and briefing accordingly.

the smaller-than-anticipated class, any standard of review issues would not overwhelm common questions. *Id. at* 11–12.

### E.    Third Order Providing Class Definition (ECF 529)

Fourteen days after the Second Order, Defendants moved for leave to file a motion for partial reconsideration. ECF 522. They argued that the court should provide an explicit class definition, which should limit class eligibility to those who "paid balance bills . . . on [the disputed claims] (not patient responsibility, coinsurance, or deductibles)." *Id.* at 4. Plaintiffs opposed because the proposed definition went beyond the reasoning in the First Order and ignored the language about members who were "required" to pay balance bills. ECF 524 at 1–2.

On November 25, 2025, the court denied leave but granted Defendants' "implied" motion for clarification, declined Defendants' proposed carve-out for patient responsibility amounts, and issued the following class definition:

> Any member of a health benefit plan administered or issued by United . . . where the member's plan utilized United's [R&C Program] for [OON] benefits, and whose [claims] . . . [were] priced by MultiPlan's Viant methodology, . . . and who paid balance bills from their provider . . . .

ECF 529 at 3.

## Argument

### A.    Review is warranted because the district court's Article III analysis is manifestly erroneous.

#### 1.    *Wit 3* *and the weight of authority hold that underpayment alone constitutes an Article III injury.*

The certification ruling rests on the premise that class members lack Article III injury unless they pay a balance bill. That premise cannot be squared with this

Court's recent decision in *Wit 3*, which holds that ERISA protects contractually defined benefits and that a fiduciary's wrongful adjudication presents a concrete injury. *Wit 3* identifies multiple categories of harms flowing from self-interested administration in conflict with plan terms, including: (1) creating a material risk that members' contractual benefits will be interpreted and administered contrary to their "best interest[s]" and plan terms; (2) narrowing the scope of coverage, (3) creating "uncertainty" about what is covered, (4) impairing members' ability to make informed coverage decisions about "purchas[ing] alternative coverage"; (5) impairing members' ability to know whether they are paying for "unnecessary coverage," and (6) undermining "fair adjudication" of claims. None of these categories of harm require any out-of-pocket loss.[5] 79 F.4th at 1082–83.

Despite the clear precedent of *Wit 3*, the district court required "some other concrete injury" beyond underpayment or receipt—that is, payment. *See* ECF 516 at 6. That alone was manifest error warranting Rule 23(f) review. *Wit 3* contradicts the court's ruling and gives this Court an uncomplicated task because the issue has already been decided. Despite being presented with *Wit 3*—and having the opportunity to address it in multiple orders—the district court offered no answer.

Beyond *Wit 3*, the weight of authority holds that underpayment alone constitutes an Article III injury. *See, e.g.*, *Mitchell*, 953 F.3d at 536 (collecting

---

[5] Although *Wit 3* involved outright denials, its reasoning applies equally to systemic underpayments. An underpayment is simply a partial denial of the contracted-for benefit; it limits coverage and alters the "scope" of plan benefits in the same way a full denial does. This is consistent with ERISA, which defines an "Adverse Benefit Determination" to include underpayment. 29 C.F.R. § 2560.503-1(m)(4).

13

cases); *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 193 (5th Cir. 2015) ("[A] patient suffers a concrete injury if money that she is allegedly owed contractually is not paid . . . . [and] failure to pay also denies the patient the benefit of her bargain" in contracting for OON coverage); *HCA Health Servs. of Ga., Inc. v. Emplrs. Health Ins.*, 240 F.3d 982, 991 (11th Cir. 2001) (similar); *Springer v. Cleveland Clinic Emple. Health Plan Total Care*, overruled on other grounds, 900 F.3d 284, 287 (6th Cir. 2018) (similar and noting "[e]very circuit court to consider this issue agrees that a plaintiff . . . does not need to suffer financial loss"); *Collins v. Anthem, Inc.*, 20-cv-01969, 2024 U.S. Dist. LEXIS 48569, at *26 (E.D.N.Y. Mar. 19, 2024) (noting "[a]t least five Circuits have held that the denial of plan benefits is a concrete injury for Article III standing even when patients were not directly billed"); *see* ECF 426/427-2 at 8 (including additional authority).

The district court also failed to adequately distinguish *Spinedex*, the Ninth Circuit case several other circuits have cited as support for the underpayment-as-injury theory. *See* 469 at 17 n.11. *Spinedex* was a provider-plaintiff case: the provider, Spinedex, could sue only as assignee of its patients' benefit claims, and defendants there argued that Spinedex lacked Article III injury because it had not balance billed patients. The Ninth Circuit rejected that argument and held that the provider had standing because the plan beneficiaries had standing at the time of assignment. As beneficiaries, they had an "unquestioned right to bring suit for benefits." *Id.* at 1291. Instead of suing on their own behalf, the patients assigned that right to Spinedex, and "as assignee, Spinedex took from its assignors what

they had at the time of the assignment" and thus "also ha[d] Article III standing." *Id*. Nothing in *Spinedex* suggests that the patients had to receive or pay a balance bill. If anything, as the Eighth Circuit in *Mitchell* recognized, *Spinedex* supports the proposition that plan beneficiaries are injured, not when they receive or pay a balance bill, but "when a plan administrator fails to pay a healthcare provider in accordance with the terms of their benefits plan." *Mitchell*, 953 F.3d at 536.

### 2.   *The district court cites no meaningful authority for its Article III analysis.*

Across its certification orders, the court identifies no controlling decision that requires payment to establish injury in an ERISA underpayment case, and what it does cite is inapposite. In fact, neither Defendants nor the district court appear to have identified *any* authority imposing a payment requirement in an ERISA case.

The district court's Article III analysis is anchored in *WellPoint*, which it cited in both the First and Second Orders. *See* ECF 516 at 6; ECF 469 at 17. But the district court plainly misread *Wellpoint*. In the very language the district court relied on, *Wellpoint* states that injury occurs when a balance bill "means that an insured will owe more money" or "will likely be billed." 2016 U.S. Dist. LEXIS 194584 at *11. It further states "the *existence* (or likely *future* existence) of balance billing is needed to confer injury in fact." *Id.* (emphasis added). That language ties injury to the *receipt* or *likely receipt* of a balance bill—not payment. Indeed, it is

hard to see how the district court or Defendants could read that language as imposing a payment requirement.[6]

The district court also cited *Bryant v. Am. Seafoods Co.*, 348 F. App'x 256, 257 (9th Cir. 2009). *Bryant* is a two-paragraph, unpublished maritime "maintenance and cure" case—not an ERISA case. The plaintiff seamen alleged defendants falsely presented them to providers as covered by a state workers' program entitling them to reduced medical bills. *See id.*, 2007 U.S. Dist. LEXIS 105319, at *4 (W.D. Wash. Sep. 19, 2007). But once providers learned the seamen were not so entitled, they sent balance bills to the seamen. *Id.* However, there was no evidence of balance bills *before* the plaintiffs' operative complaint was filed, and those bills were requested by plaintiffs' attorneys on "accounts that had already been closed." *Id.* at *8. The court found plaintiffs lacked standing because of timing: The seamen had no standing "at the outset of litigation." In addition, the court found the seamen's claims could not arise under maritime law until "an employer refuse[d] to pay" or the seamen were denied "proper medical treatment," neither of which occurred. *Id.* at *10. The Ninth Circuit affirmed on the same grounds. 348 F. App'x at 257. *Bryant* is thus a case about *timing*, it predates *Wit 3*, and does not involve ERISA benefits.

---

[6] *Wellpoint* also relies on authorities which support only the receipt theory. *See AMA v. United Healthcare Corp.*, 2007 U.S. Dist. LEXIS 44196, at *58, 62–63 (S.D.N.Y. June 15, 2007) (court found no standing where plaintiffs "never . . . faced the threat of suffering out-of-pocket expenses," but nevertheless found standing on fiduciary claims); *Owen v. Regence BCBS of Utah*, 388 F. Supp. 2d 1318, 1326 (D. Utah 2005) (provider "never billed" the plaintiff and any potential balance billing was "not so imminent to confer standing").

Finally, the Second Order cited one new case: *Fraser v. Team Health Holdings, Inc.*, 20-cv-04600, 2022 U.S. Dist. LEXIS 60544, at *3 (N.D. Cal. Mar. 31, 2022). *See* ECF 516 at 6. But Fraser was a provider-billing case involving RICO and consumer protection statutes—not an ERISA case about a fiduciary's underpayment of contractually defined plan benefits. That case simply does not speak to whether underpayment itself constitutes ERISA injury.

### 3. *The district court's predominance ruling is wrong and erroneously preempts Plaintiffs' ability to expand the class.*

The Second Order found predominance because the certified (payment) class was smaller than anticipated, making any ERISA standard-of-review sorting "not an overly complicated task." ECF 516 at 11–12. That linkage risks over-limiting class scope. Plaintiffs raise this issue now because, if the Article III error is corrected and the class returns to its proper scope, predominance should not flip from "yes" to "no" merely because the class is larger. Otherwise, the parties will return to this court soon.

Predominance in this case does not depend on class size: As Plaintiffs extensively briefed: (1) The core question of whether Viant produced a UCR amount predominated over the secondary question of what level of deference applies; (2) any necessary sorting between plans that confer discretionary authority and those that do not is a binary classification issue that can be resolved without overwhelming common issues; (3) United delegated pricing discretion to MultiPlan, an unauthorized entity not unambiguously granted discretion under any plan, thus categorically requiring de novo review; and (4) the standard of review

17

issue does not defeat certification because it relates to just one of Plaintiffs' three operative causes of action—their 29 U.S.C. § 1132(a)(1)(B) claim—and does not relate to Plaintiffs' other causes of action. The court bypassed these arguments and also ignored that Plaintiffs further sought reprocessing under Rule 23(b)(1) and (b)(2), which would obviate predominance altogether. ECF 489/490-2 at 17–23.

### 4. *The district court erred in refusing to consider Plaintiffs' reprocessing theory under Rules 23(b)(1) and 23(b)(2).*

Plaintiffs have sought classwide reprocessing in this case under Rules 23(b)(1) and 23(b)(2). *See* ECF 489/490-2 at 23–25 (explaining reprocessing background and collecting authority). In the First Order, the district court declined to reach reprocessing and instead directed Plaintiffs to file a narrowed renewed motion limited to numerosity and predominance for a Rule 23(b)(3) damages class. ECF 469 at 2 n.3, 4 n.4, 20. Constrained by that instruction, Plaintiffs nonetheless renewed their request for reprocessing and for certification under Rules 23(b)(1) and 23(b)(2). *See* ECF 489/490-2 at 23–25.

In its Second Order, the court again declined to consider reprocessing, stating that it had been pled "in the alternative" and that, because a (narrow) Rule 23(b)(3) damages class had been certified, there was no need to evaluate relief under Rules 23(b)(1) or 23(b)(2). ECF 516 at 12 n.10. That was error. Plaintiffs did not abandon reprocessing. Rule 23 does not require a court to choose between a limited (b)(3) damages class and a broader (b)(1)/(b)(2) class. Courts routinely certify both. *See*, *e.g.*, *Raffin v. Medicredit, Inc.*, 2017 U.S. Dist. LEXIS 5311, at *28–29 (C.D. Cal. Jan. 3, 2017) (certifying under (b)(2) and (b)(3)); 2 Newberg

and Rubenstein on Class Actions § 4:12, 4:38 (6th ed. 2025). And reprocessing is consistently the "most common" ERISA remedy, including in the class action context. *See*, *e.g.*, *Lacko v. United of Omaha Life Ins.*, 926 F.3d 432, 447 (7th Cir. 2019); *Hendricks v. Aetna Life Ins.*, 344 F.R.D. 237, 245, 247 (C.D. Cal. 2023).

Reprocessing should have been evaluated on its own terms, especially because it could have supported a much broader class and provided relief to many more members affected by Defendants' conduct.

### B. Review is warranted because the petition presents an important and fundamental issue of law relating to class actions.

For all the reasons already discussed, the district court's payment-only rule is wrong on the law. But even assuming any doubt remains, the court itself acknowledged that authority is "divided." ECF 469 at 17. That makes this petition ripe for interlocutory guidance on a foundational, classwide question.

The answer matters beyond this case. The answer is pivotal to ERISA benefits litigation. It drives Rule 23(a) commonality as well as Rule 23(b)(3) predominance. A payment-only rule would inject individualized tracing of payments, cost-sharing allocations, and collection status, thereby making certification unnecessarily harder. That result also undermines ERISA's core purpose—to protect contractually defined benefits—by insulating systemic underpayment schemes from classwide accountability. *N. Cypress*, 781 F.3d at 193. Clarifying now that underpayment itself is an injury aligns Article III with ERISA's design and provides uniform guidance across cases.

## C.    Review is warranted because the district court's decision creates a death-knell situation for the plaintiffs.

The district court's decision also represents a death-knell situation for the Plaintiffs—even if the Court finds that the district court's decision is merely "questionable." *Chamberlan*, 402 F.3d at 959. The payment-only limitation functions as a practical denial of class relief for the majority of underpaid members—as the district court recognized, ECF 516 at 11—creating a death-knell scenario. By redefining injury to require payment rather than underpayment, the order excludes most members whose ERISA benefits were uniformly adjudicated below the promised UCR rate but who did not (or, as members suffering from potentially debilitating MH/SUD issues, *could* not) pay a balance bill. For those excluded members, the "only sure path to appellate review is by proceeding to final judgment" on claims that—standing alone—are "far smaller than the costs of litigation." *Dalton v. Lee Publications, Inc.*, 625 F.3d 1220, 1221 (9th Cir. 2010) (O'Scannlain, J., dissenting) (quoting *Chamberlan*, 402 F.3d at 959). Individual recoveries tied to a few healthcare claims are dwarfed by the cost of expert analysis and merits discovery. Interlocutory review therefore "best embodies Rule 23(f)'s purpose," because absent correction now, settlement dynamics and litigation costs will "foreclose any appellate review whatsoever" for the very members most affected by the uniform underpayment. *Dalton*, 625 F.3d at 1221.

## Conclusion

For the reasons stated above, this Petition for leave to appeal should be granted.

Dated: December 9, 2025                    Arnall Golden Gregory LLP

                                           By:    _s/ Matthew M. Lavin_
                                                  Matthew M. Lavin


                                           DL Law Group

                                           By:    _s/ David M. Lilienstein_
                                                  David M. Lilienstein
                                                  Katie J. Spielman

                                                  Attorneys for Plaintiffs-
                                                  Petitioners

## Statement of Related Cases

Pursuant to Circuit Rule 28-2.6, the undersigned counsel states that they are unaware of any other pending related case.

However, Plaintiffs filed a Rule 23(f) petition in this Court, No. 23-80032, on April 14, 2023, relating to an earlier denial of class certification not at issue in this appeal. *See* No. 23-80032, Doc. 1. On June 2, 2023, this Court stayed that petition pending issuance of the mandate in *Wit v. United Behavioral Health*, Nos. 20-17363, 21-15193, 20-17364, 21-15194. *See* No. 23-80032, Doc. 10. On December 19, 2023, Plaintiffs voluntarily dismissed their petition pursuant to Fed. R. App. P. 42(b) after the district court allowed Plaintiffs to file a new class certification motion—beginning the series of motions and orders at issue in this appeal. *See id.*, Doc. 11. On December 21, 2023, this Court granted the motion for voluntary dismissal and dismissed the petition. *Id.*, Doc. 12.

## Certificate of Compliance

Pursuant to Ninth Circuit Rule 32-1 and Fed. R. App. P. 27(d), I certify that this Petition is proportionately spaced in Times New Roman, has a typeface of 14 points, was created in Word format, and is 5,253 words. This brief therefore complies with the word limitation established by Ninth Circuit Rule 5-2(b), which sets a 20-page limit on petitions for permission to appeal (excluding the accompanying documents required by Rule 5(b)(1)(E)), in conjunction with Ninth Circuit Rule 32-3(2), which allows the filing of a proportionally spaced brief "in which the word count divided by 280 does not exceed the designated page limit."

Dated: December 9, 2025

By:    *s/ Matthew M. Lavin*
Matthew M. Lavin

Attorney for Plaintiffs-
Petitioners

## Certificate of Service

I hereby certify that on December 9, 2025, undersigned counsel filed the foregoing Petition via the Appellate Electronic Filing system. In addition, pursuant to Federal Rule of Appellate Procedure 25(c), undersigned counsel hereby certifies that the Petition was served by mail via FedEx Overnight under Fed. R. App. P. 25(c)(1)(C), and by email pursuant to Fed. R. App. P. 25(c)(2), on counsel for Defendants:

Counsel for Defendants United Behavioral Health
and UnitedHealthcare Insurance Company

| | |
|---|---|
| By mail: | Geoffrey M. Sigler<br>Gibson, Dunn & Crutcher LLP<br>1700 M Street,<br>N.W., Washington, DC 20036 |
| Derek K. Kraft | DKraft@gibsondunn.com |
| Geoffrey M. Sigler | GSigler@gibsondunn.com |
| Lauren M. Blas | LBlas@gibsondunn.com |
| Matthew G. Aiken | MAiken@gibsondunn.com |
| Nicole R. Matthews | NMatthews@gibsondunn.com |

Counsel for Defendant MultiPlan, Inc.

| | |
|---|---|
| By mail: | Errol J King , Jr<br>Phelps Dunbar LLP<br>II City Plaza, 400 Convention Street, Suite 1100<br>Baton Rouge, Louisiana 70802 |
| Errol J. King , Jr | Errol.King@phelps.com |
| Craig Caesar | Craig.Caesar@phelps.com |
| Katie Mannino | Katie.Mannino@phelps.com |
| Taylor J. Crousillac | Taylor.Crousillac@phelps.com |
| Brittany Holt Alexander | Brittany.Alexander@phelps.com |

Dated: December 9, 2025

By:  *s/ Matthew M. Lavin*
     Matthew M. Lavin

     Attorney for Plaintiffs-Petitioners

# EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **LD, ET AL.,** | **Case No. 4:20-CV-2254-YGR** |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION** |
| v. | |
| **UNITED BEHAVIORAL HEALTH, INC., ET AL,** | Re: Dkt. No. 396. |
| Defendants. | |

Plaintiffs in this action seek to represent thousands of patients who utilized out-of-network ("OON") intensive outpatient program ("IOP") services through their employer-sponsored healthcare plans. Those plans were sponsored by several different employers but were entirely administered by defendant United Healthcare.[1] Relevant here, United treated all claims similarly by outsourcing the pricing process to Multiplan, whose wholly-owned subsidiary Viant priced claims using an eponymously named "cost-containment tool." (Dkt. No. 397-1, Plaintiffs' Renewed Motion for Class Certification ("Mtn.") at 1; TAC, ¶ 41.)

As alleged, the Viant pricing methodology inappropriately and systematically underpriced claims, thereby shifting out-of-pocket costs back to plaintiffs in violation of both the Employee Retirement Income Security Act ("ERISA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Here, plaintiffs filed a renewed motion to certify a class under Federal Rule of Civil Procedure 23.

In short, plaintiffs' renewed motion[2] posits that United was contractually obligated to price all relevant claims at a specific, calculable "uniform, customary, and reasonable" ("UCR") rate, but

---

[1] According to the operative third amended complaint, United Behavioral Health "is responsible for payment of claims related to . . . covered . . . health plans," while UnitedHealthcare Insurance Company is an insurance provider. (Dkt. No. 91, Third Amended Complaint ("TAC"), ¶¶ 37-38.) The Court refers to the United entities collectively as "United."

[2] The Court denied plaintiffs' first motion at Dkt. No. 301, Order Denying Motion for Class Certification ("Prior Order").

instead, with the help of Viant, significantly underpriced all claims by using an unreliable data set and ignoring several components of care provided. Plaintiffs allege that United promised to uphold this obligation in communications with providers and patients, while disguising the real method through which it underpriced claims, leaving plaintiffs and the putative class members to pay the difference before finally applying an additional fee that was passed on to plan members, called a "savings fee".

Ultimately, the Court finds plaintiffs again fail to demonstrate named plaintiffs' standing to pursue prospective injunctive relief. Thus, the motion under Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2) is denied with prejudice.[3] With respect to a damages class under Rule 23(b)(3), plaintiffs fail to provide evidence that demonstrates putative class members outside of named plaintiffs were actually balanced billed. Without that evidence, the motion for a damages class fails. Here, however, the ruling is without prejudice.

The Court's ruling is based upon careful consideration of the filings and the pleadings in this action as further explained below.

## I. LEGAL STANDARD

The standard for class certification is well known. A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979)). Because of this, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 348-49 (quoting *East Tex. Motor Freight Syst., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)).

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

---

[3] As explained below, fn. 4, the Court takes no position on plaintiffs' claim for reprocessing.

United States District Court
Northern District of California

982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981. Importantly, "Rule 23 does not set forth a mere pleading standard." *Dukes,* 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the rule" and "be prepared to prove" as much. *Id.*

Rule 23 is satisfied when a party demonstrates meeting all four prerequisites of Rule 23(a) plus one of three factors in Rule 23(b). In short, Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. Rule 23(b) offers three avenues to certification each of which is discussed below and which are dispositive of the pending motion.

## II.    PROPOSED CLASS AND SUB-CLASSES

Plaintiffs move for certification once again, alleging violations of ERISA (i) § 502(a)(1)(B) and (ii) § 502(a)(3); and (iii) civil RICO (18 U.S.C. § 1962(c)–(d)).  Initially, plaintiffs proposed a class defined as follows:

> Any member of a health benefit plan administered or issued by United and governed by ERISA, where the member's plan utilized United's "Reasonable and Customary" program for out-of-network benefits, and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, during the class period from January 1, 2015, to the present.

(Mtn. at 2.) In reply, plaintiffs revised the class definitions by subdividing them in two ways and creating four subclasses.  One, plaintiffs subdivided the class into an ERISA class and a RICO class (corresponding to the causes of action pled), and within each of those two, further subdivided between those plans using "UCR" language in the plans versus "competitive fees" language.  More specifically, plaintiffs created subclasses corresponding to the language used in each plan to identify required reimbursement rates. See Appendix A with the text of each (differences are italicized for the reader's convenience).

Each subclass sought either injunctive relief or damages.

## III.    MOTION RE CLASSES FOR INJUNCTIVE RELIEF UNDER RULE 23(B)(1) AND RULE 23(B)(2)

The Court will not repeat the entire contents of its Prior Order here.  Relevant here, the Court held that "[n]o . . . injunctive relief is available to plaintiffs because they do not and,

ostensibly, cannot, allege a threat of imminent harm." (Prior Order at 7.) This finding was based on the fact that each named plaintiff no longer works for an employer whose plan is subject to Viant's methodology, nor does any named plaintiff allege that they "are in, seeking, or plan to seek IOP treatment in the future." *Id.* Plaintiffs' renewed briefing offers nothing to change this calculus.[4]

The Court analyzes plaintiffs' Rule 23(b)(1) and 23(b)(2) claims together, as both concern injunctive relief.[5] The Ninth Circuit has instructed:

> A plaintiff must demonstrate constitutional standing separately for each form of relief requested. . . . For injunctive relief, which is a prospective remedy, the threat of injury must be actual and imminent, not conjectural or hypothetical. . . . In other words, the threatened injury must be *certainly impending* to constitute injury in fact and allegations of *possible* future injury are not sufficient. . . . Past wrongs, though insufficient by themselves to grant standing, are evidence bearing on whether there is a real and immediate threat of repeated injury. . . . Where standing is premised entirely on the threat of repeated injury, a plaintiff must show a sufficient likelihood that he will again be wronged in a similar way.

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (cleaned up) (italics in original). Here, and again, none of the named plaintiffs' coverage status has changed. Further, none of the legal arguments raised to the contrary persuade.

Plaintiffs argue that they "could resume prior employment" and thus "plausibly" could suffer harm. (Reply at 14.) The argument is too tenuous to confer standing for injunctive relief on the grounds of imminent harm, even with a lens not "too narrow or technical." *See Davidson,* 889 F.3d at 967 (quoting *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other*

---

[4] The parties disagree whether reprocessing is an available remedy notwithstanding plaintiffs' lack of standing to pursue prospective injunctive relief. The parties issued supplemental briefing to the Court as to the status of this question in the circuit following *Wit v. United Behav. Health, Inc.*, 79 F.4th 1068 (9th Cir. 2023). Plaintiffs only move for reprocessing in the event a damages class is not certified. As the Court's order denying damages class certification is without prejudice, the Court takes no position at this juncture on plaintiffs' claim that they have standing to seek retrospective injunctive relief. *See Kazda v. Aetna Life Ins.,* 2023 WL 7305038 (N.D. Cal. Nov. 6, 2023).

[5] Mtn. at 22 ("Plaintiffs seek certification under Rule 23(b)(1)(A) solely with respect to their claims under ERISA seeking primarily injunctive relief."); *Id.* at 23 (identifying the proposed 23(b)(2) class an "injunctive class.").

United States District Court
Northern District of California

1    *grounds by Johnson v. California*, 543 U.S. 499 (2005)). To do so would read the imminence

2    requirement out of standing doctrine altogether.

3          Plaintiffs identify three examples to support their position.  Each is distinguishable.

4          *First*, in a case challenging other United billing practices, a District of New Jersey court

5    allowed the claims of putative class members to proceed in seeking injunctive relief despite the fact

6    that the relevant patients were "no longer United insureds [and could] not submit future benefit

7    claims to United that would be subject to future repayment demands." *Premier Health Ctr., P.C. v.*

8    *UnitedHealth Grp.*, 2014 WL 7073439 at *5 (D.N.J. 2014). However in that case, there were

9    relevant "*pending* repayment demands regarding claims while [putative class members] were

10   United-insureds." *Id.* (emphasis supplied). Thus, an injunction requiring United to apply a different

11   pricing methodology would provide relief to class members at imminent risk of future harm. Here,

12   named class members allege that United underpaid *previously* priced claims. Absent a showing of

13   imminent future injury, there is no standing to seek injunctive relief.

14         *Second,* in *Owen v. Regence Bluecross Blueshield of Utah*, a district court entertained a

15   class certification motion despite the named plaintiffs' lack of standing to seek injunctive relief.

16   388 F. Supp. 2d 1318, 1332 (D. Utah 2005). However there, the court began by explicitly

17   reaffirming the principal this Court does today: standing for injunctive relief against an insurance

18   defendant's allegedly harmful pricing practices is lost when a plaintiff is no longer insured under

19   the relevant plan. *Id.* at 1327-28. The court then enumerated five exceptions to the "general rule

20   [that] a suit brought as a class action must be dismissed for mootness when the personal claims of

21   the named plaintiffs are satisfied and no class has been properly certified." *Id.* at 1330. Those

22   exceptions came from the Supreme Court's decision in *U.S. Parole Comm'n v. Geraghty*, 445 U.S.

23   388 (1980), and plaintiffs do not argue that any apply.[6] More importantly, the question here is one

---

[6] As recounted in *Owen*, those exceptions are: one, certification prior to the named plaintiff's individual claim becoming moot; two, where "where the claim is capable of repetition, yet evading review;" three, "claims [that] are so inherently transitory that the trial court will not have enough time to rule on a motion for class certification before the proposed representative's individual interest expires;" and the fourth and fifth relate to one's standing to appeal the denial of a class certification.  388 F. Supp. 2d at 1330.

United States District Court
Northern District of California

of standing, not mootness. The Supreme Court has explicitly ruled on how the *Geraghty* factors are distinct from questions of standing:

> [I]f mootness were simply "standing set in a time frame," the exception to mootness for acts that are capable of repetition, yet evading review could not exist. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs., (TOC), Inc.*, 528 U.S. 167, 170 (2000) (internal cites omitted). The Ninth Circuit therefore notes that no "mootness exception stands for the proposition that a class can be certified if the class representative lacked standing as to its individual claim." *NEI Contracting and Eng., Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019). Because the Court's finding is based on standing, not mootness, *Owen* does nothing to change the analysis.

*Third,* in Rhode Island, a magistrate judge did recommend certification of an injunctive class whose named plaintiffs included at least some ERISA plan members no longer covered by the relevant plan. *See Caranci v. Blue Cross & Blue Shield of Rhode Island*, 1999 WL 766974 (D.R.I. 1999.) There, the opinion's cursory standing analysis does not indicate that the judge even considered possible issues arising in the specific context of seeking injunctive relief. *See id.* at *11. Further, the opinion notes that in the operative complaint, "paragraph 1 state[d] that the plaintiffs *are* participants or beneficiaries in ERISA covered plans." *Id.* (emphasis supplied). Thus, given the use of the present tense, the named plaintiffs in that case were still covered by the relevant ERISA plans and subject to ongoing pricing schemes which they challenged.

In sum, plaintiffs fail to demonstrate named plaintiffs' standing to pursue injunctive relief. The motion for certification of a prospective injunctive relief class under Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2) is **DENIED** for the second time, and this time, with prejudice.

## IV.    MOTION RE CLASS FOR DAMAGES UNDER RULE 23(B)(3)

In its Prior Order, the Court declined to certify a damages class because plaintiffs' own experts admitted to not having a damages model. (Prior Order at 6.)

1  Here, the question of whether to certify a damages class implicates whether plaintiffs can

2  satisfy the predominance prong under Rule 23(b)(3). That subsection requires a finding "that the

3  questions of law or fact common to class members predominate over any questions affecting only

4  individual members." Although the 23(a) commonality and predominance inquiries are similar, the

5  former has been described as "less rigorous than the companion requirements of Rule 23(b)(3)."

6  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (overruling on other grounds

7  recognized in *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223 (9th Cir. 2024) *cert. denied* (Jan. 13,

8  2025) (No. 24-384)). This is because the commonality requirement "has been construed

9  permissively," *id.*, whereas the "predominance inquiry asks whether the common, aggregation-

10  enabling, issues in the case are more prevalent or important than the non-common, aggregation-

11  defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal

12  cites omitted).

### A. Factual Background: United's Reasonable and Customary (R&C) Program

14  The Court outlines here the factual background relevant to the motion for a damages class:

15  By way of background, health insurance companies such as United contract with specific

16  health providers to offer in-network services for individuals receiving health coverage through one

17  of their plans. (*See* Dkt. No. 407, Declaration of Rebecca Paradise ("Paradise Decl."), ¶ 5.) Should

18  a United-insured patient decide to accept services from an OON provider, United will pay the

19  provider an amount to be determined by the company in accordance with the patient's plan, and the

20  provider may bill the patient for any remaining balance. (*See id.*, ¶¶ 11, 25.) This case concerns

21  patients who sought IOP care via OON providers because, according to plaintiffs, in-network

22  options can be limited.

23  Medical services are billed using a five-character Healthcare Common Procedure Coding

24  System ("HCPCS") code. (Dkt. No. 397-5, Expert Report of Lamon Willis ("Willis Report"), ¶¶ 4,

25  11, 19.) Ideally, the coding system accounts for the precise nature of the corresponding medical

26  service. This may be complicated, however, by services which contain both professional and

27  facility components, the former corresponding to services performed by the actual healthcare

28  provider, and the latter associated with the facility where the services are performed. (*See* Willis

7

Report, ¶ 7.) Coding IOP services can be complicated as they are often hybrids of facility and professional services. (*See* Dkt. No. 397-55, Rebuttal Report of Jessica Schmor ("Schmor Report"), ¶¶ 16, 52-53.) Thus, plaintiffs argue, one HCPCS code corresponding solely to one discrete service may not be sufficiently holistic to capture the "multidisciplinary" nature of the IOP service at issue.

Here, plaintiffs proffer that for all relevant claims, United mandated the use of HCPCS code H0015, defined as:

> Alcohol and/or drug services; intensive outpatient treatment (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment . . . .

(Schmor Report, ¶ 15.)[7]   In order to determine the amount to be paid in accordance with the patient's company's plan, the parties focus on the members' plan language.  They dispute the extent and significance of variation in the putative class members' plan language, but importantly, all agree that United treated all relevant plans identically.

Relevant here, United's internal classification system sorts relevant plans into different "programs." (*See, e.g.,* Dkt. No. 397-14, Deposition of Rebeca Paradise ("Paradise Depo.") at 22:25-23:6.) At issue is United's "R&C" program, which stands for "Reasonable & Customary." (*See id.* at 163:6-10.) That program, in turn, has two subparts: physician R&C and professional R&C. (*Id.* at 165:10-14.) As one would expect, each of these corresponds to the professional and facility services represented by the charge. (*Id.*) Although IOP services contain both elements, United priced all relevant claims using its facility R&C program. (Dkt. No. 397-11 at 32:2-6.) These facts are undisputed.

Plaintiffs allege that all relevant plans contained some formulation of the term "usual & customary," also known as UCR, as a means of describing the rate at which United would pay for the OON IOP services. (Mtn. at 18-19.) According to plaintiffs:

> "Usual and customary" is a term of art, regularly used and commonly understood within the industry. . . . It means what it sounds like: A UCR amount represents a percentile value—usually the 80th percentile— calculated from the billed charges of providers in the same geographic area. . . . A percentile value indicates a specific point within a dataset

---

[7] Some providers in this case used a different code, but Viant automatically recoded all IOP services at issue here as H0015. (Mtn. at 3.)

> expressed as a percentage. For example, a median is the 50th percentile—
> 50 percent of the values in the data fall below it, 50 percent above it.

(*Id*. at 4-5.) Plaintiffs further contend that all variations of the term UCR are synonymous:

> To be sure, there are some superficial differences in plan language
> regarding their articulation of the OON payment. But those differences are
> immaterial. . . . Sometimes different words mean the same thing. United
> uses "reasonable and customary." Viant uses "usual and customary."
> There is no difference.

(*Id*. at 18-19.) Thus, plaintiffs attest that differences in plan language are immaterial where United's

core obligation was dictated by the singular term UCR.

Defendants disagree, arguing that UCR is susceptible to multiple meanings and variations

which plaintiffs "gloss over." (Dkt. No. 414-1, Defendants' Opposition to Plaintiffs' Renewed

Motion for Class Certification ("Oppo.") at 4.)

**B.  Common Evidence and Trial Theories Regarding United's R&C Program**

1.  The Viant Methodology Re Damages

Regardless of the plan language, again, it is undisputed that United priced all claims using

the Viant methodology. (*See* Paradise Depo. at 162:18-19.) In October 2018, Viant changed its

method, and plaintiffs allege both the first and second Viant methods are facially unreasonable.

***First Method.*** Under the first method, Viant calculated reimbursement rates using a

database of Medicare claims called the Medicare Outpatient Standard Analytical File ("OPSAF")

database. (Dkt. No. 397-8, Deposition of Sean Crandell ("Crandell Depo.") at 34:14-17.) When

providers submit claims for payment under Medicare, they submit charge data for services provided

using one of two forms. (Dkt. No. 397-58, Deposition of Jessica Schmor ("Schmor Depo.") at

274:10-23.) Data from each type of form is stored in a database: facility charge data is stored in the

OPSAF, and professional charge data stored in another. (*Id.* at 134:18-135:8; Willis Report, ¶ 94.)

Until October 2018, Viant relied on data from H0015 claims in the OPSAF to pay the relevant

H0015 claims. (Crandell Depo. at 34:14-17.) This much is again undisputed.

Plaintiffs argue this database did not, because it could not, provide accurate payment

information for these claims for two primary reasons: First, because Medicare did not actually start

covering IOP treatment until 2024 and has never covered H0015 claims, the database simply does

not contain enough entries to accurately calculate payment rates. Allegedly, "out of OPSAF's more

than 500 million total claims, fewer than 300 are H0015 claims, and those claims are split across several years and multiple geographic areas." (Mtn. at 9.)  Plaintiffs assert that the sample size is too small to provide a UCR amount, much less one geographically localized as is required under the R&C program.  On this basis, plaintiffs find many of the 300 H0015 claims in the database likely "arise out of erroneous claim submissions." (*Id.*) Second, because OPSAF is a facility-only database, plaintiffs allege its use to calculate reimbursement rates for the provision of professional services resulted in systematic underpayment. For example, plaintiffs posit that the 80th percentile UCR from the 2017 OPSAF data was $350, compared to the 80th percentile UCR value of $1,995 yielded by the 2017 H0015 claims in United's own dataset. (*Id.*)

***Second Method.***  The second method priced claims using Medicare's ambulatory payment classification ("APC") system. Each APC represents "a group of services Medicare classifies as similar in clinical intensity, resource utilization, and cost." (*Id.* at 10; Schmor Report, ¶ 8.) Thus, when a provider submits charge data to Medicare, the services provided are assigned one singular APC and "Medicare pays for the services categorized into [that] APC based on a fixed daily composite rate to cover the facility component of services grouped within the APC." (Mtn. at 10; Schmor Report, ¶ 33.) Here, Viant assigned H0015 claims to APC 5823, the APC for "Level 3 Health and Behavioral Services." (Schmor Report, ¶¶ 8, 32.)

Plaintiffs attack this method on three grounds: one, the services categorized as H0015 services "have nothing to do with" APC 5823 services; two, as with the first method, APC data is facility-only and thus its use ignores relevant professional services; and three, "the codes grouped into APC 5823 are for services that generally involve less than an hour of counseling services." (Mtn. at 10.) Recall that by its own terms, HCPCS code H0015 represents at least three hours of care per unit. *See, supra*, Section IV.A.

### 2.  United's Communication with Providers and Patients Re RICO

To support their RICO claims, plaintiffs also attach significance to the manner in which United communicated its coverage decisions to putative class members and their healthcare providers.

United States District Court
Northern District of California

1   First, when seeking coverage information, providers made verification of benefits calls

2   ("VOB calls") during which a United representative verified the patients' active insurance, their

3   eligibility for benefits, and the payment method for authorized service. (Dkt. No. 397-13,

4   Deposition of Denise C. Strait ("Strait Depo.") at 159:7-181:15.) Plaintiffs claim that United used a

5   standardized program, called Internal Benefits at a Glance ("IBAAG") which acted as a "script"

6   through which all United representatives made the same promises to providers on VOB calls.

7   Importantly, United agents did not have access to specific plan language during the VOB calls.

8   Rather, IBAAG informed the agent that where a patient's plan is categorized internally by United

9   as a R&C plan, reimbursement should be set "according to a specified UCR percentile – usually

10  80th percentile." (Mtn. at 6; Strait Depo. at 87:22–88:5.) Defendants dispute the characterization of

11  IBAAG as a script, and argue the content of VOB calls varied widely based on the specific service

12  and plan language at issue. For their part, defendants rely on transcripts from some VOB calls

13  which show that "[s]ome providers, for example, did not have ***any*** discussions about out-of-

14  network reimbursement rates, methodologies, or 'UCR' on these calls." (Oppo. at 9 (emphasis in

15  original).)

16  Second, plaintiffs note that patients and providers did not even learn of Viant's existence

17  until they received written communication after the provision of the covered service.[8]  Though this

18  communication informed recipients of the relevant charges, plaintiffs assert it lacked sufficient

19  information for the plaintiffs to understand that a claim had been underpriced.

20  ### 3.  United's "Savings Fees" Re Damages

21  Finally, plaintiffs argue United charged a "savings fee" to member health plans calculated

22  as a percentage of the difference between billed charges and what United paid.  (Paradise Depo. at

23  70:25-71:2.) Plaintiffs characterize this as a perverse scheme in which United first set the

24  reimbursement at an artificially low rate, and then added an additional fee on top where no savings

25  was actually achieved. Relevant here, plaintiffs then argue that because the fee is billed to the plan,

26

27

28  _____

[8] Plaintiffs identify three such forms of written communication: Explanation of Benefits statements, Provider Remittance Advices, and Patient Advocacy Department letters.

patients ultimately pick up the tab, constituting a violation of United's fiduciary duty to both the plan and its members and creating damage.

Defendants note that the "savings fees" across plans are not identical.  Each plan contains different terms with regard to how the savings fee is calculated:

> What sponsors pay for these services also is often the subject of negotiation and varies from plan to plan, so any dispute about this compensation structure would require a plan-specific inquiry. . . . Some plans pay a contractually specified percentage of savings—i.e., of the difference between the provider's billed charges and what was actually paid on the claim. . . . But others cap claim payments at a per-employee per-month ("PEPM") amount, . . . or on a per-employee or per-claim basis . . . . As Plaintiffs' own exhibit confirms, the fee percentages and PEPM caps vary by plan.

(Oppo. at 10.)

## C. Legal Analysis

### 1.  Rule 23(a) Factors

The Court initially notes that plaintiffs have met their burden as regards adequacy and commonality. The Court recognizes that named plaintiffs and their counsel have poured hours into this case already and have no reason to believe either is inadequate.

With respect to commonality, plaintiffs have demonstrated the existence of a common issue. Commonality is interpreted permissively. "[F]or purposes of Rule 23(a)(2), even a single common question will do." *Dukes*, 564 U.S. at 359 (alteration and internal citations omitted). Plaintiffs contend that Viant is "*per se* arbitrary and capricious." (Reply at 3.) Despite different wording across plans, the core issue is the establishment of the rate. Here, plaintiffs provide common evidence to determine whether United's reimbursement rate is based on a "meaningful connection between (1) the charges used to calculate percentile values and (2) the charges for the specific services rendered (here, IOP)." (*Id.*) Whether or not Viant as a methodology is so connected is a singular question a factfinder may answer.

Defendants' arguments to the contrary do not dictate denial of class certification.  The arguments made can be addressed at trial. First, United urges that variations in the standard of review are wide enough to defeat commonality as to the ERISA claims. The argument is better analyzed pursuant to the predominance inquiry, which the Court addresses below. Even were

12

1    defendants correct that such wide variations exist, it would not mean that plaintiffs have failed to

2    identify a single question for classwide resolution.

3         Second, defendants assert that variation in the plan language precludes commonality.

4    Plaintiffs accurately note that there are requirements common to all class members plans such that

5    ascertaining whether Viant is *per se* arbitrary and capricious can be done "in one stroke." *Dukes*,

6    564 U.S. at 350. The Court also notes that United had no problem treating the plans identically in

7    utilizing Viant to price all claims regardless of those differences in plan language. The litigation

8    argument to the contrary thus rings hollow and can be asserted at trial.

9         Third, defendants argue that the existence of hypothetical alternative pricing methodologies

10   United could have used, other than Viant, defeats commonality. This is true, they urge, for two

11   reasons: one, "[e]ven if Plaintiffs were to prevail on their challenges to the Viant methodology, it

12   does not follow the methodology resulted in underpayments in each instance," and two, "[b]ecause

13   many plans reserved for United the discretion to interpret the plans or determine the reimbursement

14   rate, . . . United could have lawfully adopted these alternative methods and thereby paid less for at

15   least some of the claims now at issue." (Oppo. at 19.) Whether Viant does ultimately underpay

16   claims that are supposed to be tethered to a statistical index is part of the fact question plaintiffs

17   seek to try and defendants are free to raise the argument before a jury. Further, that there exists

18   some theoretical alternative United could have used has no bearing on whether plaintiffs have

19   presented a common issue for trial.

20        Fourth, United argues that as to the RICO claims, the IBAAG calls vary widely and thus

21   preclude a finding of commonality. Having reviewed the sample transcripts provided, the Court

22   does not agree.  Plaintiffs offer nine transcript excerpts from VOB calls, eight of which promise to

23   pay according to a reasonable and customary or usual and customary amount (i.e., an amount

24   tethered to a geographic sample). (*See* Dkt. No. 397-19, Plaintiffs' Exhibit 20.) Plaintiffs further

25   offered an internal United document titled "OON Reimbursement Standard Operating Procedure

26   (SOP)." (Dkt. No. 397-40, Plaintiffs Exhibit 41.) The document is a step-by-step instruction manual

27   advising call center representatives on which precise steps they should go through in order to

28   answer calls received attempting to verify benefits. Though the details of patients' individual plans

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    may vary, the instructions leave no room for nuance: they dictate exactly what information the call

2    center representative should ask for from the caller and advise them precisely on what to say next.

3    This is sufficient common evidence. The Court notes once again that United tries to have it both

4    ways: it treated all relevant claims identically including on VOB calls, wherein callers were told

5    their claims were being processed pursuant to a usual and customary or reasonable and customary

6    rate, and now it argues the opposite.

7           Fifth, for the RICO claims, United alleges that even if the VOB calls present no

8    commonality problem, plaintiffs cannot show uniform reliance across the class sufficient to meet

9    the certification requirements. As defendants put it, "[p]laintiffs' fraud theory depend on two causal

10   links: (1) the providers rely on the information from VOB calls with United to provide treatment

11   and (2) the providers share those representations with patients, who rely on [them] to determine

12   whether to proceed with treatment. . . . But both links require individualized inquiries." (Oppo. at

13   23 (internal cites omitted).) The argument does not persuade. Even defendants acknowledge, first

14   party reliance is not a prerequisite to class certification. (*See* Oppo. at 23; *see In re Juul Labs, Inc.,*

15   *Mktg. Sales Practices and Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 980 (N.D. Cal.2022).) Plaintiffs

16   have adequately shown, as required, that "'someone' in the chain relied sufficient for purposes of

17   showing common, predominate proof." *Juul*, 609 F. Supp. 3d at 981. In fact, the case for

18   certification is even stronger here than in typical consumer products actions which defendants

19   reference.  In the insurance context, patients and health care providers are not shopping in a

20   broader, open market; hence, anyone who participates in a VOB call is calling for the precise

21   purpose of determining the reimbursement rate, and is therefore by definition relying on that

22   information when they ultimately make payment. When payment is made pursuant to United's

23   pricing after a VOB call, the most reasonable conclusion is that the payment was made pursuant to

24   the representation made on the call. [9]

25

26   _____

27          [9] The Court notes here that it is not persuaded by many of defendants' arguments regarding
      the nature of the evidence gathered as it concerns the common manner in which United administers
28    the various plans, communicates rates, and calculates payments, notwithstanding the terms used.
      That said, plaintiffs must be able to satisfy all of the Rule 23 requirements; not just some.

United States District Court
Northern District of California

1     In sum, plaintiffs have met their burden on commonality by identifying a core, common

2  question to try that will have a significant impact on the litigation.

3                              2.   Article III Injury

4     Next, defendants assert, as a threshold issue, that plaintiffs fail to show classwide Article III

5  injury.

6     To address the issue of injury or damages, the Court recognizes that it must "determine after

7  rigorous analysis whether the common question predominates over any individual questions,

8  including individualized questions about injury or entitlement to damages." *Olean Wholesale*

9  *Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). Though circuit

10  precedent holds that the need for determining individualized damages and the presence of some

11  uninjured class members may not alone preclude certification, district courts are ultimately tasked

12  with making a fact-specific determination regarding predominance for all putative members.

13     Plaintiffs ground their injury on the notion that because Viant's practices are *per se* illegal,

14  the underpricing of a claim is itself is an injury, whether or not a class member received a balance

15  bill. They also argue class members are injured by indirectly paying the cost of the "savings fee" as

16  passed down to them by the plan. Finally, they urge that if the Court were to decide that receipt of a

17  balance bill is needed, identification of such receipt is easily determined.

18     With respect to the issue of the receipt of balance bills, the evidence is as follows: plaintiffs

19  provide invoices purporting to show receipt of and payment on balance bills sent to the five named

20  plaintiffs. This tracks with the allegation in the TAC that all named plaintiffs did so pay. However,

21  despite plaintiffs' recitation that they can easily identify all patients with balance bills, no evidence

22  of actual payment on balance bills is provided for anyone other than the named plaintiffs.

23     Defendants' evidence in opposition on this issue is similarly not grounded in data specific to

24  individual class members. Rather, defendants draw the Court's attention to subpoenas issued to 29

25  health care providers in this action to ascertain the relative prominence of balance billing amongst

26  the putative class.[10] *Seven* providers submitted declarations, four of which indicated that the

27  _____

28     [10] *Six* subpoenaed entities provided no information.

1    provider does not balance bill as a matter of practice. *Sixteen* providers submitted relevant

2    documents, fourteen of which indicated that the provider never balance billed putative class

3    members. Thus, eighteen of twenty-three providers for which United has some information did not

4    balance bill in this matter. (Dkt. No. 415-25, Third Expert Report of Daniel P. Kessler at 25.)

5    Mathematically, that means that five of those twenty-three providers did or may have balance

6    billed.  The Court has been provided with insufficient information of the possible number of class

7    members impacted by those five providers. *See id.*

8        Next, defendants note that Rebecca Paradise, United's Vice President for Out-of-Network

9    Payment Strategy, stated in her declaration that even where a patient does receive a balance bill,

10   "Viant's fee negotiation service provides the member with an opportunity to obtain a negotiated

11   resolution by which the member is 'held harmless' (i.e., does not need to pay a balance bill)."

12   (Paradise Decl., ¶ 25.) She provided documentation demonstrating that even amongst cases where a

13   balance bill was disputed, over 99% of disputes resulted in a "successful negotiation," defined as a

14   result where "the provider and the member [were] held harmless." (*Id.*, ¶ 26, Ex. 73.) Defendants

15   thus provide affirmative evidence for this sample size suggesting that a vast majority of putative

16   class members were not balance billed and suffered no out-of-pocket injury.  To this, plaintiffs

17   reply that "all 16 providers who submitted documentation included documentation regarding their

18   practice of balance billing," and therefore the evidence "shows that a majority of providers engage

19   in balance billing and that at least some members pay their balances." (Reply at 8.)

20       Given the context of this action, the Court finds that receipt of a balance bill is required for

21   class members to demonstrate an Article III injury. More specifically, for the RICO claims, the law

22   permits "[a]ny person injured *in his business or property*" to pursue civil remedies for relevant

23   violations, 18 U.S.C. § 1964(c) (emphasis supplied); so, too, with the ERISA claims.

24       In the ERISA context, the Court is not persuaded by plaintiffs' argument that injury stems

25   from the underpayment of the disputed claims is itself, regardless of balance billing. The Court

26   grounds its rationale on three reasons.

27

28

United States District Court
Northern District of California

16

1       First, plaintiffs fail to identify any Ninth Circuit cases supporting their assertion.[11] Indeed,

2   though not binding, defendants point to the Ninth Circuit's opinion in *Bryant v. Am. Seafoods Co.*,

3   348 Fed. Appx. 256 (9th Cir. 2009), which held that because plaintiffs "did not receive balance

4   bills from their medical providers until after they filed their third amended complaint, the seamen

5   had suffered no injury-in-fact at the time the third amended complaint was filed and therefore

6   lacked standing to bring their complaint." This indicates that in the Ninth Circuit balance billing, at

7   a minimum, is required.

8       Second, beyond the Ninth Circuit, the proposition is, at best, divided. *See In re Wellpoint,*

9   *Inc., Out of Network "UCR" Rates Litig.*, 2016 WL 6645789 at *3 (2016 C.D. Cal.) (collecting

10  cases).

11      Third, even if underpayment itself constituted injury which entitled plaintiffs to some

12  remedy, plaintiffs do not present a model outlining how to calculate such underpayments.[12] *Cf*

---

13      [11]  Plaintiffs refer to an Eighth Circuit opinion collecting cases to support the proposition
14  that "plan participants are injured not only when an underpaid healthcare provider charges them for
    the balance of a bill; they are also injured when a plan administrator fails to pay a healthcare
15  provider in accordance with the terms of their benefits plan." *Mitchell v. Blue Cross Blue Shield of*
    *North Dakota*, 953 F.3d 529, 536 (8th Cir. 2020). One such case comes from the Ninth Circuit,
16  *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282 (9th Cir.
    2014), but it is readily distinguishable. There, ERISA plan beneficiaries assigned claims that United
17  denied to their provider. *Id.* at 1277. At the time of the assignment, the provider had not yet sought
    payment from plaintiffs for the services received. *Id.* at 1278. Thus, defendant tried to argue,
18  because the provider never sought payment from the patients, the patients themselves suffered no
    injury-in-fact, and thus had no standing that could be transferred to the provider via assignment. *Id.*
19  The Ninth Circuit rejected the argument, noting that at the time of assignment, the patients "had the
    legal right to seek payment directly from the Plans for [denied] charges by non-network health care
20  providers," and that a legal victory would therefore bring the assigned provider financial remedy.
21  *Id.* at 1291. The differences between the cases are thus readily apparent: *Spinedex* involved an
    outright claim denial rather than a challenge to the reimbursement rate, and victory there would
22  necessarily entitle plaintiffs to damages, a fact not true, in all likelihood, of most class members in
    the instant case.
23
24
25      [12] Plaintiffs proffer two damages models, neither of which is sufficient. The first part seeks
    to recalculate the patients' services using an appropriate UCR rate, and would award a plaintiff
26  damages equal to the extent to which they overpaid as a result of being balance billed. But the
    model still assumes that this injury resulted from the provider charging the patient after being
27  overcharged themselves by United's savings fee program. The model is thus tethered only to the
    injury felt by those who actually received balance bills. (*See* Dkt. No. 397-2, Expert Report of
28  Research and Planning Consultants, LP, ¶¶ 91, 98-102.)

1  *Comcast Corp. v. Behrend,* 569 U.S. 27, 35 (2013) (". . . a model purporting to serve as evidence of

2  damages in this class action must measure only those damages attributable to that theory. If the

3  model does not even attempt to do that, it cannot possibly establish that damages are susceptible of

4  measurement across the entire class for purposes of Rule 23(b)(3).").

5      This leaves the Court without a record upon which to rule that plaintiffs have met their

6  burden of *proving* that any of its proposed classes (or subclasses) meet each of Rule 23's

7  requirements. Plaintiffs accurately note that the Ninth Circuit has held that classes which "include[]

8  more than a de minimis number of uninjured class members" may be certified. *Olean,* 31 F.4th at

9  669. Here though, the affirmative evidence suggests that a majority of the class received no balance

10  bill, and were not injured. Without evidence to the contrary, the Court cannot determine whether

11  the proposed class includes more than the *de minimus* number allowed under *Olean.* This is also

12  why plaintiffs' reliance on sixteen providers engaging in balance billing as a matter of practice is

13  misguided: fourteen of those providers acknowledged never doing so *in this case*. The Court cannot

14  ignore this evidence and plaintiffs have simply not proven their case that classwide injury exists.

15      Plaintiffs in reply proposed a subclass defined to include only those class members who

16  received balance bills. They further state that ascertaining precisely who these individuals are

17  would be an easy task. At this juncture, that task remains uncompleted and the purported ease of the

18  inquiry is murky. The Court is not willing to allow plaintiffs to bypass this task and explain, as best

19  as possible, how many class members would meet the proposed subclass definition.  Thus, the

20  Court finds that for this possible subclass plaintiffs have not proven numerosity.

21      In sum, the record before the Court indicates that some, though not most, class members

22  received balance bills. Certification would therefore be inappropriate based thereon, without any

23  way to identify whether plaintiffs have proven numerosity.[13]

---

24      Plaintiffs' second model also fails. The model seeks to recoup (via disgorgement) what
United improperly received from the plan in the form of a savings fee. But plaintiffs assume
25  without evidence that class members were responsible for paying the extra fees charged to the plan.
The Court cannot sanction this model, which rests on recouping money taken from the plan,
26  without proof as to how much class members themselves were charged in this process.
27

28  [13] The Court notes that a class of individuals all of whom paid on balance bills would
resolve the commonality concerns defendants raise as to the injury question.

United States District Court
Northern District of California

### 3.  Standard of Review Differences

The parties further dispute whether standard of review differences amongst the plans present predominance problems for plaintiffs' ERISA claims.

Under ERISA, a court's review of a coverage decision applies a *de novo* standard, unless "the plan provides to the contrary by granting the administrator or fiduciary *discretionary authority* to determine eligibility for benefits." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (internal cites omitted) (emphasis in original). Where the plan does so grant, a court's review is limited to an abuse of discretion standard. *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 112 (2013).

According to plaintiffs, "[a]ny individualized determinations regarding the appropriate standard of review, if any, are subordinate to the common factual core of the uniform and indiscriminate use of Viant," and "the Court 'will need to apply at most two different standards to the plans at issue.'" (Reply at 7-8 (quoting *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 502 (N.D. Cal. 2017).) Defendants, for their part, argue that "[d]etermining the standard of review would require a plan-by-plan analysis." (Dkt. No. 435-3, Defendants' Sur-Reply to Plaintiffs' Reply In Support Of The Renewed Motion for Class Certification at 3.) Because of this, defendants urge, the standard of review issue frustrates plaintiffs' ability to "resolv[e] these issues on a classwide basis." (Oppo. at 27.)

In light of the Court's ruling above on the issue of injury, there is no way to determine which of these arguments better applies to the unidentified number of class members who received balance bills. If the group – or the number of plans under which the group was insured – is small enough, plaintiffs may be correct that assigning one of two standards to each plan is a simple task. On the other hand, defendants may be correct that the requisite plan-by-plan analysis would render the case unfit for classwide resolution.

As the requirements for class certification are plaintiffs' burden to prove, the Court cannot conclude on the record before it that the standard of review issue presents no certification problem for plaintiffs.

## V.  CONCLUSION

1    For the reasons stated above, plaintiffs' motion is **DENIED WITH PREJUDICE** as to the class

2  seeking prospective injunctive relief and **DENIED WITHOUT PREJUDICE** as to the damages class.

3    The parties shall meet and confer regarding a scheduling for the remainder of the action,

4  including a briefing schedule for any renewed motion for class certification, and file a statement as

5  appropriate no later than **MARCH 7, 2025**. Any renewed motion shall be limited solely to the issues

6  of balance billing and standard of review identified above, and no party shall re-argue any point

7  already decided in this order.

8    This terminates Docket No. 396.

9    **IT IS SO ORDERED**.

10  Date: February 6, 2025

    **YVONNE GONZALEZ ROGERS**
    **UNITED STATES DISTRICT COURT JUDGE**

1

**APPENDIX A**

2

3  **A.1. Proposed Alternative Competitive Fee ERISA Subclass**

4       Any member of a health benefit plan where the member's plan is a
         *Competitive Fees Plan,* and whose claim(s) for intensive outpatient services
5       were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive
         per diem, priced by MultiPlan's Viant methodology, and never adjusted,
6       during the class period from January 1, 2015, to the present.

7

8       For purposes of this Class Definition, the term "Competitive Fees Plan"
         means a self-funded employer-sponsored health benefit plan, governed by
9       ERISA and administered by United, that contains a written plan term
         providing, in substance, that the Allowed Amounts for out-of-network
10      services will be based on *available data resources of "competitive fees"* in the
         geographic area.

11  **A.2. Proposed Alternative UCR ERISA Subclass**

12      Any member of a health benefit plan where the member's plan is a *UCR Plan,*
         and whose claim(s) for intensive outpatient services were billed with HCPCS
13      H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by
         MultiPlan's Viant methodology, and never adjusted, during the class period
14      from January 1, 2015, to the present.

15

16      For purposes of this Class Definition, the term "UCR Plan" means a self-
         funded employer-sponsored health benefit plan, governed by ERISA and
17      administered by United, that contains a written plan term providing, in
         substance, that the Allowed Amounts for out-of-network *IOP* services will be
18      based on *"usual, customary, and reasonable rates"* for health care services
         *provided* in the geographic region.

19

20  **B.1. Proposed Alternative Competitive Fee RICO Subclass**

21      Any member of a health benefit plan where the member's plan is a
         *Competitive Fees Plan,* and whose claim(s) for intensive outpatient services
22      were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive
         per diem, priced by MultiPlan's Viant methodology, and never adjusted,
23      whose provider(s) received representations from Defendants during
         verification of benefits calls that their claims would be reimbursed based on a
24      UCR *amount,* and who paid amounts on a balance from their providers, during
         the class period from January 1, 2015, to the present.
25

26      For purposes of this Class Definition, the term "UCR" means a usual,
         customary, and reasonable amount, meaning, a percentile value of billed
27      charges of similar providers for the same or similar service in the provider's
         geographic area. For purposes of this Class Definition, the term *"Competitive*
28

United States District Court
Northern District of California

United States District Court
Northern District of California

*Fees Plan"* means a self-funded employer-sponsored health benefit plan, governed by ERISA and administered by United, that contains a written plan term providing, in substance, that the Allowed Amounts for out-of-network services will be based on *available data resources of "competitive fees"* in the geographic area.

**B.2. Proposed Alternative UCR RICO Subclass**

Any member of a health benefit plan where the member's plan is *a UCR Plan*, and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, whose provider(s) received representations from Defendants during verification of benefits calls that their claims would be reimbursed based on UCR, and who paid amounts on a balance from their providers, during the class period from January 1, 2015, to the present.

For purposes of this Class Definition, the term "UCR" means a usual, customary, and reasonable amount, meaning, a percentile value of billed charges of similar providers for the same or similar service in the provider's geographic area. For purposes of this Class Definition, the term *"UCR Plan"* means a self-funded employer-sponsored health benefit plan, governed by ERISA and administered by United, that contains a written plan term providing, in substance, that the Allowed Amounts for out-of-network *IOP* services will be based on *"usual, customary, and reasonable rates"* for health *care services* provided in the geographic region.

# EXHIBIT 2

1
2
3                **UNITED STATES DISTRICT COURT**
4                **NORTHERN DISTRICT OF CALIFORNIA**
5
6
7   **LD, ET AL.,**                          Case No.: **4:20-CV-02254-YGR**
8                                            **ORDER GRANTING MOTION FOR CLASS**
         Plaintiffs,                         **CERTIFICATION**
9
       v.
10                                           Re: Dkt. Nos. 489, 490, 498, 505, and 507.
    **UNITED BEHAVIORAL HEALTH, ET AL.,**
11
         Defendants
12
    .
13

14          Before the Court is plaintiffs' third, and more narrowed, motion for class certification,

15   seeking to represent a class of individuals whose claims for out-of-network ("OON") intensive

16   outpatient program ("IOP") services they allege were inappropriately priced by defendants in

17   violation of both the Employee Retirement Income Security Act ("ERISA") and the Racketeer

18   Influenced and Corrupt Organizations Act ("RICO").  Having carefully considered the papers

19   submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby

20   **GRANTS** the motion.[1]

21

22

23   ────────────────────

24          [1] The Court has reviewed the parties' omnibus sealing requests related to the portions of the
    record the parties seek to seal in connection with briefing on the class certification motion. The
25   Court **GRANTS** all requests other than the requests to seal the following portions of defendants'
    opposition: the second redaction in footnote 4, the redactions in footnote 5, the redaction at the top
26   of page 14, and the redaction in footnote 7. The information sought-to-be sealed in these requests
    pertains to individual information about various patients' care and subsequent billing, though the
27   identity of those patients is already protected from public disclosure based on the language of the
    motion and the other documents the Court agrees to seal. The Court therefore finds those requests
28   unnecessary.

United States District Court
Northern District of California

## I.    BACKGROUND

The Court presumes familiarity with the factual dispute animating this case.

As relevant here, the Court's Prior Order[2] denying class certification without prejudice held that plaintiffs satisfied their commonality and adequacy burdens under Federal Rule of Civil Procedure 23(a). The Court also held that plaintiffs failed to demonstrate eligibility for prospective injunctive relief, and therefore declined to certify a class under Rule 23(b)(1) or 23(b)(2).

Regarding a damages class, the Court was unable to determine, on the record before it at the time, whether plaintiffs satisfied their numerosity or predominance burdens. In so holding, the Court found that "receipt of a balance bill is required for class members to demonstrate an Article III injury," thereby rejecting "plaintiffs' argument that injury stems from the underpayment of the disputed claims itself, regardless of balance billing." (Prior Order at 16.) "In sum," the Court held, "the record before the Court indicates that some, though not most, class members received balance bills. Certification would therefore be inappropriate based thereon, without any way to identify whether plaintiffs have proven numerosity." (*Id*. at 18.)

The Court also held this finding implicated the record as it relates to predominance. Specifically, the parties disagreed as to whether differences in the standard of review across the relevant plans overwhelmed the identified common questions. The Court held as follows:

> In light of the Court's ruling above on the issue of injury, there is no way to determine which of these arguments better applies to the unidentified number of class members who received balance bills. If the group – or the number of plans under which the group was insured – is small enough, plaintiffs may be correct that assigning one of two standards to each plan is a simple task. On the other hand, defendants may be correct that the requisite plan-by-plan analysis would render the case unfit for classwide resolution.

(*Id*. at 19.)

Following the denial of plaintiffs' prior motion on these grounds, the Court authorized a limited follow-up period in which the parties could conduct further discovery on the balance billing and standard of review issues. Following the close of the supplemental discovery window, plaintiffs move again for class certification.

---

[2] Dkt. No. 469, Order Denying Motion for Class Certification ("Prior Order").

## II.    LEGAL FRAMEWORK

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). Because of this, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 348-49 (quoting *East Tex. Motor Freight Syst., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981. Importantly, "Rule 23 does not set forth a mere pleading standard." *Dukes,* 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the rule" and "be prepared to prove" as much. *Id.*

Rule 23 is satisfied when a party demonstrates meeting all four prerequisites of Rule 23(a) plus one of three factors in Rule 23(b). In short, Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. Rule 23(b) offers three avenues to certification, two of which were addressed in the Prior Order. The Court there denied the motion for class certification under Rule 23(b)(1) and 23(b)(2) with prejudice.

Additionally, the Ninth Circuit has clarified recently "that plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F.4th 651, 665 (9th Cir. 2022).

///

///

United States District Court
Northern District of California

### III. ANALYSIS

#### A. Standing

The Court resolves at the outset the parties' differing interpretations of the Court's prior order. The Court at times used the phrase "receipt of a balance bill," to which plaintiffs ascribe an understanding that *payment* on a balance bill is not required to establish Article III injury. Defendants disagree, pointing to other language referencing payment on balance bills as being relevant to the injury inquiry.[3] The Court agrees with defendants.

In the RICO context, the statutory language easily settles the debate. *See* 18 U.S.C. § 1964(c) ("Any person injured *in his business or property* by reason of a violation of section 1962 of this chapter may sue . . . .") (emphasis supplied). Plaintiffs' reading of the phrase "receipt of a balance bill" to mean that injury stems purely from receiving the bill is inconsistent with the statutory requirement of injury to one's property.

With regard to ERISA, plaintiffs' arguments similarly fail to persuade for several reasons. First, the Prior Order squarely held that "the Court is not persuaded by plaintiffs' argument that injury stems from the underpayment of the disputed claims is itself." (Prior Order at 16.) Plaintiffs offer no explanation for what the concrete injury could possibly be as conferred by *receipt* of balance bill, if not accompanied by payment, and not counting the already excluded underpayment of disputed claims. Second, though the Court has been unable to identify a Ninth Circuit case directly on point, the circuit identified certain standing principles in *Spinedex Physical Therapy v. United Healthcare of Az., Inc.,* 770 F.3d 1282 (9th Cir. 2014). There, the trial court held that a medical provider, as assignee of patients' rights and benefits under the governing ERISA plans, did not have standing to sue United when opting not to seek payment for allegedly underpaid claims directly from the patients. The trial court had accepted United's argument that as assignee,

---

[3] The general requirements for establishing Article III injury are well-known and not in dispute. They are: i) injury in fact, ii) which is traceable to the defendant's conduct, and iii) likely to be redressed by a favorable decision. *See Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 560-61 (1992).

United States District Court
Northern District of California

Spinedex stood in the shoes of and could incur no more injury than the patients. As no payment was sought from the patients, Spinedex could not claim injury. The Ninth Circuit reversed:

> We agree with Defendants that Spinedex has not sought to recover from its patients any shortfall in Spinedex's recovery from the Plans, and **that the patients have not suffered injury in fact after assigning their claims.** But the patients' injury in fact *after* the assignment is irrelevant. As assignee, Spinedex took from its assignors what they had *at the time of* the assignment. At the time of the assignment, Plan beneficiaries had the legal right to seek payment directly from the Plans **for charges** by non-network health care providers. **If the beneficiaries had sought payment directly from their Plans for treatment provided by Spinedex, and if payment had been refused, they would have had an unquestioned right to bring suit for benefits.** No one, including Defendants in this suit, would contend that the beneficiaries would have lacked Article III standing in that circumstance. However, instead of bringing suit on their own behalf, plaintiffs assigned their claims to Spinedex.

*Id.* at 1291 (emphases supplied).

Thus, particularities of the case notwithstanding, the injury in *Spinedex* was still tied to the obligation to pay. The court expressly stated that after assignment—and thus after any obligation to pay was alleviated—the patients suffered no injury. At the time of assignment, standing came from the patients' ability to "seek payment . . . for charges."

Finally, plaintiffs proffered cases do not compel a different conclusion. Plaintiffs primarily rely on *Des Roches v. Cal. Physicians' Serv.* 320 F.R.D. 486 (N.D. Cal. 2017). In granting certification there, the court found a named plaintiff had standing upon receipt of balance bill despite receiving oral promises from his employer that he would not have to pay. First, the court noted that the promises were unenforceable. Second, the court held that:

> [e]ven if Des Roches does not pay the debt, an unpaid debt could have other effects, such as harming Des Roches's credit. This outstanding debt because of Defendants' denial of coverage is a "change in a legal status" that is sufficient to confer standing for Des Roches to pursue his claims related to the denial of coverage.

*Id.* at 505 (quoting *Renee v. Duncan*, 623 F.3d 787, 797 (9th Cir. 2010).) Thus, *Des Roches* is distinguishable. It is plaintiffs' burden here to prove non-speculative injury. As the Court already rejected the argument that receipt alone is sufficient in its Prior Order, plaintiffs have the burden to

1  demonstrate some other concrete injury and have not done so. *See also, Fraser v. Team Health*

2  *Holdings, Inc.,* 2022 WL 971579, at *8 (N.D. Cal. 2022) (White, J., collecting cases and rejecting

3  the same argument plaintiffs make here).

4       Thus, the Court undertakes a review of plaintiffs' proffered evidence with regard to those

5  putative class members who have actually paid on balance bills or who plaintiffs show are required

6  to do so.[4]

7      **B. Numerosity**

8       The Court found last time it was unable to determine if plaintiffs had met their burden as to

9  numerosity because the record was sparse as to how many class members were charged out of

10  pocket for services at issue.

11       The law requires no fixed minimum size for a class to be sufficiently numerous, though

12  many courts have held that a class of forty members is presumptively appropriate. *See In re Banc of*

13  *Cal. Secs. Litig.,* 326 F.R.D. 640, 646 (C.D. Cal. 2018) ("It's generally accepted that when a

14  proposed class has at least forty members, joinder is presumptively impracticable based on numbers

15  alone."). The Ninth Circuit has recently reaffirmed longstanding precedent as follows:

16          . . . where the size of the class is more modest, the number of class
members does not weigh as heavily in the analysis, and other factors
17          bearing upon the feasibility and convenience of joinder may assume
more significance.  These potentially countervailing factors include
18          the geographical diversity of class members, the ability of individual
claimants to institute separate suits, and whether injunctive or
19          declaratory relief is sought," as well as the ability to identify and locate
class members.
20

21  *A.B. v. Haw. State Dep't. of Educ.,* 30 F.4th 828, 835-36 (9th Cir. 2022) (internal citations omitted).

22

23  ——————————————

24      [4] The Court is aware that other courts have reached a different conclusion and a general split
on the issue exists. *Compare In re Wellpoint, Inc. Out of Network "UCR" Rates Litig.*, 2016 WL
25  6645789, at *3 (collecting cases and finding injury only where a balance bill "means that an insured
will owe more money" and that "until an insured is actually or will likely be billed this amount by
26  the OON provider, he or she experiences no risk of out-of-pocket loss from the improperly low
reimbursement"), *with Sidlo v. Kaiser Permanente Ins. Co.,* 221 F. Supp. 3d 1183, 1199-1200 (D.
27  Haw. 2016) (finding injury based on a legal and contractual expectation that reimbursement be
made directly to providers at a certain rate).
28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The parties each conducted follow-up discovery on the issue of balance billing and present

2 competing evidence:

3    Plaintiffs "collected balance billing evidence from a limited sample of four providers with a

4 relatively high volume of claims," out of "a total of 1,548 providers who treated putative class

5 members" and found evidence that "at least 37 individuals are known to have made payments in

6 response to those bills." (Dkt. No. 490-2, Plaintiffs' Renewed Motion to Certify ("Mtn.") at 1.) As

7 support, plaintiffs submit documentation from providers showing proof of payment from thirty-two

8 putative class members. (Dkt. Nos. 490-6 at 75-89; 490-7 at 46, 100, 731; 490-8.) For twenty-seven

9 of these patients, the evidence comes in the form of a summary table from the provider simply

10 listing the amount paid rather than a picture of the bill. Together with the five named plaintiffs, this

11 brings the total number of class members who have demonstrated payment history to thirty-seven,

12 which plaintiffs argue allows for a reasonable inference that the forty-member threshold can easily

13 be crossed when the total size of the putative class is taken into account. (*See* Mtn. at 12.)

14    Defendants attack these submissions in several ways. First, defendants argue that because

15 plaintiffs "hand-picked" the providers from whom they sought information, the sample is not

16 random in a statistically meaningful sense, and therefore the Court cannot "extrapolate" from it

17 how many other class members paid on balance bills. (Dkt. No. 498-1, Defendants' Opposition to

18 Plaintiffs' Second Renewed Motion for Class Certification ("Oppo.") at 9.) In reply, plaintiffs note

19 that statistical sampling is not required; rather, their burden is merely to present "an evidentiary

20 showing sufficient to support a reasonable inference that joinder is impracticable." (Dkt. No. 505-2,

21 Plaintiffs' Reply in support of Class Certification ("Reply") at 3.)

22    Second, defendants attack the summary table from one provider showing proof of payment

23 from twenty-seven class members. Defendants note that a 2022 declaration from the same provider

24 stated that "as a general practice, [the provider] does not issue balance bills to patients," whereas a

25 replacement declaration offered in this latest round of discovery states the exact opposite, that the

26 provider, upon review of the 2022 declaration and in attempt to "provide clarification regarding

27 [its] billing practices," "uses a third-party billing company to manage its billing matters, including

28

7

United States District Court
Northern District of California

1    sending balance bills to patients." (*Compare* Dkt. No. 498-39, *with* Dkt. 490-7 at 43.)[5] Because this

2    represents a complete reversal of this provider's stated practices, defendants argue the Court should

3    not rely on the later declaration "absent cross-examination." (Oppo. at 12.) Additionally,

4    defendants' expert attempted to match these twenty-seven class members to at-issue claims, and

5    found as follows:

6         I was able to match 22 of the 27 Members to at-issue claims. Of the 22
7         Members I could match to at-issue claims, seven had alleged dates of
          service that were entirely before or after the actual dates of at-issue
8         services . . ., 16 had alleged balance bills that exceeded the maximum
          possible balance bill . . ., and 17 had either one or the other . . . .

9         In my opinion, there is no evidence in Plaintiffs' production that any
10        of the seven Members with alleged dates of service that were entirely
          before or after the actual dates of at-issue services made a balance bill
11        payment for at-issue services. According to Plaintiffs' production,
          these Members completed the treatment referenced in the produced
12        table before their first at-issue service, or started the treatment
13        referenced in the produced table after their last at-issue service.

14        For example, Plaintiffs allege Member 40 in Exhibit 1 received
          services from December 7 to December 8, 2017. However, according
15        to the claims data, this member did not receive at-issue services until
16        December 11. Thus, any alleged balance bills this Member received or
          alleged payments that this Member made relating to the treatment
17        referenced in the produced table must have been for services that were
          not at-issue.

18        For the other 10 of 16 Members who had alleged balance bills that
19        exceeded their maximum possible balance bill according to the claims
          data, their alleged balance bill must have included some services that
20        were not at issue. . . .

21        More generally, since Plaintiffs provided no itemized balance bills for
22        any of these 27 Members, I was not able to verify that a balance bill
          was sent, much less paid. In particular, I was not able to verify that any
23        of the payments were for balance bills. Members' payments may have
          been for deductible or coinsurance responsibility . . . . Deductible and
24        coinsurance payments are distinct from balance bill payments.

25   (Dkt. No. 498-46 ¶¶ 14-18.) Per defendants, there is no way to verify from just a spreadsheet listing

26   only names and amounts allegedly paid that the payment reflects at-issue services.

27   _____

28        [5] Defendants filed the 2022 declaration on the docket in connection with this motion, but
     plaintiffs do not appear to contest its authenticity.

8

United States District Court
Northern District of California

1    Upon careful review of the parties' evidence and arguments, the Court finds plaintiffs have

2    met their numerosity burden. Defendants raise factual questions as to the actual number of class

3    members who paid on balance bills for relevant charges. In considering this evidence, however, the

4    Court is mindful of its obligations at this procedural stage. On the one hand, the Court

5    "*must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis*, 657 F.3d at 981

6    (emphasis in original), On the other, the Supreme Court has held as follows:

> Although we have cautioned that a court's class-certification analysis
> must be "rigorous" and may "entail some overlap with the merits of
> the plaintiff's underlying claim," *Wal–Mart Stores, Inc. v. Dukes*, 564
> U.S. 338, 351, Rule 23 grants courts no license to engage in free-
> ranging merits inquiries at the certification stage. Merits questions
> may be considered to the extent—but only to the extent—that they are
> relevant to determining whether the Rule 23 prerequisites
> for class certification are satisfied. See *id.,* at 352, n.6, (a district court
> has no "authority to conduct a preliminary inquiry into the merits of a
> suit" at class certification unless it is *necessary* "to determine the
> propriety of certification.").

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 465-66 (2013) (cleaned up, emphasis
supplied).

In this context, the Court finds it unnecessary to resolve the factual questions raised by
defendants in order to ascertain that a sufficient number of putative class members paid on balance
bills. In just a short discovery window, plaintiffs were able to find evidence that thirty-seven
putative class members paid on balance bills. Even assuming that defendants are correct some of
these reflect charges not relevant to the class definition, plaintiffs' argument is compelling that it is
highly likely when all providers—over 1,500 in total—are considered, at least forty individuals will
have paid on relevant charges. Having so found, going bill by bill with an eye towards identifying
whether defendants' raised objections demand each one be removed from the pool of evidence
plaintiffs offer would be precisely the sort of "free-ranging merits inquiry" disallowed at this
juncture. *See id.*

With that in mind, the Court addresses some of defendants' primary arguments. First,
plaintiffs have offered a satisfactory explanation as to the charge that one provider submitted
conflicting declarations. Whereas defendants are correct there appears to be a discrepancy as to

whether the provider routinely balance bills, plaintiffs characterize the second declaration as a "corrected" declaration and state that this provider relies on a third-party service to issue balance bills. Per plaintiffs, "as part of this most recent discovery period, that provider reached out to the third-party billing company to get this data, and they received this report" indicating twenty-seven putative class members paid on balance bills. United will receive its opportunity to question the provider about any discrepancy, but the Court cannot simply credit United's facial attack on the newly submitted declaration without impermissibly ignoring plaintiffs' response.

Second, United is correct that because plaintiffs purposely selected high-volume providers, they cannot statistically infer that rates of balance billing for those providers can be extrapolated to the broader class. However, plaintiffs have proffered evidence of thirty-seven balance bills paid. To reach a threshold of forty, therefore, they need not extrapolate across the whole class at the same rate.[6] They merely need to present sufficient evidence to allow the Court to infer that at least three class members exist who paid on balance bills from other providers. In a putative class numbering in the thousands, this inference is more than reasonable.[7]

Therefore, the Court finds plaintiffs have satisfied their burden as to numerosity and thus as to all four of 23(a)'s prerequisites.[8]

**C. Predominance**

As plaintiffs seek to certify a damages class, the Court must ensure itself that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

Defendants present two arguments as to why this case presents individualized questions which defeat predominance.

---

[6] As recounted above, courts have certified classes smaller than forty members. The Court need not opine on the minimum number required, though, where plaintiffs have demonstrated a class exists of at least that size.

[7] Again, even if a certain number of the identified thirty-seven are removed as per defendants' objections, the preponderance of the evidence still suggests that forty is a number plaintiffs will be able to reach.

[8] Defendants raise no typicality concerns.

10

1    First, defendants assert that "plaintiffs identify no class-wide methodology to prove receipt

2    or payment of balance bills." (Oppo. at 9.) The arguments as to why this is so lack substance.

3    Though defendants raise some valid questions as to the details of each payment in plaintiffs'

4    sample of thirty-seven, this is not the same as demonstrating plaintiffs' offered solution of

5    requesting records from the relevant providers cannot work. Indeed, as plaintiffs note, the process

6    of obtaining the relevant records from the providers is relatively straightforward. This sets this case

7    apart from *Olean*, as well, to which defendants point, where the question centered around the

8    sufficiency of plaintiffs' statistical model to identify the *fact and amount* of injury attributable to

9    the alleged wrongdoing. *See Olean,* 31 F.4th at 673. That is categorically different from this case,

10   where the task is merely to identify class members who paid *any* amount on a balance bill for a

11   relevant service.[9]

12    Second, defendants claim the standard of review issue predominates. The Court finds the

13   existence of only two standards of review does not predominate over the relevant common

14   questions. Though plaintiffs have produced enough class members to satisfy numerosity, discovery

15   revealed that the number of putative class members, and therefore the number of relevant plans, is

16   far lower than earlier thought. The number of plans through which the parties would have to sort is

17   therefore significantly lower than defendants' motion suggests. Indeed, this was precisely the

18   concern raised by the Court in its last order. (*See* Prior Order at 19 ("If the group —or the number

19   of plans under which the group was insured —is small enough, plaintiffs may be correct that

20   assigning one of two standards to each plan is a simple task.").) Plaintiffs perhaps exaggerate how

21   binary and rote the sorting task will be. However, the relevant question is not whether the task is

22   completely rote; rather, it is whether this task will *predominate* over the common questions

23   identified. Because ascertaining the appropriate standard as to each plan is not an overly

---

[9] Even if some bills contain charges for co-payments or deductibles plaintiffs cannot count as injury, defendants fail to identify why plaintiffs could not simply tweak the requests to providers to exclude records containing only payments towards these irrelevant charges.

United States District Court
Northern District of California

1 | complicated task, and because ultimately a fact-finder will be tasked with answering at most two

2 | questions, the issue does not defeat predominance.

3 |      The Court therefore finds plaintiffs have satisfied the requirements to certify a class under

4 | Rule 23(b)(3).[10]

5 | **IV. CONCLUSION**

6 |      For the reasons stated above, the Court **GRANTS** plaintiffs' renewed motion for class

7 | certification. The Court sets a case management conference for **November 10, 2025 at 1:30 p.m.**

8 | on the Zoom platform. Parties shall meet and confer on a schedule for the balance of the action and

9 | file a statement with respect to scheduling no later than seven days prior to the conference.

11 |      This terminates Docket Nos. 489, 490, 498, 505, and 507.

12 |      **IT IS SO ORDERED**.

13 | Date: October 3, 2025

14 |          **YVONNE GONZALEZ ROGERS**
         **UNITED STATES DISTRICT COURT JUDGE**

---

[10] The Court construes plaintiffs' motion as seeking reprocessing in the alternative. Since the Court finds the case appropriate for damages class certification, it does not reach the parties' arguments on the issue, including the open question the parties present as to whether, post-*Wit III*, a reprocessing class is most appropriate for certification under Rule 23(b)(1), 23(b)(2), or 23(b)(3).

United States District Court
Northern District of California

# EXHIBIT 3

1

2

3

4                              **UNITED STATES DISTRICT COURT**

5                              **NORTHERN DISTRICT OF CALIFORNIA**

6

7   **LD, ET AL.,**                          Case No.: 4:20-cv-02254-YGR

8              Plaintiffs,                    **ORDER DENYING DEFENDANTS' MOTION
                                              FOR LEAVE TO FILE MOTION FOR PARTIAL
                                              RECONSIDERATION OF CLASS
9         v.                                  CERTIFICATION ORDER;**

10  **UNITED BEHAVIORAL HEALTH, ET AL.,**     **GRANTING IMPLIED MOTION FOR
                                              CLARIFICATION**
11
             Defendants.                      Re: Dkt. No. 522
12

13          Pending before the Court is defendants' motion for leave to file a motion for partial

14   reconsideration of the Court's class certification order pursuant to Civil Local Rule 7-9(b)(3).[1]

15   Plaintiffs filed a response to the motion, and defendants filed a reply.[2]

16          Having considered the papers submitted in support and opposition, the Court hereby

17   **DENIES** defendants' motion for leave to file for reconsideration but **GRANTS** its implied motion for

18   clarification. The Court does not reconsider its prior Order, but given the dispute regarding the

19   definition of the class, it does provide clarity in accordance with the reasoning explained therein.

20          To quickly remind, under Rule 54(b), a court may revise any interlocutory order. However,

21   reconsideration of a prior ruling is an "extraordinary remedy, to be used sparingly." *Kona Enters.,*

22   *Inc. v. Est. of Bishop,* 229 F.3d 877, 890 (9th Cir.2000). "Reconsideration is appropriate if the

23   district court (1) is presented with newly discovered evidence, (2) committed clear error or the

24   initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."

25   ───────────────

26       [1] Dkt. No. 516, Order Granting Motion for Class Certification ["Order"]; Dkt. No. 522,
     Defendants' Motion for Leave to File Motion for Partial Reconsideration of Class Certification
27   Order ["Mtn."].

28       [2] Dkt. No. 523, Plaintiffs' Response to Defendants' Motion for Leave ["Oppo."]; Dkt. No.
     527, Defendants' Response to Plaintiffs' Brief Regarding Defendants' Motion for Leave ["Reply"].

1   *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). "There may also be other,

2   highly unusual, circumstances warranting reconsideration." *Id.* None of those factors exist here.

3   Rather, the parties are arguing over the impact of the Court's Order. Thus, the Court clarifies.

4          In its third renewed motion, plaintiffs sought to certify the following class:

> Any member of a health benefit plan administered or issued by
> United and governed by ERISA, where the member's plan
> utilized United's "Reasonable and Customary" program for
> out-of-network benefits, and whose claim(s) for intensive
> outpatient services were billed with HCPCS H0015 and/or
> revenue code 0906 as an all-inclusive per diem, priced by
> MultiPlan's Viant methodology, and never adjusted, and **who
> received** balance bills from their provider, during the class
> period from January 1, 2015, to the present.

11  (Dkt. No. 489 at 2 (emphasis supplied for the reader's convenience).) After briefing and argument,

12  the Court granted the motion but was explicit in its Order that it limited the certified class to

13  members *who paid, not just received,* a balance bill for the relevant services. (*See* Order at 4–6

14  (rejecting plaintiffs' argument that payment on a balance bill is not required to establish Article III

15  injury in both RICO and ERISA contexts), at 9 (plaintiffs satisfied numerosity burden by proffering

16  evidence that allowed the Court to infer that at least forty class members exist "who paid on

17  balance bills"), at 11–12 (plaintiffs satisfied predominance burden by demonstrating a classwide

18  methodology to "identify class members who paid *any* amount on a balance bill for a relevant

19  service").)

20          Despite that clarity, the parties continue to argue, as has been their ongoing practice in this

21  action. Defendants seek clarification and seek to re-define the class as:

> Any member of a health benefit plan administered or issued by
> United and governed by ERISA, where the member's plan
> utilized United's "Reasonable and Customary" program for
> out-of-network benefits, and whose claim(s) for intensive
> outpatient services were billed with HCPCS H0015 and/or
> revenue code 0906 as an all-inclusive per diem, priced by
> MultiPlan's Viant methodology, and never adjusted, **and who
> paid** balance bills from their provider **on these claims (not
> patient responsibility, coinsurance, or deductibles),** during the
> class period from January 1, 2015, to **October 3, 2025**.

28

United States District Court
Northern District of California

(Mtn. at 4 (emphasis supplied for the reader's convenience).) With respect to the first issue (received versus paid), plaintiffs suggest that the putative class members include those "who have actually paid on balance bills *or who plaintiffs show are required to do so*.'" (Oppo. at 1–2 (citing Order at 9).) In reply, defendants construe plaintiffs' opposition as an attempt to expand the class definition. (Reply at 1 (citing Oppo. at 1).)

Thus, as should have been obvious from the Order, the certified class was defined as:

> Any member of a health benefit plan administered or issued by United and governed by ERISA, where the member's plan utilized United's "Reasonable and Customary" program for out-of-network benefits, and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, and **who paid** balance bills from their provider, during the class period from January 1, 2015, to the present.

Emphasis supplied for the reader's convenience. Given the procedural posture of this request, and to provide further clarity, the Court confirms that the "present date" is consistent with October 3, 2025, the date of the Court's Order. Thus, the class definition is hereby adjusted:

> Any member of a health benefit plan administered or issued by United and governed by ERISA, where the member's plan utilized United's "Reasonable and Customary" program for out-of-network benefits, and whose claim(s) for intensive outpatient services were billed with HCPCS H0015 and/or revenue code 0906 as an all-inclusive per diem, priced by MultiPlan's Viant methodology, and never adjusted, **and who paid** balance bills from their provider, during the class period from January 1, 2015, to **October 3, 2025.**

Emphasis supplied for the reader's convenience.

As to the second proposed change to add: "**on these claims (not patient responsibility, coinsurance, or deductibles)**," plaintiffs dispute the proposed definition because it "oversimplifies and at minimum introduces ambiguity into the concept of balance billing" and "would improperly narrow the class by embedding a disputed merits issue into the class definition itself." (Oppo. at 2.)

3

As the parties are quite aware, they never briefed the issue of whether the definition should include an explicit carveout for payments toward "patient responsibility, coinsurance, or deductibles," and therefore the Court does not adopt defendants' proposal.

The Court sets a case management conference for **December 15, 2025 at 11:30 a.m.** on the Zoom platform. Parties should have already met and conferred on a schedule for the balance of the action. A joint statement with respect to scheduling shall be filed no later than seven (7) days prior to the conference.

This Order terminates Docket No. 522.

**IT IS SO ORDERED**.

Date:   November 25, 2025

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California

4